# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Kevin Moitoso, Tim Lewis, and Mary Lee Torline, individually and as representatives of a class of similarly situated persons, and on behalf of the Fidelity Retirement Savings Plan,<br><br>Plaintiffs,<br><br>v.<br><br>FMR LLC, the FMR LLC Retirement Committee, Fidelity Management & Research Company, FMR Co., Inc., Fidelity Investments Institutional Operations Company, Inc., and John and Jane Does 1–20,<br><br>Defendants. | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT** |

## NATURE OF THE ACTION

1.      Plaintiffs Kevin Moitoso, Tim Lewis, and Mary Lee Torline ("Plaintiffs") individually and as representatives of the class described herein, and on behalf of the Fidelity Retirement Savings Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA").

2.      Plaintiffs assert their class claims against the Plan's fiduciaries—FMR LLC, the FMR LLC Retirement Committee (the "Committee"), and John and Jane Does 1–20 (together, the "Fiduciary Defendants")[1]—who failed to manage the Plan in a prudent and loyal manner, and against certain Fidelity entities—FMR LLC, Fidelity Management & Research Company ("FMR"), FMR Co., Inc. ("FMRC"), and Fidelity Investments Institutional Operations

_____

[1] FMR LLC, its subsidiaries, and its affiliates collectively do business as "Fidelity Investments". For purposes of the Complaint, these entities shall collectively be referred to as "Fidelity".

Company, Inc. ("FIIOC") (together, the "Entity Defendants")—who profited as a result of these fiduciary breaches.

3.      As described herein, the Fiduciary Defendants have breached their fiduciary duties with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries. Plaintiffs bring this action to remedy this unlawful conduct, prevent further mismanagement of the Plan, and obtain equitable and other relief as provided by ERISA.

## PRELIMINARY STATEMENT

4.      As of the end of 2016, Americans had over $7 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans. *See* Pensions & Investments, *U.S. Retirement assets at $28 trillion in Q1, little changed from end of 2017* (June 21, 2018), *available at* http://www.pionline.com/article/20180621/INTERACTIVE/180629958/us-retirement-assets-at-28-trillion-in-q1-little-changed-from-end-of-2017. Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations. *See* Bankrate, *Pensions Decline as 401(k) Plans Multiply* (July 24, 2014), *available at* https://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-plans-multiply-1.aspx. By 2012, approximately 98% of employers offered defined contribution plans to their current employees, whereas only 3% offered pension plans. *Id.*

5.      The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439

2

(1999). Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments. But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). Thus, the employer has no incentive to keep costs low or to closely monitor the plan to ensure every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the employee.

6.     The real-life effect of such imprudence on workers can be severe. According to one study, the average working household with a defined contribution plan will lose $154,794 to fees and lost returns over a 40-year career. See Melanie Hicken, *Your employer may cost you $100k in retirement savings*, CNN Money (June 1, 2014), *available at* http://money.cnn.com/2013/03/27/retirement/401k-fees. Put another way, excessive fees can force a worker to work an extra five to six years to make up for the excess fees that were paid.

7.     For financial service companies like Fidelity, the potential for imprudent and disloyal conduct is especially high, because the plan's fiduciaries are in a position to benefit the company through the plan's investment decisions by, for example, filling the plan with proprietary investment products that an objective and prudent fiduciary would not choose.

8.     To safeguard against the financial incentives for disloyalty and imprudence in defined contribution plans, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with

the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000) (citation and internal quotation marks omitted).

9.     As of the end of 2016, the Plan had nearly $15 billion in assets, making it one of the 20 largest private sector defined contribution plans in the United States.

10.     The Fiduciary Defendants have not managed the Plan with the care, skill, or diligence one would expect of a plan this size. Instead, they have used the Plan as an opportunity to promote Fidelity's mutual fund business at the expense of the Plan and its participants. The Fiduciary Defendants loaded the Plan exclusively with Fidelity-affiliated investments, without investigating whether Plan participants would have been better served by investments managed by unaffiliated companies. Perhaps worse, the Fiduciary Defendants have included almost every non-identical Fidelity mutual fund in the Plan's investment lineup (hundreds in total), many of which were inappropriate offerings due to their poor performance, high fees, lack of diversification, or speculative nature.

11.     The Fiduciary Defendants' failure to manage the Plan in accordance with their fiduciary duties has been devastating for Plan participants. Among the 20 defined contribution plans with over $5 billion in assets for which necessary data was available, Fidelity's plan performed the worst (almost three times worse than average), representing over $100 million per year in losses compared to the average plan.

12.     The Fiduciary Defendants' conduct is particularly inexcusable given that they know better. As the nation's largest retirement plan recordkeeper, Fidelity has all of the data and

resident expertise necessary to build a plan in their participants' best interests, yet the Fiduciary Defendants made no effort to do so. Further, the Fiduciary Defendants know that their conduct is illegal, having quickly settled a similar lawsuit less than four years ago for an eight-figure sum. *See Bilewicz v. FMR LLC, et al.*, No. 1:13-cv-10636, ECF No. 72 (D. Mass. Oct. 16, 2014).

13.    The Fiduciary Defendants' mismanagement of the Plan and prioritization of Fidelity's profits over the interests of the participants and beneficiaries of the Plan constitute a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104. Based on this conduct, Plaintiffs assert claims against the Fiduciary Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two), and against the Entity Defendants for equitable disgorgement of ill-gotten profits (Count Three).

## JURISDICTION AND VENUE

14.    Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

15.    This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

16.    Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

## THE PARTIES

### PLAINTIFFS

17.    Plaintiff Kevin Moitoso ("Moitoso") resides in Marlborough, Massachusetts and

was a participant in the Plan from 2007 until 2016. While a participant, Moitoso was invested in several of the Plan's designated investment alternatives, such as Fidelity Mid Cap II, Fidelity Advisor New Insights, Fidelity Emerging Markets, Fidelity Diversified International, and several of the Fidelity Select sector funds. His account was also recordkept by Fidelity. Moitoso's account would have been worth more at the time it was distributed from the Plan had Defendants not violated ERISA as described herein.

18.     Plaintiff Tim Lewis ("Lewis") resides in Carlsbad, California and was a participant in the Plan from 2007 until 2016. While a participant, Lewis was invested in several of the Plan's designated investment alternatives, such as Fidelity Freedom 2040 and Fidelity Government Money Market. His account was also recordkept by Fidelity. Lewis's account would have been worth more at the time it was distributed from the Plan had Defendants not violated ERISA as described herein.

19.     Plaintiff Mary Lee Torline ("Torline") resides in California, Kentucky and was a participant in the Plan from 1999 until 2017. While a participant, Torline was invested in several funds offered within the Plan, such as Fidelity Focused High Income, Fidelity Contrafund, Fidelity Export & Multinational, Fidelity Growth Strategies, Fidelity Mid Cap Stock, and Fidelity Growth & Income. Her account was also recordkept by Fidelity. Torline's account would have been worth more at the time it was distributed from the Plan had Defendants not violated ERISA as described herein.

20.     Torline was enrolled in the Fidelity Portfolio Advisory Service at Work (PAS-W) managed accounts program, whereby participants are invested in a model portfolio based upon their demographic information and certain participant input. In the marketplace, Fidelity offers plan sponsors two versions of this service, one (named PAS-W Index) that invests participants in

low-cost index funds and one (named PAS-W Core) that seeks to "enhanc[e] risk adjusted returns" using a lineup made up largely of higher-fee, actively-managed funds. *See* Fidelity Investments, *Fidelity Personalized Planning & Advice*, *available at* https://workplace.fidelity.com/sites/default/files/index-and-core-investment-offerings.pdf.    The Fiduciary Defendants required Plan participants who enrolled in the PAS-W program to use the PAS-W Core version of this service. Thus, at all relevant times, more than 85% of Plaintiff Torline's portfolio consisted of higher-fee, actively-managed, Fidelity-affiliated mutual funds.

### DEFENDANTS

### *FMR LLC*

21.     Defendant FMR LLC is a financial services conglomerate headquartered in Boston, Massachusetts. FMR LLC is the "plan sponsor" of the Plan within the meaning of 29 U.S.C. § 1002(16)(B). FMR LLC is also a "named fiduciary" pursuant to 29 U.S.C. § 1102(a) with respect to the Plan because it is identified in the Plan Document as having ultimate authority to control and manage the operation and administration of the Plan. FMR LLC is also a Plan employer for the Plan. FMR LLC exercises discretionary authority or discretionary control with respect to management of the Plan, and is therefore a fiduciary under 29 U.S.C. § 1002(21)(A).

22.     FMR LLC is also a fiduciary because it has authority to appoint and remove members of the Retirement Committee. All members of the Retirement Committee were appointed to the Retirement Committee by FMR LLC's senior officer for human resources. It is well-accepted that the authority to appoint, retain, and remove plan fiduciaries constitutes discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). 29 C.F.R. § 2509.75-8 (D-4); *Norton Co. v. John Hancock Mut. Life Ins. Co.*, 1992 WL 237410, at *6 (D. Mass. Sept. 14, 1992) ("An

employer has a fiduciary duty when it appoints other fiduciaries, such as a pension committee."); *Kling v. Fidelity Mgmt. Trust Co.*, 323 F. Supp. 2d 132, 142 (D. Mass. 2004) (appointment authority confers fiduciary status). The responsibility for appointing and removing members of retirement plan committees carries with it an accompanying duty to monitor the appointed fiduciaries, and to ensure that they are complying with the terms of the Plan and ERISA's statutory standards.

23.     FMR LLC also had supervisory authority over the Retirement Committee through its appointment of senior management to the Retirement Committee. *See Sharp v. Coopers & Lybrand*, 649 F.2d 175, 182 n.8 (3d Cir. 1981) ("Officers are able to make policy and generally carry authority to bind the corporation. Their action in behalf of the corporation is therefore primary, and holding a corporation liable for their actions does not require respondeat superior."). For this reason as well, FMR LLC exercises discretionary authority or discretionary control with respect to management and administration of the Plan and disposition of Plan assets, and is a fiduciary under 29 U.S.C. § 1002(21)(A).

***FMR LLC Board of Directors***

24.     FMR LLC's Board of Directors (the "Board") is the governing body that oversees the activities and discharges the legal obligations of FMR LLC, including the duties identified above with respect to the Plan. The Plan Document provides that FMR LLC acts through the Board when discharging duties with respect to the Plan. *See Bilewicz*, No. 1:13-cv-10636, ECF No. 25-1, at ¶ 2.70 (D. Mass. Jun 3, 2013) ("'Retirement Committee' means the committee assigned responsibility by the Board of Directors for the operation and administration of the Plan…."); *id.*, ¶ 13.1 ("[FMR LLC] reserves the right at any time and from time to time to modify, amend or terminate the Plan or any of its provisions as to all Participating Companies,

by executing an instrument in writing by authorization of the Board of Directors…."). Actions, omissions, and duties attributed to FMR LLC throughout this Complaint therefore also refer to the Board. Because the Board exercises FMR LLC's discretionary authority or discretionary control with respect to management and administration of the Plan and disposition of Plan assets, the Board is a fiduciary under 29 U.S.C. § 1002(21)(A).

