# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Kevin Moitoso, Tim Lewis, Mary Lee Torline, and Sheryl Arndt, individually and as representatives of a class of similarly situated persons, and on behalf of the Fidelity Retirement Savings Plan, | Case No. 1:18-cv-12122-WGY |
| Plaintiffs, | **THIRD AMENDED COMPLAINT** |
| v. | **CLASS ACTION** |
| FMR LLC, the FMR LLC Funded Benefits Investment Committee, the FMR LLC Retirement Committee, Fidelity Management & Research Company, FMR Co., Inc., Fidelity Investments Institutional Operations Company, Inc., and Strategic Advisers, Inc., | JURY TRIAL DEMANDED LEAVE TO FILE GRANTED ON MARCH 25, 2019 |
| Defendants. | |

## NATURE OF THE ACTION

1.      Plaintiffs Kevin Moitoso, Tim Lewis, Mary Lee Torline, and Sheryl Arndt ("Plaintiffs") individually and as representatives of the class of former employees described herein,[1] and on behalf of the Fidelity Retirement Savings Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA").

2.      Plaintiffs assert their class claims against three sets of Defendants: (1) the Plan's fiduciaries—FMR LLC, the FMR LLC Funded Benefits Investment Committee ("FBIC") and the FMR LLC Retirement Committee ("Retirement Committee") (together, the "Plan

---

[1] Plaintiff Torline also brings certain claims on behalf of a sub-class of these former employees.

Fiduciaries")[2]—who failed to manage the Plan in a prudent and loyal manner; (2) Strategic Advisers, Inc. ("SAI"), which failed to employ a prudent and loyal process in its operation of the Plan's managed accounts service; and (3) certain Fidelity entities—FMR LLC, Fidelity Management & Research Company ("FMR"), FMR Co., Inc. ("FMRC"), and Fidelity Investments Institutional Operations Company, Inc. ("FIIOC") (together, the "Entity Defendants")—which profited as a result of the unlawful conduct described herein.

3.      Among other things, Plaintiffs allege that the Plan Fiduciaries violated ERISA by populating the Plan exclusively with Fidelity mutual funds, failing to monitor the performance of those funds, failing to negotiate reasonable recordkeeping fees or revenue sharing rebates, and failing to properly monitor the Plan's managed accounts program (which was run by SAI), resulting in the payment of grossly excessive fees to Fidelity and significant losses to the Plan. Fidelity attempted to mitigate the harmful effects of this conduct with an annual "Revenue Credit" equal to the total fees the Plan paid to Fidelity each year. But Fidelity paid this Revenue Credit exclusively to current employees in the form of a discretionary employer contribution, thus paying nothing to the more than 15,000 former employees who remained in the Plan and were subject to Fidelity's abuses in connection with the Plan. Plaintiffs bring this action on behalf of a class of former employees to remedy this unlawful conduct, prevent further mismanagement of the Plan, and obtain other relief as provided by ERISA.

---

[2] FMR LLC, its subsidiaries, and its affiliates collectively do business as "Fidelity Investments". For purposes of the Second Amended Complaint, these entities shall collectively be referred to as "Fidelity".

## PRELIMINARY STATEMENT

4.      As of the end of 2016, Americans had over $7 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans. *See* Pensions & Investments, *U.S. Retirement assets at $28 trillion in Q1, little changed from end of 2017* (June 21, 2018), *available at* http://www.pionline.com/article/20180621/INTERACTIVE/180629958/us-retirement-assets-at-28-trillion-in-q1-little-changed-from-end-of-2017. Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations. *See* Bankrate, *Pensions Decline as 401(k) Plans Multiply* (July 24, 2014), *available at* https://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-plans-multiply-1.aspx. By 2012, approximately 98% of employers offered defined contribution plans to their current employees, whereas only 3% offered pension plans. *Id.*

5.      The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments. But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). Thus, the employer has no incentive to keep costs low or to closely monitor the plan to ensure every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the employee.

3

6.      The real-life effect of such imprudence on workers can be severe. According to one study, the average working household with a defined contribution plan will lose $154,794 to fees and lost returns over a 40-year career. See Melanie Hicken, *Your employer may cost you $100k in retirement savings*, CNN Money (June 1, 2014), *available at* http://money.cnn.com/2013/03/27/retirement/401k-fees. Put another way, excessive fees can force a worker to work an extra five to six years to make up for the excess fees that were paid.

7.      For financial service companies like Fidelity, the potential for imprudent and disloyal conduct is especially high, because the plan's fiduciaries are in a position to benefit the company through the plan's investment decisions by, for example, filling the plan with proprietary investment products that an objective and prudent fiduciary would not choose.

8.      To safeguard against the financial incentives for disloyalty and imprudence in defined contribution plans, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000) (citation and internal quotation marks omitted).

9.      The Plan Fiduciaries have not come close to meeting their fiduciary obligations. As of the end of 2017, the Plan had over $17 billion in assets, making it one of the 20 largest

private sector defined contribution plans in the United States. Yet, the Plan Fiduciaries treated it as little more than an arm of the family business. As a result, among the 20 defined contribution plans with over $5 billion in assets for which necessary data was available, Fidelity's plan performed the worst (almost three times worse than average), with over $100 million per year in losses compared to the average plan.

10.     The Plan Fiduciaries have not managed the Plan with the care, skill, or diligence one would expect of a plan this size. Instead, they have used the Plan to promote Fidelity's mutual fund business at the expense of the Plan and its participants. The Plan Fiduciaries loaded the Plan exclusively with Fidelity mutual funds, without investigating whether Plan participants would have been better served by investments managed by unaffiliated companies. Moreover, the Plan Fiduciaries have included almost every non-identical Fidelity mutual fund in the Plan's investment lineup (hundreds in total), many of which were inappropriate offerings due to their poor performance, high fees, lack of diversification, or speculative nature.

11.     To make matters worse, the Plan's managed accounts service (which was managed by Fidelity's subsidiary, SAI) imprudently managed the investments of participants who signed up for the service. Among other things, this managed accounts service was designed to prioritize high-fee, actively-managed funds over lower-fee index funds that were likely to perform better but were not as profitable to Fidelity. Furthermore, the Plan Fiduciaries never investigated alternative versions of the service offered by SAI that would have placed participants in lower-fee investments. This self-serving conduct has dragged down the performance of over 30 percent of the Plan's assets enrolled in the service.

12.     Further, the Plan Fiduciaries failed to prudently monitor and control the Plan's recordkeeping expenses, and failed to obtain revenue sharing rebates and fee credits (which

Fidelity made available to its other retirement plan customers) that could have been passed on to Plan participants. As a result, the Plan's recordkeeping expenses were more than 10 times the amount that similarly-sized plans paid on a per-participant basis.

13.     Notably, the Plan's high fees and poor performance were hidden from Plan participants in violation of ERISA's disclosure requirements. In 2012, the Department of Labor began requiring employers to provide participants with periodic disclosures of the performance and expenses associated with each "designated investment alternative" in the plan, defined as "*any* investment alternative designated by the plan into which participants…may direct the investment of assets held in, or contributed to, their individual accounts." 29 C.F.R. § 2550.404a-5(h)(4). In a transparent ploy to evade legal liability, Fidelity amended its Plan Document in 2014 to define only two of the Plan's investment options as "designated investment alternatives," even though Fidelity continued to make hundreds of other proprietary mutual funds available to participants, and these funds continued to hold over 85 percent of the Plan's assets (which were over $12 billion as of August 2014). This scheme hurt Plan participants in two ways. First, the Plan Fiduciaries completely abandoned any monitoring of the vast majority of the Plan's investment options. Second, Fidelity ceased providing required disclosures as to almost all investment options, despite Plan participants' continued investment in them. This self-serving maneuver deprived participants of valuable information about the cost and performance of their investments, which was necessary for them to make informed choices about their retirement savings.

14.     The Plan Fiduciaries know better. As the nation's largest retirement plan recordkeeper, Fidelity has all of the data and resident expertise necessary to build a plan in participants' best interests, yet the Plan Fiduciaries made no effort to do so. Further, the Plan

Fiduciaries know that their conduct is illegal, having quickly settled a similar lawsuit less than four years ago for an eight-figure sum. *See Bilewicz v. FMR LLC, et al.*, No. 1:13-cv-10636, ECF No. 72 (D. Mass. Oct. 16, 2014).

15.     Although all participants in the Plan were damaged by Fidelity's disloyal and imprudent conduct, former employees within the Plan were particularly harmed.[3] During the class period, Fidelity calculated a "Revenue Credit" at the end of each year, in an amount approximating the total investment fees paid by all of the Plan's participants. But rather than simply refunding these fees to the participants that actually incurred them, Fidelity instead paid out this "Revenue Credit" to its current employees as part of its year-end profit sharing program.[4] Yet, the approximately 19,000 former employees still participating in the Plan received nothing. Thus, Fidelity shifted the Plan's excessive fees to its least powerful constituency: people who no longer had a voice in Fidelity's business. Adding insult to injury, the Plan Fiduciaries then used the Revenue Credit as justification for abandoning any efforts to manage the Plan's investment and recordkeeping expenses.

16.     The Plan Fiduciaries' mismanagement of the Plan and prioritization of Fidelity's profits over the interests of Plan participants and beneficiaries constitutes a breach of their fiduciary duties, and is unlawful. Additionally, the direct and indirect transfer of Plan assets to FMR LLC in connection with transactions involving the assets of the Plan constituted prohibited transactions in violation of 29 U.S.C. § 1106(b)(3). Based on this conduct, Plaintiffs assert

---

[3] As of the end of 2017, the Plan had approximately 57,000 participants with account balances, consisting of approximately 38,000 current Fidelity employees and 19,000 former employees. Former employees' Plan assets constituted approximately $5 billion as of the end of 2017.

[4] The Revenue Credit was largely an accounting gimmick, as the total amount of profit sharing remained the same before and after the Revenue Credit, and was targeted to 10% of employee compensation.

claims against the Plan Fiduciaries for breach of the fiduciary duties of prudence and loyalty (Count One), breach of the fiduciary duty of impartiality (Count Two), inadequate disclosures (Count Three), engaging in prohibited transactions with a fiduciary (Count Five), and failure to monitor fiduciaries (Count Six – asserted against FMR LLC only). In addition, Plaintiffs assert a claim against SAI and the Plan Fiduciaries for breach of the fiduciary duties of prudence and loyalty related to the Plan's managed accounts service (Count Four), and a claim against the Entity Defendants for equitable disgorgement of ill-gotten profits (Count Seven).

## JURISDICTION AND VENUE

17.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

18.     This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

19.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

## THE PARTIES

### PLAINTIFFS

20.     Plaintiff Kevin Moitoso ("Moitoso") resides in Marlborough, Massachusetts and was a participant in the Plan from 2007 until 2016. Moitoso's employment with Fidelity ended in May 2014. While a participant, Moitoso was invested in several of the Plan's investment options, such as Fidelity Mid Cap II, Fidelity Advisor New Insights, Fidelity Emerging Markets, Fidelity

Diversified International, and several of the Fidelity Select sector funds. His account was also recordkept by Fidelity. Moitoso's account would have been worth more at the time it was distributed from the Plan had Defendants not violated ERISA as described herein.

21.     Plaintiff Tim Lewis ("Lewis") resides in Carlsbad, California and was a participant in the Plan from 2007 until 2017. Lewis's employment with Fidelity ended in 2016, roughly a year before his participation in the Plan ended. While a participant, Lewis was invested in several of the Plan's investment options, such as Fidelity Freedom 2040 and Fidelity Government Money Market. His account was also recordkept by Fidelity. Lewis's account would have been worth more at the time it was distributed from the Plan had Defendants not violated ERISA as described herein.

22.     Plaintiff Mary Lee Torline ("Torline") resides in California, Kentucky and was a participant in the Plan from 1999 until January 2018. Torline's employment with Fidelity ended in mid-2017. While a participant, Torline was invested in several funds offered within the Plan, such as Fidelity Focused High Income, Fidelity Contrafund, Fidelity Export & Multinational, Fidelity Growth Strategies, Fidelity Mid Cap Stock, and Fidelity Growth & Income. Her account was also recordkept by Fidelity. Torline's account would have been worth more at the time it was distributed from the Plan had Defendants not violated ERISA as described herein.

23.     Torline was enrolled in the Fidelity Portfolio Advisory Service at Work (PAS-W) managed accounts program, whereby participants are invested in a model portfolio based upon their demographic information and certain participant input. In the marketplace, Fidelity offers plan sponsors multiple versions of this service, one of which (named PAS-W Index) invests participants in low-cost index funds. *See* Fidelity Investments, *Fidelity Personalized Planning & Advice*, *available at* https://workplace.fidelity.com/sites/default/files/index-and-core-investment-

offerings.pdf. Yet the Plan Fiduciaries only offered the version of this service that directed the large majority of participants' assets to higher-cost actively-managed mutual funds. Thus, at all relevant times, more than 85% of Plaintiff Torline's portfolio consisted of higher-fee, actively-managed, Fidelity mutual funds.

24.     Plaintiff Sheryl Arndt ("Arndt") resides in Albuquerque, New Mexico, and has been a participant in the Plan from 2014 to the present. Ms. Arndt's employment with Fidelity ended in 2015. Ms. Arndt is invested in several funds offered within the Plan, such as Fidelity Small Cap Value, Fidelity Emerging Markets, Fidelity Contrafund, Fidelity Low-Priced Stock, Fidelity Select Healthcare, and Fidelity Select Communication Services. Her account is also recordkept by Fidelity. Arndt's account would be worth more had Defendants not violated ERISA as described herein.

**DEFENDANTS**

*FMR LLC*

25.     Defendant FMR LLC is a financial services conglomerate headquartered in Boston, Massachusetts. FMR LLC is the "plan sponsor" of the Plan within the meaning of 29 U.S.C. § 1002(16)(B). FMR LLC is also a "named fiduciary" pursuant to 29 U.S.C. § 1102(a) with respect to the Plan because it is identified in the Plan Document as having ultimate authority to control and manage the operation and administration of the Plan. FMR LLC is also a Plan employer for the Plan. FMR LLC exercises discretionary authority or discretionary control with respect to management of the Plan, and is therefore a fiduciary under 29 U.S.C. § 1002(21)(A).

26.     FMR LLC is also a fiduciary because it has authority to appoint and remove members of the Committees. All members of the Committees were appointed by FMR LLC's senior officer for human resources. It is well-accepted that the authority to appoint, retain, and

remove plan fiduciaries constitutes discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). 29 C.F.R. § 2509.75-8 (D-4); *Norton Co. v. John Hancock Mut. Life Ins. Co.*, 1992 WL 237410, at *6 (D. Mass. Sept. 14, 1992) ("An employer has a fiduciary duty when it appoints other fiduciaries, such as a pension committee."); *Kling v. Fidelity Mgmt. Trust Co.*, 323 F. Supp. 2d 132, 142 (D. Mass. 2004) (appointment authority confers fiduciary status). The responsibility for appointing and removing members of retirement plan committees carries with it an accompanying duty to monitor the appointed fiduciaries, and to ensure that they are complying with the terms of the Plan and ERISA's statutory standards.

