# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Kevin Moitoso, Tim Lewis, Mary Lee Torline, and Sheryl Arndt, individually and as representatives of a class of similarly situated persons, and on behalf of the Fidelity Retirement Savings Plan,<br><br>        Plaintiffs,<br>v.<br><br>FMR LLC, the FMR LLC Funded Benefits Investment Committee, the FMR LLC Retirement Committee, Fidelity Management & Research Company, FMR Co., Inc., and Fidelity Investments Institutional Operations Company, Inc.,<br><br>        Defendants. | Case No. 1:18-cv-12122-WGY |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

UNDISPUTED MATERIAL FACTS ........................................................................................ 3

I.   PLAN "REDESIGN" AND SUBSEQUENT FAILURE TO MONITOR INVESTMENT OPTIONS ............... 3

II.  FAILURE TO MONITOR AND CONTROL RECORDKEEPING EXPENSES ........................................... 6

UNDISPUTED EXPERT OPINIONS ...................................................................................... 7

STANDARD OF REVIEW ...................................................................................................... 8

ARGUMENT ......................................................................................................................... 9

I.   PLAINTIFFS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT REGARDING WHETHER THE
     COMMITTEES BREACHED THEIR FIDUCIARY DUTY OF PRUDENCE UNDER ERISA ................. 9

     A.   The FBIC Breached Its Duty to Prudently Monitor the Plan's Investments .............. 9

     B.   The Retirement Committee Breached Its Duty to Prudently Monitor and Control
          Recordkeeping Expenses .......................................................................................... 13

II.  PLAINTIFFS ALSO ARE ENTITLED TO SUMMARY JUDGMENT AS TO LIABILITY ON THEIR
     PROHIBITED TRANSACTION CLAIM IN COUNT III ................................................................... 15

     A.   FMR LLC is a Fiduciary of the Plan ......................................................................... 16

     B.   FMR LLC Received Consideration in Connection with Transactions Involving
          Assets of the Plan, in Violation of 29 U.S.C. § 1106(b) ........................................... 16

     C.   No Prohibited Transaction Exemption Applies ......................................................... 17

          1.   PTE 77-3 Does Not Apply .................................................................................. 17

          2.   Defendants Have Not Identified Any Other Exemption that Applies to Claims
               under 29 U.S.C. § 1106(b) ............................................................................... 18

CONCLUSION .................................................................................................................... 20

# **TABLE OF AUTHORITIES**

## **Cases**

*Acosta v. City Nat'l Corp.*, 922 F.3d 880 (9th Cir. 2019)..........................................................14, 19

*Bilewicz v. FMR LLC, et al.*, No. 1:13-cv-10636 (D. Mass.) ...........................................................3

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009) ....................................................17

*Brotherston v. Putnam Invs., LLC*, 2017 WL 1196648 (Mar. 30, 2017)...............................16, 19

*Brotherston v. Putnam Invs., LLC*, 2017 WL 2634361 (D. Mass. June 19, 2017)...................9, 10

*Brotherston v. Putnam Invs., LLC*, 907 F.3d 17 (1st Cir. 2018)...................2, 3, 11, 13, 17, 18, 19

*Carpenters Local Union No. 26 v. U.S. Fidelity and Guar. Co.*, 215 F.3d 136 (1st Cir. 2000)....19

*Conjugal P'ship v. Conjugal P'ship*, 22 F.3d 391 (1st Cir. 1994) ................................................19

*Evicci v. Baker*, 190 F. Supp. 2d 233 (D. Mass. 2002)...................................................................9

*Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014)......................................................11

*George v. Kraft Foods Global, Inc.*, 641 F.3d 786 (7th Cir. 2011) ................................................14

*Glass Dimensions, Inc. Profit Sharing Plan & Trust v. State St. Bank & Trust Co.*,

290 F.R.D. 11 (D. Mass. 2013)................................................................................................17

*Glass Dimensions, Inc. Profit Sharing Plan & Trust v. State St. Bank & Trust Co.*,

931 F. Supp. 2d 296 (D. Mass. 2013) .......................................................................................9

*Haddock v. Nationwide Fin. Servs.*, 419 F. Supp. 2d 156 (D. Conn. 2006) ..................................17

*Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*, 751 F.3d 740 (6th Cir. 2014) .............19

*LaPlante v. Mass. Dept. of Corr.*, 89 F. Supp. 3d. 235 (D. Mass. 2015).........................................8

*Leimkuehler v. Am. Utd. Life Ins. Co.*, 752 F. Supp. 2d 974 (S.D. Ind. 2010) .............................17

*Liss v. Smith*, 991 F. Supp. 278 (S.D.N.Y. 1998) .........................................................................10

*Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65 (3d Cir. 2012) ...............................................................19

*Perez v. City Nat'l Corp.*, 176 F. Supp. 3d 945 (C.D. Cal. 2016) .................................................14

*Tibble v. Edison Int'l*, 135 S. Ct. 1823 (2015).........................................................................1, 9

*Tibble v. Edison Int'l*, 843 F.3d 1187 (9th Cir. 2016) ....................................................13

*Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014) ..............................................1, 14

*U.S. v. Thompson*, 32 F.3d 1 (1st Cir. 1994)....................................................16

*Williams v. Ashland Eng'g Co., Inc.*, 45 F.3d 588 (1st Cir. 1995) .............................19

## **Rules, Statutes, and Regulations**

29 C.F.R. § 2509.94-2(2) ....................................................................................10

29 U.S.C. § 1102(a)(21)(A) ...............................................................................16

29 U.S.C. § 1104(a)(1)(B) ....................................................................................9

29 U.S.C. § 1104(a)(1)(D) ..................................................................................11

29 U.S.C. § 1104(c)(1)(A)(ii) .............................................................................12

29 U.S.C. § 1106(b) ..............................................................................................3

29 U.S.C. § 1106(b)(3) ........................................................................................16

29 U.S.C. § 1110(a) .............................................................................................11

42 Fed. Reg. 18734-35 ........................................................................................17

72 Fed. Reg. 70988 (Dec. 13, 2007) ...................................................................14

Fed. R. Civ. P. 56(a) .............................................................................................8

## **Other Authorities**

DOL Advisory Op. 2013-03A, 2013 WL 3546834, at 4 (July 3, 2013)........................14

Restatement (Third) of Trusts § 88, cmt. a (2007) ......................................................13

## INTRODUCTION

Plaintiffs assert two primary fiduciary breaches in this case: (1) failure to monitor Plan investment options; and (2) failure to monitor and control recordkeeping expenses. *Fourth Amended Complaint ("FAC"), ECF No. 77, ¶ 3.*[1] As to each, the material facts are undisputed, rendering a trial unnecessary.

