# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| KEVIN MOITOSO, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>FMR LLC, *et al.*,<br><br>Defendants. | 1:18-CV-12122-WGY |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

William M. Jay
  (*pro hac vice* application pending)
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC 20001
Tel: (202) 346-4000
Fax: (202) 346-4444
wjay@goodwinlaw.com

John J. Falvey, Jr. (BBO# 542674)
Alison V. Douglass (BBO# 646861)
Dave Rosenberg (BBO# 679434)
Benjamin S. Reilly (BBO# 693742)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel: (617) 570-1000
Fax: (617) 523-1231
jfalvey@goodwinlaw.com
adouglass@goodwinlaw.com
drosenberg@goodwinlaw.com
breilly@goodwinlaw.com

*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

**Page**

THE COMPLAINT ........................................................................................................ 2

FACTUAL BACKGROUND ......................................................................................... 3

ARGUMENT ................................................................................................................. 5

I.     THE COMPLAINT IS BARRED BY A PRIOR COURT-APPROVED CLASS ACTION SETTLEMENT AND FINAL JUDGMENT. .......................... 5

II.     THE COMPLAINT IS TIME-BARRED. ............................................................. 9

      A.     The Impartiality Allegations (Count II) Are Time-Barred. ........... 9

      B.     The Prohibited Transaction Allegations (Count III) Are Time-Barred. ............................................................................... 10

      C.     The Breach of Fiduciary Duty Claims (Count I) Are Time-Barred. ..................................................................................... 11

III.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON EACH OF PLAINTIFFS' CLAIMS ON THE MERITS. ................................... 13

      A.     Plaintiffs Have Failed to Establish a Breach of the Fiduciary Duties of Prudence or Loyalty (Count I). .................... 13

            1.     Plaintiffs Fail to Show a Breach of the Duty to Monitor. ......................................................................... 13

            2.     A Mutual-Fund-Only Structure Does Not Violate ERISA. ........................................................................... 14

            3.     Defendants Did Not Breach Any Fiduciary Duty With Respect to the Plan's Recordkeeping Fees. ............ 15

      B.     No Duty of Impartiality Applies Here (Count II). ....................... 18

      C.     The Prohibited Transaction Claim (Count III) Should Be Dismissed. ................................................................................ 20

      D.     Count IV and Count V Should Be Dismissed. ............................. 20

CONCLUSION ............................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Banco Popular de Puerto Rico v. Greenblatt,*
    964 F.2d 1227 (1st Cir. 1992)......................................................................................................6

*Bernaola v. Checksmart Fin. LLC,*
    322 F. Supp. 3d 830 (S.D. Ohio 2018) ...................................................................................12

*Bishop-Bristol v. Mass. Mut. Life Ins. Co.,*
    2019 WL 1501581 (D. Mass. Feb. 5, 2019).........................................................................6, 9

*Breneman v. United States ex rel. FAA,*
    381 F.3d 33 (1st Cir. 2004).........................................................................................................6

*Brotherston v. Putnam Invs., LLC,*
    2017 WL 1196648 (D. Mass. Mar. 30, 2017).........................................................................11

*Brotherston v. Putnam Invs., LLC,*
    907 F.3d 17 (1st Cir. 2018).......................................................................................11, 19, 20

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)....................................................................................................................5

*CIGNA Corp. v. Amara,*
    563 U.S. 421 (2011)..................................................................................................................10

*Curtiss-Wright Corp. v. Schoonejongen,*
    514 U.S. 73 (1995)....................................................................................................................10

*David v. Alphin,*
    704 F.3d 327 (4th Cir. 2013) ...................................................................................................11

*Dorman v. Charles Schwab Corp.,*
    2018 WL 6803738 (N.D. Cal. Sept. 20, 2018) ......................................................................15

*Edes v. Verizon Commc'ns Inc.,*
    417 F.3d 133 (1st Cir. 2005)......................................................................................................9

*In re Fidelity ERISA Float Litigation,*
    829 F.3d 55 (1st Cir. 2016).......................................................................................................19

*Figas v. Wells Fargo & Co.,*
    2010 WL 2943155 (D. Minn. Apr. 6, 2010)...........................................................................11

*Fisher v. Penn Traffic Co.*,
    319 F. App'x 34 (2d Cir. 2009) ...................................................................................20

*In re Halpin*,
    566 F.3d 286 (2d Cir. 2009)........................................................................................16

*Harzewski v. Guidant Corp.*,
    489 F.3d 799 (7th Cir. 2007) ......................................................................................19

*Havercombe v. Dep't of Educ.*,
    250 F.3d 1 (1st Cir. 2001)..............................................................................................9

*Hughes Aircraft Co. v. Jacobson*,
    525 U.S. 432 (1999)....................................................................................................14

*Krueger v. Ameriprise Fin., Inc.*,
    2014 WL 1117018 (D. Minn. Mar. 20, 2014) ...........................................................11

*Larson v. Allina Health Sys.*,
    350 F. Supp. 3d 780 (D. Minn. 2018).........................................................................15

*LaRue v. DeWolff, Boberg & Assocs., Inc.*,
    552 U.S. 248 (2008)....................................................................................................19

*LeClair v. MBTA*,
    300 F. Supp. 3d 318 (D. Mass. 2018) ...........................................................................9

*Lockheed Corp. v. Spink*,
    517 U.S. 882 (1996)....................................................................................................14

*Mahoney v. Bd. of Trs.*,
    973 F.2d 968 (1st Cir. 1992)..................................................................................18, 19

*Main v. Am. Airlines Inc.*,
    248 F. Supp. 3d 786 (N.D. Tex. 2017) .......................................................................15

*Martin v. Consultants & Adm'rs, Inc.*,
    966 F.2d 1078 (7th Cir. 1992) ......................................................................................9

*Mathewson Corp. v. Allied Marine Indus., Inc.*,
    827 F.2d 850 (1st Cir. 1987)..........................................................................................2

*Merrimon v. Unum Life Ins. Co.*,
    758 F.3d 46 (1st Cir. 2014)..........................................................................................19

*Muehlgay v. Citigroup, Inc.*,
    649 F. App'x 110 (2d Cir. 2016) .................................................................................12

*Nottingham Partners v. Trans-Lux Corp.*,
 925 F.2d 29 (1st Cir. 1991)..................................................................6, 7

*Phillips v. Alaska Hotel & Rest. Emps. Pension Fund*,
 944 F.2d 509 (9th Cir. 1991) ...................................................................11

*Riley v. Metro. Life Ins. Co.*,
 971 F. Supp. 2d 186 (D. Mass. 2013) .....................................................11

*Shaw v. Delta Air Lines*,
 463 U.S. 85 (1983)...................................................................................18

*Tibble v. Edison Int'l*,
 843 F.3d 1187 (9th Cir. 2016) .................................................................12