***FMR LLC Retirement Committee***

25.     The FMR LLC Retirement Committee (the "Committee") is designated by the Plan Document to assist FMR LLC with administration of the Plan. The Committee is a "named fiduciary" and "administrator" of the Plan identified by the Plan Document. *See* 29 U.S.C. §§ 1002(16)(A)(i) & 1102(a). The members of the Committee are appointed by FMR LLC's senior officer for human resources. The Committee has the duty to select, monitor, evaluate, and modify the Plan's investments, subject to the ultimate oversight and discretion of FMR LLC.[2] In performance of its duties, the Committee exercises "authority or control respecting management or disposition of the Plan's assets" and is therefore a fiduciary under 29 U.S.C. § 1002(21)(A).

26.     Defendants John and Jane Does 1–20 (the "Doe Defendants") are members of the Retirement Committee, or were members of the Retirement Committee during the putative class period. The identities of the Doe Defendants are not currently known to Plaintiffs.

27.     Each Defendant identified above as a Plan fiduciary is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because it enabled other fiduciaries to commit

---

[2] *See Bilewicz*, No. 1:13-cv-10636, ECF No. 25-1, at ¶ 12.5 ("The Investment Committee shall from time to time determine the Investment Companies available to Participants under the Plan and whether the shares of an Investment Company once made available under the Plan shall continue to be available."). Since the publication of this Plan Document in 2005, the Retirement Committee has assumed the duties of the Investment Committee.

breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration

of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having

knowledge of the breaches.

*Fidelity Management & Research Company*

28.     Defendant Fidelity Management & Research Company ("FMR") is a wholly-

owned subsidiary of FMR LLC and a plan employer. At all relevant times, FMR served as the

investment advisor to hundreds of Fidelity mutual funds held within the Plan. At all relevant

times, FMR has collected fees from Plan assets invested in Fidelity investment products. These

fees were earned at the expense of the Plan and its participants, and generated profits for FMR.

29.     Because FMR provides services to the Plan and is a Plan employer, FMR is a

"party in interest" pursuant to 29 U.S.C. § 1002(14). FMR possesses any actual or constructive

knowledge possessed by FMR LLC. As disclosed in Statements of Additional Information for

multiple Fidelity mutual funds, numerous directors of the Fidelity Funds are also officers and/or

directors of FMR LLC and FMR. For example, Charles S. Morrison, a Trustee to numerous

Fidelity funds, is the current President of FMR, President of Asset Management at FMR LLC,

and director for other FMR LLC subsidiaries. Likewise, James C. Curvey, a Trustee to numerous

Fidelity funds, is also the current Vice Chairman and Director of FMR LLC and a Director of

FMR, and previously served simultaneously as President and Chief Operating Officer of FMR

LLC. Given the interconnected nature of FMR, FMR LLC, and other FMR LLC subsidiaries,

FMR had actual and constructive knowledge that the revenues it was receiving from Plan assets

were the product of fiduciary breaches by Defendants. As a result, FMR is subject to appropriate

equitable relief under 29 U.S.C. § 1132(a)(3), including disgorgement of ill-gotten profits

associated with its knowing receipt of payments that resulted from other Defendants' breaches of their fiduciary duties.

***FMR Co., Inc.***

30.     Defendant FMR Co., Inc. ("FMRC") is a wholly-owned subsidiary of FMR LLC and a plan employer. At all relevant times, FMRC served as the investment subadvisor to numerous Fidelity mutual funds held within the Plan, and was paid fees calculated as a percentage of the assets it subadvised. At all relevant times, FMRC has collected fees as a result of the Plan's investment in Fidelity-affiliated mutual funds. These fees generated profits for FMRC and came at the expense of the Plan and its participants.

31.     Because FMRC provides services to the Plan and is a Plan employer, FMRC is a "party in interest" pursuant to 29 U.S.C. § 1002(14). FMRC possesses any actual or constructive knowledge possessed by FMR LLC. Abigail Johnson, the Chief Executive Officer and Chairman of the Board for FMR LLC (as well as numerous other FMR LLC subsidiaries), is also the Chairman of the Board for FMRC. John Remondi and Peter Lynch serve as Directors to both FMRC and FMR, with Lynch acting as the Vice Chairman for both and Remondi also serving as an Executive Vice President of FMR LLC. James C. Curvey, whose involvement as a Trustee of Fidelity funds and an executive and director of FMR LLC and its subsidiaries is discussed above, is also a Director of FMRC. Given the interconnected nature of FMRC and other FMR LLC subsidiaries, FMRC had actual and constructive knowledge that the profits it was earning as a result of the Plan's investments in Fidelity funds were the product of fiduciary breaches by the Fiduciary Defendants. As a result, FMRC is subject to appropriate equitable relief under 29 U.S.C. § 1132(a)(3), including disgorgement of ill-gotten profits associated with its knowing receipt of payments that resulted from other Defendants' breaches of their fiduciary duties.

*Fidelity Investments Institutional Operations Company, Inc.*

32.     Fidelity Investments Institutional Operations Company, Inc. ("FIIOC") is a wholly-owned subsidiary of FMR LLC. FIIOC is a participating employer in the Plan, and at all relevant times, FIIOC acted as the transfer agent for each fund in the Plan. FIIOC is paid monthly fees based in part on the percentage of assets held in each of these funds, and therefore received fees—representing profits to FIIOC—as a result of the Plan's investments in Fidelity mutual funds. Consequently, FIIOC profited as a result of the fiduciary breaches by the Fiduciary Defendants. FIIOC also provided recordkeeping services to the Plan, a service it also provides to third-party retirement plans. As part of these services, FIIOC interacted frequently with the Fiduciary Defendants and had personal knowledge of all investment decisions made by the Fiduciary Defendants. Based on its role as the Plan's recordkeeper, FIIOC had actual and/or constructive knowledge of the fiduciary breaches committed during the relevant period by the Fiduciary Defendants. As a result, FIIOC is subject to appropriate equitable relief under 29 U.S.C. § 1132(a)(3), including disgorgement of ill-gotten profits associated with its knowing receipt of payments that resulted from other Defendants' breaches of their fiduciary duties.

## PRIOR LAWSUIT

33.     In 2013, participants in the Plan filed a class action lawsuit against various Fidelity-affiliated defendants. *See Bilewicz v. FMR LLC, et al.*, No. 1:13-cv-10636, ECF No. 1 (D. Mass. 2013). Plaintiffs alleged that the defendants placed Fidelity's interests above plan participants' interests in violation of ERISA's duty of loyalty. For example, Plaintiffs alleged that the decision to offer only Fidelity mutual funds in the Plan was motivated by self-interest and that Fidelity offered retail mutual funds and other high-fee mutual funds despite the

availability of comparable cheaper alternatives. Plaintiffs also alleged that the defendants committed prohibited transactions under ERISA by including proprietary funds in the Plan.

34.     In July 2014, the parties moved for preliminary approval of a class action settlement agreement. This motion was filed after the defendants' motion to dismiss had been briefed by both parties, but before any order by the court on the motion to dismiss. In October 2014, the court issued a judgment approving the settlement agreement.

35.     Pursuant to the settlement agreement, the defendants paid $12 million to a common fund. *See Bilewicz*, No. 1:13-cv-10636, ECF No. 53-1 at ¶ 7.2. Additionally, the defendants agreed to change the plan's default investment option, add a self-directed brokerage account option to the plan, and increase the default contribution rate for certain participants. *See id.* at ¶ 7.3. The "Effective Date" of the settlement agreement was the day on which judgment was entered. *Id.* at ¶ 1.46. The court entered judgment on October 16, 2014. *See Bilewicz*, No. 1:13-cv-10636, ECF No. 72.

## ERISA FIDUCIARY DUTIES

36.     ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> > (A) for the exclusive purpose of
> >
> > > (i) providing benefits to participants and their beneficiaries; and
> > >
> > > (ii) defraying reasonable expenses of administering the plan;
>
> > (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims….

37.     These ERISA fiduciary duties are "the highest known to the law." *Braden*, 588 F.3d at 598 (quoting *Bierwirth*, 680 F.2d at 272 n.8).

38.     In considering whether a fiduciary has breached the duties of prudence and loyalty, the court considers both the "merits of [the] transaction" as well as "the thoroughness of the investigation into the merits of [the] transaction." *Bunch v. W.R. Grace & Co.*, 532 F. Supp. 2d 283, 288 (D. Mass. 2008), *aff'd*, 555 F.3d 1 (1st Cir. 2009) (quoting *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996)). Mere "subjective good faith" in executing these duties is not a defense: "a pure heart and an empty head are not enough." *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983). Therefore a defendant "cannot claim as a defense…that a great deal of time was spent reviewing" a decision when that decision was "tainted by the fact that he did not have all of the information he needed," rendering the decision "flawed from its inception." *Chao v. Hall Holding Co.*, 285 F.3d 415, 431 n.10 (6th Cir. 2002).

### DUTY OF LOYALTY

39.     The duty of loyalty requires fiduciaries to act with "an eye single" to the interests of plan participants. *Pegram*, 530 U.S. at 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quoting G. Bogert et al., *Law of Trusts and Trustees* § 543 (rev. 2d ed. 1980)). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or

superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

40.     While ERISA does not prohibit an employer's corporate officers or high-level employees from serving as plan fiduciaries—basically wearing two hats—it does require that they "wear the fiduciary hat when making fiduciary decisions." *Pegram*, 530 U.S. at 225. For example, in administering an ERISA plan, corporate officers must "avoid placing themselves in a position where their acts [or interests] as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan." *Bierwirth*, 680 F.2d at 271. "A fiduciary with a conflict of interest must act as if he is 'free' of such a conflict. 'Free' is an absolute. There is no balancing of interests; ERISA commands undivided loyalty to the plan participants." *Bedrick ex rel. Humrickhouse v. Travelers Ins. Co.*, 93 F.3d 149, 154 (4th Cir. 1996).

41.     "The presence of conflicting interests imposes on fiduciaries the obligation to take precautions to ensure that their duty of loyalty is not compromised." *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 299 (5th Cir. 2000). "When it is 'possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries.'" *Howard*, 100 F.3d at 1488-89 (quoting *Leigh v. Engle*, 727 F.2d 133, 125–26 (7th Cir. 1984)); *see also Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir. 1992) (explaining that where fiduciaries have "dual loyalties," courts "should look closely at whether the fiduciaries investigated *alternative actions* and relied on outside advisors") (emphasis added).

### DUTY OF PRUDENCE

42.     ERISA also "imposes a 'prudent person' standard by which to measure

fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (citation and internal quotation marks omitted). Under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble*, 135 S. Ct. at 1828. If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (citation and internal quotation marks omitted). Fiduciaries therefore may be held liable for either "assembling an imprudent menu of investment options" or for failing to monitor the plan's investment options to ensure that each option remains prudent. *Bendaoud v. Hodgson*, 578 F. Supp. 2d 257, 271 (D. Mass. 2008) (citing *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423-24 (4th Cir. 2007)). It is no defense to the imprudence of some investments that others may have been prudent; "a fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds" available within the plan could have "theoretically…create[d] a prudent portfolio." *Bunch*, 532 F. Supp. 2d at 289 (1st Cir. 2009) (quoting *DiFelice*, 497 F.3d at 423).