27.     FMR LLC also had supervisory authority over the Committees through its appointment of senior management to the Committees. *See Sharp v. Coopers & Lybrand*, 649 F.2d 175, 182 n.8 (3d Cir. 1981) ("Officers are able to make policy and generally carry authority to bind the corporation. Their action in behalf of the corporation is therefore primary, and holding a corporation liable for their actions does not require respondeat superior."). For this reason as well, FMR LLC exercises discretionary authority or discretionary control with respect to management and administration of the Plan and disposition of Plan assets, and is a fiduciary under 29 U.S.C. § 1002(21)(A).

### *FMR LLC Board of Directors*

28.     FMR LLC's Board of Directors (the "Board") is the governing body that oversees the activities and discharges the legal obligations of FMR LLC, including the duties identified above with respect to the Plan. The Plan Document provides that FMR LLC acts through the Board when discharging duties with respect to the Plan. *See* FMR LLC Profit Sharing Plan, 2014 Restatement (hereafter, "Plan Document") (attached hereto as Exhibit 1), at § 2.53 ("'Investment

Committee' means the committee assigned responsibility by the Board of Directors for the selection of investment options available under the Plan")[5]; *id.*, § 2.76 ("'Retirement Committee' means the committee assigned responsibility by the Board of Directors for the operation and administration of the Plan…."); *id.*, § 13.1 ("[FMR LLC] reserves the right at any time and from time to time to modify, amend or terminate the Plan or any of its provisions as to all Participating Companies, by executing an instrument in writing by authorization of the Board of Directors…."). FBIC minutes further demonstrate that the Board was responsible for adding new investments to the Plan, even though the Board may not have been delegated this authority under the Plan Document. Actions, omissions, and duties attributed to FMR LLC throughout this Second Amended Complaint therefore also refer to the Board. Because the Board exercises FMR LLC's discretionary authority or discretionary control with respect to management and administration of the Plan and disposition of Plan assets, the Board is a fiduciary under 29 U.S.C. § 1002(21)(A).

### FMR LLC Funded Benefits Investment Committee

29.     The FBIC is designated by the Plan Document to assist FMR LLC with administration of the Plan. The FBIC is a "named fiduciary" and "administrator" of the Plan identified by the Plan Document. *See* 29 U.S.C. §§ 1002(16)(A)(i) & 1102(a). The members of the FBIC are appointed by FMR LLC's senior officer for human resources. The FBIC has the duty to select, monitor, evaluate, and modify the Plan's investment options, subject to the ultimate oversight and discretion of FMR LLC. In performance of its duties, the FBIC exercises "authority or control respecting management or disposition of the Plan's assets" and is therefore

---

[5] The Investment Committee's name was later changed to the FMR LLC Funded Benefits Investment Committee.

a fiduciary under 29 U.S.C. § 1002(21)(A).

**FMR LLC Retirement Committee**

30.     The Retirement Committee is designated by the Plan Document to assist FMR LLC with administration of the Plan. The Retirement Committee is a "named fiduciary" and "administrator" of the Plan identified by the Plan Document. *See* 29 U.S.C. §§ 1002(16)(A)(i) & 1102(a). The members of the Retirement Committee are appointed by FMR LLC's senior officer for human resources. The Retirement Committee has the "authority and obligation to control and manage the operation and administration of the Plan." Plan Document, § 11.1. This included responsibility for overseeing the performance of FIIOC, as the Plan's recordkeeper, including the negotiation and review of its compensation.  In the performance of its duties, the Retirement Committee exercises "discretionary authority or discretionary responsibility in the administration of" the Plan " and is therefore a fiduciary under 29 U.S.C. § 1002(21)(A)(iii).

31.     Each Defendant identified above as a Plan fiduciary is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

**Fidelity Management & Research Company**

32.     Defendant Fidelity Management & Research Company ("FMR") is a wholly-owned subsidiary of FMR LLC and a plan employer. At all relevant times, FMR served as the investment advisor to hundreds of Fidelity mutual funds held within the Plan. At all relevant times, FMR has collected fees from Plan assets invested in Fidelity investment products. These fees were generally paid in transactions that took place on a monthly basis, were paid as a

percentage of the assets invested in each fund in the Plan that FMR advised, and generated profits for FMR and its parent FMR LLC that were earned at the expense of the Plan and its participants.

33.     Because FMR provides services to the Plan and is a Plan employer, FMR is a "party in interest" pursuant to 29 U.S.C. § 1002(14). FMR possesses any actual or constructive knowledge possessed by FMR LLC. As disclosed in Statements of Additional Information for multiple Fidelity mutual funds, numerous directors of the Fidelity Funds are also officers and/or directors of FMR LLC and FMR. For example, Charles S. Morrison, a Trustee to numerous Fidelity funds, is the current President of FMR, President of Asset Management at FMR LLC, and director for other FMR LLC subsidiaries. Likewise, James C. Curvey, a Trustee to numerous Fidelity funds, is also the current Vice Chairman and Director of FMR LLC and a Director of FMR, and previously served simultaneously as President and Chief Operating Officer of FMR LLC. Given the interconnected nature of FMR, FMR LLC, and other FMR LLC subsidiaries, FMR had actual and constructive knowledge that the revenues it was receiving from Plan assets were the product of fiduciary breaches by Defendants. As a result, FMR is subject to appropriate equitable relief under 29 U.S.C. § 1132(a)(3), including disgorgement of ill-gotten profits associated with its knowing receipt of payments that resulted from other Defendants' breaches of their fiduciary duties and violation of the prohibited transaction provisions of ERISA.

***FMR Co., Inc.***

34.     Defendant FMR Co., Inc. ("FMRC") is a wholly-owned subsidiary of FMR LLC and a plan employer. At all relevant times, FMRC served as the investment subadvisor to numerous Fidelity mutual funds held within the Plan, and was paid fees calculated as a percentage of the assets it subadvised. At all relevant times, FMRC has collected fees as a result

of the Plan's investment in Fidelity mutual funds. These fees were generated in transactions that generally took place on a monthly basis, and the fees generated profits for FMRC and its parent FMR LLC that were earned at the expense of the Plan and its participants.

35.     Because FMRC provides services to the Plan and is a Plan employer, FMRC is a "party in interest" pursuant to 29 U.S.C. § 1002(14). FMRC possesses any actual or constructive knowledge possessed by FMR LLC. Abigail Johnson, the Chief Executive Officer and Chairman of the Board for FMR LLC (as well as numerous other FMR LLC subsidiaries), is also the Chairman of the Board for FMRC. John Remondi and Peter Lynch serve as Directors to both FMRC and FMR, with Lynch acting as the Vice Chairman for both and Remondi also serving as an Executive Vice President of FMR LLC. James C. Curvey, whose involvement as a Trustee of Fidelity funds and an executive and director of FMR LLC and its subsidiaries is discussed above, is also a Director of FMRC. Given the interconnected nature of FMRC and other FMR LLC subsidiaries, FMRC had actual and constructive knowledge that the profits it was earning as a result of the Plan's investments in Fidelity funds were the product of fiduciary breaches by the Plan Fiduciaries. As a result, FMRC is subject to appropriate equitable relief under 29 U.S.C. § 1132(a)(3), including disgorgement of ill-gotten profits associated with its knowing receipt of payments that resulted from other Defendants' breaches of their fiduciary duties and violation of the prohibited transaction provisions of ERISA.

***Fidelity Investments Institutional Operations Company, Inc.***

36.     Fidelity Investments Institutional Operations Company, Inc. ("FIIOC") is a wholly-owned subsidiary of FMR LLC. FIIOC is a participating employer in the Plan, and at all relevant times, FIIOC acted as the transfer agent for each fund in the Plan. In this capacity, FIIOC was paid fees in connection with transactions that generally took place on a monthly

basis, and the fees were calculated as a percentage of the total assets held in each of these funds. FIIOC therefore received fees—representing profits to FIIOC and its parent FMR LLC—as a result of the Plan's investments in Fidelity mutual funds, and these fees were earned at the expense of the Plan and its participants. Consequently, FIIOC profited as a result of the fiduciary breaches by the Plan Fiduciaries.

37.     FIIOC also provided recordkeeping services to the Plan, a service it also provides to third-party retirement plans. As part of these services, FIIOC interacted frequently with the Plan Fiduciaries and had personal knowledge of all investment decisions made by the Plan Fiduciaries. Because FIIOC provides services to the Plan and is a Plan employer, FIIOC is a "party in interest" pursuant to 29 U.S.C. § 1002(14). Based on its role as the Plan's recordkeeper, FIIOC had actual and/or constructive knowledge of the fiduciary breaches committed during the relevant period by the Plan Fiduciaries. As a result, FIIOC is subject to appropriate equitable relief under 29 U.S.C. § 1132(a)(3), including disgorgement of ill-gotten profits associated with its knowing receipt of payments that resulted from other Defendants' breaches of their fiduciary duties and violation of the prohibited transaction provisions of ERISA.

***Strategic Advisers, Inc.***

38.     Strategic Advisers, Inc. ("SAI") is a wholly-owned subsidiary of FMR LLC. SAI is a participating employer in the Plan, and at all relevant times, SAI acted as the investment manager for each account in the Plan invested in the PAS-W managed accounts program. Pursuant to the Plan's Trust Agreement, for each participant enrolled in this managed accounts program, SAI was responsible for determining the participant's asset allocation and subsequently selecting specific investments for each asset class within the model portfolio.  Trust Agreement §

5(g), Sched. B, Ex. A.[6] By the end of 2017, over 30 percent of Plan participants were enrolled in the managed accounts program. In its service agreement with the Plan, SAI agrees that for every participant enrolled in the managed accounts program, SAI is a fiduciary pursuant to 29 U.S.C. § 1002(38).[7] By accepting formal fiduciary responsibility for these accounts, SAI is a named fiduciary pursuant to 29 U.S.C. §§ 1102(c)(3), 1105(d)(1). Further, because SAI "exercises… authority or control respecting management or disposition of [the Plan's] assets," SAI is a functional fiduciary pursuant to 29 U.S.C. § 1002(21)(A)(i).

## PRIOR LAWSUIT

39.     In 2013, participants in the Plan filed a class action lawsuit against various Fidelity-affiliated defendants. *See Bilewicz v. FMR LLC, et al.*, No. 1:13-cv-10636, ECF No. 1 (D. Mass. 2013). Plaintiffs alleged that the defendants placed Fidelity's interests above plan participants' interests in violation of ERISA's duty of loyalty. For example, Plaintiffs alleged that the decision to offer only Fidelity mutual funds in the Plan was motivated by self-interest and that Fidelity offered retail mutual funds and other high-fee mutual funds despite the availability of comparable cheaper alternatives. Plaintiffs also alleged that the defendants committed prohibited transactions under ERISA by including proprietary funds in the Plan.

40.     In July 2014, the parties moved for preliminary approval of a class action settlement agreement. This motion was filed after the defendants' motion to dismiss had been briefed by both parties, but before any order by the court on the motion to dismiss. In October 2014, the court issued a judgment approving the settlement agreement.

---

[6] Plan documents limit the investments SAI may utilize to mutual funds managed by Fidelity. *Id.* § 5(g)(v); Plan Document § 12.2(b)(1) (1st Amendment).
[7] SAI is also identified in the Trust Document as having responsibility for the Plan assets invested in PAS-W.

41.    Pursuant to the settlement agreement, the defendants paid $12 million to a common fund. *See Bilewicz*, No. 1:13-cv-10636, ECF No. 53-1 at ¶ 7.2. Additionally, the defendants agreed to change the plan's default investment option, add a self-directed brokerage account option to the plan, and increase the default contribution rate for certain participants. *See id.* at ¶ 7.3. The "Effective Date" of the settlement agreement was the day on which judgment was entered. *Id.* at ¶ 1.46. The court entered judgment on October 16, 2014. *See Bilewicz*, No. 1:13-cv-10636, ECF No. 72.

## ERISA FIDUCIARY DUTIES AND PROHIBITED TRANSACTION PROVISIONS

42.    ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> > (A) for the exclusive purpose of
> >
> > > (i) providing benefits to participants and their beneficiaries; and
> > >
> > > (ii) defraying reasonable expenses of administering the plan;
> >
> > (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims….

43.    These ERISA fiduciary duties are "the highest known to the law." *Braden*, 588 F.3d at 598 (quoting *Bierwirth*, 680 F.2d at 272 n.8).

44.    In considering whether a fiduciary has breached the duties of prudence and loyalty, the court considers both the "merits of [the] transaction" as well as "the thoroughness of the investigation into the merits of [the] transaction." *Bunch v. W.R. Grace & Co.*, 532 F. Supp. 2d 283, 288 (D. Mass. 2008), *aff'd*, 555 F.3d 1 (1st Cir. 2009) (quoting *Howard v. Shay*, 100

F.3d 1484, 1488 (9th Cir. 1996)). Mere "subjective good faith" in executing these duties is not a defense: "a pure heart and an empty head are not enough." *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983). Therefore a defendant "cannot claim as a defense…that a great deal of time was spent reviewing" a decision when that decision was "tainted by the fact that he did not have all of the information he needed," rendering the decision "flawed from its inception." *Chao v. Hall Holding Co.*, 285 F.3d 415, 431 n.10 (6th Cir. 2002).

### DUTY OF LOYALTY

45.     The duty of loyalty requires fiduciaries to act with "an eye single" to the interests of plan participants. *Pegram*, 530 U.S. at 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quoting G. Bogert et al., *Law of Trusts and Trustees* § 543 (rev. 2d ed. 1980)). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

46.     While ERISA does not prohibit an employer's corporate officers or high-level employees from serving as plan fiduciaries—basically wearing two hats—it does require that they "wear the fiduciary hat when making fiduciary decisions." *Pegram*, 530 U.S. at 225. For example, in administering an ERISA plan, corporate officers must "avoid placing themselves in a position where their acts [or interests] as officers or directors of the corporation will prevent

their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan." *Bierwirth*, 680 F.2d at 271. "A fiduciary with a conflict of interest must act as if he is 'free' of such a conflict. 'Free' is an absolute. There is no balancing of interests; ERISA commands undivided loyalty to the plan participants." *Bedrick ex rel. Humrickhouse v. Travelers Ins. Co.*, 93 F.3d 149, 154 (4th Cir. 1996).

47.     "The presence of conflicting interests imposes on fiduciaries the obligation to take precautions to ensure that their duty of loyalty is not compromised." *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 299 (5th Cir. 2000). "When it is 'possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries.'" *Howard*, 100 F.3d at 1488-89 (quoting *Leigh v. Engle*, 727 F.2d 133, 125–26 (7th Cir. 1984)); *see also Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir. 1992) (explaining that where fiduciaries have "dual loyalties," courts "should look closely at whether the fiduciaries investigated *alternative actions* and relied on outside advisors") (emphasis added).