***Failure to Monitor Investment Options***.  Fidelity acknowledges in its fiduciary training materials that fiduciaries have a "continuing duty to monitor" the investment options in a retirement plan. *Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts ("SoF"), ¶ 17; see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). Yet, Fidelity admittedly failed to monitor any of the approximately 200 Fidelity investment options in its own Plan, other than two "designated" options (the Plan's target date funds and managed account service). *Id., ¶ 18*. This left the majority of the Plan's investment holdings—constituting billions of dollars in Plan assets—unmonitored during the class period. *Id., ¶ 16*. Plaintiffs' fiduciary process expert, Marcia Wagner, has opined that this was imprudent, *id., ¶ 24*, and Defendants do not offer any contrary expert opinion. *Id., ¶ 25*. Nor could Defendants excuse their failure to monitor, given the Supreme Court's decision in *Tibble*. Accordingly, Plaintiffs are entitled to summary judgment as to breach on this portion of their fiduciary duty claim.

***Failure to Monitor and Control Recordkeeping Expenses***. Fidelity also acknowledges that "fiduciaries have a duty to monitor recordkeeping fees and to perform thorough due diligence with respect to competitiveness." *SoF, ¶ 27; see also Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014). Yet, Fidelity admittedly failed to monitor the Plan's recordkeeping expenses as well. *See SoF, ¶¶ 28-29*. Plaintiffs' fiduciary process expert (Ms. Wagner) and

---

[1] Plaintiffs assert other discrete breaches, such as failure to consider a stable value fund option (*FAC, ¶¶ 95-100*) and failure to consider alternatives to mutual funds such as collective trusts (*id., ¶¶ 68-71*).  However, these other breaches are not the subject of the present motion.

recordkeeping expert (James Scheinberg) have both opined that this was imprudent. *Id., ¶¶ 32-33*. Again, these opinions are uncontested by Defendants' experts, and Defendants offer no recordkeeping expert of their own. Indeed, Defendants have ***stipulated*** that the Plan's fiduciaries "could have obtained recordkeeping services" at a much lower cost if they had "negotiated…for recordkeeping services at arm's length." *Id., ¶¶ 30-31*. Thus, summary judgment is also appropriate as to breach on this portion of Plaintiffs' fiduciary duty claim.

The only remaining fact issues as to these claims relate to damages—specifically, the amount of losses and loss causation. The first issue is not relevant to this motion (which is focused on breach), and Plaintiffs do not bear the burden of proof on the second issue. *See Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 39 (1st Cir. 2018) ("*Brotherston III*"). Even if they did, loss causation is undisputed. Defendants' own fiduciary process expert conceded that a prudent investment monitoring process would have resulted in the removal of at least 11 funds from the Plan during the class period. *SoF, ¶ 25*. As to the failure to control recordkeeping costs, Defendants stipulated that the Plan could have obtained recordkeeping services for $14 to $21 per participant during the class period, *id., ¶ 31*, yet their own expense reports show that the Plan paid hundreds of dollars per participant, *id., ¶ 30.* And while Fidelity purported to rebate all fees to Plan participants through its annual 10% profit-sharing contributions (a portion of which were re-labeled as a so-called mandatory "Revenue Credit"), these contributions were not provided to class members while they were in the class. *Id., ¶¶ 34-38.*

***Related Prohibited Transactions***. For similar reasons, Plaintiffs are also entitled to summary judgment on their claim that the Plan engaged in prohibited transactions with a fiduciary (Count III). Fidelity acknowledges that "[a] fiduciary cannot cause the plan to engage in transactions that benefit…plan fiduciaries…[u]nless permitted under a prohibited transaction

exemption." *SoF, ¶ 39*; *see also* 29 U.S.C. § 1106(b); *Brotherston III*, 907 F.3d at 25. Here, it is undisputed that (1) Defendant FMR LLC is a fiduciary of the Plan, *SoF, ¶ 40*; (2) "the amounts paid to Fidelity by the mutual funds in which the Plan invests are transferred…to a centralized corporate account registered to FMR LLC," *id., ¶ 41*; and (3) absent the so-called "Mandatory Revenue Credit" (i.e. profit sharing contribution), which was **_not_** paid to class members, Fidelity's dealings with the Plan were "less favorable" than Fidelity's dealings with other shareholders of Fidelity mutual funds, *id., ¶¶ 38, 43*. This defeats Prohibited Transaction Exemption 77-3, *see Brotherston III*, 907 F.3d at 27-30, and Fidelity identifies no other prohibited transaction exemption that would apply.

Therefore, Plaintiffs request that the Court grant partial summary judgment as to the alleged breaches and violations in Counts I and III.

## UNDISPUTED MATERIAL FACTS

**I.    PLAN "REDESIGN" AND SUBSEQUENT FAILURE TO MONITOR INVESTMENT OPTIONS**

The Plan is a defined contribution plan sponsored by FMR LLC in which participants invest monies in their accounts within a menu of available investment options. *SoF, ¶¶ 1-3*. Prior to the class period, the Plan automatically offered every eligible Fidelity mutual fund (other than tax-exempt funds),[2] and did not offer investments from any other investment management firms. *Id., ¶ 5*. This resulted in a prior lawsuit against Fidelity in this District (the "*Bilewicz* Action"), brought by different plaintiffs represented by different counsel. *Id., ¶ 6* (citing *Bilewicz v. FMR LLC, et al.*, No. 1:13-cv-10636 (D. Mass.)).