*Vander Luitgaren v. Sun Life Assur. Co.*,
 765 F.3d 59 (1st Cir. 2014)......................................................................19

*Walsh v. BOA Corp. Severance Program*,
 2008 WL 2856805 (D. Mass. July 22, 2008)..........................................18

*White v. Chevron Corp.*,
 2017 WL 2352137 (N.D. Cal. May 31, 2017),
 *aff'd*, 752 F. App'x 453 (9th Cir. 2018)............................................11, 15

*Wildman v. Am. Century Servs., Inc.*,
 2019 WL 293382 (W.D. Mo. Jan. 23, 2019) ...........................................15

*Wolf v. Causley Trucking, Inc.*,
 719 F. App'x 466 (6th Cir. 2017) ............................................................20

**Statutes**

26 U.S.C. § 415(c)(1)..........................................................................17, 19

Employee Retirement Income Security Act of 1974 (ERISA),
 29 U.S.C. § 1001 *et seq.*................................................................... *passim*

 29 U.S.C. § 1022(a) .................................................................................10

 29 U.S.C. § 1024(b)(1)(A)........................................................................10

 29 U.S.C. § 1104 .....................................................................................13

 29 U.S.C. § 1106(b)(3) ............................................................................20

 29 U.S.C. § 1113(2) ...............................................................................9, 12

## Rules and Regulations

29 C.F.R. § 2520.104b-1(c) ...................................................................................10

29 C.F.R. § 2550.404a-5(a), (c)(1)(i)......................................................................12

29 C.F.R. § 2550.404a-5(a), (c), (d) .......................................................................13

29 C.F.R. § 2550.404a-5(e) .....................................................................................12

29 C.F.R. § 2550.404a-5(h)(4).................................................................................13

79 Fed. Reg. 49,469 (2014) .....................................................................................14

Fed. R. Civ. P. 56(c) .................................................................................................5

## Administrative Materials

DOL Advisory Opinion 2013-03A, 2013 WL 3546834 (July 3, 2013).........................17

DOL, Field Assistance Bull. No. 2003-03, 2003 WL 24127777, at *2 (May 19, 2003) ...................................................................................................................19

Employee Benefits Sec. Admin., U.S. Dep't of Labor, *Field Assistance Bulletin 2008-1*, at 2 (Feb. 1, 2008).................................................................................16

## Treatises

3 Scott and Ascher on Trusts §17.15 (5th ed. 2007)...................................................19

Effective November 17, 2014, Fidelity[1] settled a pair of class actions, *Bilewicz* and

*Yeaw*,[2] that were brought under ERISA to complain about various aspects of the Fidelity

Retirement Savings Plan (the "Plan").  L.R. 56.1 Statement of Undisputed Material Facts

("SUMF") ¶¶ 12, 40.  Under the Settlement, Fidelity not only paid $12 million but also made

substantial amendments altering the structure of the Plan in June 2014.  The plaintiffs

highlighted those amendments to the Court as a reason the settlement was fair.  Five months

later, the Court-approved settlement took effect, including a broad Release[3] that expressly

covered the full litany of Plan-related conduct and features, including those in the June 2014

Amendment.  SUMF ¶¶ 30-33.  Plaintiffs here were class members.  The Plan itself and every

named plaintiff here are parties to the Settlement and subject to the Release.  SUMF ¶ 38.

The Fourth Amended Complaint ("Compl.") here is a direct attack on the features of the

Plan that were covered by the Release and that were cited by Plaintiffs in seeking the Court's

approval of the Settlement.  Plaintiffs make no pretense of seeking relief for something that has

changed post-Release; to the contrary, they expressly argue Fidelity's continued *compliance* with

the June 2014 amended Plan terms violates ERISA.  They describe the June 2014 Amendment as

the "defining event" in this litigation, and they claim Fidelity was already in breach of its ERISA

duties on the "first day" after the Settlement Effective Date.  ECF No. 50, at 9, 16.

The 2014 Release—and the plaintiffs' touting to the Court the same Plan features they

now challenge—establish not only that the Settlement bargained away the claims made here, but

also that the Complaint is untimely.  Plaintiffs had "actual knowledge" of their claims through

---

[1]  As used here, "Fidelity" will refer to FMR LLC and all affiliates and fiduciaries that have been named as defendants in this case or its two predecessors.

[2]  *Bilewicz v. FMR LLC*, Compl., No. 13-10636-DJC, ECF No. 1 (D. Mass. 2013); *Yeaw v. FMR LLC*, Compl., No. 14-10035-DJC, ECF No. 1 (D. Mass. 2014).

[3]  The final judgment in *Bilewicz/Yeaw* incorporated the Settlement Agreement, which included the Release, and also independently recited the definitions of "Release" and "Released Claims."  This memorandum uses the term "Release" to refer to the Release as set forth in both the judgment and the Settlement Agreement.

the Settlement, and also through disclosures that described the very Plan features they complain of here, more than three years before suing in October 2018.  ECF No. 1.

The *Bilewicz/Yeaw* Settlement received the full fairness protections afforded the settlement of class action claims, under the supervision of Judge Casper.  Strong public policy favors the enforcement of settlement agreements generally.  *See*, *e.g.*, *Mathewson Corp. v. Allied Marine Indus., Inc.*, 827 F.2d 850, 857 (1st Cir. 1987) ("There is an institutional interest in the solemnity of [settlement] agreements, . . . and in minimizing opportunities for lawyers and litigants alike to act as Monday morning quarterbacks.").  That policy is even more essential where, as here, the effort to find an "escape hatch" would unravel the considered judgment not only of the parties, but also the Court.

As explained below, summary judgment should be granted based on the Release, res judicata, the statute of limitations, and the legal deficiencies in each and every claim.

## THE COMPLAINT

The Plaintiffs' core complaints are as follows.

First, the prohibited transaction, "impartiality," and excessive recordkeeping expense claims are all variants of the claim that compensation to Fidelity from the Plan's investments violated ERISA, either because the amounts received were too high, or because, in the case of the prohibited transaction claim, no compensation should have been received at all.  The prohibited transaction count further alleges that Fidelity should have returned to the Plan, via "revenue sharing rebates," a portion of compensation received from the Plan's investments Compl. ¶ 145.  This set of claims runs straight into the Plan's Mandatory Revenue Credit, which (as expanded by the June 2014 Amendment) requires Fidelity to repay to the Plan *all* amounts received by Fidelity as a result of Plan investments.  SUMF ¶¶ 120-31.  Because the Mandatory Revenue Credit brings Fidelity's net compensation from the Plan to zero, it dooms these claims.

The Complaint therefore alleges that the Mandatory Revenue Credit is a mere "gimmick" and that the way it operates discriminates against former employees.  Compl. ¶¶ 107, 111 (heading).