## OVERVIEW OF THE PLAN

43.     The Plan was established by Fidelity and went into effect on December 30, 1952. The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), covering all eligible current and former employees of Fidelity and its subsidiaries, including Plaintiffs. The Plan is a qualified plan under 26 U.S.C. § 401, commonly referred to as a "401(k) plan." The Plan is maintained pursuant to a written instrument called the "Plan Document." *See* 29 U.S.C. § 1102(a). On July 1, 2015, the Plan was amended to change its name from "FMR LLC Profit Sharing Plan" to "Fidelity Retirement Savings Plan."

44.     In a defined contribution plan, fiduciaries are obligated to assemble a diversified menu of investment options. 29 U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii). Plan participants may invest in any of these "designated investment alternatives" that fiduciaries include within the plan's menu of investment options.[3]

45.     Participants in the Plan are responsible for directing the investment of contributions, choosing from among a lineup of options offered by the Plan.[4] However, because the Plan's Retirement Committee determined the investment options available, the investment lineup maintained by the Retirement Committee was critical to participants' investment results and, ultimately, the retirement benefits they received.  The fact that participants have the ability to exercise "independent control" over the assets in their accounts "does not serve to relieve a fiduciary from its duty to prudently select and monitor any…designated investment alternative offered under the plan."  29 C.F.R. § 2550.404c-1(d0(1)(iv).

46.     Each investment option within a defined-contribution plan is generally a pooled investment product—which includes mutual funds, collective investment trusts, and separate accounts—offering exposure to a particular asset class or sub-asset class. *See* Investment

---

[3] A "designated investment alternative" is defined as "any investment alternative designated by the plan into which participants…may direct the investment of assets held in, or contributed to, their individual accounts." 29 C.F.R. § 2550.404a-5(h)(4).

[4] Employer contributions, along with the opportunity to participate in a defined contribution plan in the first instance, are part of a standard benefits package offered by nearly all large employers to attract and retain talented employees. *See* 401(k) Specialist, *Top 4 Priorities of 401(k) Plan Sponsors* (Jan. 3, 2016) (highlighting survey findings that, among large defined contribution plan sponsors, attracting and retaining talented employees is a top priority), *available at* http://401kspecialistmag.com/top-4-priorities-of-401k-plan-sponsors; Joan Vogel, *Until Death Do Us Part: Vesting of Retiree Insurance*, 9 INDUS. REL. L.J. 183, 216 (1987) (noting that employers offer retirement benefits to attract and retain "reliable, productive employees"). ERISA is concerned with what happens next: the disposition of assets contributed. *See In re RCN Litig.*, 2006 WL 753149, at *6 n.4 (D. N.J. Mar. 21, 2006) (observing that employer contributions occur before ERISA's fiduciary duties kick in).

Company Institute, *A Close Look at 401(k) Plans*, at 8 (Mar. 2018), *available at* https://www.ici.org/pdf/ppr_18_dcplan_profile_401k.pdf (hereinafter "2018 ICI Study"); Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 YALE L.J. 1476, 1485 (2015) (hereinafter "*Beyond Diversification*").

47.     In a pooled investment vehicle, the assets of numerous investors are pooled together and used to purchase a portfolio of securities in a particular manner and style determined by the vehicle's governing documents. Every investor in a pooled investment vehicle owns a certain number of shares, with each share representing an undivided percentage of the entire pool of assets managed within the vehicle. The value of each share on any given day is equal to the total value of all assets held by the vehicle divided by the total outstanding number of shares. Pooled investment products charge certain fees and expenses that are deducted from the pool of assets on a monthly or quarterly basis. For every fund in the Plan, management fees were deducted regularly and paid to Fidelity. Mutual funds, collective investment trusts, and separate accounts are subject to differing regulations related to required disclosures, governance requirements, and regulatory supervision. However, differences in the type of pooled investment vehicle employed do not necessarily translate into differences in the securities held by the vehicle. Thus, it is very common for investment managers (including Fidelity) to offer identical versions of a particular product as a mutual fund, collective trust, and a separate account, with each version holding the exact same mix of investments.

48.     As of the end of 2016 (the most recent calendar year for which the Plan's Form 5500 filings are available with the Department of Labor), the Plan had more than 58,000 participants and nearly $15 billion in assets, making it one of the 20 largest private sector defined

contribution plans in the United States by assets.

49.     The Plan offers only Fidelity mutual funds as designated investment alternatives. Indeed, the Plan's designated investment alternatives include almost every non-identical Fidelity mutual fund in existence that is eligible for inclusion in a defined contribution plan.[5]

50.     In 2014, the Plan's designated investment alternatives consisted of 206 Fidelity funds. In 2015, despite having recently settled a lawsuit for fiduciary misconduct regarding the Plan, Defendants increased the number of Fidelity funds in the Plan to 224. In 2016, Defendants continued adding Fidelity funds to the Plan, which now had 234 proprietary funds and zero nonproprietary funds.

51.     In addition to a core menu of designated investment alternatives, many plans (including the Plan at issue here) also provide employees the option of opening a self-directed brokerage account ("SDBA"), giving participants access to a broad array of stocks, bonds, and mutual funds. Ayres & Curtis, *Beyond Diversification* at 1524. However, SDBAs have significant drawbacks. They are administratively difficult to set up and logistically challenging to manage, and as a result are used by 2% or less of participants on average. Investment Company Institute & Deloitte Consulting LLP, *Inside the Structure of Defined Contribution/401(k) Plan*

---

[5] The Fidelity funds that were *not* included in the Plan were left out for obvious reasons, not because the Fiduciary Defendants conducted a prudent investigation. For example, the omitted Fidelity funds included more expensive share classes of funds already offered in the Plan (which were otherwise identical), municipal bond funds (which are never included in defined contribution plans given that the plans' favorable tax status eliminates the benefit of municipal bonds' preferential tax treatment), and certain funds from Fidelity's Advisor Series (designed specifically for investors working with a financial advisor) that were identical to non-Advisor series funds already offered as designated investment alternatives. Nor was the Fiduciary Defendants' removal of funds from the Plan the result of careful monitoring of the Plan's designated investment options.  Instead, it appears that the only reason that a fund ceased to be offered within the Plan was the fund ceasing to exist due to cessation of its operations.

*Fees*, at 15 (Aug. 2014), *available at* www.ici.org/pdf/rpt_14_dc_401k_fee_study.pdf ("ICI/Deloitte Study").[6] Compared to investing in the Plan's designated investment alternatives, participants investing through SDBAs are often subject to additional account fees, transaction fees, and higher investment expenses given that SDBA options are typically limited to retail shares, whereas lower-priced institutional shares would be available if the same funds were included as designated investment alternatives.[7] Furthermore, SDBA investors often invest in imprudent investments, because there is no fiduciary selecting or monitoring the investments within an SDBA. 29 C.F.R. § 2550.404a-5(f), (h)(4). As a result of these facts, "performance is generally lower with self-directed accounts compared to managed portfolios. This translates into low real rates of return and higher retirement failure rates." Marijoyce Ryan, CPP, *Money Management: The Downside of Self- Directed Brokerage Accounts*, The Daily Record (June 26, 2012), *available at* http://nydailyrecord.com/blog/2012/06/26/money-management-the-downside-of-self-directed-brokerage-accounts; Gregory Kasten, *Self-Directed Brokerage Accounts Reduce Success* (2004), at 1, 13-14, *available at* http://etf.wi.gov/boards/agenda_items_2004/dc20040819item4.pdf (discussing study showing that SDBAs lagged the performance of a model portfolio of the plan's designated investment alternatives by an average of 4.70% per year). For all of these reasons, the existence of an SDBA option within a Plan does not excuse an imprudently designed and monitored menu of designated investment alternatives. *See Wildman v. Am. Century Services, LLC*, 237 F. Supp. 3d 902, 913

---

[6] Consistent with this experience, less than 1% of the Plan's assets were held in the Plan's SDBA option as of the end of 2016.

[7] Investments available within a self-directed brokerage account are excluded from the definition of "designated investment alternative." 29 C.F.R. § 2550.404a-5(h)(4). Therefore, fiduciaries are under no obligation to disclose performance, benchmark, or fee information regarding the investments available within an SDBA. *Id.* § 2550.404a-5(d).

(W.D. Mo. 2017) ("The existence of the [SDBA] option is irrelevant to determining whether Defendants used a disloyal and imprudent process to select the other investment options.").

## DEFENDANTS' VIOLATIONS OF ERISA

I.   **DEFENDANTS FAILED TO PRUDENTLY AND LOYALLY MANAGE THE PLAN'S INVESTMENTS**

52.   The complete absence of nonproprietary investment options in the Plan gives rise to an inference that the Fiduciary Defendants failed to investigate whether nonproprietary designated investment alternatives were available that would have better met the needs of Plan participants due to lower fees and/or superior investment management services.

53.   Likewise, the decision to offer almost every Fidelity mutual fund in existence as a designated investment alternative demonstrates that the Fiduciary Defendants put Fidelity's interests ahead of participants. A prudent fiduciary would have limited the Plan menu to the asset classes and investment options that offered the best opportunity for participants to maximize the value of their accounts at an appropriate level of risk, while excluding funds that interfered with that goal due to their high fees, poor track record, inexperienced managers, or inappropriate risk/reward profile. The Fiduciary Defendants' complete failure to limit either the asset classes offered within the Plan's menu or the particular options within each asset class gives rise to an inference that the Fiduciary Defendants did not investigate which asset classes and investment options would best meet the needs of participants. This failure further evidences the Fiduciary Defendants' failure to engage in a meaningful process of monitoring the Plan's investment options to ensure that they remained prudent.

54.   The Fiduciary Defendants' conduct in managing the Plan's designated investment alternatives furthered Fidelity's corporate interests in a number of ways. First, Fidelity collected

fee revenue as a result of the Plan's exclusive use of Fidelity funds—approximately $83 million in 2016 alone. Additionally, the Plan's exclusive use of proprietary funds ensured that Fidelity's employees—many of whom are employed to sell others on the benefits of owning Fidelity funds—would themselves own Fidelity funds, thereby building loyalty, product knowledge, and a built-in sales pitch touting the employees' personal investment in the pitched products. Further, the Plan provided an injection of capital into recently-created funds, lowering overhead expenses and boosting the funds' standing in the marketplace. The Fiduciary Defendants' refusal to prune the Plan's menu of designated investment alternatives also avoided antagonizing Fidelity's fund managers, some of whom would otherwise have had their funds excluded from the Plan. And finally, by excluding nonproprietary options, Fidelity avoided creating any perception of endorsing investment products managed by other firms.

## II.   DEFENDANTS' MISMANAGEMENT OF THE PLAN CAUSED TREMENDOUS LOSSES

55.    The Fiduciary Defendants' failure to manage the Plan in a prudent and loyal manner has been disastrous for Plan participants. Out of the 20 comparable plans with over $5 billion in assets[8] for which necessary data was available, Fidelity's plan performed the very worst (almost three times worse than average), representing over $100 million per year in losses compared to the average plan.[9]

---

[8] A defined contribution plan's bargaining power appears to taper off somewhat once it hits $5 billion in assets. *See* Cerulli Associates, *State of Large and Mega Defined Contribution Plans: Investment Innovation and the Plan Sponsor Perspective*, at 76 (2012), *available at* https://www.cerulli.com/vapi/public/getcerullifile?filecid=Cerulli_State_of_Large_and_Mega_R etirement_Plan_Info_Packet_2012 ("[T]he significant difference is more likely to be between plans with more than $5 billion and those with less than $5 billion. Interviews that Cerulli conducted with industry executives alluded to this potential result.").