## DUTY OF PRUDENCE

48.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (citation and internal quotation marks omitted). Under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble*, 135 S. Ct. at 1828. If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (citation and internal quotation marks omitted). Fiduciaries therefore may be held liable for either "assembling an imprudent menu of

investment options" or for failing to monitor the plan's investment options to ensure that each option remains prudent. *Bendaoud v. Hodgson*, 578 F. Supp. 2d 257, 271 (D. Mass. 2008) (citing *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423-24 (4th Cir. 2007)). It is no defense to the imprudence of some investments that others may have been prudent; "a fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds" available within the plan could have "theoretically…create[d] a prudent portfolio." *Bunch*, 532 F. Supp. 2d at 289 (1st Cir. 2009) (quoting *DiFelice*, 497 F.3d at 423).

PROHIBITED TRANSACTIONS

49.     The general duties of loyalty and prudence imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106. These transactions are considered "*per se*" violations because they entail a high potential for abuse. Section 1106(b) states, in pertinent part:

> A fiduciary with respect to the plan shall not –
>
> (1)     deal with the assets of the plan in his own interest or for his own account,
>
> (2)     in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interests of its participants or beneficiaries, or
>
> (3)     receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

**OVERVIEW OF THE PLAN**

50.     The Plan was established by Fidelity and went into effect on December 30, 1952. The Plan is available to certain employees and former employees of FMR LLC and certain of its affiliates (the "Plan Employers"). The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29

U.S.C. § 1002(34), covering all eligible current and former employees of Fidelity and its subsidiaries, including Plaintiffs. The Plan is a qualified plan under 26 U.S.C. § 401, commonly referred to as a "401(k) plan." The Plan is maintained pursuant to a written instrument called the "Plan Document." *See* 29 U.S.C. § 1102(a). On July 1, 2015, the Plan was amended to change its name from "FMR LLC Profit Sharing Plan" to "Fidelity Retirement Savings Plan."

51.     In a defined contribution plan, fiduciaries are obligated to assemble a diversified menu of investment options. 29 U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii). Plan participants may invest in any of these investment options that fiduciaries include within the plan's menu of investment options.

52.     Participants in the Plan are responsible for directing the investment of contributions, choosing from among a lineup of options offered by the Plan.[8] However, because the FBIC and the Board determined the investment options available, the resulting investment lineup was critical to participants' investment results and, ultimately, the retirement benefits they received. The fact that participants have the ability to exercise "independent control" over the assets in their accounts "does not serve to relieve a fiduciary from its duty to prudently select and

---

[8] Employer contributions, along with the opportunity to participate in a defined contribution plan in the first instance, are part of a standard benefits package offered by nearly all large employers to attract and retain talented employees. *See* 401(k) Specialist, *Top 4 Priorities of 401(k) Plan Sponsors* (Jan. 3, 2016) (highlighting survey findings that, among large defined contribution plan sponsors, attracting and retaining talented employees is a top priority), *available at* http://401kspecialistmag.com/top-4-priorities-of-401k-plan-sponsors; Joan Vogel, *Until Death Do Us Part: Vesting of Retiree Insurance*, 9 INDUS. REL. L.J. 183, 216 (1987) (noting that employers offer retirement benefits to attract and retain "reliable, productive employees"). ERISA is concerned with what happens next: the disposition of assets contributed. *See In re RCN Litig.*, 2006 WL 753149, at *6 n.4 (D. N.J. Mar. 21, 2006) (observing that employer contributions occur before ERISA's fiduciary duties kick in).

monitor any…designated investment alternative offered under the plan." 29 C.F.R. § 2550.404c-1(d0(1)(iv).[9]

53.     Each investment option within a defined-contribution plan is generally a pooled investment product—which includes mutual funds, collective investment trusts, and separate accounts—offering exposure to a particular asset class or sub-asset class. *See* Investment Company Institute, *A Close Look at 401(k) Plans*, at 8 (Mar. 2018), *available at* https://www.ici.org/pdf/ppr_18_dcplan_profile_401k.pdf (hereinafter "2018 ICI Study"); Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 YALE L.J. 1476, 1485 (2015) (hereinafter "*Beyond Diversification*").

54.     In a pooled investment vehicle, the assets of numerous investors are pooled together and used to purchase a portfolio of securities in a particular manner and style determined by the vehicle's governing documents. Every investor in a pooled investment vehicle owns a certain number of shares, with each share representing an undivided percentage of the entire pool of assets managed within the vehicle. The value of each share on any given day is equal to the total value of all assets held by the vehicle divided by the total outstanding number of shares. Pooled investment products charge certain fees and expenses that are deducted from the pool of assets on a monthly or quarterly basis. For every fund in the Plan, management fees

---

[9] A "designated investment alternative" is defined as "any investment alternative designated by the plan into which participants…may direct the investment of assets held in, or contributed to, their individual accounts." 29 C.F.R. § 2550.404a-5(h)(4).  Though the definition of "designated investment alternative" excludes mutual funds held in a brokerage window, pursuant to a June 2014 agreement between the plan sponsor and the recordkeeper, "Fidelity Mutual Funds will be available in the Plan, but recordkept outside of BrokerageLink," which is the Plan's self-directed brokerage account.

were deducted regularly and paid to Fidelity. Mutual funds, collective investment trusts, and separate accounts are subject to differing regulations related to required disclosures, governance requirements, and regulatory supervision. However, differences in the type of pooled investment vehicle employed do not necessarily translate into differences in the securities held by the vehicle. Thus, it is very common for investment managers (including Fidelity) to offer identical versions of a particular product as a mutual fund, collective trust, and a separate account, with each version holding the exact same mix of investments.

55.      As of the end of 2016 (the most recent calendar year for which the Plan's Form 5500 filings are available with the Department of Labor), the Plan had more than 58,000 participants and nearly $15 billion in assets, making it one of the 20 largest private sector defined contribution plans in the United States by assets.

56.      The Plan offers only Fidelity mutual funds as investment options. Indeed, the Plan's investment options include almost every non-identical Fidelity mutual fund in existence that is eligible for inclusion in a defined contribution plan.[10]

57.      In 2014, the Plan's investment options consisted of 206 Fidelity funds. In 2015, despite having recently settled a lawsuit for fiduciary misconduct regarding the Plan, the Plan

---

[10] The Fidelity funds that were *not* included in the Plan were left out for obvious reasons, not because the Plan Fiduciaries conducted a prudent investigation. For example, the omitted Fidelity funds included more expensive share classes of funds already offered in the Plan (which were otherwise identical), municipal bond funds (which are never included in defined contribution plans given that the plans' favorable tax status eliminates the benefit of municipal bonds' preferential tax treatment), and certain funds from Fidelity's Advisor Series (designed specifically for investors working with a financial advisor) that were identical to non-Advisor series funds already offered as investment options. Nor was the Plan Fiduciaries' removal of funds from the Plan the result of careful monitoring of the Plan's investment options. Instead, it appears that the only reason that a fund ceased to be offered within the Plan was the fund ceasing to exist due to cessation of its operations.

Fiduciaries increased the number of Fidelity funds in the Plan to 224. In 2016, the Plan Fiduciaries continued adding Fidelity funds to the Plan, which now had 234 proprietary funds and zero nonproprietary funds.

58.     In addition to a core menu of investment options, many plans (including the Plan at issue here) also provide employees the option of opening a self-directed brokerage account ("SDBA"), giving participants access to a broad array of stocks, bonds, and mutual funds. Ayres & Curtis, *Beyond Diversification* at 1524. However, SDBAs have significant drawbacks. They are administratively difficult to set up and logistically challenging to manage, and as a result are used by 2% or less of participants on average. Investment Company Institute & Deloitte Consulting LLP, *Inside the Structure of Defined Contribution/401(k) Plan Fees*, at 15 (Aug. 2014), *available at* www.ici.org/pdf/rpt_14_dc_401k_fee_study.pdf ("ICI/Deloitte Study").[11] Compared to investing in the Plan's investment options, participants investing through SDBAs are often subject to additional account fees, transaction fees, and higher investment expenses given that SDBA options are typically limited to retail shares, whereas lower-priced institutional shares would be available if the same funds were included as investment options. Furthermore, SDBA investors often invest in imprudent investments, because there is no fiduciary selecting or monitoring the investments within an SDBA. 29 C.F.R. § 2550.404a-5(f), (h)(4). As a result of these facts, "performance is generally lower with self-directed accounts compared to managed portfolios. This translates into low real rates of return and higher retirement failure rates." Marijoyce Ryan, CPP, *Money Management: The Downside of Self- Directed Brokerage Accounts*,     The     Daily     Record     (June     26,     2012),     *available     at*

---

[11] Consistent with this experience, less than 2% of the Plan's assets were held in the Plan's SDBA option as of the end of 2018.

http://nydailyrecord.com/blog/2012/06/26/money-management-the-downside-of-self-directed-brokerage-accounts; Gregory Kasten, *Self-Directed Brokerage Accounts Reduce Success* (2004), at 1, 13-14, *available at* http://etf.wi.gov/boards/agenda_items_2004/dc20040819item4.pdf (discussing study showing that SDBAs lagged the performance of a model portfolio of the plan's investment options by an average of 4.70% per year). For all of these reasons, the existence of an SDBA option within a Plan does not excuse an imprudently designed and monitored menu of investment options. *See Wildman v. Am. Century Services, LLC*, 237 F. Supp. 3d 902, 913 (W.D. Mo. 2017) ("The existence of the [SDBA] option is irrelevant to determining whether Defendants used a disloyal and imprudent process to select the other investment options.").

## DEFENDANTS' VIOLATIONS OF ERISA

**I.     THE PLAN FIDUCIARIES FAILED TO PRUDENTLY AND LOYALLY MANAGE THE PLAN'S INVESTMENTS**

59.     The complete absence of nonproprietary investment options in the Plan gives rise to an inference that the Plan Fiduciaries failed to investigate whether nonproprietary investment options were available that would have better met the needs of Plan participants due to lower fees and/or superior investment management services.

60.     Likewise, the decision to offer almost every Fidelity mutual fund in existence as an investment option demonstrates that the Plan Fiduciaries put Fidelity's interests ahead of participants. A prudent fiduciary would have limited the Plan menu to the asset classes and investment options that offered the best opportunity for participants to maximize the value of their accounts at an appropriate level of risk, while excluding funds that interfered with that goal due to their high fees, poor track record, inexperienced managers, or inappropriate risk/reward profile. The Plan Fiduciaries' complete failure to limit either the asset classes offered within the

Plan's menu or the particular options within each asset class gives rise to an inference that the Plan Fiduciaries did not investigate which asset classes and investment options would best meet the needs of participants. This failure further evidences the Plan Fiduciaries' failure to engage in a meaningful process of monitoring the Plan's investment options to ensure that they remained prudent.

61.     The Plan Fiduciaries' conduct in managing the Plan's investment options furthered Fidelity's corporate interests in a number of ways. First, Fidelity collected fee revenue as a result of the Plan's exclusive use of Fidelity funds—approximately $83 million in 2016 alone. Additionally, the Plan's exclusive use of proprietary funds ensured that Fidelity's employees—many of whom are employed to sell others on the benefits of owning Fidelity funds—would themselves own Fidelity funds, thereby building loyalty, product knowledge, and a built-in sales pitch touting the employees' personal investment in the pitched products. Further, the Plan provided an injection of capital into recently-created funds, lowering overhead expenses and boosting the funds' standing in the marketplace. The Plan Fiduciaries' refusal to prune the Plan's menu of investment options also avoided antagonizing Fidelity's fund managers, some of whom would otherwise have had their funds excluded from the Plan. And finally, by excluding nonproprietary options, Fidelity avoided creating any perception of endorsing investment products managed by other firms.

## II.     THE PLAN FIDUCIARIES' MISMANAGEMENT OF THE PLAN CAUSED TREMENDOUS LOSSES

62.     The Plan Fiduciaries' failure to manage the Plan in a prudent and loyal manner has been disastrous for Plan participants. Out of the 20 comparable plans with over $5 billion in

assets[12] for which necessary data was available, Fidelity's plan performed the very worst (almost three times worse than average), representing over $100 million per year in losses compared to the average plan.[13]

63.     These losses are attributable to several causes: excessive fees, reckless inclusion of speculative investments as investment options, the failure to investigate nonproprietary options, and the failure to monitor the proprietary options that were included in the Plan's investment menu to ensure they were serving the goals of the Plan's participants. Each of these causes are addressed in turn below.

---

[12] A defined contribution plan's bargaining power appears to taper off somewhat once it hits $5 billion in assets. *See* Cerulli Associates, *State of Large and Mega Defined Contribution Plans: Investment Innovation and the Plan Sponsor Perspective*, at 76 (2012), *available at* https://www.cerulli.com/vapi/public/getcerullifile?filecid=Cerulli_State_of_Large_and_Mega_R etirement_Plan_Info_Packet_2012 ("[T]he significant difference is more likely to be between plans with more than $5 billion and those with less than $5 billion. Interviews that Cerulli conducted with industry executives alluded to this potential result.").

[13] The Restatement of Trusts provides that losses attributable to a fiduciary breach are appropriately measured by comparison to comparable trusts, with the comparison rendered more accurate by reference to a customized benchmark made up of multiple market benchmarks to reflect the asset allocation of the trust. *See* Restatement of Trusts (Third) § 100, cmt. b(1) & Reporter's Notes thereto. Plaintiffs compared the Plan's performance (as reported in publicly available Form 5500 filings to the Department of Labor) to that of a weighted benchmark determined by the Plan's asset allocation (which was itself determined by the investments reported on the Plan's Form 5500 submissions). This same technique was applied to all other comparable plans with over $5 billion in assets for which necessary data was available. To assemble a comparable universe of plans with over $5 billion in assets, Plaintiffs excluded plans using separate account vehicles (for which it is practically impossible to determine asset allocation from the plan's Form 5500), as well as plans with a disproportionately large allocation to company stock (Fidelity does not include company stock as an option). Each comparator plan's calendar-year returns were compared to a weighted benchmark determined by the Plan's asset allocation. By controlling for participants' asset allocation decisions and the performance of the underlying markets, this methodology isolates the portion of the plan's performance generally attributable to the performance of the underlying investment options in the plan.