In 2013, in reaction to the *Bilewicz* Action, Fidelity convened a team of lawyers to change the Plan's structure. *Id., ¶¶ 6, 7*. Fidelity's self-described "lead ERISA attorney," Ralph

---

[2] The amounts paid to Fidelity by the mutual funds in which the Plan invests flow to the corporate account of the Plan sponsor, FMR LLC. *SoF, ¶ 41*.

Derbyshire, personally conceived of the new Plan structure and led the effort. *Id., ¶ 8*. After consulting with Fidelity's senior management and other Fidelity lawyers, Mr. Derbyshire recommended the new Plan structure to a subcommittee of Fidelity's Board of Directors, and the new structure was adopted through a Plan amendment. *Id., ¶¶ 7-8*.

Under the new Plan structure, all Fidelity mutual funds continued to be automatically included in the Plan, and were removed only when they were no longer offered in the marketplace. *Id., ¶¶ 10, 19*. However, the new Plan structure was different in other respects:

- Two Fidelity investment options—a suite of target date funds and a managed account program—were labeled "designated investment alternatives" ("DIAs");

- A self-directed brokerage account, offering all eligible non-Fidelity mutual funds in the marketplace, was made available to Plan participants; and

- An investment committee (the Funded Benefits Investment Committee, or "FBIC") assumed responsibility for investment monitoring, while an administrative committee (the Retirement Committee) assumed responsibility for monitoring the Plan's administrative services.

*Id., ¶¶ 9, 11-13*.

This Plan structure was implemented in July 2014, and was followed by a 30-day re-enrollment period. *Id., ¶ 14*. During this period, participants could choose to retain their existing investment selections with a single click on the re-enrollment website. *Id*. Participants who did not make a selection were defaulted into an age-appropriate Fidelity target date fund. *Id*.

Following this re-enrollment, the majority of the Plan's assets remained in the existing Fidelity investments. *Id., ¶ 16*. And despite Fidelity's claim to have overhauled the Plan structure, the manner in which Fidelity funds were offered to participants remained the same. *Id., ¶ 10*. Every eligible Fidelity fund continued to be made available on the Fidelity Participant Recordkeeping System (FPRS), and listed on NetBenefits, the online platform provided by Fidelity to participants. *Id*.

Non-Fidelity funds were available only through a separate self-directed brokerage account platform called BrokerageLink. *Id., ¶ 11.* To access the self-directed brokerage account, Plan participants were required to navigate to a different website and enroll in a new online platform. *Id.* Moreover, participant contributions to BrokerageLink are typically not accessible for trading for two business days, and are invested in a Fidelity money market fund until the participant gives Fidelity further instructions. *Id.* Defendants themselves described this separate SDBA platform as "clunky" and recognized that it "may have deterred people from signing up." *Id.* Further, there are important differences in the underlying investments themselves. The Fidelity funds offered through the Plan come in "the share class with the lowest expense ratio," but SDBAs such as BrokerageLink offer more expensive retail share classes. *Id.*[3]

Following the "overhaul," approximately 99% of the Plan's assets remained invested in Fidelity funds. *Id., ¶ 16.* And the majority of those assets (amounting to several **billion** dollars) were in Fidelity funds other than the so-called "DIAs". *Id.* Yet, Fidelity abandoned all fiduciary monitoring of those funds. *Id., ¶ 18.* Even though the Plan continued to include approximately 200 Fidelity funds, the FBIC monitored only the two "DIAs." *Id.*

This radical curtailment of monitoring was led by Mr. Derbyshire. After conceiving of the new Plan structure in his role as Fidelity's lead ERISA attorney, Mr. Derbyshire served simultaneously as an FBIC member (a fiduciary position) and the FBIC's legal adviser (a non-fiduciary position) from the time the FBIC was created until he was replaced as legal adviser in August 2018. *Id., ¶ 21 n.11.* Throughout this time, Mr. Derbyshire repeatedly instructed other FBIC members that the non-"DIAs" were outside the FBIC's authority. *Id., ¶ 21.* At a September 2014 FBIC meeting, Derbyshire noted that the amended Plan is "hard-wired" and that "there is

---

[3] Notably, Fidelity's managed account service (one of the two "DIAs") gave no consideration to investments in the SDBA when assembling model portfolios for participants who enrolled in the service. *Id. at n.5.*

5

no real decision-making over the [Plan's] funds, other than the Plan's [target-date suite] and [managed account service]." *Id.* At a December 2014 meeting, he stated that "the Committee's role was more about setting policy than evaluating the underlying investments." *Id.* At an October 2015 meeting, Mr. Derbyshire stated that "the [non-DIAs] offered under the Plan are set by the plan document and are not under the purview of the [FBIC]." *Id.*

The FBIC should have known better. Fidelity's own fiduciary training materials state that "[c]ommon fiduciary breaches include the failure to…[p]rudently monitor the plan's investment options[.]" *SoF, ¶ 17.* The same training materials recognize that the "Supreme Court held that fiduciaries have a continuing duty to monitor investments and remove ones that may become imprudent[.]" *Id.* And Fidelity has published guidance recognizing that a "plan document's mandate" does not "absolve plan fiduciaries from the duty under ERISA to assure themselves that all plan investment options are prudent." *Id., ¶ 23.*

## II.   FAILURE TO MONITOR AND CONTROL RECORDKEEPING EXPENSES

The Retirement Committee also failed to monitor the Plan's recordkeeping fees. *SoF, ¶ 28.* Legally-required fee disclosures were not provided to the Committee, *id., ¶ 29*, and its members never reviewed or discussed the Plan's per-participant recordkeeping costs, *id., ¶ 28.* Defendants also did not issue any requests for proposals ("RFPs"), solicit bids for recordkeeping, or conduct any third-party benchmarking of the Plan's recordkeeping fees. *Id., ¶ 29.*

As a result, the Retirement Committee did not know what the Plan's recordkeeping costs were. *Id., ¶ 28.* Specifically, the Retirement Committee was unaware that Plan participants paid recordkeeping fees to Fidelity (which were built-in to the cost of Fidelity's mutual funds) amounting to hundreds of dollars per participant annually. *Id., ¶ 30.* Fidelity has stipulated that had the Plan's fiduciaries negotiated for recordkeeping services, they could have obtained the

same services for between $14-$21 per participant per year during the class period. *Id., ¶ 31.*