Second, the breach of fiduciary duty claim focuses primarily on a component of the June 2014 Plan restructuring pursuant to which the Plan's *only* designated investment alternatives would be a "target date" series of mutual funds (the Fidelity Freedom Funds) and a managed account service.  For participants who wanted a broader range of choices, the Plan provided access to a "supermarket" of thousands of funds.  SUMF ¶ 53.  While Plaintiffs appear to agree that fund "supermarkets" need not be monitored by Plan fiduciaries, they allege that Fidelity nevertheless had a duty to monitor Fidelity funds other than the target date funds, and breached ERISA duties by failing to do so.

## FACTUAL BACKGROUND

### The *Bilewicz/Yeaw* Litigation and Settlement

The overlap between the *Bilewicz*, *Yeaw*, and *Moitoso* complaints is considerable. Among other things, *Bilewicz* complained of failure to monitor Fidelity funds, and *Yeaw* complained that Fidelity did not pay revenue sharing rebates to the Plan and that the Plan paid excessive recordkeeping expenses.  SUMF ¶¶ 4-5, 9-10.

The extensively-negotiated Settlement required Fidelity to make a $12 million payment and to make substantial amendments to the structure of the Plan.  SUMF ¶ 13, 27.  The Plan amendment most relevant here concerns the Mandatory Revenue Credit:  ***the Settlement required that it be expanded, that the expanded credit operate "in the same way" as the pre-amendment version, and that it remain in place for three years***. SUMF ¶ 14.[4]  On June 26,

---

[4]  The pre-amendment version of the Mandatory Revenue Credit (the "8th amendment") required Fidelity to repay to the Plan all revenue received on Fidelity funds.  The June 2014 Amendment required that it be expanded to require that Fidelity also repay to the Plan all revenue attributable to non-Fidelity funds.  SUMF ¶¶ 17, 21.

2014, Fidelity executed the amendments required by the Settlement.  SUMF ¶ 52.

In exchange for the $12 million payment and the structural reforms, Fidelity received a very broad Release and Covenant Not to Sue:[5]

- The "Released Claims" include claims, "matters and issues" "in any way . . . relating to, based on, or in connection with" the full litany of plan-related features, including plan structure, plan expenses, selection of investment options and "any assertions regarding revenue sharing paid, received or not recaptured."  SUMF ¶ 30.

- The "Released Claims" also expressly include any claims that "*have any connection with* the Plan features" that were enumerated in the "Affirmative Relief" portion of the Settlement.  The amendments to the Plan mandated by that provision included a requirement that the Mandatory Revenue Credit be expanded to cover non-Fidelity mutual funds and that the credits be made "*in the same way*" as required under the Plan Amendment that originally established the Mandatory Revenue Credit in 2012.  SUMF ¶¶ 30-31 (citing §§ 3.3(v) and 7.3.4) (emphases added).[6]

- The Release expansively discharges all Released Claims that Plaintiffs "now have or hereafter may have," whether "accrued or unaccrued," known or unknown.  SUMF ¶¶ 28, 30.[7]

- The Covenant Not To Sue not only bars Plaintiffs from pursuing Released Claims, but also forecloses any claim "relating to" the structural changes provided for in the June 2014 Amendment.  SUMF ¶ 20. The Covenant is a "*complete defense*."  *Id.*

In short, the Release covered all claims relating to Plan features and conduct and all claims "relating in any way to the . . . new Plan lineup."  SUMF ¶¶ 20, 33.  This Court has previously noted the "breadth of the release."  ECF No. 106.  On any fair reading, the parties agreed to give Fidelity a fresh start as to the Plan via an expansive and comprehensive Release.

Seeking approval of the Settlement—and of their attorneys' fees—Plaintiffs described the Plan amendments as containing *the very elements that they now claim violate ERISA*, and also represented to the Court that the amendments had enormous value to participants.  SUMF ¶ 19.

---

[5]  The Release bound the entire *Bilewicz* settlement class, which includes Plaintiffs here, *and the Plan itself.  See* SUMF ¶¶ 28-29.

[6]  Section 7.3.4 of the Settlement Agreement referenced "the 8th amendment to the 2005 restatement of the *Plan*," which is the Mandatory Revenue Credit provision.  SUMF ¶ 16 (citing §5.1(e)).

[7]  The definition of Released Claims included "Unknown Claims," and the release of unknown claims was expressly acknowledged to be a "separately bargained" term and a "key element."  SUMF ¶¶ 30, 32 (citing §1.52).

Plaintiffs stated that the Plan amendments: (i) "eliminat[ed] all the investments as direct options except for the target date funds" and (ii) "continu[e] Fidelity's planned policy of rebating all fees received from its plan back to the participants."  SUMF ¶ 26.  The Court asked the "value" of the Plan changes; Plaintiffs estimated:  "maybe $50 million a year."  *Id*.

Neither the Complaint nor Plaintiffs' experts' reports assert that Fidelity has changed its conduct with respect to the Plan in any relevant way since the Settlement.  To the contrary, Plaintiffs are challenging the same Plan structure that existed "on the first day" of the class period.  ECF No. 50 at 16; SUMF ¶¶ 40, 53.

### Post-Settlement Disclosures

Starting outside the three-year limitations period, Fidelity provided disclosures to participants that disclosed every feature of the Plan about which they are now complaining, including the fact that Fidelity funds (other than the target date funds) would not be monitored, and that the Mandatory Revenue Credit is paid only to current employees.  SUMF ¶¶ 47-48, 50, 93, 104-05, 111.

### ARGUMENT

Federal Rule of Civil Procedure 56(c) requires entry of summary judgment against a party who fails to show a genuine issue as to any material fact, thus enabling a court to decide the case as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## I.    THE COMPLAINT IS BARRED BY A PRIOR COURT-APPROVED CLASS ACTION SETTLEMENT AND FINAL JUDGMENT.

The Plan changes of June 2014 were a key part of an overall deal: Fidelity would adopt the June 2014 Amendment, pay $12 million, and have peace with respect to its Plan.  Notably, ***Plaintiffs are not alleging that anything has changed since the deal was struck.***  What they object to are features of the June 2014 Amendment itself—indeed, features that were touted to

the Court as grounds for the Settlement's fairness.  After Fidelity adopted those Plan features—

including expanding the Mandatory Revenue Credit and "eliminating all the investments as

direct options except for the target date funds"—the plaintiff class released its claims.  The

Settlement's language clearly expresses the parties' intentions to make the Release as broad as

possible.  And the Court made its own determination that the Settlement's terms were fair.

Plaintiffs cannot now seek to extract a few components of the overall resolution and claim they

violate ERISA—while keeping the other Settlement benefits.  The claims in this new action fall

within the bargained-for, Court-approved Release and Covenant, and cannot proceed.