[9] The Restatement of Trusts provides that losses attributable to a fiduciary breach are appropriately measured by comparison to comparable trusts, with the comparison rendered more

56.     These losses are attributable to several causes: excessive fees, reckless inclusion of speculative investments as designated investment alternatives, the failure to investigate nonproprietary options, and the failure to monitor the proprietary options that were included in the Plan's investment menu to ensure they were serving the goals of the Plan's participants. Each of these causes are addressed in turn below.

III.     **THE FIDUCIARY DEFENDANTS' DISLOYAL AND IMPRUDENT MANAGEMENT RESULTED IN PAYMENT OF EXCESSIVE FEES BY PARTICIPANTS**

57.     At retirement, employees' benefits "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. Accordingly, excessive fees can significantly impair the value of a participant's account. Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of savings available at retirement. *See, e.g.*, Stacy Schaus, *Defined Contribution Plan Sponsors Ask Retirees, "Why Don't You Stay?" Seven Questions for Plan Sponsors*, PIMCO (Nov. 2013), https://www.pimco.com/insights/investment-strategies/featured-solutions/defined-contribution-

---

accurate by reference to a customized benchmark made up of multiple market benchmarks to reflect the asset allocation of the trust. *See* Restatement of Trusts (Third) § 100, cmt. b(1) & Reporter's Notes thereto. Plaintiffs compared the Plan's performance (as reported in publicly available Form 5500 filings to the Department of Labor) to that of a weighted benchmark determined by the Plan's asset allocation (which was itself determined by the investments reported on the Plan's Form 5500 submissions). This same technique was applied to all other comparable plans with over $5 billion in assets for which necessary data was available. To assemble a comparable universe of plans with over $5 billion in assets, Plaintiffs excluded plans using separate account vehicles (for which it is practically impossible to determine asset allocation from the plan's Form 5500), as well as plans with a disproportionately large allocation to company stock (Fidelity does not include company stock as an option). Each comparator plan's calendar-year returns were compared to a weighted benchmark determined by the Plan's asset allocation. By controlling for participants' asset allocation decisions and the performance of the underlying markets, this methodology isolates the portion of the plan's performance generally attributable to the performance of the underlying investment options in the plan.

plan-sponsors-ask-retireeswhy-dont-you-stay-seven-questions-for-plan-sponsors (explaining that "a reduction in [annual] fees from 100 bps[10] to 50 bps [within a retirement plan] could extend by **several years** the potential of participants' 401(k)s to provide retirement income") (emphasis added). Further, higher investment fees are not generally associated with superior investment management services. *See* Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873, 883 (2009) ("[T]he empirical evidence implies that superior management is not priced through higher expense ratios."); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1983 (2010) (summarizing numerous studies showing that "[e]ven before costs are reflected in returns,…there is little evidence that higher fees are correlated with increased performance").

58.    Prudent fiduciaries exercising control over administration of a plan and the selection and monitoring of designated investment alternatives will minimize plan expenses by hiring low-cost service providers and by curating a menu of low-cost investment options. *See* Restatement (Third) of Trusts § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function….").[11] This task is made significantly easier the larger a plan gets. Economies of scale generally lower administrative expenses on a per-participant or

---

[10] The term "bps" is an abbreviation of the phrase "basis points."  One basis point is equal to .01%, or 1/100th of a percent.  Thus, a fee level of 100 basis points translates into fees of 1% of the amount invested. *See* Investopedia, Definition of 'Basis Point (BPS)', http://www.investopedia.com/terms/b/basispoint.asp.

[11] The Supreme Court has noted that the legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828. Therefore, "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.* In fact, the duty of prudence imposed under 29 U.S.C. § 1104(a)(1)(B) is a codification of the common law prudent investor rule found in trust law. *Buccino v. Continental Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983).

percentage-of-assets basis. ICI/Deloitte Study at 7, 21. Empirical evidence bears this out. In 2015, total plan fees in defined contribution plans averaged 0.88%, but this varied between an average of 1.17% in plans with $1 million to $10 million in assets, and an average of only 0.30% for plans with over $1 billion in assets. 2018 ICI Study at 53.

59.    Given the significant variation in total plan costs attributable to plan size, the reasonableness of administrative expenses and investment management expenses should be determined by comparison to other similarly-sized plans. *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character").

60.    With nearly $15 billion in assets, the Plan is one of the 20 largest private sector plans in the United States, giving the Fiduciary Defendants nearly unparalleled bargaining power to negotiate low fees from both investment managers and service providers. However, the Fiduciary Defendants failed to appropriately utilize that bargaining power to lower costs, and as a result, Plan participants paid significantly higher fees than participants in similar plans.

61.    As of the end of 2016, the Plan had by far the highest fees among the approximately 110 defined contribution plans with more than $5 billion in assets. The Plan's fees were 0.58% of assets, more than double the asset-weighted average of 0.24%, and a full 0.10% higher than its closest peer. Had the Plan's fees simply matched the average for plans with more than $5 billion in assets, total fees would have been $47 million lower in 2016 alone. These high fees are the result of numerous failures by the Fiduciary Defendants.

A.    THE FIDUCIARY DEFENDANTS RETAINED PROPRIETARY FUNDS IN THE PLAN
DESPITE THEIR EXCESSIVE FEES

62.    By indiscriminately including every Fidelity fund within every asset class, the

Fiduciary Defendants needlessly increased average expenses. For example, as of the end of 2015,

the Plan included six different funds within the Diversified Emerging Markets Morningstar

Category, with a broad range of expenses, as shown here:

| Funds in the Plan | Ticker | Expense Ratio |
|---|---|---|
| Fidelity EMEA | FEMEX | 1.39% |
| Fidelity Emerging Markets Discovery | FEDDX | 1.35% |
| Strategic Advisers Emg Mkts Fd of Fds | FLILX | 1.31% |
| Fidelity Total Emerg Mkts | FTEMX | 1.26% |
| Fidelity Emerging Markets | FEMKX | 0.97% |
| Fidelity Emerging Markets Idx Instl Prm | FPADX | 0.08% |

The costliest of these options charged high fees because they failed to penetrate the market and

accrue economies of scale, not because they provided a higher level of services. The Fiduciary

Defendants breached their fiduciary duties by failing to investigate whether the additional costs

of each of these duplicative, more expensive options were justified. This example holds true for

the remainder of the Plan, where the automatic selection and retention of redundant, high-fee

funds cost participants millions of dollars in excess fees.

B.    THE FIDUCIARY DEFENDANTS FAILED TO INVESTIGATE COMPARABLE, LESS-
COSTLY NONPROPRIETARY FUNDS

63.    The Fiduciary Defendants also failed to investigate the availability of lower-cost

marketplace alternatives. ERISA fiduciaries have a duty to make comparisons between different

products and managers, who may offer similar products for very different costs. *See* Restatement

(Third) of Trusts ch. 17, intro. note (2007) (emphasizing the "duty to avoid unwarranted costs"

and noting that "similar products [are] offered with significantly differing costs"); Restatement

(Third) of Trusts § 78, cmt. c(8) ("[T]he trustee must be sufficiently aware of overall costs

associated with other mutual-fund alternatives to enable the trustee to fulfill its important responsibility to be cost conscious in managing the trust's investment program."); *see also Velazquez v. Massachusetts Financial Servs. Co.*, 320 F. Supp. 3d 252, 259 (D. Mass. 2018) (holding that "allegations that proprietary mutual funds 'were more expensive than similar alternatives'" were sufficient to support a "claim of breach of fiduciary duty" under ERISA) (quoting *Main v. Am. Airlines Inc.*, 248 F. Supp. 3d 786, 793 (N.D. Tex. 2017)); *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 2016 WL 4507117, at *7 (C.D. Cal. Aug. 5, 2016) ("fail[ure] to investigate lower-cost options with comparable performances" supported breach of fiduciary duty claim).

64.    Had the Fiduciary Defendants investigated marketplace alternatives, they could have identified similar funds that provided comparable or superior investment management services at a significantly lower-cost. For example, the Plan offered all eight of Fidelity's mutual funds within the High Yield Bond Morningstar Category. Below, those options are compared to three lower-cost nonproprietary options that would have provided comparable or superior investment management services in the same investment style.

| Funds in the Plan | Ticker | Expense Ratio |
|---|---|---|
| Fidelity Global High Income | FGHNX | 1.02% |
| Fidelity Advisor High Income I | FHNIX | 0.80% |
| Fidelity Focused High Income | FHIFX | 0.80% |
| Fidelity Short Duration High Income | FSAHX | 0.80% |
| Fidelity Advisor High Income Advantage | FAHCX | 0.77% |
| Strategic Advisers Income Opps Fd of Fds L | FQAFX | 0.76% |
| Fidelity High Income | SPHIX | 0.70% |
| Fidelity Capital & Income | FAGIX | 0.67% |

| Marketplace Alternatives | Ticker | Expense Ratio |
|---|---|---|
| Federated High Yield Bond R6 | FIHLX | 0.49% |
| Prudential High Yield R6 | PHYQX | 0.42% |
| Vanguard High-Yield Corporate Adm | VWEAX | 0.13% |

Had the Fiduciary Defendants engaged in a marketplace investigation of high-yield bond options, in accordance with their fiduciary duty to manage the Plan in a cost-conscious manner, they would have identified comparable or superior low-cost options that would have better served the needs of Plan participants. Because the Fiduciary Defendants instead stocked the Plan with every Fidelity fund, participants paid higher fees than they would have had the Plan been managed prudently and loyally. This example holds true for the remainder of the Plan, where the Fiduciary Defendants' failure to adequately investigate comparable or superior non-Fidelity options cost Plan participants tens of millions of dollars in excess fees.

### C.   THE FIDUCIARY DEFENDANTS FAILED TO INVESTIGATE THE USE OF SEPARATE ACCOUNTS AND COLLECTIVE TRUSTS

65.     Additionally, the Fiduciary Defendants failed to adequately investigate non-mutual fund alternatives such as collective trusts and separate accounts. Collective trusts are a common investment vehicle in large 401(k) plans, and are accessible even to midsize plans with $100 million in assets or more. Anne Tergesen, *401(k)s Take a New Tack*, Wall Street Journal (Sept. 25, 2015), *available at* http://www.wsj.com/articles/some-funds-in-your-401-k-arent-really-mutual-funds-after-all-1443173400.

66.     Likewise, separate accounts are widely available to large plans such as the Plan. *See* U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 15 (April 13, 1998), *available at* https://www.dol.gov/sites/default/files/ebsa/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf. By using separate accounts, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds." *Id.* Separate accounts offer a number of advantages over mutual funds, including the ability to negotiate fees. Costs within separate accounts are typically much lower than even the

lowest-cost share class of a particular mutual fund.