### III. THE PLAN FIDUCIARIES' DISLOYAL AND IMPRUDENT MANAGEMENT RESULTED IN PAYMENT OF EXCESSIVE FEES BY PARTICIPANTS

64. At retirement, employees' benefits "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. Accordingly, excessive fees can significantly impair the value of a participant's account. Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of savings available at retirement. *See, e.g.*, Stacy Schaus, *Defined Contribution Plan Sponsors Ask Retirees, "Why Don't You Stay?" Seven Questions for Plan Sponsors*, PIMCO (Nov. 2013), https://www.pimco.com/insights/investment-strategies/featured-solutions/defined-contribution-plan-sponsors-ask-retireeswhy-dont-you-stay-seven-questions-for-plan-sponsors (explaining that "a reduction in [annual] fees from 100 bps[14] to 50 bps [within a retirement plan] could extend by **several years** the potential of participants' 401(k)s to provide retirement income") (emphasis added). Further, higher investment fees are not generally associated with superior investment management services. *See* Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873, 883 (2009) ("[T]he empirical evidence implies that superior management is not priced through higher expense ratios."); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1983 (2010) (summarizing numerous studies showing that "[e]ven before costs are reflected in returns,…there is little evidence that higher fees are

---

[14] The term "bps" is an abbreviation of the phrase "basis points." One basis point is equal to .01%, or 1/100th of a percent. Thus, a fee level of 100 basis points translates into fees of 1% of the amount invested. *See* Investopedia, Definition of 'Basis Point (BPS)', http://www.investopedia.com/terms/b/basispoint.asp.

correlated with increased performance").

65.      Prudent fiduciaries exercising control over administration of a plan and the selection and monitoring of investment options will minimize plan expenses by hiring low-cost service providers and by curating a menu of low-cost investment options. *See* Restatement (Third) of Trusts § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function….").[15] This task is made significantly easier the larger a plan gets. Economies of scale generally lower administrative expenses on a per-participant or percentage-of-assets basis. ICI/Deloitte Study at 7, 21. Empirical evidence bears this out. In 2015, total plan fees in defined contribution plans averaged 0.88%, but this varied between an average of 1.17% in plans with $1 million to $10 million in assets, and an average of only 0.30% for plans with over $1 billion in assets. 2018 ICI Study at 53.

66.      Given the significant variation in total plan costs attributable to plan size, the reasonableness of administrative expenses and investment management expenses should be determined by comparison to other similarly-sized plans. *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character").

67.      With nearly $15 billion in assets, the Plan is one of the 20 largest private sector plans in the United States, giving the Plan Fiduciaries nearly unparalleled bargaining power to

---

[15] The Supreme Court has noted that the legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828. Therefore, "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.* In fact, the duty of prudence imposed under 29 U.S.C. § 1104(a)(1)(B) is a codification of the common law prudent investor rule found in trust law. *Buccino v. Continental Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983).

negotiate low fees from both investment managers and service providers. However, the Plan Fiduciaries failed to appropriately utilize that bargaining power to lower costs, and as a result, Plan participants paid significantly higher fees than participants in similar plans.

68.     As of the end of 2016, the Plan had by far the highest fees among the approximately 110 defined contribution plans with more than $5 billion in assets. The Plan's fees were 0.58% of assets, more than double the asset-weighted average of 0.24%, and a full 0.10% higher than its closest peer. Had the Plan's fees simply matched the average for plans with more than $5 billion in assets, total fees would have been $47 million lower in 2016 alone. These high fees are the result of numerous failures by the Plan Fiduciaries.

A.     **THE PLAN FIDUCIARIES RETAINED PROPRIETARY FUNDS IN THE PLAN DESPITE THEIR EXCESSIVE FEES**

69.     By indiscriminately including every Fidelity fund within every asset class, the Plan Fiduciaries needlessly increased average expenses. For example, as of the end of 2015, the Plan included six different funds within the Diversified Emerging Markets Morningstar Category, with a broad range of expenses, as shown here:

| Funds in the Plan | Ticker | Expense Ratio |
|---|---|---|
| Fidelity EMEA | FEMEX | 1.39% |
| Fidelity Emerging Markets Discovery | FEDDX | 1.35% |
| Strategic Advisers Emg Mkts Fd of Fds | FLILX | 1.31% |
| Fidelity Total Emerg Mkts | FTEMX | 1.26% |
| Fidelity Emerging Markets | FEMKX | 0.97% |
| Fidelity Emerging Markets Idx Instl Prm | FPADX | 0.08% |

The costliest of these options charged high fees because they failed to penetrate the market and accrue economies of scale, not because they provided a higher level of services. The Plan Fiduciaries breached their fiduciary duties by failing to investigate whether the additional costs of each of these duplicative, more expensive options were justified. This example holds true for

the remainder of the Plan, where the automatic selection and retention of redundant, high-fee funds cost participants millions of dollars in excess fees.

> **B.   THE PLAN FIDUCIARIES FAILED TO INVESTIGATE COMPARABLE, LESS-COSTLY NONPROPRIETARY FUNDS**

70.     The Plan Fiduciaries also failed to investigate the availability of lower-cost marketplace alternatives. ERISA fiduciaries have a duty to make comparisons between different products and managers, who may offer similar products for very different costs. *See* Restatement (Third) of Trusts ch. 17, intro. note (2007) (emphasizing the "duty to avoid unwarranted costs" and noting that "similar products [are] offered with significantly differing costs"); Restatement (Third) of Trusts § 78, cmt. c(8) ("[T]he trustee must be sufficiently aware of overall costs associated with other mutual-fund alternatives to enable the trustee to fulfill its important responsibility to be cost conscious in managing the trust's investment program."); *see also Velazquez v. Massachusetts Financial Servs. Co.*, 320 F. Supp. 3d 252, 259 (D. Mass. 2018) (holding that "allegations that proprietary mutual funds 'were more expensive than similar alternatives'" were sufficient to support a "claim of breach of fiduciary duty" under ERISA) (quoting *Main v. Am. Airlines Inc.*, 248 F. Supp. 3d 786, 793 (N.D. Tex. 2017)); *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 2016 WL 4507117, at *7 (C.D. Cal. Aug. 5, 2016) ("fail[ure] to investigate lower-cost options with comparable performances" supported breach of fiduciary duty claim).

71.     Had the Plan Fiduciaries investigated marketplace alternatives, they could have identified similar funds that provided comparable or superior investment management services at a significantly lower-cost. For example, the Plan offered all eight of Fidelity's mutual funds within the High Yield Bond Morningstar Category. Below, those options are compared to three

lower-cost nonproprietary options that would have provided comparable or superior investment management services in the same investment style.

| Funds in the Plan | Ticker | Expense Ratio |
|---|---|---|
| Fidelity Global High Income | FGHNX | 1.02% |
| Fidelity Advisor High Income I | FHNIX | 0.80% |
| Fidelity Focused High Income | FHIFX | 0.80% |
| Fidelity Short Duration High Income | FSAHX | 0.80% |
| Fidelity Advisor High Income Advantage | FAHCX | 0.77% |
| Strategic Advisers Income Opps Fd of Fds L | FQAFX | 0.76% |
| Fidelity High Income | SPHIX | 0.70% |
| Fidelity Capital & Income | FAGIX | 0.67% |

| Marketplace Alternatives | Ticker | Expense Ratio |
|---|---|---|
| Federated High Yield Bond R6 | FIHLX | 0.49% |
| Prudential High Yield R6 | PHYQX | 0.42% |
| Vanguard High-Yield Corporate Adm | VWEAX | 0.13% |

Had the Plan Fiduciaries engaged in a marketplace investigation of high-yield bond options, in accordance with their fiduciary duty to manage the Plan in a cost-conscious manner, they would have identified comparable or superior low-cost options that would have better served the needs of Plan participants. Because the Plan Fiduciaries instead stocked the Plan with every Fidelity fund, participants paid higher fees than they would have had the Plan been managed prudently and loyally. This example holds true for the remainder of the Plan, where the Plan Fiduciaries' failure to adequately investigate comparable or superior non-Fidelity options cost Plan participants millions of dollars in excess fees.

### C. THE PLAN FIDUCIARIES FAILED TO INVESTIGATE THE USE OF SEPARATE ACCOUNTS AND COLLECTIVE TRUSTS

72. Additionally, the Plan Fiduciaries failed to adequately investigate non-mutual fund alternatives such as collective trusts and separate accounts. Collective trusts are a common investment vehicle in large 401(k) plans, and are accessible even to midsize plans with $100

million in assets or more. Anne Tergesen, *401(k)s Take a New Tack*, Wall Street Journal (Sept. 25, 2015), *available at* http://www.wsj.com/articles/some-funds-in-your-401-k-arent-really-mutual-funds-after-all-1443173400.

73.     Likewise, separate accounts are widely available to large plans such as the Plan. *See* U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 15 (April 13, 1998), *available at* https://www.dol.gov/sites/default/files/ebsa/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf. By using separate accounts, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds." *Id.* Separate accounts offer a number of advantages over mutual funds, including the ability to negotiate fees. Costs within separate accounts are typically much lower than even the lowest-cost share class of a particular mutual fund.

74.     Separate accounts and collective trusts held by modern defined contribution plans function much like mutual funds. For example, they offer daily valuation of shares, daily liquidity comparable to mutual funds, the ability to readily access up-to-date valuation and performance information online, and disclosure documents similar to the prospectuses and quarterly reports mutual funds produce. These products' features have come to mimic mutual funds to such an extent that most participants invested in these vehicles don't even realize they aren't invested in a mutual fund. *See* Anne Tergesen, *Some Funds in Your 401(k) Aren't Really Mutual Funds After All*, Wall Street Journal, available at https://www.wsj.com/articles/some-funds-in-your-401-k-arent-really-mutual-funds-after-all-1443173400.

75.     Fidelity offers its institutional clients collective trust and separate account products that are similar or identical to mutual funds in the Plan. For example, Oracle

Corporation's 401(k) plan has historically included several lower-cost Fidelity separate account products that were otherwise identical to the higher-cost mutual funds offered in the Plan.[16]

| Fund Name | Plan Sponsor | Plan Size | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| Fidelity Contrafund Commingled Pool | Oracle | $12.9 billion | 0.43% | N/A |
| Fidelity Contrafund | Fidelity | $14.3 billion | 0.61% | 42% higher |

| Fund Name | Plan Sponsor | Plan Size | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| Fidelity Growth Company Commingled Pool | Oracle | $12.9 billion | 0.43% | N/A |
| Fidelity Growth Co. | Fidelity | $14.3 billion | 0.77% | 79% higher |

| Fund Name | Plan Sponsor | Plan Size | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| Fidelity Low-Priced Stock Commingled Pool | Oracle | $12.9 billion | 0.48% | N/A |
| Fidelity Low-Priced Stock | Fidelity | $14.3 billion | 0.69% | 44% Higher |

A prudent fiduciary would have investigated the availability of vehicles like those used by Oracle. Had an adequate investigation occurred, the Plan Fiduciaries would have switched the Plan's investments to such vehicles in light of the enormous cost savings as well as the lack of benefit from the mutual fund structure.[17] The Plan Fiduciaries' failure to conduct such an investigation resulted in unnecessary fees, thereby profiting Fidelity while costing Plan participants millions of dollars.

---

[16] Plaintiffs obtained expense ratios as of 2014 for investment options in the Oracle plan from the 404a-5 fee disclosure made to participants in that plan, which was filed as part of a lawsuit. *See Troudt v. Oracle Corp.*, No. 1:16-cv-00175, ECF No. 36-1 at 9 (Mar. 29, 2016). Expenses for the Fidelity options are taken from Fidelity's 2015 Annual Reports, reflecting the prior year's expenses.

[17] Given the size of the Plan, the sophistication of the plan sponsor, and the sponsor's affiliation with the fund company, the Plan has not benefited from the use of the mutual fund structure or the protections of the Investment Company Act.

###### D. THE PLAN FIDUCIARIES FAILED TO UTILIZE THE CHEAPEST AVAILABLE SHARE CLASS OF CERTAIN PROPRIETARY FUNDS IN THE PLAN

76.     The Plan Fiduciaries also failed to adequately investigate the availability of lower-cost share classes of several of the mutual funds in the Plan. Given that there is no material difference between share classes other than cost—with institutional share classes of Fidelity's mutual funds offering the same daily liquidity, daily valuation, and disclosures as its retail share classes—a prudent fiduciary acting under these circumstances would have selected the least expensive share class. Specifically, the Plan Fiduciaries in some cases failed to use lower-cost K shares of the Fidelity-branded funds and failed to use lower-cost Z shares of the Fidelity Advisor-branded funds. For example, the Plan used the standard no-load version of the Fidelity Emerging Markets fund, with expenses of 0.96% per year, even though K shares of the Fidelity Emerging Markets fund would have cost participants only 0.81% per year. Similarly, the Plan used I shares of the Fidelity Advisor Overseas fund, which charged 0.92% per year, despite the availability of Fidelity Advisor Overseas Z shares, which would have charged only 0.80% per year. The Plan Fiduciaries' retention of identical, more expensive share classes cost Plan participants millions of dollars in excess fees.

###### E. THE PLAN FIDUCIARIES FAILED TO SECURE AVAILABLE REVENUE SHARING REBATES FROM THE PLAN'S INVESTMENTS AND CAUSED PLAN PARTICIPANTS TO PAY EXCESSIVE RECORDKEEPING FEES

77.     The Plan Fiduciaries also failed to demand revenue sharing rebates from FIIOC in connection with the Fidelity funds in the Plan, even though FIIOC made similar payments in connection with Fidelity funds held by other plans, including plans that used third-party recordkeepers unaffiliated with Fidelity. In plans of comparable size, FIIOC offered revenue sharing rebates on nearly all Fidelity funds of between 10 and 25 basis points (as a percentage of

assets invested in the fund), with the amount depending upon the type of fund and share class. Those payments can be used to offset the recordkeeping fees charged by FIIOC. And when revenue sharing amounts exceed recordkeeping fees, excess amounts can be refunded to participants. During the relevant period, these foregone revenue sharing rebates amounted to between $200 and $300 per Plan participant on an annual basis, according to compensation disclosures to the Plan made by Fidelity.

78. Further, the Plan Fiduciaries failed to negotiate additional "fee credits" that FIIOC paid to plans that used Fidelity products and were recordkept by Fidelity. Given the Plan's exclusive use of Fidelity funds and Fidelity recordkeeping services, the Plan Fiduciaries were perfectly positioned to demand these rebates, which would have amounted to an additional $100 to $200 per participant on an annual basis, according to compensation disclosures made to the Plan by Fidelity.

79. As a result of the Plan Fiduciaries' failure to negotiate these revenue sharing rebates and fee credits, FIIOC retained these monies and received excessive compensation for the recordkeeping services it provided to the Plan. According to Fidelity's own disclosures, each participant paid an average of between $390 and $450 per year in recordkeeping costs from 2014 through 2018, amounting to aggregate recordkeeping compensation of over $20 million per year. Had the Plan Fiduciaries simply negotiated a contract in line with Fidelity's recordkeeping contracts with other retirement plans, or investigated the availability of lower-cost recordkeeping services in the marketplace from third-party providers, they could have reduced the Plan's recordkeeping expenses by 90% or more. But the Plan Fiduciaries never leveraged the Plan's immense negotiating power to secure these rebates and fee credits, resulting in a tremendous windfall for FIIOC at the expense of participants.