Retirement Committee members appear to have assumed that recordkeeping fees were paid by Fidelity and not Plan participants. *Id., ¶ 30.* As one Committee member testified: "Our Plan is unique, and there are no fees. Thus, the topic [of monitoring recordkeeping fees] has not come up, to my knowledge." *Id.* However, Fidelity's own expense disclosures identify the "Investment Option Fees Attributable to Recordkeeping" for each Fidelity fund in the Plan. *Id., ¶ 30 n.16.* These fees amounted to millions of dollars per year during the class period. *Id., ¶ 30.*

In 2012, Fidelity introduced a so-called "Mandatory Revenue Credit" that purported to reimburse the investment management fees paid by the Plan (including the recordkeeping component of those fees). *Id., ¶ 35.* However, this was merely an accounting gimmick. *Id., ¶ 36.* Prior to the adoption of this "credit," Fidelity consistently made an annual profit-sharing contribution to eligible Plan participants in an amount equal to 10 percent of their compensation. *Id., ¶ 34.* After the "credit", Fidelity's total contribution (inclusive of the "credit") remained 10%. *Id., ¶ 35.* Thus, no additional consideration was provided. In any event, former employees who remain in the Plan are not eligible for the "credit" except in limited circumstances where they were employed for a portion of a Plan year. *Id., ¶ 37.* The class members in this case consist entirely of former employees who did not receive the "credit" for years they were in the class. *Id., ¶ 38.* Thus, the credit is effectively moot.[4]

## UNDISPUTED EXPERT OPINIONS

The relevant expert opinions relating to the subject of this motion are also undisputed. Specifically, Plaintiffs submitted a detailed expert report from their fiduciary process expert, Marcia Wagner, opining (among other things) that: (1) "[t]he FBIC failed to adhere to a prudent

---

[4] Defendants have stipulated that, absent this "credit", "Fidelity's dealings with the Plan during the Class Period…would have been on terms less favorable than Fidelity's dealings with some other shareholders of certain Fidelity-advised mutual funds." *Id. ¶ 43.*

process for monitoring the Plan's investment options"; (2) "it is well-accepted in the retirement community that…the existence of an SDBA does not relieve plan fiduciaries of their obligation to monitor investment options offered directly to participants"; and (3) "the Retirement Committee failed to prudently monitor and control recordkeeping expenses," *SoF, ¶¶ 24, 32*. None of Defendants' experts offered a rebuttal to these opinions. *Id. ¶ 25.* Although Defendants did retain a fiduciary expert (Phillip Suess), his report was directed exclusively to the opinions of Plaintiffs' damages expert, Dr. Steve Pomerantz. *Id.* And in rebutting Dr. Pomerantz's report, Mr. Suess conceded that he would have removed at least 11 of the unmonitored Fidelity funds during the class period. *Id.*

Plaintiffs also submitted an expert report from their recordkeeping expert, James Scheinberg. Similar to Ms. Wagner, Mr. Scheinberg opined that "[t]he Plan fiduciaries failed to prudently and loyally oversee the Plan's recordkeeping arrangement." *Id., ¶ 33*. Defendants offered no rebuttal to Mr. Scheinberg's report, and did not retain a recordkeeping expert. *Id.*[5]

## STANDARD OF REVIEW

Summary judgment is proper when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *LaPlante v. Mass. Dept. of Corr.*, 89 F. Supp. 3d 235, 241 (D. Mass. 2015) (Young, J.) (quoting Fed. R. Civ. P. 56(a)). The moving party bears the burden of proving the absence of a genuine dispute over a material fact. *Id.* at 241 (citation omitted). If the moving party satisfies this burden, then "the nonmovant can only survive summary judgment by proffering evidence

---

[5] The only opinions Defendants offered regarding recordkeeping came from Defendants' damages expert (Dr. Bruce Strombom), and were once again directed at Plaintiffs' damages expert (Dr. Pomerantz). Both Dr. Strombom and Defendants' counsel concede that Dr. Strombom is not a recordkeeping expert. In light of Dr. Strombom's undisputed lack of expertise, Plaintiffs have moved for exclusion of this portion of his report. *See ECF No. 123*.

supporting the existence of a genuine issue of material fact to be resolved at trial." *Evicci v. Baker*, 190 F. Supp. 2d 233, 237 (D. Mass. 2002) (Young, J.) (citation omitted).

## ARGUMENT

### I. PLAINTIFFS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT REGARDING WHETHER THE COMMITTEES BREACHED THEIR FIDUCIARY DUTY OF PRUDENCE UNDER ERISA

Plaintiffs are entitled to partial summary judgment on their fiduciary breach claim. ERISA's fiduciary duties are among "the highest known to the law." *Glass Dimensions, Inc. Profit Sharing Plan & Trust v. State St. Bank & Trust Co.*, 931 F. Supp. 2d 296, 305 (D. Mass. 2013); *see also SoF, ¶ 17 n.7* ("In general, fiduciaries must satisfy the highest standards of conduct known to law."). These duties explicitly include a duty to exercise appropriate "care, skill, prudence, and diligence" in managing the Plan. 29 U.S.C. § 1104(a)(1)(B). While the appropriate ***degree of care*** is sometimes the subject of debate, it is axiomatic that a fiduciary cannot satisfy its duty of prudence by exercising ***no care*** whatsoever. Yet, that is exactly what happened in this case—the FBIC failed to monitor any of the Plan's investment options other than the two so-called DIAs, and the Retirement Committee failed to monitor or take any steps to control the Plan's recordkeeping expenses. Accordingly, Plaintiffs are entitled to summary judgment on the issue of breach in each of these respects.