Public policy recognizes the "systemic benefits" from enforcing settlements as written,

including bargained-for releases.  *Banco Popular de Puerto Rico v. Greenblatt*, 964 F.2d 1227,

1232 (1st Cir. 1992); *see Bishop-Bristol v. Mass. Mut. Life Ins. Co.*, 2019 WL 1501581, at *4 (D.

Mass. Feb. 5, 2019) (settlement and release of ERISA claims "containing unambiguous language

must be construed according to [its] plain and natural meaning") (citation omitted).  In seeking

pre-Release discovery (ECF No. 50), Plaintiffs sought to exclude these claims from the Release

based on hair-splitting distinctions.  These "sneak attacks on the terms of a fully consummated

settlement" (*Banco Popular*, 964 F.2d at 1232) should be rejected.

In addition, res judicata bars the same claims.  The identical parties have litigated to a

final judgment on claims arising from a common nucleus of operative fact, and any claims that

were or could have been brought in the first action are barred.  *Breneman v. United States ex rel.*

*FAA*, 381 F.3d 33, 38 (1st Cir. 2004); *see also Nottingham Partners v. Trans-Lux Corp.*, 925

F.2d 29, 31-32 (1st Cir. 1991) ("It is beyond cavil that a suit can be barred by the earlier

settlement of another suit [by] res judicata.").

Applying the Release to each of the key claims makes clear that they are covered.

**The Impartiality and Excessive Recordkeeping Expenses Claims:**   These claims assert that the Mandatory Revenue Credit is illusory, making recordkeeping expenses excessive, and that, even if the Mandatory Revenue Credit is genuine, the Credit is itself a basis of liability, because it is not allocated to the accounts of former employees.   But Section 3.3 of the Settlement expressly released all claims that "have any connection to" the Affirmative Relief required under Section 7.3.4.   SUMF ¶ 30.   Section 7.3.4, in turn, *required* that the expanded Mandatory Revenue Credit be implemented "***in the same way***" as the Credit had been implemented since 2012—before either *Bilewicz* or *Yeaw* were filed.[8]   SUMF ¶¶ 14, 31.   The Release also covers "any assertions regarding revenue sharing paid, received or not recaptured," which was the core of the *Yeaw* complaint.[9]   SUMF ¶ 30.   It also covers claims related to Plan "structure" and Plan expenses.   *Id.*

Any claim that the Mandatory Revenue Credit is unlawful or ineffective at recapturing revenue cannot proceed.   The Mandatory Revenue Credit dates to 2012, before *Bilewicz* or *Yeaw* was filed, and its continuation was a core element of the Settlement:   in identifying Plan amendments that provided significant value to the Plan, the *Bilewicz* plaintiffs themselves pointed to "continuing Fidelity's planned policy of rebating all fees received from its plan back to the participants."   SUMF ¶ 26.   If not released, these claims would still be barred by res judicata:   not only did they arise before the entry of judgment in the prior actions, they closely overlap with facts previously at issue.   *E.g.*, note 9, *supra*.

---

[8]  The Released Claims expressly include any claims that "have any connection" with the Plan features that were amended, one of which was the Mandatory Revenue Credit originally embodied in a 2012 "8th Amendment" to the 2005 Plan.  SUMF ¶¶ 30-31 (citing §§ 3.3(v), 7.3.4).

[9]  The *Yeaw* plaintiffs hired a consultant to review the Plan's revenue-sharing arrangements and then (in January 2014) filed an action alleging that the "Fidelity plan did not receive a single dollar in revenue-sharing recapture." SUMF ¶ 9.  Common questions asserted in that class action included whether Fidelity breached ERISA duties by failing to "obtain a favorable revenue-sharing recapture arrangement with Fidelity."  SUMF ¶ 10.  And in fact, the *Yeaw* complaint annexed as an exhibit *the same* Fidelity Form 5500 describing the Mandatory Revenue Credit that the current Complaint now relies on to characterize the credit as a "gimmick."  SUMF ¶ 10; Compl. ¶ 106.

**The Prohibited Transaction Claims**:  As discussed above, this claim asserts both that Fidelity has received revenue from the Plan and that it has failed to pay revenue sharing rebates. Thus, it too asks the Court to find that the Mandatory Revenue Credit is, essentially, illusory; as a result of the Mandatory Revenue Credit, Fidelity receives *no* net revenue from the Plan.  A claim that is premised on the Mandatory Revenue Credit being a "gimmick" clearly has a "connection to" that Credit, and is released and barred for the reasons just discussed.

**The Breach of Fiduciary Duty Claims:**  The core of this claim is that because Plan participants now access the Fidelity funds (other than the target date funds) through a "brokerage window," those funds no longer receive fiduciary monitoring.  This, again, is a claim about the Plan "structure," and all such claims were released.[10]  Indeed, as with the Mandatory Revenue Credit, this change to the structure was an express part of the parties' understanding and expectation.  One need look no further than the fairness hearing, where the plaintiffs *highlighted* this change in explaining the value the Plan amendments (executed months before) brought to class members.  SUMF ¶ 26.  It is clear that if Plaintiffs have ever had a claim concerning the investment structure established by the June 2014 Amendment, they had it by then.  Plaintiffs themselves confirmed in prior submissions in *this litigation* that their central theory of liability is that the "amendment process" that resulted in the June 2014 Amendment was "tainted" and violative of Fidelity's fiduciary duties on the "first day of the statutory period."  ECF No. 50, at 9.[11]  That admission is fatal:  these pre-Release claims are barred by the Release.

**Purportedly Post-Settlement Claims**:  Plaintiffs' attempt to avoid the Release and res

---

[10]  The claims as to use of mutual funds and failure to offer stable value funds (*see* Compl. ¶ 130) are plainly released for similar reasons:  Plaintiffs expressly released claims that have "any connection" with either the Plan's "structure" or the "selection" of the "investment options available under the Plan."

[11]  Plaintiffs' damages expert (Dr. Pomerantz) testified that he did "not have an opinion on the prudence at a fund level of any of these particular funds" because his "concern, and where [he thinks] the breach lies, is at a much higher level in terms of the actual design of the plan," in the "lack of a due diligence process surrounding the selection of the funds" which he testified "fails at step zero."  *See* SUMF ¶ 54.

judicata by starting the *class period* after the Settlement Effective Date does not change the analysis.  These claims do not turn on *events* after the Settlement Effective Date.  The Release itself makes clear that the plaintiffs released claims that they "hereafter may have," if (*inter alia*) they relate to or have any connection with the Plan features adopted in the June 2014 Amendment.  *Bishop-Bristol*, 2019 WL 1501581, at *3, *6.  Even if that were not so, res judicata extinguishes claims that were or could have been litigated when judgment enters; those same claims cannot be revived afterward.  *See, e.g.*, *Havercombe v. Dep't of Educ.*, 250 F.3d 1, 4-7 (1st Cir. 2001) (plaintiff's second lawsuit was barred because he failed to establish a "discrete, separable wrong" that arose after the events of his first); *LeClair v. MBTA*, 300 F. Supp. 3d 318, 323 (D. Mass. 2018) (plaintiff did not defeat res judicata of prior settlement by positing harm suffered *after* settlement entered, where harm was of the type alleged and resolved in the prior settlement).