67.     Separate accounts and collective trusts held by modern defined contribution plans function much like mutual funds. For example, they offer daily valuation of shares, daily liquidity comparable to mutual funds, the ability to readily access up-to-date valuation and performance information online, and disclosure documents similar to the prospectuses and quarterly reports mutual funds produce. These products' features have come to mimic mutual funds to such an extent that most participants invested in these vehicles don't even realize they aren't invested in a mutual fund. *See* Anne Tergesen, *Some Funds in Your 401(k) Aren't Really Mutual Funds After All*, Wall Street Journal, available at https://www.wsj.com/articles/some-funds-in-your-401-k-arent-really-mutual-funds-after-all-1443173400.

68.     Fidelity offers its institutional clients collective trust and separate account products that are similar or identical to mutual funds in the Plan. For example, Oracle Corporation's 401(k) plan has historically included several lower-cost Fidelity separate account products that were otherwise identical to the higher-cost mutual funds offered in the Plan.[12]

| Fund Name | Plan Sponsor | Plan Size | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| Fidelity Contrafund Commingled Pool | Oracle | $12.9 billion | 0.43% | N/A |
| Fidelity Contrafund | Fidelity | $14.3 billion | 0.61% | 42% higher |

---

[12] Plaintiffs obtained expense ratios as of 2014 for investment options in the Oracle plan from the 404a-5 fee disclosure made to participants in that plan, which was filed as part of a lawsuit. *See Troudt v. Oracle Corp.*, No. 1:16-cv-00175, ECF No. 36-1 at 9 (Mar. 29, 2016). Expenses for the Fidelity options are taken from Fidelity's 2015 Annual Reports, reflecting the prior year's expenses.

| Fund Name | Plan Sponsor | Plan Size | Expense Ratio | %  Fee Excess |
|---|---|---|---|---|
| Fidelity Growth Company Commingled Pool | Oracle | $12.9 billion | 0.43% | N/A |
| Fidelity Growth Co. | Fidelity | $14.3 billion | 0.77% | 79% higher |

| Fund Name | Plan Sponsor | Plan Size | Expense Ratio | %  Fee Excess |
|---|---|---|---|---|
| Fidelity Low-Priced Stock Commingled Pool | Oracle | $12.9 billion | 0.48% | N/A |
| Fidelity Low-Priced Stock | Fidelity | $14.3 billion | 0.69% | 44% Higher |

A prudent fiduciary would have investigated the availability of vehicles like those used by Oracle. Had an adequate investigation occurred, the Fiduciary Defendants would have switched the Plan's investments to such vehicles in light of the enormous cost savings as well as the lack of benefit from the mutual fund structure.[13] The Fiduciary Defendants' failure to conduct such an investigation resulted in unnecessary fees, thereby profiting Fidelity while costing Plan participants millions of dollars.

### D.   DEFENDANTS FAILED TO UTILIZE THE CHEAPEST AVAILABLE SHARE CLASS OF CERTAIN PROPRIETARY FUNDS IN THE PLAN

69.    The Fiduciary Defendants also failed to adequately investigate the availability of lower-cost share classes of several of the mutual funds in the Plan. Because the funds in the Plan did not pay revenue sharing to the Plan, more expensive share classes of particular funds did not confer any benefit to participants. Given that there is no material difference between share classes other than cost—with institutional share classes of Fidelity's mutual funds offering the same daily liquidity, daily valuation, and disclosures as its retail share classes—a prudent fiduciary acting under these circumstances would have selected the least expensive share class.

---

[13] Given the size of the Plan, the sophistication of the plan sponsor, and the sponsor's affiliation with the fund company, the Plan has not benefited from the use of the mutual fund structure or the protections of the Investment Company Act.

Specifically, the Fiduciary Defendants in some cases failed to use lower-cost K shares of the Fidelity-branded funds and failed to use lower-cost Z shares of the Fidelity Advisor-branded funds. For example, the Plan used the standard no-load version of the Fidelity Emerging Markets fund, with expenses of 0.96% per year, even though K shares of the Fidelity Emerging Markets fund would have cost participants only 0.81% per year. Similarly, the Plan used I shares of the Fidelity Advisor Overseas fund, which charged 0.92% per year, despite the availability of Fidelity Advisor Overseas Z shares, which would have charged only 0.80% per year. The Fiduciary Defendants' retention of identical, more expensive share classes cost Plan participants millions of dollars in excess fees.

### E. THE FIDUCIARY DEFENDANTS FAILED TO SECURE AVAILABLE REVENUE SHARING REBATES FROM THE PLAN'S INVESTMENTS

70. Administrative expenses (*e.g.*, recordkeeping, trustee and custodial services, accounting, etc.) can be paid directly by employers, directly by the plan, or indirectly as a built-in component of the fees charged for the investment products offered in the plan in a practice known as "revenue sharing." Ayres & Curtis, *Beyond Diversification* at 1486; ICI/Deloitte Study at 16. These "revenue sharing" payments from investment managers to plan service providers typically happen on a monthly or quarterly basis and are determined by an agreed-upon contribution formula. Although revenue sharing arrangements are not necessarily prohibited transactions under 29 U.S.C. § 1106, plan fiduciaries "must act prudently and solely in the interest of plan participants and beneficiaries both in deciding whether to enter into, or continue, [a revenue sharing arrangement] and in determining the investment options in which to invest or make available to plan participants and beneficiaries in self-directed Plan." DOL Advisory Opinion 2003-09A, 2003 WL 21514170, at *6 (June 25, 2003).

71.     The Fiduciary Defendants failed to demand revenue sharing rebates from the investment manager that managed all of the Plan's investments (Fidelity) or the affiliated entity that made those payments (FIIOC), even though FIIOC made similar payments to most of its other retirement plan customers. In plans of comparable size recordkept by Fidelity, FIIOC offered revenue sharing rebates on nearly all Fidelity funds of between 10 and 35 basis points (as a percentage of assets invested in the fund), with the amount depending upon the type of fund and share class. Those payments can be used to offset the recordkeeping fees charged by FIIOC. And when revenue sharing amounts exceed recordkeeping fees, excess amounts can be either refunded to participants or used to pay for other plan expenses.

72.     Had the Fiduciary Defendants simply negotiated a contract in line with Fidelity's recordkeeping contracts with other retirement plans, revenue sharing rebates from 2015 and 2016 would have covered Fidelity's standard recordkeeping charges (which would have been between $1 and $1.5 million per year, given the number of participants), with an excess of approximately $31.5 million per year that could have been refunded to participants. But the Fiduciary Defendants never leveraged the Plan's immense negotiating power to secure these revenue sharing payments, resulting in a tremendous windfall for Fidelity at the expense of participants. A prudent fiduciary would have negotiated a deal similar to those negotiated by other similarly-sized retirement plans and secured in excess of $30 million per year in fee rebates for participants.

## IV.     DEFENDANTS RETAINED INAPPROPRIATELY SPECULATIVE FUNDS IN THEIR OWN SELF-INTEREST

73.     Investment fiduciaries have a duty to "initially determine and continue to monitor the prudence of each investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at

289. In so doing for a particular investment, the fiduciary must determine whether the investment "is reasonably designed, as part of the portfolio…to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment." 29 C.F.R. § 2550.404a-1(b)(2)(i).

74. The duty of prudence therefore requires "prudent management of risk." Restatement (Third) of Trusts § 90 cmt. e(1) (explaining that the prudent investor rule's "requirement of caution ordinarily imposes a duty to use reasonable care and skill in an effort to minimize or at least reduce diversifiable risks"). This does not require outright avoidance of risk, but instead limiting risks to those that are compensated through improved potential for returns. "In understanding a trustee's duties with respect to the management of risk, it is useful to distinguish between diversifiable (or 'uncompensated') risk and market (or nondiversifiable) risk that is, in effect, compensated through pricing in the marketplace." *Id.* Failure…to reduce uncompensated risk is ordinarily a violation of both the duty of caution and the duties of care and skill." *Id.* "Because market pricing cannot be expected to recognize and reward a particular investor's failure to diversify, a trustee's acceptance of this type of risk cannot, without more, be justified on grounds of enhancing expected return." *Id.*

75. One example of uncompensated risk is 'sector' or 'industry' risk, meaning the risk that a particular industry will perform poorly for reasons unique to that industry. As investment manager and fiduciary expert Patrick Collins has explained,

> [T]he obligation to utilize care, skill, and caution…admonishes the portfolio manager not to set the level of uncompensated or firm-related risk higher than suitable for the particular trust under his or her stewardship….[T]he portfolio manager should mitigate uncompensated (i.e., non-market) risk unless there is clear and compelling justification for assuming it….Sector betting within an asset class is risky because of the low-breadth problem—it takes an extraordinary level of forecasting skill to achieve persistent profitability in the betting system; and,

conversely, one wrong call in the sector shifting strategy can destroy the profitability of a long series of past correct calls….[Sectors] are the building blocks of asset classes. Diversifying an asset class requires diversification across all sectors within the asset class as well as diversification within each of the sectors.

Patrick Collins, *Prudence*, 124 BANKING LAW J. 3, 60-61 (2007) (quoted in Restatement (Third) of Trusts § 90 cmt. g Reporter's Notes).

76.     Fidelity offers 39 sector funds in the marketplace—such as Fidelity Select Banking, Fidelity Select Chemicals, and Fidelity Select IT Services. Contrary to the foregoing investment principles, the Fiduciary Defendants included all 39 of these funds in the Plan as designated investment alternatives. These sector funds took on substantial uncompensated risk that a prudent fiduciary would have found imprudent. Further, these funds did not advance the goals of the Plan within the context of the entire menu of designated investment alternatives. The Plan menu already contained broadly diversified equity investments providing exposure to all of these industry sectors. Thus, none of these sector funds provided any diversification benefit to Plan participants. Instead, the sector funds constituted speculative bets on particular industries that were not conducive to participant implementation of a prudent investment strategy.

77.     Making matters worse, sector funds tend to be more expensive than diversified alternatives, due in part to their boutique mission and their relatively smaller amounts of assets under management. Here, the weighted average cost of the Plan's sector funds was 25% higher than the weighted average cost of the rest of the funds in the Plan. While sector funds comprised less than 8% of the Plan's assets, that still amounted to over $1 billion of plan participants' assets. A prudent fiduciary would not have heaped every single Fidelity sector fund into the Plan given those funds' high fees and lack of diversification.

78.     The imprudence of these sector fund offerings was not merely theoretical. Among the problems presented by sector funds is how their higher volatility interacts with decisional heuristics that are known to lead to poor investment decisions. It is well-established that due to two behavioral biases known as the "gambler's fallacy" and "sample size neglect," investors often view short-term periods of mutual fund outperformance as predictive of a trend and indicative of managerial skill, when in fact such outperformance is often attributable to the random and cyclical nature of markets. *See* Daniel Kahneman & Amos Tversky, *Judgment Under Uncertainty: Heuristics and Biases*, 185 SCIENCE 1124, 1125 (1974); Nicholas Barberis & Richard Thaler, *A Survey of Behavioral Finance*, *in* HANDBOOK OF THE ECONOMICS OF SCIENCE 1051, 1065 (George M. Constantinides, Milton Harris & René M. Stulz, eds, 2003).