**IV.    THE PLAN FIDUCIARIES RETAINED INAPPROPRIATELY SPECULATIVE FUNDS IN THEIR OWN SELF-INTEREST**

80.    Investment fiduciaries have a duty to "initially determine and continue to monitor the prudence of each investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289. In so doing for a particular investment, the fiduciary must determine whether the investment "is reasonably designed, as part of the portfolio…to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment." 29 C.F.R. § 2550.404a-1(b)(2)(i).

81.    The duty of prudence therefore requires "prudent management of risk." Restatement (Third) of Trusts § 90 cmt. e(1) (explaining that the prudent investor rule's "requirement of caution ordinarily imposes a duty to use reasonable care and skill in an effort to minimize or at least reduce diversifiable risks"). This does not require outright avoidance of risk, but instead limiting risks to those that are compensated through improved potential for returns. "In understanding a trustee's duties with respect to the management of risk, it is useful to distinguish between diversifiable (or 'uncompensated') risk and market (or nondiversifiable) risk that is, in effect, compensated through pricing in the marketplace." *Id.* Failure…to reduce uncompensated risk is ordinarily a violation of both the duty of caution and the duties of care and skill." *Id.* "Because market pricing cannot be expected to recognize and reward a particular investor's failure to diversify, a trustee's acceptance of this type of risk cannot, without more, be justified on grounds of enhancing expected return." *Id.*

82.    One example of uncompensated risk is 'sector' or 'industry' risk, meaning the risk that a particular industry will perform poorly for reasons unique to that industry. As investment manager and fiduciary expert Patrick Collins has explained,

> [T]he obligation to utilize care, skill, and caution…admonishes the portfolio manager not to set the level of uncompensated or firm-related risk higher than suitable for the particular trust under his or her stewardship….[T]he portfolio manager should mitigate uncompensated (i.e., non-market) risk unless there is clear and compelling justification for assuming it….Sector betting within an asset class is risky because of the low-breadth problem—it takes an extraordinary level of forecasting skill to achieve persistent profitability in the betting system; and, conversely, one wrong call in the sector shifting strategy can destroy the profitability of a long series of past correct calls….[Sectors] are the building blocks of asset classes. Diversifying an asset class requires diversification across all sectors within the asset class as well as diversification within each of the sectors.

Patrick Collins, *Prudence*, 124 BANKING LAW J. 3, 60-61 (2007) (quoted in Restatement (Third) of Trusts § 90 cmt. g Reporter's Notes).

83.      Fidelity offers 39 sector funds in the marketplace—such as Fidelity Select Banking, Fidelity Select Chemicals, and Fidelity Select IT Services. Contrary to the foregoing investment principles, the Plan Fiduciaries included all 39 of these funds in the Plan as investment options. These sector funds took on substantial uncompensated risk that a prudent fiduciary would have found imprudent. Further, these funds did not advance the goals of the Plan within the context of the entire menu of investment options. The Plan menu already contained broadly diversified equity investments providing exposure to all of these industry sectors. Thus, none of these sector funds provided any diversification benefit to Plan participants. Instead, the sector funds constituted speculative bets on particular industries that were not conducive to participant implementation of a prudent investment strategy.

84.      Making matters worse, sector funds tend to be more expensive than diversified alternatives, due in part to their boutique mission and their relatively smaller amounts of assets under management. Here, the weighted average cost of the Plan's sector funds was 25% higher than the weighted average cost of the rest of the funds in the Plan. While sector funds comprised

less than 8% of the Plan's assets, that still amounted to over $1 billion of plan participants' assets. A prudent fiduciary would not have heaped every single Fidelity sector fund into the Plan given those funds' high fees and lack of diversification.

85.     The imprudence of these sector fund offerings was not merely theoretical. Among the problems presented by sector funds is how their higher volatility interacts with decisional heuristics that are known to lead to poor investment decisions. It is well-established that due to two behavioral biases known as the "gambler's fallacy" and "sample size neglect," investors often view short-term periods of mutual fund outperformance as predictive of a trend and indicative of managerial skill, when in fact such outperformance is often attributable to the random and cyclical nature of markets. *See* Daniel Kahneman & Amos Tversky, *Judgment Under Uncertainty: Heuristics and Biases*, 185 SCIENCE 1124, 1125 (1974); Nicholas Barberis & Richard Thaler, *A Survey of Behavioral Finance*, *in* HANDBOOK OF THE ECONOMICS OF SCIENCE 1051, 1065 (George M. Constantinides, Milton Harris & René M. Stulz, eds, 2003).

86.     The heightened volatility of sector funds exacerbates these behavioral biases. At least a few of the Plan's 39 sector funds are likely at any given time to be producing a recent run of eye-popping returns, thus serving as "attractive nuisances" to participants prone to performance-chasing. Confronted with severe gains or losses, investors are more likely to churn through funds, ignoring buy-and-hold and diversification principles based on the misconception that recent returns will be predictive of future performance. *See* T. Rowe Price, *Constructing More Effective Defined Contribution Investment Lineups* (Apr. 2018), at 8, *available at* https://www4.troweprice.com/gis/content/dam/fai/Collections/DC%20Resources/Constructing% 20More%20Effective%20DC%20Investment%20Lineups/Constructing_More_Effective_DC_In vestment_Lineups.pdf (recommending that plan sponsors "[m]inimize sector and other specialty

investment options" because "[m]any have wide swings in performance that can result in large participant flows in and out").

87.  For example, consider how fluctuating performance during 2016 impacted investment flows within four of the Plan's sector funds, and the effects of that volatility on participants.

| Fund | Plan Balance as of 12/31/15 | 2016 Return | Plan Balance as of 12/31/16 | 2017 Return |
|---|---|---|---|---|
| Fidelity Select Biotech | $276MM | -23.72% | $160MM | 27.87% |
| Fidelity Select Healthcare | $140MM | -10.68% | $89MM | 24.02% |
| Fidelity Select Banking | $20MM | 26.84% | $38MM | 12.68% |
| Fidelity Select Energy | $48MM | 33.84% | $77MM | -2.64% |

In summary, 2016 outperformance in the Banking and Energy sectors drew significant participant funds into those sector funds, while negative results in the Healthcare and Biotech sectors caused tremendous flight from those sector funds. Unsurprisingly, this investment pattern produced poor results, as many investors missed the run-up in banking and energy stocks and subsequently the recovery of biotech and health stocks. So while it might appear on paper that each of these four funds produced average- to above-average performance during 2016 and 2017, results for participants were worse because of when assets entered and exited the funds.

88.  The boom-bust cycles of these sector funds illustrate why fiduciaries must be extremely wary of sector funds. By their very nature, these funds introduce significant uncompensated risk and sabotage investment diversification. Tossed unscrupulously into a plan menu, as they were here, these funds prey on participants' behavioral biases, resulting in predictable and substantial underperformance over the long term due to excess fees, under-diversification, and excessive risk-taking. Had the Plan Fiduciaries fulfilled their fiduciary duty to monitor participant investment patterns and performance results, they would have observed

that the Plan's sector funds were fueling performance-chasing behavior and speculation to the detriment of participants, and therefore should have been removed from the Plan. The Plan Fiduciaries' failure to adequately investigate and monitor these hazardous funds cost Plan participants millions of dollars in the form of higher fees and poor returns.

## V. THE PLAN FIDUCIARIES FAILED TO INVESTIGATE BETTER-PERFORMING NONPROPRIETARY FUNDS

89.     Though Fidelity is one of the two largest investment managers by assets, its marketing strength does not always translate into investment success. As of the end of 2017, Fidelity was ranked by Barron's as the 29th best-performing mutual fund company over the prior ten-year period out of 50 firms, a decidedly mixed bag. Like most fund families, Fidelity has areas in which it does well, areas in which its performance is uneven, and areas in which it has consistently underperformed.

90.     By failing to investigate nonproprietary options, the Plan Fiduciaries saddled participants with Fidelity's institutional weaknesses, despite years—or in some cases, decades— of evidence that in certain asset classes, Fidelity's managers could not generate competitive returns. For example, below is a ten-year performance chart of Fidelity's six mid-cap growth funds (all of which were included in the Plan) as of the end of October 2015, as well as the benchmark index for those funds.

| Fund | Ticker | 10-year Average Return as of 10-1-15 |
|------|--------|--------------------------------------|
| Fidelity Stock Selector Mid Cap | FSSMX | 5.43% |
| Fidelity Growth Strategies K | FAGKX | 6.42% |
| Fidelity Leveraged Company Stock K | FLCKX | 6.81% |
| Fidelity Advisor Mid Cap II Z | FZAMX | 7.37% |
| Fidelity Select Construction & Hsg Port | FSHOX | 7.55% |
| Fidelity Mid-Cap Stock K | FKMCX | 7.62% |

| Benchmark Index | Ticker | 10-year Average Return as of 10-1-15 |
|---|---|---|
| Russell Midcap Growth Index | n/a | 8.11% |

As the chart shows, every Fidelity mid-cap growth fund materially underperformed its benchmark index in the prior ten-year period. Despite this substandard overall performance, the Plan Fiduciaries never looked beyond Fidelity's funds to investigate whether better options existed in the marketplace.

91.     Had the Plan Fiduciaries conducted such an investigation, they would have readily found better-managed options. For example, since at least 2010, the T. Rowe Price Mid Cap Growth Fund has been the most commonly-used mid-cap growth fund among fiduciaries of plans with over $1 billion in assets. Over the ten-year period ending September 30, 2015, the T. Rowe Price Mid Cap Growth Fund had an average annual return of 10.02% per year. While *all* of the Plan's six mid-cap growth offerings have underperformed their benchmark index over the past three years, the T. Rowe Price Mid Cap Growth fund has outperformed that same index by approximately 1.2% per year. Additionally, the lowest-cost share class of the T. Rowe Price Mid Cap Growth Fund currently charges fees of 0.61% per year, lower than all six of Fidelity's offerings. Had the Plan Fiduciaries investigated other options in the marketplace, as a prudent and loyal fiduciary would have done, they would have replaced Fidelity's consistently-underperforming mid-cap growth funds with a better-managed fund like the T. Rowe Price Mid Cap Growth Fund.

92.     This illustration is not an anomaly. There are numerous asset classes in which the Plan Fiduciaries have forced Fidelity's persistently underperforming funds on participants (the large cap value and large cap blend categories are two additional illustrative examples) without investigating whether other options in the marketplace would have better served Plan

participants. The Plan Fiduciaries' insistence on selecting every non-identical Fidelity fund (and only Fidelity funds) regardless of past performance has cost Plan participants millions of dollars in the form of poor returns.

## VI.   THE PLAN FIDUCIARIES FAILED TO REMOVE UNDERPERFORMING PROPRIETARY FUNDS

93.    The Plan Fiduciaries polluted the Plan with a variety of consistently-underperforming Fidelity funds. For example, as of October 1, 2015, six of the eight large cap blend funds in the Plan had underperformed the benchmark index over the past ten years, with mean underperformance of 0.93% *per year*. This example holds true for the remainder of the Plan, where numerous Fidelity funds were retained despite consistent long-term underperformance.

94.    As the Supreme Court has explained, among the fundamental duties of a fiduciary is to monitor the performance of the investment options held by the plan and remove those that are imprudent. *See Tibble*, 135 S. Ct. at 1828. A prudent and loyal fiduciary would have removed funds that exhibited consistent underperformance, saving participants millions of dollars. *See* Veronika K. Pool *et al.*, *It Pays to Set the Menu: Mutual Fund Investment Options in 401(k) Plans*, 71 J. FIN. 1779, 1780-81, 1808-10 (2016) (summarizing previous studies showing that mutual funds with poor historical performance tend to perform poorly in the future, and demonstrating the existence of this phenomenon among underperforming proprietary mutual funds held by 401(k) plans). By failing to monitor the funds in the Plan and remove those that were imprudent, the Plan Fiduciaries breached their fiduciary duties.

95.    The Plan Fiduciaries' inclusion of every Fidelity option within every asset class had an additional negative effect upon participants' behavior. Stuffing a plan with duplicative investment options tends to promote a horse-race mentality among participants, in which they are

motivated to pick the best fund among the many options offered within a given category. *See* T. Rowe Price, *Helping Plan Participants Stay on Track* (Summer 2008), at 1, *available at* https://www2.troweprice.com/rms/rps/Sponsors/DefaultContent/StaticAssets/

Helping_Plan_Participants_Stay_On_Track.pdf ("Plan participants tend to chase performance, ending up buying high and selling low."); AllianceBernstein, *Implications of Participant Behavior for Plan Design*, at 7, *available at* http://www.alliancebernstein.com/CmsObjectABD/PDF/Research_WhitePaper/R29284_Implicat ions_0131_WP.pdf (participants "request value or growth funds based on recent quarterly performance, and we know that there is a high likelihood that today's winners will become tomorrow's mediocrity"). This is a logical consequence of the "gambler's fallacy" and "sample size neglect" biases noted above, in which investors assume that prior outperformance is reflective of skill or a trend rather than random happenstance. *See supra* ¶ 84.

96.     Fiduciaries have a "duty to reevaluate the trust's investments periodically as conditions change." A. Hess, G. Bogert, & G. Bogert, Law of Trusts and Trustees § 684, p. 146 (3d ed. 2009) (Bogert 3d). This reevaluation must take account of the circumstances and behavior of the trust's beneficiaries. *See* Mark L. Ascher, 3 Scott & Ascher on Trusts § 18.2.2, at 1351 (5th ed. 2007) ("If the trustee fails to inquire into the beneficiary's circumstances, the trustee thereby fails to exercise his or her judgment, and the court may interpose."). "The duty to review trust investments should be performed by the collection of information currently as changes occur, and also by a systematic consideration of all the investments of the trust at regular intervals, for example, once every six months." Bogert 3d § 684, at 147-48. For example, the Department of Labor recommends that fiduciaries consider participants' "salary levels, turnover rates, contribution rates and withdrawal patterns." U.S. Dep't of Labor, *Target Date*

*Retirement Funds - Tips for ERISA Plan Fiduciaries* (Feb. 28, 2013), *available at* https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds.pdf.

97.    As the below table shows, participants in the Plan exhibited extraordinary levels of performance-chasing within large-cap blend investments, resulting in the same frenzied investment pattern that characterized investments in the Plan's sector funds.

| Fund | Plan Balance as of 12/31/15 | 2016 Return | Plan Balance as of 12/31/16 | 2017 Return |
|---|---|---|---|---|
| Fidelity Growth & Income | $154 MM | 16.06% | $205 MM | 16.88% |
| Fidelity Export & Multinational | $129MM | 10.12% | $41MM | 21.07% |

Short periods of outperformance appear to have triggered huge inflows of assets into Fidelity Growth & Income, and out of Fidelity Export & Multinational. Yet the two funds' relative results flipped the next year, and as a result, participants were more likely to experience each fund's respective periods of underperformance than its period of outperformance.