### A. The FBIC Breached Its Duty to Prudently Monitor the Plan's Investments

"[T]he duty of prudence involves a continuing duty to monitor investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1829. This Court has previously described this as a "demanding fiduciary duty." *Brotherston v. Putnam Invs., LLC*, 2017 WL 2634361, at *9 (D. Mass. June 19, 2017) (Young, J.) ("*Brotherston II*"). "Although there is no uniform checklist" of steps that must be taken, "it must be the case that prudence requires more than blindly to defer to the decisions of someone else." *Id.* (internal quotation marks and citation omitted). Yet, the FBIC

did exactly that by allowing the Plan sponsor, FMR LLC, to dictate that all of Fidelity's non-tax exempt funds would be included in the Plan, regardless of cost or performance. *SoF, ¶ 18.*

This is precisely what the Court found to support a failure to monitor claim in *Brotherston*. In that case, "Plaintiffs argue[d] that the Defendants violated their duty of prudence by failing to implement or follow a prudent objective process for investigating and monitoring the individual merits of each of the Plan's investments in terms of costs, redundancy, or performance." *Brotherston II*, 2017 WL 2634361, at *8. And the plaintiffs supported their claim with evidence that is strikingly similar to the evidence here:

**Evidence of Failure to Monitor**

| Putnam Benefits Investment Committee | Funded Benefits Investment Committee |
| --- | --- |
| The "PBIC did not seem to have independent standards or criteria for monitoring the Plan investments." *Brotherston II*, 2017 WL 2634361, at *7. | The FBIC had no quantitative or qualitative criteria for monitoring the "non-DIAs". *See SoF, ¶ 19.* |
| There was no discussion "as to whether a particular fund was appropriate for the Plan." *Id.* | The FBIC never discussed specific non-DIA funds. *Id.* |
| The "PBIC never once removed a fund from the Plan lineup." *Id.*. at *7. | The FBIC never removed any non-DIA funds from the Plan. *Id.* |
| "A fund was removed from the Plan lineup only if merged or closed." *Id.* at *7 n.8 | Funds were only removed from Plan if they were no longer offered in marketplace. *Id.* |
| The PBIC did not adopt an investment policy statement, even though a draft was circulated and "Putnam strongly recommended that other plan sponsors adopt Investment Policy Statements." *Id.* at *7 n.9 | The FBIC did not have an investment policy statement, even though drafts were circulated and Fidelity acknowledges that an IPS "[d]emonstrates prudence." *Id., ¶ 19 & n.9.*[6] |

Based on these facts, the Court found "it would be warranted in ruling that PBIC…failed to monitor the Plan investments." *See Brotherston II*, 2017 WL 2634361, at *9.*[7] While the Court made these remarks "tentatively" at the conclusion of plaintiffs' case at trial, there is no need for

---

[6] The DOL advises that maintenance of an IPS "is consistent with the fiduciary obligations set forth in ERISA § 404(a)(1)(A) and (B)." 29 C.F.R. § 2509.94-2(2); *see also Liss v. Smith*, 991 F. Supp. 278, 296 (S.D.N.Y. 1998) ("I find…such a policy is necessary to insure that the plan investments are performing adequately."). Defendants' own fiduciary process expert testified that "all of [his] clients" have one. *SoF, ¶ 19 n.9.*

[7] The Court ruled against plaintiffs on the issue of loss, which is not the subject of this motion.

a trial here where Fidelity has ***admitted*** that it did not monitor any Plan investments other than the two so-called DIAs. *SoF, ¶ 18.*

The justification that Mr. Derbyshire provided to the FBIC for this failure to monitor is that "the other investments offered under the Plan are set by the Plan document and not under the purview of the Funded Benefits Investment Committee." *SoF, ¶ 21.* However, the Supreme Court has expressly held that "the duty of prudence trumps the instructions of a plan document." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2468 (2014). Consistent with this decision, the text of the statute provides that fiduciaries may follow plan documents only "insofar as such documents...are consistent with the provisions of [ERISA]." *Id.* (citing 29 U.S.C. § 1104(a)(1)(D)); *see also* 29 U.S.C. § 1110(a) ("any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility...for any...duty under this part shall be void"). Fidelity's own literature interpreting *Dudenhoeffer* recognizes:

> One implication of the recent ruling is that neither a presumption of prudence nor the plan document's mandate may absolve plan fiduciaries from the duty under ERISA to assure themselves that ***all*** plan investment options are prudent.

*SoF, ¶ 23* (emphasis added).

In spite of this binding legal authority, the FBIC never took any measures to assure itself that "all plan investment options" were prudent, and instead limited its monitoring to the two so-called DIAs. This was a clear breach of its duty to monitor the Plan's investments.[8]

While it is true that investments offered outside a plan through a self-directed brokerage account need not be monitored, it is undisputed that the Fidelity funds were "excluded from BrokerageLink." *SoF, ¶ 11 n.3.* "All Fidelity Mutual Funds"—regardless of whether they were

---

[8] Even Putnam did not argue that the Plan document absolved it of its monitoring duties. *See Brotherston III*, 907 F.3d at 23-24 ("The Plan itself did instruct the PBIC to include as investment options any publicly offered, open-end mutual fund (other than tax-exempt funds) that are generally made available to employer-sponsored retirement plans…by Putnam…But the parties presume…this instruction does not immunize defendants from potential liability based on the duty of prudence in selecting investment offerings under the Plan.").

labeled as DIAs—were "available ***in the Plan***" on the Plan's recordkeeping platform (FPRS) through the Plan's website (NetBenefits). *Id., ¶ 10* (emphasis added); *see also id. ¶ 11 n.5* ("under the Plan") *& supra* at 4. There was "no difference" in how Plan participants accessed those funds in order to invest in them before and after the supposed Plan redesign. *Id., ¶ 10.* Accordingly, the FBIC had a duty to monitor all of the Fidelity investment options in the Plan regardless of whether they were labeled "designated investment alternatives." That term appears nowhere in the statute, and only appears in the Department of Labor's disclosure regulations under 29 C.F.R. § 2550.404a-5, promulgated pursuant to 29 U.S.C. § 1104(c)(5). While compliance with these disclosure regulations is a precondition of qualifying for protection from liability for individual investment decisions under Section 404**(c)** of ERISA,[9] they have no bearing on ERISA's affirmative fiduciary duties with respect to the Plan under Section 404**(a)**.