Plaintiffs' claims are barred by the Release and the Covenant Not To Sue.

## II.      THE COMPLAINT IS TIME-BARRED.

An ERISA plaintiff must sue for breach of fiduciary duty within "three years after the earliest date on which [he] had actual knowledge of the breach or violation."  29 U.S.C. § 1113(2).  Actual knowledge means either knowledge of, or willful blindness to, "the essential facts of the transaction or conduct constituting the violation."  *Edes v. Verizon Commc'ns Inc.*, 417 F.3d 133, 142 (1st Cir. 2005) (quoting *Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1086 (7th Cir. 1992)).  Here Plaintiffs knew the essential facts underlying the theories they now advance more than three years before October 10, 2018, when they filed suit.

### A.      The Impartiality Allegations (Count II) Are Time-Barred.

Fidelity credits to the Plan an amount equal to all revenue received by Fidelity from Plan investments.  Compl. ¶ 3.  Count II alleges that this Mandatory Revenue Credit violates a "duty

of impartiality" because it is credited to the accounts of current but not former employees.  But this has been true since the Mandatory Revenue Credit was added to the Plan in 2012.  SUMF ¶ 156.  And Plaintiffs necessarily knew the essential facts of how the Mandatory Revenue Credit was credited by July 2014, because they made it a term of the Settlement that the Revenue Credit not only be expanded, but also be "credited in the same way" as in the past.  SUMF ¶ 14.

Plaintiffs also received actual notice via a July 29, 2015 summary plan description ("SPD")[12] that the Mandatory Revenue Credit is allocated only to accounts of participants employed by Fidelity at year end.  SUMF ¶ 106. The SPD was disseminated to Plaintiffs by email dated July 29, 2015, consistent with applicable rules.  *See* 29 C.F.R. § 2520.104b-1(c).  All named Plaintiffs received it.  SUMF ¶ 106.

### B.       The Prohibited Transaction Allegations (Count III) Are Time-Barred.

The Complaint alleges that the offering of Fidelity funds to the Plan resulted in a fiduciary's receipt of "consideration for its own personal account from parties dealing with the Plan in connection with the transactions involving the assets of the Plan."  Compl. ¶ 143.  But Plaintiffs indisputably knew, outside the limitations period, the facts on which they base both elements of that claim:  that the Plan offered Fidelity funds and that those funds paid fees to Fidelity.  Plaintiffs knew that the Plan offered Fidelity funds because the Settlement required that the Plan offer access to "a large number of Fidelity funds," SUMF ¶ 14, and there was extensive disclosure in multiple Plan materials that Fidelity funds were offered.  SUMF ¶¶ 99-100.  And *each Plaintiff* testified that he or she was aware before October 10, 2015 that Fidelity received fees in connection with Fidelity funds, including those available to the Plan.  SUMF ¶¶ 101-03.

---

[12]  An SPD is a "clear, simple communication" that gives "beneficiaries the essential information about the plan." *CIGNA Corp. v. Amara*, 563 U.S. 421, 437-38 (2011); *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995).  It is "sufficiently . . . comprehensive" to communicate beneficiaries' "rights and obligations under the plan."  29 U.S.C. § 1022(a); *see id.* § 1024(b)(1)(A).

Those fees were also fully disclosed in fund prospectuses and elsewhere.  SUMF ¶¶ 114, 119. This claim therefore is untimely.

Attempting to avoid the time-bar, Plaintiffs allege that each monthly payment of fees starts the clock anew.  That is incorrect.  As this Court has ruled, the relevant "actual knowledge" in this context is knowledge that the plan offered the fund that allegedly resulted in the payment of prohibited transactions—not the ongoing receipt of monthly fees from that fund.  *See Brotherston v. Putnam Invs., LLC*, 2017 WL 1196648, at *10-11 (D. Mass. Mar. 30, 2017) (relevant "actual knowledge" of the relevant "transaction" was simply "aware[ness] that the parties involved were all Putnam entities" notwithstanding plaintiffs' argument that the violation was "the monthly receipt of fees"), *aff'd in part and vacated in part on other grounds,* 907 F.3d 17, 30 n.10, 42 (1st Cir. 2018).  Multiple courts agree.[13]

### C.    The Breach of Fiduciary Duty Claims (Count I) Are Time-Barred.

The core breach of fiduciary duty claim is that the Plan fiduciaries breached their ERISA duties by failing to monitor Fidelity funds other than the Freedom Funds.  But that precise fact was clearly and repeatedly disclosed more than three years before the Complaint was filed.  The parties disagree about whether Fidelity had a *duty* to monitor the other Fidelity funds, but the fact that Fidelity disclaimed such duty and disclosed that it would not be doing so is undisputed.  A fiduciary's "clear repudiation" of the purported duty gives the plaintiff all the facts necessary to start the limitations clock running on a claim for breach.  *Riley v. Metro. Life Ins. Co.*, 971 F. Supp. 2d 186, 194 (D. Mass. 2013) (citing *Phillips v. Alaska Hotel & Rest. Emps. Pension Fund,*

---

[13] *David v. Alphin*, 704 F.3d 327, 340 (4th Cir. 2013); *Krueger v. Ameriprise Fin., Inc.*, 2014 WL 1117018, at *4-6 (D. Minn. Mar. 20, 2014); *Figas v. Wells Fargo & Co.,* 2010 WL 2943155, at *2-3 (D. Minn. Apr. 6, 2010); *see also White v. Chevron Corp.*, 2017 WL 2352137, at *22 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 453, 455 (9th Cir. 2018).

944 F.2d 509, 520 (9th Cir. 1991)), *aff'd*, 744 F.3d 241 (1st Cir. 2014).[14]

As the *Bilewicz* plaintiffs explained to Judge Casper, the Settlement implemented a new

structure, "eliminating all the investments as direct options except for the target date [Fidelity

Freedom] funds."  SUMF ¶ 26.  That new structure was implemented via a re-enrollment process

that was the "highest outreach project [Fidelity's Benefits department had done] in the recent

past, if not ever."  SUMF ¶ 87.  In both the 2014 re-enrollment communications and the SPD

sent July 29, 2015 (*see* p. 10, *supra*), participants were notified that Plan officials would be

monitoring *only* the Freedom Funds and the PAS-W managed account service:

> **Please note that the plan sponsor, plan administrator, and other plan officials (together, "Plan Officials") have not evaluated the investment options available under the Plan, other than the Fidelity Freedom . . . Funds and PAS-W. The Plan Officials do not and will not monitor, and do not make any representations and warranties as to the soundness of, any investment options other than the Fidelity Freedom . . . Funds and PAS-W**.