79.     The heightened volatility of sector funds exacerbates these behavioral biases. At least a few of the Plan's 39 sector funds are likely at any given time to be producing a recent run of eye-popping returns, thus serving as "attractive nuisances" to participants prone to performance-chasing. Confronted with severe gains or losses, investors are more likely to churn through funds, ignoring buy-and-hold and diversification principles based on the misconception that recent returns will be predictive of future performance. *See* T. Rowe Price, *Constructing More Effective Defined Contribution Investment Lineups* (Apr. 2018), at 8, *available at* https://www4.troweprice.com/gis/content/dam/fai/Collections/DC%20Resources/Constructing%20More%20Effective%20DC%20Investment%20Lineups/Constructing_More_Effective_DC_Investment_Lineups.pdf (recommending that plan sponsors "[m]inimize sector and other specialty investment options" because "[m]any have wide swings in performance that can result in large participant flows in and out").

80.    For example, consider how fluctuating performance during 2016 impacted investment flows within four of the Plan's sector funds, and the effects of that volatility on participants.

| Fund | Plan Balance as of 12/31/15 | 2016 Return | Plan Balance as of 12/31/16 | 2017 Return |
|---|---|---|---|---|
| Fidelity Select Biotech | $276MM | -23.72% | $160MM | 27.87% |
| Fidelity Select Healthcare | $140MM | -10.68% | $89MM | 24.02% |
| Fidelity Select Banking | $20MM | 26.84% | $38MM | 12.68% |
| Fidelity Select Energy | $48MM | 33.84% | $77MM | -2.64% |

In summary, 2016 outperformance in the Banking and Energy sectors drew significant participant funds into those sector funds, while negative results in the Healthcare and Biotech sectors caused tremendous flight from those sector funds. Unsurprisingly, this investment pattern produced poor results, as many investors missed the run-up in banking and energy stocks and subsequently the recovery of biotech and health stocks. So while it might appear on paper that each of these four funds produced average- to above-average performance during 2016 and 2017, results for participants were worse because of when assets entered and exited the funds.

81.    The boom-bust cycles of these sector funds illustrate why fiduciaries must be extremely wary of sector funds. By their very nature, these funds introduce significant uncompensated risk and sabotage investment diversification. Tossed unscrupulously into a plan menu, as they were here, these funds prey on participants' behavioral biases, resulting in predictable and substantial underperformance over the long term due to excess fees, under-diversification, and excessive risk-taking. Had the Fiduciary Defendants fulfilled their fiduciary duty to monitor participant investment patterns and performance results, they would have observed that the Plan's sector funds were fueling performance-chasing behavior and speculation to the detriment of participants, and therefore should have been removed from the Plan. The

Fiduciary Defendants' failure to adequately investigate and monitor these hazardous funds cost Plan participants millions of dollars in the form of higher fees and poor returns.

**V.    DEFENDANTS FAILED TO INVESTIGATE BETTER-PERFORMING NONPROPRIETARY FUNDS**

82.    Though Fidelity is one of the two largest investment managers by assets, its marketing strength does not always translate into investment success. As of the end of 2017, Fidelity was ranked by Barron's as the 29th best-performing mutual fund company over the prior ten-year period out of 50 firms, a decidedly mixed bag. Like most fund families, Fidelity has areas in which it does well, areas in which its performance is uneven, and areas in which it has consistently underperformed.

83.    By failing to investigate nonproprietary options, the Fiduciary Defendants saddled participants with Fidelity's institutional weaknesses, despite years—or in some cases, decades— of evidence that in certain asset classes, Fidelity's managers could not generate competitive returns. For example, below is a ten-year performance chart of Fidelity's six mid-cap growth funds (all of which were included in the Plan) as of the end of October 2015, as well as the benchmark index for those funds.

| Fund | Ticker | 10-year Average Return as of 10-1-15 |
|---|---|---|
| Fidelity Stock Selector Mid Cap | FSSMX | 5.43% |
| Fidelity Growth Strategies K | FAGKX | 6.42% |
| Fidelity Leveraged Company Stock K | FLCKX | 6.81% |
| Fidelity Advisor Mid Cap II Z | FZAMX | 7.37% |
| Fidelity Select Construction & Hsg Port | FSHOX | 7.55% |
| Fidelity Mid-Cap Stock K | FKMCX | 7.62% |

| Benchmark Index | Ticker | 10-year Average Return as of 10-1-15 |
|---|---|---|
| Russell Midcap Growth Index | n/a | 8.11% |

As the chart shows, every Fidelity mid-cap growth fund materially underperformed its benchmark index in the prior ten-year period. Despite this substandard overall performance, the Fiduciary Defendants never looked beyond Fidelity's funds to investigate whether better options existed in the marketplace.

84.     Had the Fiduciary Defendants conducted such an investigation, they would have readily found better-managed options. For example, since at least 2010, the T. Rowe Price Mid Cap Growth Fund has been the most commonly-used mid-cap growth fund among fiduciaries of plans with over $1 billion in assets. Over the ten-year period ending September 30, 2015, the T. Rowe Price Mid Cap Growth Fund had an average annual return of 10.02% per year. While *all* of the Plan's six mid-cap growth offerings have underperformed their benchmark index over the past three years, the T. Rowe Price Mid Cap Growth fund has outperformed that same index by approximately 1.2% per year. Additionally, the lowest-cost share class of the T. Rowe Price Mid Cap Growth Fund currently charges fees of 0.61% per year, lower than all six of Fidelity's offerings. Had the Fiduciary Defendants investigated other options in the marketplace, as a prudent and loyal fiduciary would have done, they would have replaced Fidelity's consistently-underperforming mid-cap growth funds with a better-managed fund like the T. Rowe Price Mid Cap Growth Fund.

85.     This illustration is not an anomaly. There are numerous asset classes in which the Fiduciary Defendants have forced Fidelity's persistently underperforming funds on participants (the large cap value and large cap blend categories are two additional illustrative examples) without investigating whether other options in the marketplace would have better served Plan participants. The Fiduciary Defendants' insistence on selecting every non-identical Fidelity fund (and only Fidelity funds) regardless of past performance has cost Plan participants millions of

dollars in the form of poor returns.

## VI.    DEFENDANTS FAILED TO REMOVE UNDERPERFORMING PROPRIETARY FUNDS

86.     The Fiduciary Defendants polluted the Plan with a variety of consistently-underperforming Fidelity funds. For example, as of October 1, 2015, six of the eight large cap blend funds in the Plan had underperformed the benchmark index over the past ten years, with mean underperformance of 0.93% *per year*. This example holds true for the remainder of the Plan, where numerous Fidelity funds were retained despite consistent long-term underperformance.

87.     As the Supreme Court has explained, among the fundamental duties of a fiduciary is to monitor the performance of the investment options held by the plan and remove those that are imprudent. *See Tibble*, 135 S. Ct. at 1828. A prudent and loyal fiduciary would have removed funds that exhibited consistent underperformance, saving participants millions of dollars. *See* Veronika K. Pool *et al.*, *It Pays to Set the Menu: Mutual Fund Investment Options in 401(k) Plans*, 71 J. FIN. 1779, 1780-81, 1808-10 (2016) (summarizing previous studies showing that mutual funds with poor historical performance tend to perform poorly in the future, and demonstrating the existence of this phenomenon among underperforming proprietary mutual funds held by 401(k) plans). By failing to monitor the funds in the Plan and remove those that were imprudent, the Fiduciary Defendants breached their fiduciary duties.

88.     The Fiduciary Defendants' inclusion of every Fidelity option within every asset class had an additional negative effect upon participants' behavior. Stuffing a plan with duplicative investment options tends to promote a horse-race mentality among participants, in which they are motivated to pick the best fund among the many options offered within a given category. *See* T. Rowe Price, *Helping Plan Participants Stay on Track* (Summer 2008), at 1,

*available at* https://www2.troweprice.com/rms/rps/Sponsors/DefaultContent/StaticAssets/ Helping_Plan_Participants_Stay_On_Track.pdf ("Plan participants tend to chase performance, ending up buying high and selling low."); AllianceBernstein, *Implications of Participant Behavior for Plan Design*, at 7, *available at* http://www.alliancebernstein.com/ CmsObjectABD/PDF/Research_WhitePaper/R29284_Implications_0131_WP.pdf    (participants "request value or growth funds based on recent quarterly performance, and we know that there is a high likelihood that today's winners will become tomorrow's mediocrity"). This is a logical consequence of the "gambler's fallacy" and "sample size neglect" biases noted above, in which investors assume that prior outperformance is reflective of skill or a trend rather than random happenstance. *See supra* ¶ 78.

89.     Fiduciaries have a "duty to reevaluate the trust's investments periodically as conditions change." A. Hess, G. Bogert, & G. Bogert, Law of Trusts and Trustees § 684, p. 146 (3d ed. 2009) (Bogert 3d). This reevaluation must take account of the circumstances and behavior of the trust's beneficiaries. *See* Mark L. Ascher, 3 Scott & Ascher on Trusts § 18.2.2, at 1351 (5th ed. 2007) ("If the trustee fails to inquire into the beneficiary's circumstances, the trustee thereby fails to exercise his or her judgment, and the court may interpose."). "The duty to review trust investments should be performed by the collection of information currently as changes occur, and also by a systematic consideration of all the investments of the trust at regular intervals, for example, once every six months." Bogert 3d § 684, at 147-48. For example, the Department of Labor recommends that fiduciaries consider participants' "salary levels, turnover rates, contribution rates and withdrawal patterns." U.S. Dep't of Labor, *Target Date Retirement Funds - Tips for ERISA Plan Fiduciaries* (Feb. 28, 2013), *available at*

https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds.pdf.

90.    As the below table shows, participants in the Plan exhibited extraordinary levels of performance-chasing within large-cap blend investments, resulting in the same frenzied investment pattern that characterized investments in the Plan's sector funds.

| Fund | Plan Balance as of 12/31/15 | 2016 Return | Plan Balance as of 12/31/16 | 2017 Return |
|---|---|---|---|---|
| Fidelity Growth & Income | $154 MM | 16.06% | $205 MM | 16.88% |
| Fidelity Export & Multinational | $129MM | 10.12% | $41MM | 21.07% |

Short periods of outperformance appear to have triggered huge inflows of assets into Fidelity Growth & Income, and out of Fidelity Export & Multinational. Yet the two funds' relative results flipped the next year, and as a result, participants were more likely to experience each fund's respective periods of underperformance than its period of outperformance.

91.    This illustration is not an anomaly. There are numerous asset classes in which the Fiduciary Defendants' inclusion of every non-identical Fidelity option created a horse-race mentality among participants, resulting in frequent trading by participants as they flocked towards the funds with superior recent performance, contrary to sound long-term investment practices. The Fiduciary Defendants could have averted these damaging behavioral trends by removing duplicative and otherwise imprudent funds from each asset category. Defendants' failure to do so is especially inexcusable given that the harmful consequences of these behavioral tendencies were evident among Plan participants for many years. The Fiduciary Defendants should have curated a menu of prudent options, rather than including duplicative and imprudent Fidelity funds that tempted participants to guess (and re-guess) which funds were worthwhile.