98.    This illustration is not an anomaly. There are numerous asset classes in which the Plan Fiduciaries' inclusion of every non-identical Fidelity option created a horse-race mentality among participants, resulting in frequent trading by participants as they flocked towards the funds with superior recent performance, contrary to sound long-term investment practices. The Plan Fiduciaries could have averted these damaging behavioral trends by removing duplicative and otherwise imprudent funds from each asset category. The Plan Fiduciaries' failure to do so is especially inexcusable given that the harmful consequences of these behavioral tendencies were evident among Plan participants for many years. The Plan Fiduciaries should have curated a menu of prudent options, rather than including duplicative and imprudent Fidelity funds that

tempted participants to guess (and re-guess) which funds were worthwhile.

**VII.    THE PLAN FIDUCIARIES MISMANAGED THE PLAN'S CAPITAL-PRESERVATION FUNDS OUT OF SELF-INTEREST**

99.    Every defined contribution plan is required to include a capital preservation option that offers current income without loss of principal. Fiduciaries are not required to offer any particular type of option, but instead are required to engage in a prudent and loyal process to evaluate and select the option(s) that best meet the needs of plan participants.

100.    Stable value funds are by far the most common capital preservation in large 401(k) plans. Like money market funds, stable value funds provide preservation of principal. And "[b]ecause they hold longer-duration instruments, [stable value funds] generally outperform money market funds, which invest exclusively in short-term securities." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); *see also* Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between Stable Value and Money Market*, 39 AKRON L. REV. 9, 20-27 (2006). These additional returns do not come with additional risk.  Even during the period of market turbulence in 2008, "stable value participants received point-to-point protection of principal, with no sacrifice of return[.]" Paul J. Donahue, *Stable Value Re-examined*, 54 RISKS AND REWARDS 26, 28 (Aug. 2009), *available at* http://www.soa.org/library/newsletters/risks-and-rewards/2009/august/rar-2009-iss54-donahue.pdf.

101.    A 2018 study from the Wharton School analyzed money market and stable value fund returns from the previous two decades and concluded that "any investor who preferred more wealth to less wealth should have avoided investing in money market funds when [stable value] funds were available, irrespective of risk preferences." David F. Babbel & Miguel A. Herce,

*Stable Value Funds Performance*, at 16 (Feb. 21, 2018), *available at* http://www.mdpi.com/2227-9091/6/1/12/pdf. Given the superior yields offered by stable value funds at comparable levels of risk, large 401(k) plans overwhelmingly choose stable value funds over money market funds. Chris Tobe, CFA, *Do Money-Market Funds Belong in 401(k)s?*, MarketWatch (Aug. 30, 2013), *available at* http://www.marketwatch.com/story/do-money-market-funds-belong-in-401ks-2013-08-30.

102.    Fidelity offers a stable value fund in the marketplace known as the Managed Income Portfolio. *See Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 3 (1st Cir. 2018). However, the Plan Fiduciaries have not included this option in the Plan, because doing so would constitute a prohibited transaction to which no exemption would apply. *See* 29 U.S.C. § 1106(b)(1)-(3). As a result, in light of the Plan Fiduciaries' apparent policy of including nothing but Fidelity options in the Plan, the Plan Fiduciaries never investigated whether other stable value funds in the marketplace would have best served the needs of the Plan. Instead, the Plan Fiduciaries limited the Plan's capital preservation option to proprietary Fidelity money market mutual funds, which were the only Fidelity capital preservation offerings in the marketplace whose inclusion did not constitute a prohibited transaction.

103.    Throughout the relevant period, the Plan's capital preservation options have consisted exclusively of Fidelity money market accounts that have earned little interest given the structural disadvantages associated with money market funds compared with other capital preservation options. Predictably, the Plan's money market funds vastly underperformed the average stable value fund during the statutory period.

| The Plan's Money Market Funds | Ticker | 2014 Return | 2015 Return | 2016 Return | 2017 Return |
|---|---|---|---|---|---|
| Fidelity Treasury Only Money Market | FDLXX | 1 bp | 1 bp | 1 bp | 47 bps |

| The Plan's Money Market Funds | Ticker | 2014 Return | 2015 Return | 2016 Return | 2017 Return |
|---|---|---|---|---|---|
| Fidelity Government Cash Reserves | FDRXX | 1 bp | 1 bp | 9 bps | 56 bps |
| Fidelity Government MMkt Prm | FZCXX | n/a | n/a | 13 bps | 61 bps |
| Fidelity Inv MM Fds Government Instl | FRGXX | n/a | 2 bps | 29 bps | 79 bps |
| Fidelity Inv MM Fds Money Market Instl | FNSXX | 9 bps | 15 bps | 53 bps | 118 bps |
| Fidelity Inv MM Fds Treasury Instl | FRBXX | n/a | 2 bps | 24 bps | 78 bps |
| Fidelity Inv MM Fds Treasury Only Instl | FRSXX | n/a | 1 bps | 21 bps | 75 bps |
| Fidelity Money Market Premium | FZDXX | n/a | n/a | 48 bps | 101 bps |
| Fidelity Retirement Gov. Money Market | FGMXX | 1 bp | 1 bp | n/a | n/a |
| Fidelity Retirement Gov. Money Market II (f/k/a Retirement Money Mkt) | FRTXX | 1 bp | 2 bps | n/a | n/a |
| Fidelity Treasury Money Market | FZFXX | n/a | n/a | 2 bps | 51 bps |
| Fidelity U.S. Government Reserves | FGRXX | 1 bp | n/a | n/a | n/a |

| Average Stable Value Fund | 2014 Return | 2015 Return | 2016 Return | 2017 Return |
|---|---|---|---|---|
| Hueler Index[18] | 169 bps | 177 bps | 179 bps | 200 bps |

104.    Had the Plan Fiduciaries managed the Plan's capital preservation options in a prudent and loyal manner, they would have investigated nonproprietary stable value offerings in the marketplace. Such an investigation would have revealed the availability of stable value vehicles that earned much better returns than the proprietary money market funds in the Plan at comparable or lower levels of risk. The Plan Fiduciaries' failure to engage in such an investigation and subsequently act in the best interests of participants has cost Plan participants millions of dollars.

---

[18] Hueler Analytics and its Hueler Index are the industry standard for reporting and measuring returns of stable value funds. "The Hueler Analytics Stable Value Pooled Fund Universe includes data on 15 funds nationwide with assets totaling over $105 billion." *See* http://hueler.com. Hueler data therefore represents a reasonable estimate of the returns of a typical stable value fund. *See also Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 810 (7th Cir. 2013) (approving of Hueler Index as a "basis for calculating damages" for a claim related to stable value funds and money market funds).

### VIII.  SAI AND THE PLAN FIDUCIARIES IMPRUDENTLY AND DISLOYALLY MANAGED THE PLAN'S MANAGED ACCOUNTS SERVICE

105.    The Plan also offers a Fidelity managed accounts program called Portfolio Advisory Service at Work ("PAS-W") (later renamed Personalized Planning and Advice, or PPA). Participants who enroll in PAS-W turns full control of their entire account over to SAI, which then places each participant into one of several model portfolios based on the participant's time horizon, risk tolerance, and other factors. In selecting funds for these model portfolios, PAS-W considers only the investment options in the plan lineup, which in this case was limited to Fidelity mutual funds. Although participants were not charged a separate fee to participate in the PAS-W service, participants are responsible for paying the expense ratios associated with the underlying funds selected by SAI.

106.    Fidelity has aggressively pushed the PAS-W program on Plan participants. Not only did Fidelity waive its fees for the service, it also inundated participants with letters, emails, and webinars about the service—in 2014 alone Fidelity designed thirty different participant communications informing participants about the PAS-W service. By late 2018, 34 percent of Plan participants were enrolled in PAS-W, totaling $5.7 billion in Plan assets. Indeed, the Plan is PAS-W's biggest client.

107.    SAI (a Fidelity affiliate) had a fiduciary duty to prudently run and manage the program in the best interest of participants, without regard to the business interests of Fidelity. In addition, the Plan Fiduciaries had a fiduciary duty to prudently and loyally monitor the Plan's managed accounts program, by (among other things) critically reviewing the design of the program and determining whether PAS-W was the best choice among available managed accounts services. However, both SAI and the Plan Fiduciaries breached these fiduciary duties.

108.    SAI breached its fiduciary duties with respect to the PAS-W program in two primary ways. First, SAI failed to properly account for expenses. Though PAS-W evaluated funds by looking at historical performance net of expenses, it did not separately evaluate the expenses charged by each fund as an independent variable. This is a demonstrably imprudent approach, given the extensive empirical evidence that models considering expense ratios as a separate variable alongside historical net performance are far better predictors of future performance than models like PAS-W that look only at historical net performance.[19] This design flaw was not only imprudent but disloyal, as it resulted in model portfolios weighted heavily towards high-cost proprietary mutual funds that generated significant profits for Fidelity.[20] Second, SAI imprudently over-weighted short-term historical performance of the subject investments, ignoring overwhelming evidence of the poor long-term performance of certain funds, the efficiency of certain asset classes, and the investment manager's historical inability to outperform benchmark indices net of expenses within the certain asset classes.

109.    For example, as of June 30, 2017, the Aggressive Growth PAS-W model portfolio had 9% of portfolio assets allocated to the Fidelity Equity Income Fund, which invests in large cap value stocks, while no assets were invested in the low-cost large cap value index fund

---

[19] Multiple studies have demonstrated that coupling analysis of historical risk-adjusted performance with an analysis of funds' expense ratios results in superior ability to predict future outperformance compared to models such as PAS-W based solely on risk-adjusted performance. *See* James Rowley, Garrett Harbron & Matthew Tufano, *In Pursuit of Alpha: Evaluating Active and Passive Strategies*, at 1, 13 (Sept. 2017), *available at* https://personal.vanguard.com/pdf/ISGZSG.pdf; Daniel Wallick, Neeraj Bhatia, Andrew Clarke, Raphael Stern, *Shopping for Alpha: You Get What You Pay For*, at 1–2, 8 (May 2011), *available at* https://personal.vanguard.com/pdf/icras.pdf; Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 F. Fin. 1915, 1931-34 (2010).

[20] Although Fidelity earns revenues from its index funds, these revenues are far lower. Further, because Fidelity prices its index funds to compete with Vanguard, index funds serve as "loss leaders" for Fidelity on which it earns little, if any, profits.

available within the Plan. This allocation is indefensible when viewed in its broader context. A four-factor Fama-French regression analysis of the Fidelity Equity Income Fund demonstrates that for each of the past eleven rolling five-year periods (starting with 2002 to 2007 and ending with 2014 to 2018), the Fund has negative alpha, meaning the manager has demonstrated no skill in selecting stocks likely to outperform the market. This is consistent with a broader trend: for every rolling 5-year period dating back to 2002, large cap value funds managed by Fidelity have exhibited significant negative alpha overall, with 92% of large cap value funds exhibiting negative alpha in the past 5 years as of September 2017, when this allocation was in place. This data demonstrates that on both the fund level and the investment manager level, Fidelity has demonstrated no ability to identify inefficiencies within the market for large cap value stocks or to exploit them net of expenses. Given the weight of this data, a prudent fiduciary would have used Fidelity's passive large cap value fund instead of Fidelity Equity Income.

110.   The Fidelity Equity Income Fund is not anomalous. SAI's model portfolios are riddled with fund managers who have demonstrated no skill over longer periods of time, and with actively-managed funds in asset classes for which Fidelity has failed to demonstrate sufficient management skill to make up for the fees of its active funds managers.

111.   Had SAI fulfilled its fiduciary duty to prudently and loyally manage the PAS-W program, its model portfolios would have been weighted more heavily towards lower-cost, passively-managed investments, and only would have included actively-managed funds that exhibited sufficient investment returns (in relation to their benchmark index) over the long run to justify their added fees. SAI's failure to employ these prudent and loyal processes has cost Plan participants millions of dollars in excess fees and underperformance.

112.    The Plan Fiduciaries' monitoring of SAI and the PAS-W program was similarly lacking. The FBIC did not discuss the prudence of the PAS-W service whatsoever until October 2015. After that, the FBIC tracked the performance of PAS-W by comparing it to the performance of participants invested in other categories of funds in the Plan, but never compared its performance to other managed-account programs in the marketplace or to other versions of the PAS-W program offered by Fidelity, and never analyzed whether PAS-W would have performed better had it been permitted to select non-Fidelity mutual funds.

113.    In early 2017, Fidelity began offering a managed accounts service that used only index funds. Given that the Plan offered at least seventeen different index funds, PAS-W Index could have provided fully-diversified portfolios covering every asset class included within the core PAS-W product, with significantly lower costs to participants and—given the core PAS-W product's empirical failure to identify actively-managed funds likely to outperform their benchmark index—superior net performance. The FBIC never investigated whether PAS-W Index had better performance history, or would have better served the interests of participants, brushing aside the benefits of the service by noting (in its only conversation about PAS-W Index) that "for the [Plan], since participants are not charged advisory fees [for Fidelity mutual funds], the two PAS-W offerings are nearly comparable from a cost perspective." The FBIC never considered that the refund of advisory fees accrues only to current employees, and that therefore *former* employees within the Plan such as Plaintiff Torline would have enjoyed significant cost savings and improved net performance with the PAS-W Index product. Nor did the FBIC analyze back-tested historical performance of the PAS-W Index model, which would have shown superior performance net of expenses without taking on additional risk. The Plan

Fiduciaries' failure to adequately investigate alternatives to the core PAS-W managed accounts service has cost Plan participants millions of dollars in the form of higher fees and poor returns.

## IX. THE PLAN FIDUCIARIES FAILED TO DISCLOSE ANY INFORMATION ABOUT THE VAST MAJORITY OF THE PLAN'S INVESTMENT OPTIONS

114.    ERISA imposes a duty on plan administrators to provide to plan participants on a "regular and periodic basis" sufficient information regarding "fees and expenses, and regarding designated investment alternatives, including fees and expenses attendant thereto," so that participants can make informed decisions regarding their individual accounts. 29 C.F.R. § 2550-404a-5(a).

115.    In order to satisfy this requirement, a plan administrator must accurately disclose (1) the "identification of any designated investment alternatives offered under the plan," (2) the "identification of any designated investment managers," (3) "an explanation of any fees and expenses for general plan administrative services…not reflected in the total annual operation expenses of any designated investment alternatives," (4) "at least quarterly, a statement" reflecting the dollar amount and nature of those administrative expenses "actually charged," (5) "the name of each designated investment alternative," and (6) "shareholder-type" fees and "the total annual operating expenses of the investment expressed as a percentage" fee, otherwise known as an expense ratio. 29 C.F.R. § 2550-404a-5(b)-(d).

116.    For designated investment alternatives that are registered under the Investment Company Act of 1940 (*i.e.* mutual funds), the annual operating expenses are that of all asset-based charges before waivers and reimbursements. For designated investment alternatives that are not registered under the Investment Company Act of 1940 (*i.e.* collective investment trusts, separate accounts, etc.), the annual operating expenses are the sum of "the management

fees…that reduce the alternative's rate of return," "the distribution and/or servicing fees…that reduce the alternative's rate of return," and "any other fees or expenses….that reduce the alternative's rate of return, excluding brokerage costs." 29 C.F.R. § 2550-404a-5(h)(5)(ii).