To the extent that there is any ambiguity concerning the applicable standard of care on the facts of this case, it is removed by Ms. Wagner's unrebutted expert opinions. Ms. Wagner is "familiar with the prudent practices of…fiduciaries from decades of experience advising them with respect to the management of retirement assets." *SoF, ¶ 24*. Her report states:

> I have never seen a retirement plan function in this manner, nor would I counsel the fiduciaries of any retirement plan to administer a plan in this fashion. In my professional opinion, no prudent fiduciary would do so.
>
> ***
>
> Although most of the Fidelity investments offered to participants were not labeled as DIAs, that did not alter the fiduciary duty to monitor those investments where both the "DIAs" and the Fidelity "DIYs" were offered side-by-side on the FPRS platform outside of the SDBA and historically had been offered together on the same platform. There was no reason to treat them differently for purposes of monitoring; otherwise, fiduciaries could simply choose not to label plan investments as DIAs as a way to write themselves out of their fiduciary responsibilities under ERISA.

---

[9] *See* 29 U.S.C. § 1104(c)(1)(A)(ii) ("no person who is otherwise a fiduciary shall be liable under this part for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control" over the assets in their account).

*Id., ¶ 24.* As Ms. Wagner further opined, "It is well-understood that retirement plan fiduciaries have an ongoing duty to monitor the investments in the plan." *Id., ¶ 17.*

These opinions are completely unrebutted by Defendants' experts. *See supra* at 7-8. This was not an oversight. Defendants' fiduciary process expert (Mr. Suess) noted that "Defendants disclaim the existence of a fiduciary obligation to monitor" any funds other than the DIAs. *SoF ¶ 25.* Yet, he is "not offering an opinion on whether they were *right* to disclaim such a fiduciary obligation." *Id.* (emphasis added). Moreover, he is not offering an opinion on (1) "whether it was prudent to allow those funds to go unmonitored"; (2) "whether it was in the best interest of participants to allow such funds to go unmonitored"; or (3) "the reasonableness or prudence of the monitoring process of the plan's fiduciaries." *Id.*[10] Mr. Suess's opinions are directed to Plaintiffs' damages expert (Dr. Pomerantz). *Id.*[11] Thus, his opinions have no bearing on whether there was a breach in the first instance.

### B. The Retirement Committee Breached Its Duty to Prudently Monitor and Control Recordkeeping Expenses

The Retirement Committee also breached its duty of prudence by failing to monitor or control the Plan's recordkeeping expenses. Cost-consciousness is "fundamental to prudence." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (en banc); *see also* Restatement (Third) of Trusts § 88, cmt. a (2007) ("Implicit in a trustee's fiduciary duties is a duty to be cost-conscious."); *SoF, ¶ 27* ("Fiduciary Duties Under ERISA" include a duty to "[e]nsure that the fees and expenses paid by the Plan are reasonable"). According to the DOL, fiduciaries must obtain information regarding "all fees or compensation received by" a recordkeeper, "including any revenue sharing", and assess whether that amount is reasonable for the services provided.

---

[10] Mr. Suess's own report states that "***Plan fiduciaries typically*** form investment committees whose members ***monitor investment options***." *Id.* n.14 (emphasis added).

[11] Loss causation is an affirmative defense on which Defendants bear the burden of proof. *See Brotherston III*, 907 F.3d at 39. In any event, Mr. Suess opined that a prudent monitoring process would have resulted in the removal of at least 11 funds from the Plan. *SoF, ¶ 25.*

DOL Advisory Op. 2013-03A, 2013 WL 3546834, at 4 (July 3, 2013).[12] A failure to properly "monitor and control recordkeeping fees" paid through "excessive revenue sharing" (or, in this case, the retention of revenue sharing by Fidelity) is a breach of fiduciary duty. *See Tussey*, 746 F.3d at 336 (plan fiduciaries "breached their fiduciary duties by failing to monitor and control recordkeeping fees and for paying excessive revenue sharing from Plan assets.").[13] Indeed, Fidelity's own fiduciary training materials state that the "Eighth Circuit held that fiduciaries have a duty to monitor recordkeeping fees and to perform thorough due diligence with respect to competitiveness." *SoF, ¶ 27.*

The facts of this case are on all fours with the Eighth Circuit's decision in *Tussey* with respect to recordkeeping.  Among other things, the record reflects that the Retirement Committee "failed to (1) calculate the amount the Plan was paying Fidelity for recordkeeping through revenue sharing, [and] (2) determine whether Fidelity's pricing was competitive." *Tussey*, 746 F.3d at 336; *cf. supra* at 6. The Retirement Committee did not issue any requests for proposals ("RFPs"), solicit bids for recordkeeping services, or conduct any third-party benchmarking of the Plan's recordkeeping fees. *SoF ¶ 29.* Indeed, the Retirement Committee did not even bother to review the expense disclosures that were provided to the Plan pursuant to ERISA § 408(b)(2). *Id.* This was plainly imprudent.  Those expense disclosures expressly state:

> The Department of Labor believes that the information required to be disclosed under ERISA section 408(b0(2) will assist plan fiduciaries when selecting and monitoring service providers, in satisfying their fiduciary obligations under ERISA section 404(a)(1) to act prudently….

---

[12] *See also* 72 Fed. Reg. 70988, 70989 (Dec. 13, 2007) ("The Department believes that in order to satisfy their ERISA obligations, plan fiduciaries need information concerning all compensation to be received by the service provider and any conflicts of interest that may adversely affect the service provider's performance under the contract or arrangement.").

[13] *See also Perez v. City Nat'l Corp.*, 176 F. Supp. 3d 945, 947 (C.D. Cal. 2016) (granting summary judgment in favor of DOL, finding that defendant's "acceptance of fees from the Plan without any review or independent investigation into the reasonableness of those fees" established a breach of prudence), *aff'd sub nom. Acosta v. City Nat'l Corp.*, 922 F.3d 880 (9th Cir. 2019); *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798-800 (7th Cir. 2011).