SUMF ¶¶ 93, 104, 111.  The Plan's amended investment structure was communicated yet again

in the 2014 DOL-mandated participant disclosures,[15] which explained:

> In addition to Fidelity Freedom . . . Funds and PAS-W, the Plan also offers a mutual fund window through which other Fidelity mutual funds and thousands of non-Fidelity mutual funds are available to help meet your individual retirement savings needs. . . .  **Unlike Fidelity Freedom . . . Funds and PAS-W, the Plan's fiduciaries do not designate or monitor the other Fidelity or non-Fidelity mutual funds available in the Plan.**

SUMF ¶ 99.  And the undisputed record is that these notices were sent to regularly maintained

---

[14] ERISA's three-year statute of limitation runs from "the earliest date of actual knowledge of a breach . . . even if the breach continues."  *See Bernaola v. Checksmart Fin. LLC*, 322 F. Supp. 3d 830, 841-42 (S.D. Ohio 2018) (emphasis added and quoting *Tibble v. Edison Int'l*, 843 F.3d 1187, 1196 (9th Cir. 2016) (en banc post-dating remand from the United States Supreme Court); *Muehlgay v. Citigroup, Inc.*, 649 F. App'x 110, 112 (2d Cir. 2016) ("applying the continuing-violation theory to § 1113(2) would improperly supplant the plain language of the statute.").

[15] These disclosures are made at least annually by 401(k) and other participant-directed individual account plans. They provide information regarding the plan so participants can "make informed decisions." 29 C.F.R. § 2550.404a-5(a), (c)(1)(i).  Like an SPD, they are "written in a manner calculated to be understood by the average plan participant."  *Id.* § 2550.404a-5(e).

and monitored e-mail accounts or to the mailing addresses on file for participants without email addresses.  SUMF ¶¶ 100-03.

## III.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON EACH OF PLAINTIFFS' CLAIMS ON THE MERITS.

### A.   Plaintiffs Have Failed to Establish a Breach of the Fiduciary Duties of Prudence or Loyalty (Count I).

Count I of the Complaint alleges that Plan fiduciaries breached their duties of loyalty and prudence under 29 U.S.C. § 1104.  That claim rests on three theories, each of which fails.

### 1.   Plaintiffs Fail to Show a Breach of the Duty to Monitor.

Plaintiffs claim that Defendants breached a duty to monitor Fidelity funds other than the Freedom Funds.  SUMF ¶ 59.  But Fidelity had no fiduciary duty to monitor those funds because they were offered in a brokerage window or "similar arrangement."

The area of dispute here is narrow.  First, there is no dispute that, if an investment option is a designated investment alternative in a plan (a "DIA"), it must be monitored.  *See* 29 C.F.R. § 2550.404a-5(a), (c), (d).  And there is no challenge in this case to the prudent monitoring of the DIAs that were designated in the Plan.  SUMF ¶ 59.  Second, it is also undisputed that many defined contribution plans offer a "brokerage window" through which participants can access the larger investment universe, and that investment options offered through such windows need not be monitored.  SUMF ¶ 61.  The definition of DIA expressly excludes "'brokerage windows,' 'self-directed brokerage accounts,' or *similar plan arrangements that enable participants and beneficiaries to select investments beyond those designated by the plan*.'"  29 C.F.R. § 2550.404a-5(h)(4) (emphasis added).  Thus, ERISA does not impose an obligation on plan fiduciaries to monitor brokerage windows or plan "arrangements" that are "similar" to brokerage windows.  Third, it is undisputed that the *non*-Fidelity funds offered via Fidelity's brokerage window need not be monitored.  SUMF ¶ 61.

Thus, the only dispute is whether the non-DIA *Fidelity* funds are, like the *non*-Fidelity funds, part of the brokerage window or "similar arrangement."  They are.  According to the DOL, "arrangements" that are "similar" to a brokerage window include both "open mutual fund windows" and "[m]ore limited mutual fund windows or 'supermarkets' [that] permit participants to invest in any mutual fund on one or more of a particular vendor's platforms."  79 Fed. Reg. 49,469 (2014).  The Plan's open-architecture structure fits that definition.  *See* SUMF ¶ 60.

Because there can be no breach of a nonexistent duty to monitor, this claim fails.

### 2.    A Mutual-Fund-Only Structure Does Not Violate ERISA.

Plaintiffs complain that the Plan's mutual-fund-only plan design breached ERISA's fiduciary standards because it precluded the use of stable value funds and other non-mutual fund offerings.  It does not: (a) the Plan's design is a settlor act, which cannot be the basis for claiming *fiduciary* breach; and (b) as numerous courts have held, such claims are legally insufficient.  Plaintiffs' "fiduciary" expert agrees with those courts.  SUMF ¶ 62.

The mutual-fund-only limitation was a component of the June 2014 Amendment.  SUMF ¶ 53.  As a component of plan design and of a plan amendment, it was not a fiduciary act, but rather a settlor function, which is not subject to fiduciary review.  "[The] defined functions [of a fiduciary] do not include plan design."  *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996).  Rather, ERISA leaves employers "generally free . . . , for any reason at any time, to adopt, modify, or terminate welfare plans," acting "analogous to the settlors of a trust" rather than as its fiduciary, and they may do so "without being subject to fiduciary review."  *Id.*  Thus, "without exception," "plan sponsors who alter the terms of a plan" simply "do not fall into the category of fiduciaries."  *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 445 (1999) (quotation marks and

brackets omitted).[16]  Moreover, even if that decision were a fiduciary act, it still would not

violate any fiduciary obligation.  Numerous courts have rejected the precise claim made here—

that it is a violation of ERISA not to offer collective trusts or stable value funds.[17]

### 3.  Defendants Did Not Breach Any Fiduciary Duty with Respect to the Plan's Recordkeeping Fees.

Finally, Plaintiffs allege that Fidelity breached its fiduciary duties by failing to monitor

the Plan's recordkeeping expenses, and failing to obtain "fee credits," resulting in the Plan

allegedly paying excessive recordkeeping expenses.[18]  *E.g.*, Compl. ¶¶ 3, 11.  This claim fails

because Fidelity paid to the Plan the Mandatory Revenue Credit, which amounted to the *entirety*

of *all* expenses paid by the Plan.  SUMF ¶ 121.  In other words, upon receipt of the Mandatory

Revenue Credit, the Plan's expenses for recordkeeping (and investment management) netted to

zero.  A net recordkeeping expense of zero is not "excessive" and need not be "monitored."

Plaintiffs attempt to salvage this claim by arguing that the Mandatory Revenue Credit is a

"gimmick" and that, even if it is genuine, payment to the Plan does not suffice, because they

purportedly have a legal entitlement to some portion of it.  Both points fail.