## VII. DEFENDANTS MISMANAGED THE PLAN'S CAPITAL-PRESERVATION FUNDS OUT OF SELF-INTEREST

92.    Every defined contribution plan is required to include a capital preservation option that offers current income without loss of principal. Fiduciaries are not required to offer any particular type of option, but instead are required to engage in a prudent and loyal process to evaluate and select the option(s) that best meet the needs of plan participants.

93.    Stable value funds are by far the most common capital preservation in large 401(k) plans. Like money market funds, stable value funds provide preservation of principal. And "[b]ecause they hold longer-duration instruments, [stable value funds] generally outperform money market funds, which invest exclusively in short-term securities." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); *see also* Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between Stable Value and Money Market*, 39 AKRON L. REV. 9, 20-27 (2006). These additional returns do not come with additional risk.  Even during the period of market turbulence in 2008, "stable value participants received point-to-point protection of principal, with no sacrifice of return[.]" Paul J. Donahue, *Stable Value Re-examined*, 54 RISKS AND REWARDS 26, 28 (Aug. 2009), *available at* http://www.soa.org/library/newsletters/risks-and-rewards/2009/august/rar-2009-iss54-donahue.pdf.

94.    A 2018 study from the Wharton School analyzed money market and stable value fund returns from the previous two decades and concluded that "any investor who preferred more wealth to less wealth should have avoided investing in money market funds when [stable value] funds were available, irrespective of risk preferences." David F. Babbel & Miguel A. Herce, *Stable Value Funds Performance*, at 16 (Feb. 21, 2018), *available at*

http://www.mdpi.com/2227-9091/6/1/12/pdf. Given the superior yields offered by stable value funds at comparable levels of risk, large 401(k) plans overwhelmingly choose stable value funds over money market funds. Chris Tobe, CFA, *Do Money-Market Funds Belong in 401(k)s?*, MarketWatch (Aug. 30, 2013), *available at* http://www.marketwatch.com/story/do-money-market-funds-belong-in-401ks-2013-08-30.

95.     Fidelity offers a stable value fund in the marketplace known as the Managed Income Portfolio. *See Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 3 (1st Cir. 2018). However, Defendants have not included this option in the Plan, because doing so would constitute a prohibited transaction to which no exemption would apply. *See* 29 U.S.C. § 1106(b)(1)-(3). As a result, in light of the Fiduciary Defendants' apparent policy of including nothing but Fidelity options in the Plan, the Fiduciary Defendants never investigated whether other stable value funds in the marketplace would have best served the needs of the Plan. Instead, the Fiduciary Defendants limited the Plan's capital preservation option to proprietary Fidelity money market mutual funds, which were the only Fidelity capital preservation offerings in the marketplace whose inclusion did not constitute a prohibited transaction.

96.     Throughout the relevant period, the Plan's capital preservation options have consisted exclusively of Fidelity-affiliated money market accounts that have earned little interest given the structural disadvantages associated with money market funds compared with other capital preservation options. Predictably, the Plan's money market funds vastly underperformed the average stable value fund during the statutory period.

| The Plan's Money Market Funds | Ticker | 2014 Return | 2015 Return | 2016 Return | 2017 Return |
|---|---|---|---|---|---|
| Fidelity Treasury Only Money Market | FDLXX | 1 bp | 1 bp | 1 bp | 47 bps |
| Fidelity Government Cash Reserves | FDRXX | 1 bp | 1 bp | 9 bps | 56 bps |
| Fidelity Government MMkt Prm | FZCXX | n/a | n/a | 13 bps | 61 bps |

| The Plan's Money Market Funds | Ticker | 2014 Return | 2015 Return | 2016 Return | 2017 Return |
|---|---|---|---|---|---|
| Fidelity Inv MM Fds Government Instl | FRGXX | n/a | 2 bps | 29 bps | 79 bps |
| Fidelity Inv MM Fds Money Market Instl | FNSXX | 9 bps | 15 bps | 53 bps | 118 bps |
| Fidelity Inv MM Fds Treasury Instl | FRBXX | n/a | 2 bps | 24 bps | 78 bps |
| Fidelity Inv MM Fds Treasury Only Instl | FRSXX | n/a | 1 bps | 21 bps | 75 bps |
| Fidelity Money Market Premium | FZDXX | n/a | n/a | 48 bps | 101 bps |
| Fidelity Retirement Gov. Money Market | FGMXX | 1 bp | 1 bp | n/a | n/a |
| Fidelity Retirement Gov. Money Market II (f/k/a Retirement Money Mkt) | FRTXX | 1 bp | 2 bps | n/a | n/a |
| Fidelity Treasury Money Market | FZFXX | n/a | n/a | 2 bps | 51 bps |
| Fidelity U.S. Government Reserves | FGRXX | 1 bp | n/a | n/a | n/a |

| Average Stable Value Fund | 2014 Return | 2015 Return | 2016 Return | 2017 Return |
|---|---|---|---|---|
| Hueler Index[14] | 169 bps | 177 bps | 179 bps | 200 bps |

97.     Had the Fiduciary Defendants managed the Plan's capital preservation options in a prudent and loyal manner, they would have investigated nonproprietary stable value offerings in the marketplace. Such an investigation would have revealed the availability of stable value vehicles that earned much better returns than the proprietary money market funds in the Plan at comparable or lower levels of risk. The Fiduciary Defendants' failure to engage in such an investigation and subsequently act in the best interests of participants has cost Plan participants millions of dollars.

---

[14] Hueler Analytics and its Hueler Index are the industry standard for reporting and measuring returns of stable value funds. "The Hueler Analytics Stable Value Pooled Fund Universe includes data on 15 funds nationwide with assets totaling over $105 billion." *See* http://hueler.com. Hueler data therefore represents a reasonable estimate of the returns of a typical stable value fund. *See also Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 810 (7th Cir. 2013) (approving of Hueler Index as a "basis for calculating damages" for a claim related to stable value funds and money market funds).

## VIII.   DEFENDANTS DO NOT REFUND THE PLAN'S FEES TO EMPLOYEES

98.     ERISA does not require employers to offer a defined contribution plan to their employees, nor does ERISA interfere with employers' corporate decisions to amend, contribute to, or terminate a particular benefit plan. *Vartanian v. Monsanto Co.*, 880 F. Supp. 63, 68 (D. Mass. 1995). But while "[e]mployers are not required to establish employee benefit plans,…if they choose to do so, they must abide by ERISA." *In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 757 (S.D.N.Y. 2003). And just as employers cannot be held liable for settlor decisions to cease discretionary contributions to or terminate a defined contribution plan, employers that elect to make discretionary contributions to plan participants' accounts do not receive any "extra credit" under ERISA for doing so. *See Nedd v. United Mine Workers of Am.*, 556 F.2d 190, 213-14 (3d Cir. 1977) (rejecting employer argument for liability offset for contributions to ERISA plan under trust law principle that a trustee cannot set off the amount of its gifts to a trust against its liability for breach).

99.     Like many employers, Fidelity makes annual profit sharing contributions to participants in its defined contribution plan. Fidelity makes both discretionary profit sharing contributions (which may vary year-to-year) and matching contributions (which match the amount of each employee's own contribution).

100.    For several years prior to 2012, Fidelity made discretionary contributions to participant accounts equal to 10% of participants' compensation. For example, the Plan's Form 5500 from 2011 stated:

> The Company contributes annually to the Plan through a profit sharing contribution equal to a percentage of participating employees' eligible compensation as determined by the Board of Directors. In 2011 and 2010, the Company contributed 10% of participating employees' eligible compensation.

101.    In 2012, according to the Plan's Form 5500, Fidelity continued to make discretionary contributions equal to 10% of participants' eligible compensation, but began characterizing a portion of this contribution as a "refund" of investment management fees paid by participants the prior year.

> The Company contributes annually to the Plan.  In 2011, the Company contributed a discretionary profit sharing contribution equal to 10% of participating employees' eligible compensation as determined by the Board of Directors.  In 2012, the profit sharing contribution was amended to include a non-discretionary portion that approximates the revenue the Company receives in connection with the investment options offered under the Plan and a discretionary portion which, when combined, results in an allocation of a percentage of participating employees' eligible compensation.  In 2012, the Company contributed 10% of participating employees' eligible compensation as a profit sharing contribution.

Ostensibly, Fidelity was now refunding all investment management fees to Plan participants, making the Plan's investment options supposedly cost-free.

102.    But in reality, this "refund" was a poorly-disguised gimmick that provided no benefit to Plan participants. Fidelity took money that it was going to contribute anyway and recharacterized a portion of it as a fee "refund." Thus, for every dollar in investment management fees that Fidelity gave back to Plan participants, Fidelity reduced its profit sharing contribution to participants by the same amount.

103.    Fidelity has made a 10% profit sharing contribution to plan participants every year since at least 2008. If, beginning in 2012, Fidelity had *added* the amount of the Plan's investment management fees to its profit sharing contributions, then the amount of those profit sharing contributions would have increased. Instead, the amount of Fidelity's profit sharing contributions remained the exact same as before the 2012 "refund": 10% each year.

104.    Fidelity has simply reduced its discretionary profit sharing contribution amount each year by the amount of its non-discretionary "refund" of Plan investment management fees. This explains why, despite a 33% increase in the amount of investment management fees

"refunded" by Fidelity between 2013 and 2016, Fidelity's profit sharing contributions have remained unchanged, at 10% of employees' eligible compensation. Plan participants did not gain a dime from Fidelity's accounting maneuver.

105.   Fidelity operates within an extremely competitive industry in which employee talent represents a company's most valuable and precious resource. Fidelity's 10% discretionary profit sharing contribution is not a gift, but instead an important part of the compensation package adopted by Fidelity to attract new talent and to retain its existing employees. This amount is in line with the discretionary profit sharing paid by other asset management companies located in Boston such as MFS, Putnam Investments, State Street Corporation, and Wellington Management, with which Fidelity competes for both assets and talent. As a result of Fidelity's competitive situation, with or without the fee refund provision in the Plan, Fidelity would have made the same 10% discretionary profit sharing contribution during the relevant period as a matter of competitive necessity.

106.   Fidelity created this "fee refund" artifice in an attempt to obscure its fiduciary misconduct. Fortunately, ERISA case law does not allow employers to use such gimmicks to evade fiduciary liability. Under trust law, an employer's decision to contribute to employee retirement accounts (and in what amount) is a settlor function that is separate and distinct from the functions of a plan fiduciary. *See* Lee T. Polk, 1 ERISA Practice and Litigation § 3:32 (Feb. 2017 update) (stating that "decisions relating to the timing and amount of contributions" are generally nonfiduciary decisions); *Coulter v. Morgan Stanley & Co. Inc.*, 753 F.3d 361, 367 (2d Cir. 2014) ("'Settlor' functions…include conduct such as establishing, *funding*, amending, or terminating a plan.") (emphasis added).