117.    The Retirement Committee was designated by the Plan Document as the Plan Administrator. The Plan Administrator is responsible for the disclosures provided to Plan participants.

118.    For the vast majority of the Plan's investment options, the Plan Fiduciaries failed to provide any disclosures whatsoever to participants. At all relevant times, the Plan Fiduciaries provided disclosures only for the Fidelity Freedom Funds (the "Freedom Funds"), a series of actively-managed target date funds offered by the Plan which at all relevant times have held between 10 and 15 percent of the Plan's assets. As a result, Plan participants who were invested in the hundreds of other investment options offered by the Plan received none of the required disclosures for those funds. These proprietary funds held at least 85 percent of the Plan's assets throughout the statutory period, yet were omitted entirely from participants' quarterly disclosure statements.

119.    This omission was not an accident. Rather, it was the result of the Plan Fiduciaries' attempt to evade liability for their continued self-dealing. Following the settlement of the *Bilewicz* lawsuit in 2014, the Plan Fiduciaries could have begun monitoring the Plan's investments rather than cramming nearly every non-identical Fidelity mutual fund into the Plan's lineup. Instead, the Plan Fiduciaries concocted a scheme designed to slough off as much fiduciary liability as possible. In July 2014, Fidelity amended the Plan Document to state that the Plan now offered only two designated investment alternatives: the Freedom Funds and Fidelity's managed accounts service. However, this technical amendment was not accompanied by any

55

substantive change to the Plan; the Plan lineup continued to include nearly every non-identical Fidelity mutual fund, and participants continued to invest in the hundreds of other proprietary funds offered by the Plan. In the next quarterly disclosure to Plan participants, Fidelity doubled down on its maneuver by removing any mention of funds other than the Freedom Funds.

120.    Fidelity's transparent legal gambit did not alter its fiduciary duties. ERISA does not permit a plan sponsor to define away responsibility over the Plan's lineup. *See Dudenhoeffer*, 134 S.Ct. at 2468-69. Even Fidelity did not fully buy into its own artifice. The Schedule of Assets attached to the Plan's Form 5500 in 2014, 2015, and 2016 continued to list every proprietary fund offered by the Plan. And Plan participants may still directly select any of the Plan's hundreds of Fidelity investment options from the Plan menu; only non-proprietary options must be selected through the Plan's SDBA. This simply exposes the reality of the situation: a huge majority of the Plan's assets continue to reside in funds other than the Freedom Funds, and Fidelity continues to have a fiduciary obligation to monitor all investment options other than those selected through the SDBA.

121.    Even by the terms of its own legal maneuver, Fidelity failed to provide required disclosures. Fidelity has labeled PAS-W a designated investment alternative, and SAI provided Fidelity with benchmarks and performance data for PAS-W. Yet, Fidelity provided no disclosures related to PAS-W. Not only did Fidelity fail to disclose the performance, benchmarks, and average fees associated with various PAS-W model portfolios, Fidelity failed to provide disclosures regarding the dozens of proprietary funds in which PAS-W assets were invested during the relevant period.

122.    This decision harmed participants, and hindered their ability to knowledgably manage their 401(k) accounts. For example, the FBIC received materials showing that, over 3-

year and 5-year periods, participants in PAS-W underperformed participants in the Plan's target date funds and participants making their own fund selections. But participants were given no performance data about PAS-W at all. Fidelity prioritized its attempt to evade legal responsibility over the interests of Plan participants. As a result, billions of dollars of Plan assets sat in the dark, with participants deprived of information about the performance and expenses of their investments.

## X. THE PURPORTED FEE REFUNDS OFFERED BY FIDELITY ARE A FURTHER SOURCE OF LIABILITY, NOT A DEFENSE TO LIABILITY

### A. THE PURPORTED FEE REFUNDS ARE ANYTHING BUT

123.   Like many employers, Fidelity makes annual profit sharing contributions to participants in its defined contribution plan. Fidelity makes both discretionary profit sharing contributions (which may vary year-to-year) and matching contributions (which match the amount of each employee's own contribution).

124.   For several years prior to 2012, Fidelity made discretionary contributions to participant accounts equal to 10% of participants' compensation. For example, the Plan's Form 5500 from 2011 stated:

> The Company contributes annually to the Plan through a profit sharing contribution equal to a percentage of participating employees' eligible compensation as determined by the Board of Directors. In 2011 and 2010, the Company contributed 10% of participating employees' eligible compensation.

125.   In 2012, according to the Plan's Form 5500, Fidelity continued to make discretionary contributions equal to 10% of participants' eligible compensation, but began characterizing a portion of this contribution as a "refund" of investment management fees paid by participants the prior year.

> The Company contributes annually to the Plan. In 2011, the Company contributed a discretionary profit sharing contribution equal to 10% of participating employees' eligible compensation as determined by the Board of Directors. In 2012, the profit sharing contribution was amended to include a non-discretionary portion that approximates the revenue the Company receives in connection with the investment options offered under the Plan and a discretionary portion which, when combined, results in an allocation of a percentage of participating employees' eligible compensation. In 2012, the Company contributed 10% of participating employees' eligible compensation as a profit sharing contribution.

Ostensibly, Fidelity was now refunding all investment management fees to Plan participants, making the Plan's investment options supposedly cost-free.

126.    But in reality, this "refund"[21] was a poorly-disguised gimmick. Fidelity took money that it was going to contribute anyway and recharacterized a portion of it as a fee "refund." Thus, for every dollar in investment management fees that Fidelity gave back to Plan participants, Fidelity reduced its profit sharing contribution to participants by the same amount.

127.    Fidelity has made a 10% profit sharing contribution to plan participants every year since at least 2008. If, beginning in 2012, Fidelity had *added* the amount of the Plan's investment management fees to its profit sharing contributions, then the amount of those profit sharing contributions would have increased. Instead, the amount of Fidelity's profit sharing contributions remained the exact same as before the 2012 "refund": 10% each year.

128.    Fidelity has simply reduced its discretionary profit sharing contribution amount each year by the amount of its non-discretionary "refund" of Plan investment management fees. This explains why, despite a 33% increase in the amount of investment management fees "refunded" by Fidelity between 2013 and 2016, Fidelity's profit sharing contributions have remained unchanged, at 10% of employees' eligible compensation.

129.    Fidelity created this "fee refund" artifice in an attempt to obscure its fiduciary

---

[21] The Plan Document refers to this annual payment as a "Revenue Credit."

misconduct. However, ERISA does not allow employers to use such gimmicks to evade fiduciary liability.

### B. DEFENDANTS DISCRIMINATED AGAINST EX-EMPLOYEES

130.    To the extent Defendants' Revenue Credit is considered relevant to Defendants' fiduciary duties, it constitutes an annual breach of the Plan Fiduciaries' duty of impartiality. As explained *supra*, the Revenue Credit took the form of a profit sharing contribution to "participating employees," which was based on the "eligible compensation" of those employees.

131.    Plan participants who were no longer working for a Plan Employer were not "participating employees," and thus received nothing. Put differently, Fidelity charged ex-employees in the Plan millions of dollars in investment management fees, and no portion of those fees were ever returned to them either directly or indirectly.

132.    Fidelity's Plan-related payments to employees, but not ex-employees, violated the Plan Fiduciaries' duty of impartiality. As part of the duty of loyalty, fiduciaries must "take impartial account of the interests of all beneficiaries." *Varity Corp. v. Howe*, 516 U.S. 489, 514 (1996). A fiduciary "must deal even-handedly among them, doing his best for the entire trust looked at as a whole." *Morse v. Stanley*, 732 F.2d 1139, 1145 (2d Cir. 1984). Fidelity's one-sided Revenue Credit flunks this test.

133.    Even if the act of granting the Revenue Credit is construed as a settlor decision, not subject to ERISA's fiduciary duties, the Plan Fiduciaries breached the duty of impartiality because they relied upon the existence of the Revenue Credit in determining how to manage and administer the Plan. In particular, the Plan Fiduciaries relied on the existence of the Revenue Credit as an excuse for failing to prudently manage the Plan's expenses, resulting in the excessive fees described throughout this Second Amended Complaint. For example, an FBIC

member "explained that there are effectively no fees for these investments because all revenue from Fidelity funds is rebated to the Plan." Likewise, when the Chairman of the Retirement Committee asked about the Plan's administrative expenses, he was told, "there are none."

134.    Because former employees do not receive the Revenue Credit, the Fidelity Defendants knew or should have known that their rationale for their lackadaisical oversight of Plan expenses at best applied only to current employees.

135.    Accordingly, to the extent Fidelity's annual Revenue Credits are considered, the Plan Fiduciaries have violated their duty of impartiality under ERISA.

## XI.    PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND PRUDENT ALTERNATIVES

136.    Plaintiffs did not have knowledge of all material facts (including, among other things, the investment option and menu choices of fiduciaries of similar plans, the costs of the Plan's investments compared to those in similarly-sized plans, the overall costs of the Plan compared to similarly-sized plans, the availability of superior options that satisfied the goals of the Plan, and other information set forth above) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed. Further, Plaintiffs did not have actual knowledge of the specifics of the Plan Fiduciaries' decision-making processes with respect to the Plan (including the Plan Fiduciaries' processes for determining which asset classes to include among the Plan's investment options as well as the Plan Fiduciaries' processes for selecting, monitoring, evaluating, and removing Plan investments), because this information is solely within the possession of Defendants prior to discovery. For purposes of this Second Amended Complaint,

Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

137.   29 U.S.C. § 1132(a)(2) authorizes any ERISA plan participant or beneficiary to bring an action on behalf of the Plan to obtain the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

138.   Plaintiffs assert their claims in Counts I-III and V-VII on behalf of a class of participants and beneficiaries defined as follows:[22]

> All participants and beneficiaries of the FMR LLC Profit Sharing Plan or the Fidelity Retirement Savings Plan who, after the effective date of the *Bilewicz* settlement, (1) remained Plan participants or beneficiaries for any length of time, (2) ceased to be employed by a participating employer before or during the period of time that they remained in the Plan, and (3) were not paid Revenue Credits issued by Fidelity in any Plan year or portion of a Plan year in which they maintained a Plan account balance and were no longer employed by a participating employer, excluding any persons with direct responsibility for the Plan's investment or administrative functions.

139.   Plaintiffs assert their claims relating to the PAS-W program in Count IV on behalf of a sub-class consisting of all class members who participated in the Plan's PAS-W program during any portion of the time that they met the eligibility criteria for the Class.

140.   <u>Numerosity</u>:   The Classes (including the Sub-Class) are so numerous that joinder of all class members is impracticable, and consist of thousands of class members.

141.   <u>Typicality</u>:   Plaintiffs' claims are typical of other class members' claims. Like other class members, Plaintiffs are Plan participants and suffered injuries as a result of the

---

[22] Plaintiffs reserve the right to propose other or additional classes or sub-classes in their motion for class certification or subsequent pleadings in this action.

unlawful conduct alleged herein. The Plan Fiduciaries treated Plaintiffs consistently with other class members with regard to the Plan, and SAI and the Plan Fiduciaries treated Plaintiff Torline consistent with other participants in the PAS-W program. Defendants' unlawful actions and decisions affected all Plan participants similarly.

142.   <u>Adequacy</u>:   Plaintiffs will fairly and adequately protect the interests of the Class and Sub-Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and Plaintiff Torline's interests are also aligned with the Sub-Class. Plaintiffs also have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

143.   <u>Commonality</u>:   Common questions of law and fact exist as to all class members, and predominate over any questions solely affecting individual class members, including but not limited to:

a.   Which of the Plan Fiduciaries are fiduciaries of the Plan;

b.   Whether the Plan Fiduciaries breached their fiduciary duties by engaging in the conduct described herein;

c.   Whether SAI breached its fiduciary duties by engaging in the conduct described herein;

d.   Whether the Plan Fiduciaries are additionally or alternatively liable, as co-fiduciaries, for the unlawful conduct described herein pursuant to 29 U.S.C. § 1105;

e.   Whether FMR LLC breached its duty to monitor other Plan fiduciaries;

f.   Whether the Plan engaged in prohibited transactions in violation of 29 U.S.C. § 1106(b);

g.   Whether the Entity Defendants had actual or constructive knowledge of the fiduciary breaches and prohibited transactions of the Plan Fiduciaries;

h.   The proper form of equitable and injunctive relief; and

i.   The proper measure of monetary relief.

144.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants.

145.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as removal of particular Plan investments, removal of a Plan fiduciary, or appointment of an independent fiduciary to oversee the Plan, would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

146.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the classes predominate over any questions affecting only individual class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Second Amended Complaint applied uniformly to all members of the Class and Sub-Class. Class members do not have an interest in pursuing separate actions against Defendants, as the

amount of each class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

## COUNT I
### Breach of Duties of Loyalty and Prudence
### 29 U.S.C. § 1104(a)(1)(A)–(B), (D)
### As to the Plan Fiduciaries

147.    Defendants FMR LLC, the FBIC, and the Retirement Committee are or were fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

148.    29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon the Plan Fiduciaries in their administration of the Plan and in their selection and monitoring of Plan investments.

149.    The scope of the fiduciary duties and responsibilities of the Plan Fiduciaries includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. The Plan Fiduciaries were directly responsible for ensuring that the Plan's fees were reasonable, selecting investment options in a prudent fashion in the best interest of Plan participants, prudently evaluating and monitoring the Plan's investments on an ongoing basis and eliminating funds that did not serve the best interest of Plan participants, and taking all necessary steps to ensure that the Plan's assets were invested

prudently and appropriately. This includes "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

150.    As described throughout this Second Amended Complaint, the Plan Fiduciaries failed to employ a prudent and loyal process for selecting, monitoring, and reviewing the Plan's investment options by prioritizing Fidelity's proprietary investments over superior available options, and by failing to critically or objectively evaluate the cost and performance of the Plan's proprietary investments in comparison to other investment options. The Plan Fiduciaries imprudently and disloyally retained higher-cost Fidelity mutual funds despite the availability of lower-cost investments and lower-cost share classes that offered comparable or superior investment management services. The Plan Fiduciaries instead selected and retained options that benefited Fidelity but offered little or no benefit to participants compared to superior options available in the marketplace. Additionally, the Plan Fiduciaries failed to investigate the use of separate accounts or collective trusts, and failed to procure available revenue sharing rebates for the mutual funds that were used instead. Further, the Plan Fiduciaries structured the Plan menu without considering the interests of participants, and failed to change the Plan's structure despite participants' consistent underperformance due to return-chasing across the Plan's vast menu of redundant investment options. Moreover, the Plan Fiduciaries failed to monitor the Plan's investments and remove those that were imprudent, including investments that were duplicative of other, less expensive funds in the Plan and sector funds that offered no diversification benefit.