*Id.*

These legally-required expense disclosures show that the Plan's recordkeeping fees amounted to hundreds of dollars per participant annually. *SoF, ¶ 30.* Had the Retirement Committee negotiated the Plan's recordkeeping fees at arm's length, Defendants have stipulated that such services could have been obtained from Fidelity for between $14 and $21 per participant per year. *Id., ¶ 31.* Further, Defendants have stipulated that the Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets. *Id.*

Based on this uncontroverted record, Ms. Wagner opined that "the Retirement Committee failed to prudently monitor and control recordkeeping expenses, consistent with the standard of care of fiduciaries in the retirement plan community." *SoF, ¶ 32.* Similarly, Plaintiffs' recordkeeping expert, Mr. Scheinberg, opined that there were "significant deviations from the standard of care observed in the industry by prudent, skilled, loyal fiduciaries overseeing similarly-sized plans" with respect to recordkeeping. *SoF, ¶ 33.* Indeed, he opined that "[t]he Plan fiduciaries exercised no diligence at all." *Id.* Once again, these opinions are unrebutted. *Id.* Accordingly, Plaintiffs also are entitled to partial summary judgment on the issue of breach with respect to monitoring recordkeeping expenses.[14]

## II.     PLAINTIFFS ALSO ARE ENTITLED TO SUMMARY JUDGMENT AS TO LIABILITY ON THEIR PROHIBITED TRANSACTION CLAIM IN COUNT III

Finally, Plaintiffs also are entitled to summary judgment as to liability on their claim in Count III that FMR LLC engaged in prohibited transactions with the Plan as a fiduciary of the

---

[14] To the extent that Defendants argue such fees were rebated through a mandatory "Revenue Credit" (i.e., profit sharing), that argument fails for the reasons below. *See infra* at 17-18. Ms. Wagner and Mr. Scheinberg both opined that this so-called "credit" did not excuse the Retirement Committee's failure to monitor and control recordkeeping expenses. *SoF, ¶¶ 36, 38.* Again, Defendants offer no contrary expert opinion.

Plan. Under 29 U.S.C. § 1106(b)(3), "a fiduciary with respect to the plan shall not…receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3). There is no genuine issue of material fact as to any element of this claim.

### A.     FMR LLC is a Fiduciary of the Plan

Defendants' own documents identify FMR LLC as a fiduciary of the Plan. *SoF, ¶ 40*. The FMR LLC Board must approve changes to the Plan's investment structure and Committee charters, and FMR LLC also has the authority to amend Section 12.2 of the Plan (which calls for the Plan to offer all of Fidelity's funds). *Id.* Thus, FMR LLC exercises "discretionary authority or discretionary control respecting management" of the Plan, and exercises "authority or control respecting management or disposition of its assets." *See* 29 U.S.C. § 1102(a)(21)(A).

### B.     FMR LLC Received Consideration in Connection with Transactions Involving Assets of the Plan, in Violation of 29 U.S.C. § 1106(b)

There is also no genuine dispute that FMR LLC received consideration "in connection with a transaction involving the assets of the plan." *See* 29 U.S.C. § 1106(b)(3). Defendants have stipulated that "the amounts paid to Fidelity by the mutual funds in which the Plan invests are transferred…to a centralized corporate account registered to FMR LLC." *SoF, ¶ 41*. Although mutual fund assets are not themselves plan assets, the "in connection with" language of § 1106(b)(3) is broad enough to cover fees associated with mutual funds in which the plan invests. *See Brotherston v. Putnam Invs., LLC*, 2017 WL 1196648, *7 (Mar. 30, 2017) ("*Brotherston I*"), *aff'd in relevant part*, 907 F.3d 17, 25 (1st Cir. 2018) ("Putnam, through the service fees it charges the Putnam funds in which the Plan invests, receives a benefit 'in connection with a transaction involving the assets of the [P]lan'…thereby implicating section 1106(b).").[15]

---

[15] *Accord U.S. v. Thompson*, 32 F.3d 1, 5-6 (1st Cir. 1994) (phrase "in connection with" has "expansive meaning" and "should be interpreted broadly," requiring only some kind of "causal

### C.      No Prohibited Transaction Exemption Applies

In light of the above, FMR LLC "runs afoul of [§ 1106(b)(3)] unless it qualifies for an applicable exemption." *Brotherston III*, 907 F.3d at 25.  No such exemption applies here.

#### 1.      PTE 77-3 Does Not Apply

Defendants rely on Prohibited Transaction Exemption ("PTE") 77-3.  *SoF, ¶ 42.* In order to qualify for this exemption (which applies to plans that invest in in-house mutual funds), Defendants must satisfy four conditions. *Brotherston III*, 907 F.3d at 27 (citing 42 Fed. Reg. 18734-35). The fourth condition requires that "[a]ll other dealings between the plan and the investment company…are on a basis no less favorable to the plan than such dealings are with other shareholders of the investment company." *Id*. Defendants fail to satisfy this condition.[16]

Defendants have stipulated that Fidelity does not provide revenue sharing rebates to the Plan or the participants of the Plan in connection with the Plan's investments in Fidelity mutual funds, even though Fidelity does make such revenue sharing available to other plans and participants of other plans. *See SoF, ¶ 44*. This is exactly the situation the First Circuit addressed in *Brotherston*:

> In many instances, the manager of the Putnam mutual fund in which the plan invests pays the recordkeeper a share of the fund's revenue to reimburse the recordkeeper for services the manager would otherwise have to provide or pay for. The recordkeeper in turn may credit this payment to the plan. And sometimes the investment manager provides the revenue sharing directly to the plan.
>
> With the Putnam Plan, the arrangement differs. Putnam itself directly pays the recordkeeper for the Plan, the recordkeeper does not charge any fees to the Plan, and Putnam's investment managers pay no revenue sharing to or for the benefit of the Plan….

---

or logical relation"); *Haddock v. Nationwide Fin. Servs.*, 419 F. Supp. 2d 156, 166-67 (D. Conn. 2006); *Leimkuehler v. Am. Utd. Life Ins. Co.*, 752 F. Supp. 2d 974, 986 (S.D. Ind. 2010).

[16] Prohibited transaction exemptions are affirmative defenses upon which defendants bear the burden of proof. *Glass Dimensions, Inc. Profit Sharing Plan & Trust v. State St. Bank & Trust Co.*, 290 F.R.D. 11, 16 & n.18 (D. Mass. 2013) (citing *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009)).