### a.  The Mandatory Revenue Credit is not a "gimmick."

---

[16]  The claim that it was a fiduciary breach to offer "sector" funds (Compl. ¶¶ 78-84) fails for the same reason.

[17]  *See, e.g.*, *Larson v. Allina Health Sys.*, 350 F. Supp. 3d 780, 796 (D. Minn. 2018) (dismissing claim based on alleged failure "to offer either a collective trust or a separate account instead of, or in addition to, the mutual funds"); *White*, 2016 WL 4502808, at *5-12 (dismissing claim based on alleged failure to include stable-value funds, collective trusts, or separate accounts); *Dorman v. Charles Schwab Corp.*, 2018 WL 6803738, at *4 (N.D. Cal. Sept. 20, 2018) ("Defendants are not required to provide a stable value fund."); *Wildman v. Am. Century Servs., Inc.*, 2019 WL 293382, at *13 (W.D. Mo. Jan. 23, 2019) ("ERISA does not require a retirement plan to offer . . . a stable value fund"); *Main v. Am. Airlines Inc.*, 248 F. Supp. 3d 786, 794 (N.D. Tex. 2017) (holding that "[d]efendants [did] not breach[] their duty of prudence by offering mutual funds and failing to consider alternatives").

[18]  The Plan, of course, did not pay a fee to Fidelity's recordkeeping division for that division's recordkeeping services.  SUMF ¶ 129.  This claim relates instead to the fact that asset managers will sometimes share some of their revenue with plan recordkeepers in recognition of the services the recordkeeper provides that would otherwise have to be performed by the asset manager; and that, when Fidelity performs recordkeeping services for other plans, it in some circumstances credits some of this revenue back to the plans through "revenue credits." Plaintiffs contend that Fidelity should have paid revenue credits to its own plan. As discussed in text, Fidelity did.

From 2009 until 2012, Fidelity's profit-sharing contribution to its Plan was entirely discretionary:  the Plan did not require Fidelity to contribute *any* amount.  In 2012, Fidelity amended the Plan to create a new mandatory contribution.  Per the 2012 amendment, Fidelity was committed to pay into the Plan an amount equal to all revenue that Fidelity received from the Fidelity mutual funds held by the Plan.  As amended, the Plan allowed Fidelity to also contribute additional discretionary amounts, but any such amounts were, as noted, entirely discretionary.  SUMF ¶ 156.  Plaintiffs assert that the 2012 amendment was a "gimmick" because the *total* of the mandatory and the discretionary payments post-2012 was 10% of eligible compensation, as it had been in the past.  Plaintiffs say this means "nothing changed."

As a matter of law, the change from discretionary to mandatory is a real change.  If a company has a long-term but informal practice of paying every employee $1000 each Christmas, it can stop doing so at any time.  If it instead puts that bonus into its employees' contracts, then the employees have a legal entitlement to that money.  A change from discretionary to mandatory is a critical change:  Fidelity's revenue credit obligation became enforceable by the Plan, and that is true whether or not Fidelity *also* chose to contribute *more*.  *See In re Halpin*, 566 F.3d 286, 289 (2d Cir. 2009) ("[W]hen an employer fails to make a required contribution to a plan in accordance with the plan documents, the plan has a claim against the employer for the contribution, and that claim is an asset of the plan." (quoting Employee Benefits Sec. Admin., U.S. Dep't of Labor, *Field Assistance Bulletin 2008-1*, at 2 (Feb. 1, 2008))).

### b.  Once Fidelity reduced the Plan's recordkeeping expenses to zero, its duties were satisfied; Plaintiffs have no individualized rights to a share of those payments.

Plaintiffs argue that, even if the Mandatory Revenue Credit did reduce the recordkeeping expenses of the Plan as a whole to zero, *their* recordkeeping expenses were still too high, because the Mandatory Revenue Credit was allocated only to current employees, not to the

former employee class members.  Plaintiffs claim that Plan fiduciaries had to monitor *individuals'* recordkeeping expenses, even if the *Plan's* total recordkeeping expenses were zero. Plaintiffs' premise is wrong:  once the Plan was made whole, Plaintiffs had no *individual* entitlement to a portion of the Mandatory Revenue Credit.

First, payment to former employees' accounts would have violated the Internal Revenue Code ("IRC").  Under the IRC, when the party making a payment to a retirement plan is the employer, those payments may not exceed 100% of the participant's compensation (or $56,000, whichever is less).  26 U.S.C. § 415(c)(1).  As former employees have an annual compensation of $0, the IRC effectively prohibits Fidelity from making any contributions to their 401(k) accounts.  The Mandatory Revenue Credit follows these rules.  That is not a fiduciary breach.

Second, even where the recordkeeper is not also the employer, ERISA does not mandate any particular allocation of revenue credits.  Only a minority of plans have done what Plaintiffs want here, *i.e.*, passed revenue credits from their recordkeeper on *to individual participants*. SUMF ¶¶ 148-49.  Revenue credits are more often paid *to the plan*, but not directly *to any or all participants*.  SUMF ¶ 147.  Upon receipt, plans presumably allocate or otherwise utilize that revenue in accordance with their plan rules, which is precisely what Fidelity did here.  SUMF ¶ 147.  That is consistent with DOL guidance, which never suggests that any group of participants would have a claim if *they* failed to receive a portion.  *See* DOL Advisory Opinion 2013-03A, 2013 WL 3546834 (July 3, 2013).

Finally, where the plan has been made whole, but plaintiffs feel aggrieved for not having received their "fair share," the law is clear that ERISA provides no relief, as discussed in the following section.  The excessive recordkeeping fees claims are in effect a species of the impartiality claim, and fail for the reasons that that claim fails.

17

### B.      No Duty of Impartiality Applies Here (Count II).

Count II asserts that, even if the Mandatory Revenue Credit is genuine and made the Plan whole, Plaintiffs have a claim for breach of a purported "fiduciary duty of impartiality" because the Mandatory Revenue Credit was paid only to current, not former, employees.  But Plaintiffs ignore the key distinction between *settlor* acts concerning Plan design and *fiduciary* acts.  The establishment of the Mandatory Revenue Credit was a settlor act, and ERISA permits plan settlors to differentiate between different classes of employees.

The design and structure of an ERISA plan is the function of a settlor.  *See* p. 14, *supra*. The design of the Mandatory Revenue Credit is set forth in the Plan:  it is a paradigmatic settlor act.  And that is the end of Plaintiffs' impartiality claim.  As the Supreme Court stated, ERISA does not "proscribe discrimination in the provision of employee benefits." *Shaw v. Delta Air Lines*, 463 U.S. 85, 91 (1983); *see also Walsh v. BOA Corp. Severance Program*, 2008 WL 2856805, at \*4 n.5 (D. Mass. July 22, 2008) (rejecting claim for "disparate treatment" because "ERISA does not require all plan participants to be treated equally.").