IX.    PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND PRUDENT ALTERNATIVES

107.   Plaintiffs did not have knowledge of all material facts (including, among other things, the investment option and menu choices of fiduciaries of similar plans, the costs of the Plan's investments compared to those in similarly-sized plans, the overall costs of the Plan compared to similarly-sized plans, the availability of superior options that satisfied the goals of the Plan, and other information set forth above) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed. Further, Plaintiffs did not have actual knowledge of the specifics of the Fiduciary Defendants' decision-making processes with respect to the Plan (including the Fiduciary Defendants' processes for determining which asset classes to include among the Plan's designated investment alternatives as well as the Fiduciary Defendants' processes for selecting, monitoring, evaluating, and removing Plan investments), because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

108.   29 U.S.C. § 1132(a)(2) authorizes any ERISA plan participant or beneficiary to bring an action on behalf of the Plan to obtain the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

109.     Plaintiffs assert their claims on behalf of a class of participants and beneficiaries defined as follows:[15]

> All participants and beneficiaries of the FMR LLC Profit Sharing Plan or the Fidelity Retirement Savings Plan at any time after the effective date of the *Bilewicz* settlement, excluding Defendants and employees with direct responsibility for the Plan's investment or administrative functions.

110.     <u>Numerosity</u>:   The Class is so numerous that joinder of all Class members is impracticable. The Plan had approximately 30,000 to 40,000 participants during the applicable period.

111.     <u>Typicality</u>:     Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are Plan participants and suffered injuries as a result of Defendants' mismanagement of the Plan. The Fiduciary Defendants treated Plaintiffs consistently with other Class members with regard to the Plan. The Fiduciary Defendants' imprudent and disloyal decisions affected all Plan participants similarly.

112.     <u>Adequacy</u>:     Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and Plaintiffs have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

113.     <u>Commonality</u>:   Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members, including but not limited to:

---

[15] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

a.  Which of the Fiduciary Defendants are fiduciaries of the Plan;

b.  Whether the Fiduciary Defendants breached their fiduciary duties by engaging in the conduct described herein;

c.  Whether the Fiduciary Defendants are additionally or alternatively liable, as co-fiduciaries, for the unlawful conduct described herein pursuant to 29 U.S.C. § 1105;

d.  Whether FMR LLC breached its duty to monitor other Plan fiduciaries;

e.  Whether the Entity Defendants had actual or constructive knowledge of the fiduciary breaches of the Fiduciary Defendants;

f.  The proper form of equitable and injunctive relief; and

g.  The proper measure of monetary relief.

114.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

115.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as removal of particular Plan investments, removal of a Plan fiduciary, or appointment of an independent fiduciary to oversee the Plan, would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

116.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
**Breach of Duties of Loyalty and Prudence**
**29 U.S.C. § 1104(a)(1)(A)–(B), (D)**
**As to the Fiduciary Defendants**

117.    Defendants FMR LLC; FMR LLC Retirement Committee; and John and Jane Does 1–20 are or were fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

118.    29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon the Fiduciary Defendants in their administration of the Plan and in their selection and monitoring of Plan investments.

119.    The scope of the fiduciary duties and responsibilities of the Fiduciary Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants

and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. The Fiduciary Defendants were directly responsible for ensuring that the Plan's fees were reasonable, selecting investment options in a prudent fashion in the best interest of Plan participants, prudently evaluating and monitoring the Plan's investments on an ongoing basis and eliminating funds that did not serve the best interest of Plan participants, and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately. This includes "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

120.   As described throughout this Complaint, the Fiduciary Defendants failed to employ a prudent and loyal process for selecting, monitoring, and reviewing the Plan's designated investment alternatives by prioritizing Fidelity's proprietary investments over superior available options, and by failing to critically or objectively evaluate the cost and performance of the Plan's proprietary investments in comparison to other investment options. The Fiduciary Defendants imprudently and disloyally retained higher-cost Fidelity mutual funds despite the availability of lower-cost investments and lower-cost share classes that offered comparable or superior investment management services. The Fiduciary Defendants instead selected and retained options that benefited Fidelity but offered little or no benefit to participants compared to superior options available in the marketplace. Additionally, the Fiduciary Defendants failed to investigate the use of separate accounts or collective trusts, and failed to procure available revenue sharing rebates for the mutual funds that were used instead. Further, the Fiduciary Defendants structured the Plan menu without considering the interests of participants, and failed to change the Plan's structure despite participants' consistent underperformance due to return-chasing across the Plan's vast menu of redundant investment

options. Moreover, the Fiduciary Defendants failed to monitor the Plan's investments and remove those that were imprudent, including investments that were duplicative of other, less expensive funds in the Plan and sector funds that offered no diversification benefit.

121.    Each of the above-mentioned actions and failures to act described in paragraph 120 and throughout the Complaint demonstrates the Fiduciary Defendants' failure to make Plan investment decisions based solely on the merits of each investment and in the best interest of Plan participants, instead selecting and retaining Plan investments based upon the affiliation of each investment with Fidelity, while failing to investigate alternative investments affiliated with other managers. Further, even aside from their failure to consider alternative investments from other companies, the Fiduciary Defendants failed to properly screen and monitor Fidelity's own in-house offerings to eliminate imprudent and/or duplicative funds, ensure the plan was invested in the lowest-cost share classes and investment vehicles, and procure available revenue sharing rebates. Through these actions and omissions, the Fiduciary Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

122.    Each of the above actions and omissions described in paragraphs 120-21 and elsewhere in this Complaint demonstrate that the Fiduciary Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

123.    Each Fiduciary Defendant is personally liable, and the Fiduciary Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, the Fiduciary Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(3).

124.    Each Fiduciary Defendant knowingly participated in each breach of the other Fiduciary Defendants, knowing that such acts were a breach; enabled the other Fiduciary Defendants to commit breaches by failing to lawfully discharge such Fiduciary Defendant's own duties; and/or knew of the breaches by the other Fiduciary Defendants, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Fiduciary Defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT II
### Failure to Monitor Fiduciaries
### As to FMR LLC

125.    As alleged throughout the Complaint, FMR LLC and the Retirement Committee are fiduciaries of the Plan pursuant to 29 U.S.C. § 1002(21).

126.    FMR LLC, through its senior officer for human resources, is responsible for appointing and removing members of the Retirement Committee.

127.    Given that FMR LLC had overall oversight responsibility for the Plan, and the fiduciary duty to appoint and remove members of the Retirement Committee through its senior officer for human resources, FMR LLC had a fiduciary responsibility to monitor the performance of the Committee.

128.     A monitoring fiduciary must ensure that the monitored fiduciaries are fulfilling their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries are not meeting their fiduciary obligations.

129.     FMR LLC breached its fiduciary monitoring duties by, among other things:

    a.   Failing to monitor and evaluate the performance of the Retirement Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions with respect to the Plan;

    b.   Failing to monitor the Retirement Committee's fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein; and

    c.   Failing to remove Retirement Committee members whose performance was inadequate in that they continued to recommend retention of imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

130.     As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses per year due to excessive fees and investment underperformance.

131.     Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), FMR LLC is liable to restore to the Plan all losses suffered as a result of its failure to properly monitor the Committee and its members, and subsequent failure to take prompt and effective action to rectify

any observed fiduciary breaches.  In addition, FMR LLC is liable for an accounting of profits and other equitable relief as provided by 29 U.S.C. §§ 1109(a) and 1132(a)(3).

**COUNT III**
**Other Equitable Relief Based on Ill-Gotten Proceeds**
**29 U.S.C. § 1132(a)(3)**
**As to the Entity Defendants**

132.    Under 29 U.S.C. § 1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. A defendant may be liable under this section regardless of whether it is a fiduciary. A non-fiduciary transferee of ill-gotten proceeds is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

133.    Defendants FMR LLC, FMR, FMRC, and FIIOC each profited from the Plan's investments in Fidelity-affiliated mutual funds.

134.    All payments to Fidelity made in connection with Plan assets are in the current possession of Fidelity, and are traceable to specific transactions that have taken place on specific dates.

135.    Pursuant to 29 U.S.C. § 1132(a)(3), each of the Entity Defendants should be required to disgorge all profits it received during the relevant class period as a result of the Plan's investments in Fidelity-affiliated mutual funds. The selection and retention of these proprietary mutual funds was imprudent and violated ERISA based on the facts set forth herein. Moreover, as detailed throughout the Complaint, each Entity Defendant had actual or constructive knowledge of circumstances rendering the selection and retention of these proprietary funds (and the payments that Fidelity received from these proprietary funds) unlawful, by virtue of:

(a)    the Board members and Committee members with executive positions at each of the Entity Defendants;

(b)     other dual-hatted employees;

(c)     the affiliation of the Entity Defendants with a common parent and one another;

(d)     the investment management and recordkeeping services that the various Entity Defendants provided to the Plan;

(e)     each Entity Defendant's participation in the Plan as an employer with employees in the Plan; and

(f)     the general operational interconnectedness of the Entity Defendants as part of Fidelity's entire enterprise.

136.    In light of the above facts and other facts likely to be revealed through discovery, the Entity Defendants had actual or constructive knowledge of the process for selecting and monitoring the investments in the Plan, and knew that the Fiduciary Defendants failed to engage in a prudent and loyal selection and monitoring processes. The Entity Defendants also knew that the proprietary investments in the Plan were excessively costly compared to investments in similarly-sized plans and likewise performed poorly in comparison to other investment alternatives used by similarly-sized plans.

137.    Given their knowledge of these fiduciary breaches, the Entity Defendants had actual or constructive knowledge that the monies they were receiving from or in connection with Plan assets were being received as a result of violations of ERISA by the Fiduciary Defendants.

138.    Therefore, to the extent any ill-gotten profits are not disgorged under the relief provisions of 29 U.S.C. § 1109(a), the Court should order appropriate equitable relief under 29 U.S.C. § 1132(a)(3) to disgorge these profits from the Entity Defendants under principles of unjust enrichment and equitable restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Moitoso, Lewis, and Torline, individually and as representatives of the Class defined herein, pray for relief as follows:

A.   A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.   Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.   A declaration that the Fiduciary Defendants have breached their fiduciary duties under ERISA;

D.   An order compelling the Fiduciary Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described above, and to restore the Plan to the position it would have been in but for this unlawful conduct;

E.   An accounting for profits earned by the Entity Defendants and a subsequent order requiring the Entity Defendants to disgorge all revenues received from, or in respect of, the Plan;

F.   An order granting equitable restitution and other appropriate equitable monetary relief against the Entity Defendants including, but not limited to, imposition of a constructive trust on all profits earned by the Entity Defendants as a result of the Fiduciary Defendants' unlawful conduct in violation of ERISA or a surcharge against the Entity Defendants to prevent their unjust enrichment;

G.   An order enjoining the Fiduciary Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.   Other equitable relief to redress the Fiduciary Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan; transfer of Plan assets out of imprudent investments into prudent alternatives; and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.   An award of pre-judgment interest;

J.     An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

K.     An award of such other and further relief as the Court deems equitable and just.

October 10, 2018                       Respectfully submitted,

**BLOCK & LEVITON LLP**

/s/ Jason M. Leviton
Jason M. Leviton (BBO #678331)
Jacob A. Walker (BBO #688074)
155 Federal Street, Ste. 400
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
jason@blockesq.com

**NICHOLS KASTER, PLLP**
Kai H. Richter, MN Bar No. 0296545*
Paul J. Lukas, MN Bar No. 22084X*
Carl F. Engstrom, MN Bar No. 0396298*
Mark E. Thomson, MN Bar No. 0398260*
     * *pro hac vice* application forthcoming
4600 IDS Center
80 S. 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
krichter@nka.com
lukas@nka.com
cengstrom@nka.com
mthomson@nka.com

*Attorneys for Plaintiffs*