151.    Each of the above-mentioned actions and failures to act described in paragraph 120 and throughout the Second Amended Complaint demonstrates the Plan Fiduciaries' failure to make Plan investment decisions based solely on the merits of each investment and in the best interest of Plan participants, instead selecting and retaining Plan investments based upon the

affiliation of each investment with Fidelity, while failing to investigate alternative investments affiliated with other managers. Further, even aside from their failure to consider alternative investments from other companies, the Plan Fiduciaries failed to properly screen and monitor Fidelity's own in-house offerings to eliminate imprudent and/or duplicative funds, ensure the plan was invested in the lowest-cost share classes and investment vehicles, and procure available revenue sharing rebates. Through these actions and omissions, the Plan Fiduciaries failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

152.    Each of the above actions and omissions described in paragraphs 120-21 and elsewhere in this Second Amended Complaint demonstrate that the Plan Fiduciaries failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

153.    Each Plan Fiduciaries is personally liable, and the Plan Fiduciaries are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, the Plan Fiduciaries are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(3).

154. Each Plan Fiduciaries knowingly participated in each breach of the other Plan Fiduciaries, knowing that such acts were a breach; enabled the other Plan Fiduciaries to commit breaches by failing to lawfully discharge such Plan Fiduciary's own duties; and/or knew of the breaches by the other Plan Fiduciaries, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Plan Fiduciary is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT II**
**Breach of the Duty of Impartiality**
**29 U.S.C. § 1104(a)**
**As to the Plan Fiduciaries**

155. As alleged throughout the Second Amended Complaint, FMR LLC, the FBIC, and the Retirement Committee are fiduciaries of the Plan pursuant to 29 U.S.C. § 1002(21).

156. The duty of loyalty outlined in 29 U.S.C. § 1104 includes a fiduciary duty of impartiality, prohibiting fiduciaries from favoring one group of participants over another in connection with their management and administration of the Plan.

157. As described in this Second Amended Complaint, the Plan Fiduciaries violated their duty of impartiality by purporting to rebate the Plan's annual expenses to participants currently employed by a Plan Employer, while offering no such purported rebate to participants no longer employed by a Plan Employer.

158. The Plan Fiduciaries further breached the duty of impartiality by making fiduciary decisions related to recordkeeping, the Plan's investment menu, and the Plan's managed accounts service in reliance upon the existence of the Revenue Credit, and in a manner that created a negative outcome for participants and beneficiaries who did not received this Revenue Credit.

159.     As a result of these breaches of the duty of impartiality, the Class suffered significant financial losses.

160.     Each Plan Fiduciaries is personally liable, and the Plan Fiduciaries are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), to make good the losses resulting from the aforementioned breaches, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, the Plan Fiduciaries are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(3).

161.     Each Plan Fiduciary knowingly participated in each breach of the other Plan Fiduciaries, knowing that such acts were a breach; enabled the other Plan Fiduciaries to commit breaches by failing to lawfully discharge such Plan Fiduciary's own duties; and/or knew of the breaches by the other Plan Fiduciaries, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Plan Fiduciary is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

<u>COUNT III</u>
**Failure to Provide Disclosures to Participants Regarding Investment Options**
**29 U.S.C. § 1104(a)**
**As to the Plan Fiduciaries**

162.     At all relevant times, as alleged above, the Plan Fiduciaries were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and/or served as an "administrator" of the Plan, as designated by the Plan Document.

163.     At all relevant times, as alleged above, the scope of the fiduciary responsibility of the Plan Fiduciaries included the responsibility to ensure that Plan participants "are made aware of their rights and responsibilities with respect to the investment of assets held in, or contributed to, their accounts and are provided sufficient information regarding the plan, including fees and

expenses, and regarding designated investment alternatives, including fees and expenses thereto, to make informed decisions with regard to the management of their individual accounts." 29 C.F.R. § 2550-404a-5(a).

164.    Under ERISA's duty of loyalty, fiduciaries must speak truthfully. This includes a negative duty not to misinform, an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful, and an affirmative duty to convey complete and accurate information material to the circumstances of participants and beneficiaries. The affirmative duty to disclose includes providing information even when a participant has not asked.

165.    The Plan Fiduciaries failed to adequately disclose all information regarding the investment options in the Plan by failing to disclose all investment options within the Plan and their fees, risks, and expenses.

166.    As a result of the foregoing failures to disclose, the Class was left in the dark regarding essential information pertaining to the Plan's investments and suffered significant financial losses.

167.    Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), the Plan Fiduciaries are liable to make good the losses resulting from the aforementioned breaches, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, the Plan Fiduciaries are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(3).

<u>**COUNT IV**</u>
**Breach of Duties of Loyalty and Prudence Related to the PAS-W Managed Accounts**
**Service**
**29 U.S.C. § 1104(a)(1)(A)–(B), (D)**
**As to SAI and the Plan Fiduciaries**

168.    At all relevant times, as alleged above, SAI was a functional fiduciary pursuant to 29 U.S.C. § 1002(21)(A) and a named fiduciary pursuant to 29 U.S.C. § 1102(a), and the Plan Fiduciaries were functional fiduciaries under 29 U.S.C. § 1002(21)(A).

169.    29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon SAI and the Plan Fiduciaries in connection with the Plan's managed accounts program.

170.    As described in this Second Amended Complaint, SAI breached its fiduciary duties with respect to the PAS-W program by, among other things, (1) prioritizing higher-fee Fidelity investment options over other available options, (2) failing to give proper consideration to investment expenses, and (3) failing to properly evaluate fund performance.

171.    As described in this Second Amended Complaint, the Plan Fiduciaries breached their fiduciary duties with respect to the Plan's managed accounts program by, among other things, (1) failing to give any consideration to alternative managed accounts services; (2) failing to properly evaluate and monitor SAI; and (3) failing to critically monitor and review the Plan's managed accounts program.

172.    As a result of these fiduciary breaches alleged in this Count, the PAS-W Sub-Class suffered significant financial losses.

173.    SAI and each Plan Fiduciary are personally liable, and SAI and the Plan Fiduciaries are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), to make good the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any

profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, SAI and the Plan Fiduciaries are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(3).

## COUNT V
### Prohibited Transactions with a Fiduciary
### 29 U.S.C. § 1106(b)
### As to the Plan Fiduciaries

174.    As described throughout the Second Amended Complaint, FMR LLC is a fiduciary of the Plan as that term is used in 29 U.S.C. §§ 1002(21) and 1106(b).

175.    FMR LLC received consideration for its own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan. These transactions took place on a monthly basis when fees were deducted from assets being held for Plan participants in exchange for the services performed by FMR, FMRC, and FIIOC, subsidiaries of FMR LLC whose profits accrued, in part or in whole, to the benefit of FMR LLC. Each of these payments to FMR, FMRC, and FIIOC constituted a prohibited transaction in violation of 29 U.S.C. § 1106(b)(3).

176.    Based on the foregoing facts and the other facts set forth in this Second Amended Complaint, FMR LLC and the other Plan Fiduciaries knowingly caused the Plan to engage in these prohibited transactions, made no efforts to prevent these transactions, and are liable for these prohibited transactions under 29 U.S.C. § 1106(b)(3).

177.    These prohibited transactions were not permitted by Prohibited Transaction Exemption 77-3 because the Plan was treated less favorably than other shareholders of Fidelity funds. As noted above, revenue sharing rebates were not provided in connection with funds held

by the Plan, despite the fact that such revenue sharing rebates were provided in connection with the same funds held by other retirement plans. *See supra* at ¶¶ 76-78.

178.    As a result of these prohibited transactions, the Plan directly or indirectly paid millions of dollars per year in investment management and other fees that accrued to the benefit of FMR LLC in transactions that were prohibited under ERISA, resulting in significant losses to the Plan and its participants.

179.    Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), FMR LLC and the other Plan Fiduciaries are liable to restore all losses suffered by the Plan as a result of these prohibited transactions and to disgorge all profits earned as a result of these prohibited transactions.

**COUNT VI**
**Failure to Monitor Fiduciaries**
**As to FMR LLC**

180.    As alleged throughout the Second Amended Complaint, FMR LLC, the FBIC and the Retirement Committee are fiduciaries of the Plan pursuant to 29 U.S.C. § 1002(21).

181.    FMR LLC, through its senior officer for human resources, is responsible for appointing and removing members of the FBIC and the Retirement Committee.

182.    Given that FMR LLC had overall oversight responsibility for the Plan, and the fiduciary duty to appoint and remove members of the FBIC and the Retirement Committee through its senior officer for human resources, FMR LLC had a fiduciary responsibility to monitor the performance of the Committee.

183.    A monitoring fiduciary must ensure that the monitored fiduciaries are fulfilling their fiduciary obligations, including those with respect to the investment and holding of plan

assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries are not meeting their fiduciary obligations.

184.  FMR LLC breached its fiduciary monitoring duties by, among other things:

a.  Failing to monitor and evaluate the performance of the FBIC and the Retirement Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions with respect to the Plan;

b.  Failing to monitor the FBIC and the Retirement Committee's fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein; and

c.  Failing to remove FBIC and Retirement Committee members whose performance was inadequate in that they continued to recommend retention of imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

185.  As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses per year due to excessive fees and investment underperformance.

186.  Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), FMR LLC is liable to restore to the Plan all losses suffered as a result of its failure to properly monitor the Committee and its members, and subsequent failure to take prompt and effective action to rectify any observed fiduciary breaches.  In addition, FMR LLC is liable for an accounting of profits and other equitable relief as provided by 29 U.S.C. §§ 1109(a) and 1132(a)(3).

**COUNT VII**
**Other Equitable Relief Based on Ill-Gotten Proceeds**
**29 U.S.C. § 1132(a)(3)**
**As to the Entity Defendants**

187.    Under 29 U.S.C. § 1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. A defendant may be liable under this section regardless of whether it is a fiduciary. A non-fiduciary transferee of ill-gotten proceeds is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

188.    Defendants FMR LLC, FMR, FMRC, and FIIOC each profited from the fiduciary breaches and prohibited transactions described above.

189.    All payments to Fidelity made in connection with Plan assets are in the current possession of Fidelity, and are traceable to specific transactions that have taken place on specific dates.

190.    Pursuant to 29 U.S.C. § 1132(a)(3), each of the Entity Defendants should be required to disgorge all profits it received during the relevant class period as a result of the Plan's investments in Fidelity mutual funds. The selection and retention of these proprietary mutual funds was imprudent and violated ERISA based on the facts set forth herein. Moreover, as detailed throughout the Second Amended Complaint, each Entity Defendant had actual or constructive knowledge of circumstances rendering the selection and retention of these proprietary funds (and the payments that Fidelity received from these proprietary funds) unlawful, by virtue of:

(a)    the Board members and Committee members with executive positions at each of the Entity Defendants;

(b)    other dual-hatted employees;

(c)     the affiliation of the Entity Defendants with a common parent and one another;

(d)     the investment management and recordkeeping services that the various Entity Defendants provided to the Plan;

(e)     each Entity Defendant's participation in the Plan as an employer with employees in the Plan; and

(f)     the general operational interconnectedness of the Entity Defendants as part of Fidelity's entire enterprise.

191.    The Entity Defendants also had knowledge of each entity's fiduciary status, and the circumstances that rendered the payment of fees to these entities prohibited transactions and fiduciary breaches.

192.    In light of the above facts and other facts likely to be revealed through discovery, the Entity Defendants had actual or constructive knowledge of the process for selecting and monitoring the investments in the Plan, and knew that the Plan Fiduciaries failed to engage in a prudent and loyal selection and monitoring processes. The Entity Defendants also knew that the proprietary investments in the Plan were excessively costly compared to investments in similarly-sized plans and likewise performed poorly in comparison to other investment alternatives used by similarly-sized plans.

193.    Given their knowledge of these fiduciary breaches and prohibited transactions, the Entity Defendants had actual or constructive knowledge that the monies they were receiving from or in connection with Plan assets were being received as a result of violations of ERISA by the Plan Fiduciaries.

194.    Therefore, to the extent any ill-gotten profits are not disgorged under the relief provisions of 29 U.S.C. § 1109(a), the Court should order appropriate equitable relief under 29

U.S.C. § 1132(a)(3) to disgorge these profits from the Entity Defendants under principles of unjust enrichment and equitable restitution.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs Moitoso, Lewis, Torline, and Arndt, individually and as representatives of the Class defined herein, pray for relief as follows:

A.   A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.   Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.   A declaration that the Plan Fiduciaries and SAI have breached their fiduciary duties under ERISA;

D.   A declaration that the Plan Fiduciaries violated 29 U.S.C. § 1106 by allowing the Plan to engage in prohibited transactions;

E.   An order compelling the Plan Fiduciaries and SAI to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties and prohibited transactions described above, and to restore the Plan to the position it would have been in but for this unlawful conduct;

F.   An accounting for profits earned by the Entity Defendants resulting from fiduciary breaches and prohibited transactions, and a subsequent order requiring the Entity Defendants to disgorge all profits received from, or in respect of, the Plan;

G.   An order granting equitable restitution and other appropriate equitable monetary relief against the Entity Defendants including, but not limited to, imposition of a constructive trust on all profits earned by the Entity Defendants as a result of the Plan Fiduciaries' and SAI's unlawful conduct in violation of ERISA or a surcharge against the Entity Defendants to prevent their unjust enrichment;

H.   An order enjoining the Plan Fiduciaries and SAI from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

I.      Other equitable relief to redress the Plan Fiduciaries' and SAI's illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan; transfer of Plan assets out of imprudent investments into prudent alternatives; and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

J.      An award of pre-judgment interest;

K.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

L.      An award of such other and further relief as the Court deems equitable and just.

Dated: March 25, 2019                        Respectfully submitted,
                                             **NICHOLS KASTER, PLLP**

                                             s/ Kai Richter
                                             Kai Richter (admitted *pro hac vice*)
                                             Paul J. Lukas (admitted *pro hac vice*)
                                             Brock T. Specht (admitted *pro hac vice*)
                                             Carl F. Engstrom (admitted *pro hac vice*)
                                             Jacob T. Schutz (admitted *pro hac vice*)
                                             Mark E. Thomson (admitted *pro hac vice*)
                                             4600 IDS Center
                                             80 S. 8th Street
                                             Minneapolis, Minnesota 55402
                                             krichter@nka.com
                                             lukas@nka.com
                                             bspecht@nka.com
                                             cengstrom@nka.com
                                             jschutz@nka.com
                                             mthomson@nka.com

                                             Jason M. Leviton (BBO #678331)
                                             Jacob A. Walker (BBO #688074)
                                             **BLOCK & LEVITON LLP**
                                             155 Federal Street, Ste. 400
                                             Boston, Massachusetts 02110
                                             (617) 398-5600
                                             jason@blockesq.com
                                             jacob@blockesq.com

                                             ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on March 25, 2019.

Dated: March 25, 2019                                    <u>s/Kai Richter</u>
                                                        Kai Richter