907 F.3d at 28. The First Circuit held that revenue sharing payments "fall within PTE 77-3's instruction to consider dealings between the 'investment company'…and 'other shareholders' (third-party plans)." *Brotherston III*, 907 F.3d at 29. Accordingly, Defendants have stipulated that they do not qualify for PTE 77-3 and treated the Plan "less favorable" than other plans, unless Fidelity's so-called "Mandatory Revenue Credits" are considered a substitute. *SoF, ¶ 43*.

Unfortunately for Defendants, these "credits" cannot be considered for two reasons. <u>First</u>, these "credits" were not fee rebates, but rather profit-sharing compensation to Fidelity's employees under a different name. *See supra* at 7 & n.14. The First Circuit has expressly held that such employer compensation is "irrelevant to the analysis under PTE 77-3." *Brotherston III*, 907 F.3d at 29. "To hold otherwise would be to allow employers to claw back with their fiduciary hands compensation granted with their employer hands." *Id.* <u>Second</u>, even if these profit-sharing payments could be considered *bona fide* fee rebates or revenue credits, they were not provided to class members (who consist of entirely of former employees) during the time that they were in the class. *See SoF, ¶ 38*.

### 2. Defendants Have Not Identified Any Other Exemption that Applies to Claims under 29 U.S.C. § 1106(b)

The only other prohibited transaction exemptions pleaded by Defendants (besides PTE 77-3) are "the exemptions provided in and/or authorized by ERISA § 408, 29 U.S.C. § 1108." *See Answer, ECF No. 88, at Affirmative Defense No. 16*. However, the exemptions in § 1108 are limited to claims regarding prohibited transactions with ***parties-in-interest*** under 29 U.S.C. § 1106(a), and do not apply to claims regarding prohibited transactions with ***fiduciaries*** under 29 U.S.C. § 1106(b).  This is clear from the language of the statute. Although § 1106<u>**(a)**</u> contains an express exemption for transactions permitted under § 1108, *see* 29 U.S.C. § 1106(a) ("Except as provided in section 1108 ..."), § 1106<u>**(b)**</u> does not contain a similar exemption.

18

Once again, *Brotherston* is directly on point. While this Court held that a "reasonable compensation" defense under § 1108(b) applied to the claim regarding prohibited party-in-interest transactions under § 1106(a), it held that this exemption did not apply to prohibited fiduciary transactions under § 1106(b)(3). *See Brotherston I*, 2017 WL 1196648, at *8. Thus, the Court's analysis of the § 1106(b)(3) claim focused exclusively on whether PTE 77-3 applied. *Id.* at *8-10. And while the First Circuit vacated this Court's ruling regarding the applicability of PTE 77-3, the First Circuit's prohibited transaction analysis was otherwise consistent with the framework adopted by this Court. The First Circuit (1) compared the language of §§ 1106(a) and 1106(b) (noting that only the former provision contains an exemption for transactions permitted under § 1108), (2) analyzed each claim separately, (3) only found that the § 1108 exemption applied to the party-in-interest claim under § 1106; and (4) focused on PTE 77-3 with respect to the § 1106(b)(3) claim. *Brotherston III*, 907 F.3d at 25-30.

Numerous other circuit courts have similarly held that the exemptions in § 1108 do not apply to claims regarding prohibited transactions with fiduciaries under § 1106(b). *See, e.g., City Nat'l*, 922 F.3d at 885-86; *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*, 751 F.3d 740, 750 (6th Cir. 2014); *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 93-96 (3d Cir. 2012). Accordingly, the exemptions in § 1108 are not a defense to Plaintiffs claim under § 1106(b)(3).[17]

---

[17] Regardless, Defendants have waived any defense under § 1108 by failing to specify which specific exemption(s) under that provision they rely upon. *See Williams v. Ashland Eng'g Co., Inc.*, 45 F.3d 588, 593 (1st Cir. 1995) ("[A] defendant who fails to assert an affirmative defense at all, or who asserts it in a ***largely uninformative way*** [ ] acts at his peril.") (emphasis added), *abrogated on other grounds by Carpenters Local Union No. 26 v. U.S. Fidelity and Guar. Co.*, 215 F.3d 136 (1st Cir. 2000); *Conjugal P'ship v. Conjugal P'ship*, 22 F.3d 391, 400 (1st Cir. 1994) ("Generally speaking, failure to plead an affirmative defense results in a waiver of the defense and the exclusion of all evidence relevant to it."). Defendants' generic pleading of all statutory and regulatory exemptions under § 1108 does not provide Plaintiffs with any meaningful notice of the defenses they will likely assert, given that § 1108 outlines twenty different exemptions.

## <u>CONCLUSION</u>

For the above reasons, Plaintiffs respectfully request that the Court grant their motion for partial summary judgment as to (1) whether the FBIC breached its fiduciary duty to prudently monitor the Plan's investments; (2) whether the Retirement Committee breached its fiduciary duty to prudently monitor and control the Plan's recordkeeping expenses; and (3) whether FMR LLC violated 29 U.S.C. § 1106(b)(3).

Respectfully Submitted,

Dated: September 6, 2019

**NICHOLS KASTER, PLLP**

s/Kai Richter_____
Kai Richter (admitted *pro hac vice*)
Paul J. Lukas (admitted *pro hac vice*)
James H. Kaster (admitted *pro hac vice*)
Brock T. Specht (admitted *pro hac vice*)
Carl F. Engstrom (admitted *pro hac vice*)
Jacob T. Schutz (admitted *pro hac vice*)
Mark E. Thomson (admitted *pro hac vice*)
NICHOLS KASTER, PLLP
4600 IDS Center
80 S. 8th Street
Minneapolis, Minnesota 55402
krichter@nka.com
lukas@nka.com
kaster@nka.com
bspecht@nka.com
cengstrom@nka.com
jschutz@nka.com
mthomson@nka.com

Jason M. Leviton (BBO #678331)
Jacob A. Walker (BBO #688074)
BLOCK & LEVITON LLP
260 Franklin Street, Suite 1860
Boston, Massachusetts 02110
(617) 398-5600
jason@blockesq.com
jacob@blockesq.com

ATTORNEYS FOR PLAINTIFFS

20

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2019, a true and correct copy of the foregoing was

served by CM/ECF to the parties registered to the Court's CM/ECF system.

Dated: September 6, 2019             s/ Kai Richter
                                     Kai Richter