As a consequence, and as Plaintiffs' experts concede, plan designs treat different categories of participants differently in numerous, material respects.  Some participants receive profit-sharing contributions and employer matches; some do not.  Some participants are permitted to take loans against their plan accounts; others are not.  And, as here, some participants bear a greater share of plan expenses than others.  Plans differentiate between employees who work in different divisions and locations, between hourly and salaried employees and, as here, between current and former employees.  SUMF ¶¶ 135-36.

Any *fiduciary* duty of impartiality is a duty *on fiduciaries*, not settlors, and applies only when the fiduciaries have been given discretion to allocate benefits or costs, not when they are simply administering the allocation rules of the plan as designed by the plan.  *See Mahoney v.*

*Bd. of Trs.*, 973 F.2d 968, 970-73 (1st Cir. 1992). Plaintiffs' suggestion that plan fiduciaries are empowered to "even out" the differentiations imposed by plan rules is radical and unsupported by any legal authority. Indeed, the DOL has expressly stated that fiduciaries must follow the terms of the plan, even if the plan's allocation rules favor a class of participants:

> Where the method of allocating expenses is determined by the plan sponsor (i.e., set forth in the plan documents), fiduciaries . . . will be required to follow the prescribed method of allocation. The fiduciary's obligation in this regard does not change merely because the allocation method favors a class (or classes) of participants. When set forth in plan documents, the method of allocating expenses, in effect, becomes part of defining the benefit entitlements under the plan.

DOL, Field Assistance Bull. No. 2003-03, 2003 WL 24127777, at *2 (May 19, 2003).[19]

Plaintiffs' expert agrees. SUMF ¶ 140.[20]

Plan rules are the final word on what participants are entitled to: a plan participant can bring a claim for a shortfall in her individual account only if the fiduciary failed to credit the account in accordance with Plan rules. Plaintiffs making such a claim must "show that they are claiming an amount of money *to which they are entitled by the plan documents*." *Harzewski v. Guidant Corp.*, 489 F.3d 799, 804 (7th Cir. 2007) (emphasis added). Multiple First Circuit cases reject claims against fiduciaries that delivered benefits in compliance with plan documents.[21]

Finally, Plaintiffs may seek relief only for a loss "to the plan," because § 502(a)(2) "does not provide a remedy for individual injuries distinct from plan injuries." *LaRue v. DeWolff,*

---

[19] Interpretation of ERISA borrows heavily from the law of trusts, *Brotherston*, 907 F.3d at 32, which is to the same effect. A trustee "must deal impartially with each of its beneficiaries, *unless the terms of the trust direct or authorize the trustee to favor on beneficiary over another*." 3 Scott and Ascher on Trusts §17.15 (5th ed. 2007) (emphasis added). Trusts often impose trust administration expenses differentially. SUMF ¶ 141.

[20] Even if the allocation of the Revenue Credit were a fiduciary act, it would still be subject to a deferential arbitrary-and-capricious standard of review. *Mahoney*, 973 F.2d at 970. Here, the Mandatory Revenue Credit's distinction between current and former employees was not arbitrary and capricious because, *inter alia*, it was necessary to comply with IRC § 415(c)(1)(B). *See* p. 17, *supra*.

[21] "Because 'ERISA's principal function is to protect . . . contractually defined benefits[,] . . . a fiduciary must act in accordance with the documents and instruments governing the plan.'" *In re Fidelity ERISA Float Litigation*, 829 F.3d 55, 60 (1st Cir. 2016) (citations, alterations, and internal quotation marks omitted); *Vander Luitgaren v. Sun Life Assur. Co.*, 765 F.3d 59, 64 (1st Cir. 2014); *Merrimon v. Unum Life Ins. Co.*, 758 F.3d 46, 59 (1st Cir. 2014).

*Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008); *accord Fisher v. Penn Traffic Co.*, 319 F. App'x 34, 35 (2d Cir. 2009) (no claim under 502(a)(2) where plaintiff did not seek relief "on behalf of all or any part of the plan"); *Wolf v. Causley Trucking, Inc.*, 719 F. App'x 466, 476 (6th Cir. 2017).  But the premise of the impartiality claim is that Plaintiffs are injured *even if the Plan was made whole*; that is not a claim based on loss "to the plan."

### C.      The Prohibited Transaction Claim (Count III) Should Be Dismissed.

The Complaint advances one prohibited transaction claim under ERISA's anti-kickback provision, 29 U.S.C. § 1106(b)(3).  That claim fails for two reasons:  Plaintiffs allege that affiliates of FMR LLC received fees, but those affiliates *are not fiduciaries*.  And as discussed above, *all* revenue received by any FMR LLC affiliate in connection with the Plan was returned to the Plan through the Mandatory Revenue Credit, so there was no net consideration.

Any prohibited transaction would in any event be exempt under the DOL's Prohibited Transaction Exemption 77-3 because Fidelity treated its own plan *more favorably* than it treated other plans, paying back *all* of its revenue rather than just a portion.  *See* § III.A.3, *supra*.[22]

### D.      Count IV and Count V Should be Dismissed.

Count IV (for breach of a fiduciary duty to monitor the fiduciary committees) and Count V (for equitable disgorgement) both hinge on the existence of an underlying breach of fiduciary duty.  As the breach of fiduciary duty counts fail, so must Counts IV and V.

### **CONCLUSION**

Judgment should enter for Fidelity on all claims.

---

[22]   The Mandatory Revenue Credit is substantially different from the employer contribution considered in *Brotherston* because it is a component of the Plan, calculated based on revenues generated from Plan investments, not based on employee compensation metrics, and because it is mandatory, not discretionary.  *See Brotherston*, 907 F.3d at 28; *see* SUMF ¶¶ 16, 121-22 (citing § 5.1(e) (2014 Plan) and § 1.12(b)(3) (2017 Plan)).

Dated: September 6, 2019
      Boston, MA

Respectfully submitted,

 /s/ John J. Falvey, Jr.
John J. Falvey, Jr. (BBO# 542674)
Alison V. Douglass (BBO# 646861)
Dave Rosenberg (BBO# 679434)
Benjamin S. Reilly (BBO# 693742)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel: (617) 570-1000
Fax: (617) 523-1231
jfalvey@goodwinlaw.com
adouglass@goodwinlaw.com
drosenberg@goodwinlaw.com
breilly@goodwinlaw.com

William M. Jay
  (*pro hac vice* application pending)
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC 20001
Tel: (202) 346-4000
Fax: (202) 346-4444
wjay@goodwinlaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, John J. Falvey, Jr., hereby certify that the foregoing document is being filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on September 6, 2019.  The foregoing document will be available for viewing and downloading from the ECF system.

 /s/  John J. Falvey, Jr.
John J. Falvey, Jr.