## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Kevin Moitoso, Tim Lewis, Mary Lee Torline, and Sheryl Arndt, individually and as representatives of a class of similarly situated persons, and on behalf of the Fidelity Retirement Savings Plan,<br><br>                   Plaintiffs,<br>v.<br><br>FMR LLC, the FMR LLC Funded Benefits Investment Committee, the FMR LLC Retirement Committee, Fidelity Management & Research Company, FMR Co., Inc., and Fidelity Investments Institutional Operations Company, Inc.,<br><br>                   Defendants. | Case No. 1:18-cv-12122-WGY |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................3

I. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE MERITS ...............................3

  A. Plaintiffs Have Shown Several Undisputed Breaches of Fiduciary Duty............................3

    1. The FBIC breached its duty to monitor billions of dollars of Plan assets .......................3

    2. The FBIC's failure to investigate non-mutual fund vehicles and stable value funds was not consistent with prudent fiduciary practice .................................................................5

    3. The Retirement Committee breached its duty to prudently monitor the Plan's recordkeeping expenses ......................................................................................................6

      a. The Mandatory Revenue Credit is a settlor act...………………………………………..6

      b. The purported Revenue "Credit" is a sham…………………………………………….7

      c. The "credit" was not tied to the expenses that anyone paid………………………...8

      d. Class members did not receive the Mandatory Revenue Credit……………………8

  B. Plaintiffs Have Identified Prohibited Transactions Involving a Fiduciary ..........................9

  C. Plaintiffs Have Shown Underlying Breaches to Support Counts IV and V ......................10

  D. Plaintiffs Withdraw Their Impartiality Claim Without Prejudice Based on Fidelity's Admission that Its "Mandatory Revenue Credit" Is a Settlor Act ......................................10

II. THE *BILEWICZ* SETTLEMENT DID NOT RELEASE PLAINTIFFS' LATER-FILED CLAIMS ................10

  A. The *Bilewicz* Release Does Not Apply to Conduct After Its Effective Date…………….10

  B. The *Bilewicz* Settlement Did Not Authorize Defendants to Abdicate Their Fiduciary Monitoring Responsibilities…………………………………………………………. .13

  C. Plaintiffs' Claims Are Not Barred by Res Judicata……………………………………...15

III. PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED ……………………………………………15

  A. Defendants Do Not Contend that Plaintiffs Had "Actual Knowledge" of a Fiduciary Breach with Respect to Recordkeeping Expenses………………………………………15

B.  Defendants Have Not Shown that Plaintiffs Had "Actual Knowledge" of Any Fiduciary Breaches with Respect to the Plan's Investments…………………………………………..16

    1.  There is no record evidence of actual knowledge……………………………………16

    2.  Defendants cannot impute constructive knowledge to Plaintiffs……………………17

    3.  Fidelity's disclosures were misleading and incomplete……………………….....18

C.  Plaintiffs Lacked Knowledge Regarding an Essential Fact of Their Prohibited Transaction Claim…………………………………………………………………………..19

D.  The Statute of Limitations Is Not a License for Recidivism……………………………20

CONCLUSION……………………………………………………………………………………..20

# TABLE OF AUTHORITIES

## Cases

*Bacon v. Stiefel Labs., Inc.*,
  2011 WL 4944122 (S.D. Fla. Oct. 17, 2011)....................................................11

*Bell v. Pension Comm. of ATH Holding Co., LLC*,
  2019 WL 387214 (S.D. Ind. Jan. 30, 2019).....................................................19

*Berard v. Royal Elec., Inc.*,
  795 F. Supp. 519 (D.R.I. 1992).......................................................................7

*Bishop-Bristol v. Mass. Mut. Life Ins. Co.*,
  2019 WL 1501581 (D. Mass. Feb. 5, 2019) .....................................................11

*Brotherston v. Putnam Invs., LLC*,
  2017 WL 2634361 (D. Mass. June 19, 2017) ....................................................3

*Brotherston v. Putnam Invs., LLC*,
  907 F.3d 17 (1st Cir. 2018)...............................................................6, 7, 9, 10

*Caputo v. Pfizer, Inc.*,
  267 F.3d 181 (2d Cir. 2001).......................................................................2, 17

*Conservation Law Found., Inc. v. Pruitt*,
  881 F.3d 24 (1st Cir. 2018)..............................................................................4

*Edes v. Verizon Commc'ns, Inc.*,
  417 F.3d 133 (1st Cir. 2005).....................................................................16-17

*Feikes v. Cardiovascular Surgery Assocs. Profit Sharing Plan, Tr.*,
  2013 WL 6205424 (D. Nev. Nov. 26, 2013) ...................................................20

*Fifth Third Bancorp v. Dudenhoeffer*,
  134 S. Ct. 2459 (2014)...................................................................2, 4, 5, 10

*Hill v. State St. Corp.*,
  2013 WL 6909524 (D. Mass. Dec. 30, 2013) ....................................................7

*In re G.E. ERISA Litig.*,
  2018 WL 6592091 (D. Mass. Dec. 14, 2018) ..................................................19

*Laurenzano v. Blue Cross & Blue Shield of Mass., Inc. Ret. Income Tr.*,
  134 F. Supp. 2d 189 (D. Mass. 2001) .............................................................20

*Leavitt v. Nw. Bell Tel. Co.*,
    921 F.2d 160 (8th Cir. 1990) ........................................................................11

*Leber v. Citigroup 401(k) Plan Inv. Cmte.*,
    2014 WL 4851816 (S.D.N.Y. Sept. 30, 2014)...........................................17, 19

*Meagher v. Int'l Ass'n of Machinists & Aerospace Workers Pension Plan*,
    856 F.2d 1418 (9th Cir. 1988) .....................................................................20

*Moreno v. Deutsche Bank Americas Holding Corp.*,
    2016 WL 5957307 (S.D.N.Y. Oct. 13, 2016) ...............................................19

*Ream v. Frey*,
    107 F.3d 147 (3d Cir. 1997)..........................................................................20

*Ruppert v. Alliant Energy Cash Balance Pension Plan*,
    255 F.R.D. 628 (W.D. Wis. 2009) ................................................................11

*Srein v. Soft Drink Workers Union, Local 812*,
    93 F.3d 1088 (2d Cir. 1996)..........................................................................11

*Sulyma v. Intel Corp. Inv. Policy Comm.*,
    909 F.3d 1069 (9th Cir. 2018) ......................................................................17

*Sulyma v. Intel Corp. Inv. Policy Comm.*,
    139 S. Ct. 2692 (2019)...................................................................................17

*Taylor v. Pension Plan of Pipefitters Local 537 Pension Fund*,
    2009 WL 1812794 (D. Mass. June 11, 2009) ...............................................15

*Tibble v. Edison Int'l*,
    135 S. Ct. 1823 (2015) ........................................................................ *passim*

*Tracey v. Mass. Inst. of Tech.*,
    2019 WL 4192148 (D. Mass. Sept. 4, 2019) ...........................................4, 5, 6

*Tussey v. ABB, Inc.*,
    746 F.3d 327 (8th Cir. 2014) ..........................................................................1

*Universal Ins. Co. v. Office of Ins. Comm'r*,
    755 F.3d 34 (1st Cir. 2014)...........................................................................15

*Velazquez v. Mass. Fin. Servs. Co.*,
    320 F. Supp. 3d 252 (D. Mass. July 19, 2018) .............................................19

*Wildman v. Am. Century Servs., LLC,*
 237 F. Supp. 3d 902 (W.D. Mo. 2017) ............................................................19

*Wildman v. Am. Century Servs., LLC,*
 362 F. Supp. 3d 685 (W.D. Mo. 2019) ..............................................................6

*Williams v. Webb Law Firm, P.C.,*
 2014 WL 3890358 (W.D. Pa. July 31, 2014) ...................................................20

*Williams v. Webb Law Firm, P.C.,*
 628 F. App'x 836 (3d Cir. 2015) ......................................................................20

## Rules, Statutes, and Regulations

26 U.S.C. § 415(c) .................................................................................................8

29 C.F.R. § 2550.404a ......................................................................................3, 18

29 C.F.R. § 2550.404c ...........................................................................................18

29 U.S.C. § 1106(b)(3) ...........................................................................................9

29 U.S.C. § 1110(a) ..........................................................................................1, 11

29 U.S.C. § 1113(2) ........................................................................................15, 17

## Other Authorities

I.R.S. P.L.R. 200136024 (Sept. 18, 2000) ..............................................................8

I.R.S. P.L.R. 201440027 (Oct. 3, 2014)..................................................................8

Lee T. Polk, 1 ERISA Practice and Litigation § 3:32................................................7

Proposed Commission Interpretation Regarding Standard of Conduct for Investment Advisers; Request for Comment on Enhancing Investment Adviser Regulation, 83 FR 21203-01 .............20

## INTRODUCTION

Defendants have filed a motion for summary judgment, but it is *Plaintiffs* who are entitled to judgment in their favor on this record. Fidelity admits that the Plan's investment committee failed to monitor any of the investments in the Plan other than two so-called designated investment alternatives ("DIAs"). *See Defs' Memo in Support of Motion to Exclude Opinions of Marcia Wagner, ECF No. 127, at 7* ("Fidelity does not dispute that the FBIC did not monitor the non-DIAs"). Fidelity further admits that it believes the Plan's recordkeeping expenses "need not be 'monitored.'" *Defs' Memo of Law in Support of Motion for Summary Judgment ("Defs' SJ Memo"), ECF No. 140, at 15.* These are flagrant fiduciary breaches that are contrary to established law,[1] Fidelity's own fiduciary training materials,[2] and the unrebutted testimony of Plaintiffs' experts regarding the applicable standard of care.[3]

Fidelity attempts to avoid responsibility for its fiduciary misconduct by focusing on two technical defenses that have nothing to do with the merits. However, each of those defenses fails. First, Fidelity claims that a prior settlement agreement authorized it to abandon its monitoring duties. The agreement did no such thing—it makes no mention of whether or how investments and expenses should be monitored. Regardless, "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under [ERISA] shall be void as against public policy." 29 U.S.C. § 1110(a).

Next, Fidelity argues that Plaintiffs' claims are time-barred because Plaintiffs had "actual knowledge" of the breaches and violations more than three year before the suit was filed.

---

[1] *See Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) (duty to monitor investments); *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (duty to monitor recordkeeping expenses).

[2] Fidelity's fiduciary training materials recognize that (1) "fiduciaries have a continuing duty to monitor investments and remove ones that may become imprudent"; and (2) "fiduciaries have a duty to monitor recordkeeping fees and to perform thorough due diligence with respect to competitiveness." *Plaintiffs' Statement of Undisputed Material Facts, ECF No. 137, ¶¶ 17, 27.*

[3] *See Wagner Report, ECF No. 138-20; Scheinberg Report, ECF No. 138-49.*

1

Once again, this misstates the record. Plaintiffs never testified that they had knowledge of the breaches and violations at issue, and Defendants have not identified anyone who did. Indeed, the Plan's fiduciaries themselves seemed confused about their monitoring responsibilities. At most, Defendants seek to charge Plaintiffs with *constructive* knowledge of the breaches and violations, based on notifications that were misleading regarding investment monitoring responsibilities and entirely silent as to monitoring of recordkeeping expenses. This is "repugnant" to the plain language of the statute, which was amended over 30 years ago to remove a constructive knowledge provision. *See Caputo v. Pfizer, Inc.*, 267 F.3d 181, 194 (2d Cir. 2001).

Finally, as to the merits (which Fidelity ignores until the end of its brief), Fidelity's arguments fail for the reasons explained in Plaintiffs' own motion for summary judgment. *See ECF No. 136*. The Supreme Court has expressly ruled that the duty to monitor plan investments trumps any language in a plan document to the contrary. *See Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2468 (2014). Thus, Fidelity cannot write itself out of its fiduciary obligations by labeling only two of the Plan's investments (holding a minority of the Plan's assets) as "DIAs." Similarly, Fidelity cannot wriggle its way out of its duty to monitor and control recordkeeping expenses by recharacterizing a portion of its existing profit-sharing contributions as a "credit" against fees. This is particularly true with respect to the class members in this case, since the so-called "credit" was not even made available to them.

In summary, Defendants offer nothing but flimsy technicalities to justify their conduct. Defendants have not identified a single plan in America that has been managed in a similar manner, and their experts are deafeningly silent as to the conduct of the Plan's fiduciaries. *See ECF No. 136 at 13*. Defendants' lawyer-driven (*id. at 3-6*), hyper-aggressive construction of ERISA has no legal support, and would do violence to the statute. Accordingly, Defendants' motion for summary judgment should be denied. Instead, Plaintiffs' motion should be granted.

## ARGUMENT

**I.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE MERITS**

### A.    Plaintiffs Have Shown Several Undisputed Breaches of Fiduciary Duty

#### 1.    The FBIC breached its duty to monitor billions of dollars in Plan assets.

"A trustee has a continuing duty to monitor trust investments." *Brotherston v. Putnam Invs., LLC*, 2017 WL 2634361, at *4 (D. Mass. June 19, 2017) ("*Brotherston II*") (Young, J.) (quoting *Tibble*, 135 S. Ct. at 1828). Yet, Defendants admittedly failed to monitor billions of dollars in investments held by the Plan. *Plaintiffs' Statement of Undisputed Material Facts ("Pls' SoF"), ECF No. 137, ¶¶ 16, 18*. Only one explanation is offered for this failure. Defendants assert that a definition contained in a 2010 Department of Labor ("DOL") disclosure regulation releases them from any obligation to monitor these investments. *See Defs' SJ Memo at 13-14*. They are sorely mistaken.

The regulation, titled "Fiduciary requirements for disclosure in participant-directed individual account plans", sets "disclosure requirements" for plans subject to ERISA. 29 C.F.R. § 2550.404a-5(b)(1). The disclosure requirements are specific to "designated investment alternatives," a term of art defined in the regulation to exclude "'brokerage windows,' 'self-directed brokerage accounts,' or similar plan arrangements." *Id.* at 2550.404a-5(h)(4). From there, Defendants make a giant leap to argue that Plan assets not labeled as "DIAs" need not be *monitored*. Defendants provide no authority for this assertion.

The term "designated investment alternative" appears nowhere in ERISA. The term is used only in the disclosure regulation, which does not address fiduciaries' monitoring obligations. It is a gross overreach for Defendants to try to use this disclosure regulation to wipe away their investment monitoring duties under the statute. "It has been said that Congress does not hide elephants in mouseholes. Here, we think it even less likely that the [DOL] hid a herd of

elephants in a mousehole, much less a herd that remained unnoticed for [nearly a decade]." *Conservation Law Found., Inc. v. Pruitt*, 881 F.3d 24, 32 (1st Cir. 2018) (citation omitted).

Outside of this litigation, Fidelity has recognized that plan fiduciaries have a "duty under ERISA to assure themselves that *__all__* Plan investment options are prudent." *ECF No. 138-43 at FID00041572* (emphasis added). The Supreme Court's opinions in this area admit of no exceptions, and make no mention of the term "designated investment alternative." *See Tibble*, 135 S. Ct. at 1828-29; *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467-68 (2014). Defendants cannot invent an exception to their monitoring duties where none exists.

Even if the Court were to entertain Defendants' baseless assertion that the DOL's disclosure regulation defines fiduciaries' monitoring duties, the Fidelity funds were not offered in a "similar arrangement" to the Plan's SDBA. Rather, the funds at issue were "available in the Plan" on the Plan's recordkeeping platform through the Plan's website. *See Pls' SoF, ECF No. 137, ¶¶ 10-11*. While Fidelity began labeling two of these funds as "DIAs" in 2014, there was "no difference" in how Plan participants accessed those funds before and after that time. *Id., ¶ 10*. Plaintiffs' fiduciary expert testified that the Plan's offering of the Fidelity funds was "not the equivalent of a self-directed brokerage account." Thomson Decl., Ex. 12, *Wagner Dep. at 146:20-147:5; see also Wagner Report, ECF No. 138-20, ¶ 63*. Defendants offer no evidence to the contrary.

In this regard, the record in this case is even more compelling than in *Tracey v. Mass. Inst. of Tech.*, 2019 WL 4192148 (D. Mass. Sept. 4, 2019). In *Tracey*, both sides set forth "compelling and competing narratives," supported by expert testimony regarding "industry practice," concerning the standard of care that applied to a purported "MIT Investment Window" that contained hundreds of Fidelity funds outside the Plan's self-directed brokerage account. *Id.* at *1-2. Based on this competing expert testimony, the court denied the defendants' summary

judgment motion with respect to whether they breached their monitoring duties. Given the absence of competing expert testimony in this case, Defendants' summary judgment motion should not only be denied; Plaintiffs' summary judgment motion should be granted.[4]

### 2. The FBIC's failure to investigate non-mutual fund vehicles and stable value funds was not consistent with prudent fiduciary practice.

Defendants also admit that the Plan's fiduciaries never investigated non-mutual fund investment vehicles such as collective trusts and separate accounts, including stable value funds. *See Defs' SJ Memo at 14*. Plaintiffs' fiduciary expert has opined that this was "inconsistent with standard fiduciary practice." *Wagner Report, ¶ 77*. Defendants offer no expert rebuttal, and none of the explanations in their brief are meritorious.

First, Defendants claim that the Plan's fiduciaries were prohibited from investigating non-mutual fund investment vehicles because "[t]he mutual-fund-only limitation was a component of the June 2014 Amendment." *Id.* However, the Supreme Court has held that "the duty of prudence trumps the instructions of a plan document." *Dudenhoeffer*, 134 S. Ct. at 2468.

Second (and relatedly), Defendants argue that the initial decision to offer only mutual funds "was not a fiduciary act, but rather a settlor function, which is not subject to fiduciary review." *Defs' SJ Memo at 14*. This misunderstands the breach. The breach is due to the Plan fiduciaries' failure to investigate using non-mutual fund investment vehicles during the class period, not Fidelity's initial decision to amend the Plan Document before the class period.

Finally, Defendants cite several cases in which courts have held that "it is not a violation

---

[4] The facts of this case are more compelling than *Tracey* for another reason as well. In July 2015 (following the Supreme Court's decisions in *Dudenhoeffer* and *Tibble*), the defendants in *Tracey* eliminated the purported MIT Investment Window, removed hundreds of Fidelity funds, and gave careful attention to a few dozen funds that remained in the plan outside the SDBA. *Id.* at *2. The defendants specifically pointed to these changes as evidence of a "robust deliberative process and ability to make logical adjustments." *Id.* at *4. Here, by contrast, the Plan was restructured in 2014 to *create* a purported window of funds outside the SDBA that would be unmonitored, and the Plan's Investment Committee believed its hands were tied. *Pls' SoF, ECF No. 137, ¶¶ 9-11, 18, 20.*

of ERISA to not offer collective trusts or stable value funds." *Id. at 15*. Again, Defendants misunderstand the breach. The Plan fiduciaries violated their duty of prudence by failing to *investigate* the use of alternative investment vehicles, not by failing to *offer* them per se. *See Fourth Amended Complaint ("FAC"), ECF No. 77, ¶¶ 68-71, 95-100*. Defendants' own caselaw makes this distinction. *See Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 704 (W.D. Mo. 2019) ("ERISA does not require a retirement plan to offer an index fund or a stable value fund, and the failure to include either in the Plan, standing alone, does not violate the duty of prudence….Rather, the issue is whether the Defendants considered these options and came to a reasoned decision for omitting them from the Plan.").[5]

### 3. The Retirement Committee breached its duty to prudently monitor the Plan's recordkeeping expenses.

The Plan's fiduciaries also never monitored the Plan's recordkeeping expenses. *Pls' SoF, ECF No. 137, ¶ 28*. Defendants do not contend otherwise; instead, they argue that recordkeeping expenses "need not be monitored" because of Fidelity's so-called "Mandatory Revenue Credit." *Defs' SJ Memo at 15-17*. This argument suffers from several serious flaws.

### a. The Mandatory Revenue Credit is a settlor act.

First, the Mandatory Revenue Credit is a settlor act. According to Fidelity, these purported credits are part of "the funding policy and method for the Plan." *Plan Document, ECF No. 138-1, § 5.1*. It is hornbook law that plan "funding" is a settlor function. *See Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 28 (1st Cir. 2018) (*"Brotherston III"*) ("[D]ecisions relating to

---

[5] Similar reasoning applies to the Plan fiduciaries' blanket inclusion of every Fidelity sector fund, regardless of its cost or performance history. *FAC, ¶¶ 76-84*. In contrast to *Wildman*, the FBIC did not "discuss[] the Plan's use of sector funds and determine[] that offering those funds served Plan participants' best interests." *Wildman*, 362 F. Supp. 3d at 705. Nor have Defendants provided any evidence that automatically offering every Fidelity sector fund was prudent. *Cf. Tracey*, 2019 WL 4192148, at *4 (D. Mass. Sept. 4, 2019) (where plaintiffs offered expert testimony that fiduciaries imprudently retained sector funds, "Defendants dispute[d] those assertions with expert testimony of their own and evidence regarding industry practice").

the timing and amount of contributions are generally not thought of as being fiduciary in nature.") (quoting Lee T. Polk, 1 ERISA Practice and Litigation § 3:32)); *Hill v. State St. Corp.*, 2013 WL 6909524, at *2 (D. Mass. Dec. 30, 2013). Defendants appear to agree, as they repeatedly describe the Mandatory Revenue Credit as a "settlor" act. *See Defs' SJ Memo at 18.*

Defendants cannot claim *fiduciary* credit for this settlor act. The First Circuit has expressly rejected Defendants' reasoning:

> [Fidelity] wore at least two hats: that of an employer dealing with its employees and that of a fiduciary dealing with the Plan. In making discretionary contributions, it acted as employer providing compensation to its employees, not as fiduciary.
>
>                          \*\*\*
>
> [Fidelity] cannot point to those contributions to offset funds [Fidelity] charges (or withholds from) the Plan in its capacity as a plan fiduciary. To hold otherwise would be to allow employers to claw back with their fiduciary hands compensation granted with their employer hands.

*Brotherston III*, 907 F.3d at 29. The same logic applies here.[6]

### b.   The purported Revenue "Credit" is a sham.

Second, even if Fidelity could take fiduciary credit for its settlor contributions, the supposed "credit" is a sham. Prior to the adoption of this "credit," Fidelity consistently made an annual profit-sharing contribution to eligible Plan participants in an amount equal to 10 percent of their compensation. *Pls' SoF, ECF No. 137, ¶ 34*. After the "credit", Fidelity's total contribution (inclusive of the "credit") remained exactly 10%. *Id., ¶ 35*. Thus, no additional consideration was provided. Although Fidelity takes umbrage at Ms. Wagner's expert testimony that the "credit" was a gimmick, *id., ¶ 36*, it conspicuously offers no contrary expert testimony.

---

[6] The fact that the Mandatory Revenue Credit is described as nondiscretionary does not change the fact that it is a settlor contribution. The settlor nature of the "credit" is made even more obvious by the fact that Fidelity retains the authority to cancel the "credit" at any time. *See Plan Document, ECF No. 138-1, § 13.1* (giving Fidelity authority to "amend or terminate the Plan or any of its provisions"). In fact, the Mandatory Revenue Credit does not begin vesting unless a participant is still employed by Fidelity two years after the "credit" is made. *Id., § 9.2*. "ERISA does not prevent an employer from terminating pension benefits which are neither accrued or vested." *Berard v. Royal Elec., Inc.*, 795 F. Supp. 519, 527 (D.R.I. 1992).

**c.      The "credit" was not tied to the expenses that anyone paid.**

Third, even without regard to the history of Fidelity's payments to the plan (which did not change after the implementation of the revenue "credit"), the amount of the "credit" was not tied to the expenses paid by Plan participants. *Pls' SoF, ECF No. 137, ¶ 37 n.17*. Instead, the credit was allocated to eligible participant accounts based on their compensation. *Id.* This further demonstrates that the so-called "credit" was really a form of supplemental compensation (i.e., profit sharing), not a bona fide expense reimbursement. *Id.*

**d.      Class members did not receive the Mandatory Revenue Credit.**

Finally, none of the class members received the "credit" for years they were in the class. *Pls' SoF, ECF No. 137, ¶ 38*. Defendants' attempts to explain away this fact lack merit.

Defendants argue that paying the Mandatory Revenue Credit "to former employees' accounts would have violated the Internal Revenue Code ('IRC')." *Defs' SJ Memo at 17*. However, the IRC expressly allows for "restorative payments" to former employees. *See* I.R.S. P.L.R. 201440027 (Oct. 3, 2014).[7] Thus, as Ms. Wagner testified, the tax code does not excuse Defendants' fiduciary misconduct. Thomson Decl., Ex. 12, *Wagner Dep. at 337:12-338:8*. Notably, Fidelity did not seek a ruling from the IRS on this issue, and there is no evidence in the record to suggest that this issue was ever discussed. Regardless, the tax implications of Fidelity's payments have nothing to do with ERISA, and nothing required Fidelity to set up the Plan in the unusual manner that it did. If it was more expensive (from a tax standpoint) for Fidelity to unwind its fiduciary breaches with respect to former employees than simply avoid the breaches in the first place—as logic would dictate and as prudent fiduciaries do—Fidelity can hardly now complain that its failure to exercise an ounce of prevention will cost a pound of cure.

---

[7] Payment of the Mandatory Revenue Credit is also analogous to demutualization proceeds, which can be made to former employees without running afoul of 26 U.S.C. § 415(c). *See* I.R.S. P.L.R. 200136024 (Sept. 18, 2000).

Defendants also argue that class members "had no *individual* entitlement" to receive a "credit." *Defs' SJ Memo at 17* (emphasis added). However, if the credit was a bona fide fee rebate (as Defendants contend), then Plaintiffs would be entitled to their fair share of the credit to reimburse them for the excess fees that they paid. Defendants cannot have it both ways.[8]

### B.    Plaintiffs Have Identified Prohibited Transactions Involving a Fiduciary

Plaintiffs also have shown prohibited transactions involving a fiduciary under 29 U.S.C. § 1106(b)(3). *See Pls' SJ Memo at 15-19.* Both of Fidelity's defenses to this claim are misplaced.

First, Defendants contend that the Fidelity affiliates that were paid in connection with transactions involving Plan assets "are not fiduciaries." *Defs' SJ Memo at 20.* This is irrelevant. Defendants stipulated that all revenue generated by these affiliates is transferred to a "corporate account registered to FMR LLC." *ECF No. 138-10, ¶ 3.* Defendants do not dispute that FMR LLC is a fiduciary, nor could they. *See Pls' SoF, ECF No. 137, ¶ 40; Pls' SJ Brief at 16.*

Second, Defendants again claim that due to the Mandatory Revenue Credit, Fidelity received "no net consideration" and the Plan was treated "more favorably" than other plans. *Defs' SJ Memo at 20.* This argument was rejected in *Brotherston III,* 907 F.2d at 29, and fails for the same reasons here. *See supra* at 6-9. Defendants have stipulated that, absent consideration of this "credit," they do not meet the requirements of PTE 77-3. *See Pls' SoF, ECF No. 137, ¶ 43.*[9]

---

[8] Further, because recordkeeping fees were so grossly excessive (hundreds of dollars per participant instead of the stipulated market rate of $14 to $21 per participant), the amount of any true recordkeeping offsets would, as a practical matter, be so large that "Plan fiduciaries would have no choice but to return those assets to participants," as there would be no other legitimate use for the monies. Thomson Decl., Ex. 13, *Scheinberg Rebuttal Report, ¶ 10.*

[9] Defendants note certain differences between the Mandatory Revenue Credit and the employer contribution considered in *Brotherston III. Defs' SJ Memo at 20 n.22.* However, Defendants provide no explanation of why these differences matter. Moreover, these purported distinctions are factually suspect, as the Mandatory Revenue Credit is allocated based on compensation, *see supra* at 8, and is subject to termination or change by Fidelity at any time, *see supra* at n.7.

**C.     Plaintiffs Have Shown Underlying Breaches to Support Counts IV and V**

Defendants' only challenge to Plaintiffs' last two claims is that they "hinge on the existence of an underlying breach of fiduciary duty." *Defs' SJ Memo at 20*. This argument fails because Plaintiffs have shown that such breaches exist. *See supra* at 3-9.

**D.     Plaintiffs Withdraw Their Impartiality Claim Without Prejudice Based on Fidelity's Admission that Its "Mandatory Revenue Credit" Is a Settlor Act**

Finally, because Defendants have admitted that Fidelity's Mandatory Revenue Credit is a settlor act, *see supra* at 6-7, Plaintiffs withdraw their impartiality claim in Count II without prejudice. Plaintiffs reserve the right to reassert this claim if Fidelity later argues otherwise.

**II.     THE *BILEWICZ* SETTLEMENT DID NOT RELEASE PLAINTIFFS' LATER-FILED CLAIMS**

Faced with challenging facts (no evidence of relevant investment or expense monitoring), an acknowledged legal duty to monitor (*see supra* at n.2), and binding case law that torpedoes both its "plan document" defense (*Dudenhoeffer*) and "plan contributions" defense (*Brotherston III*), Fidelity leans heavily on a release of claims in a prior class action lawsuit. However, that release covers neither the period at issue nor the claims at issue. Accordingly, the release is not a defense to the present action.

**A.     The *Bilewicz* Release Does Not Apply to Conduct After Its Effective Date**

Plaintiffs have accounted for the *Bilewicz* Release by limiting the class to participants with claims "after the effective date of the *Bilewicz* settlement."[10] *Stipulation and Order Regarding Class Certification, ECF No. 83, ¶ 1*. Plaintiffs do not seek any damages for periods during which the *Bilewicz* plaintiffs released claims.

While Defendants are entitled to rely to that release as a defense to claims concerning fiduciary misconduct prior to the effective date, they overreach by seeking to extend the operation of the release past the effective date. Defendants are not entitled to extend that release

---

[10] Defendants assert that the settlement was effective November 17, 2014. *Defs' SJ Memo at 1.*

indefinitely into the future, essentially exempting themselves from ERISA's duties of loyalty and prudence. The statute expressly provides that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy." 29 U.S.C. § 1110(a). "This wording has been applied to bar the waiver of a future liability, thereby preventing a contracting party from issuing to any fiduciary a license to violate the statute." *Srein v. Soft Drink Workers Union, Local 812*, 93 F.3d 1088, 1096 (2d Cir. 1996). Thus, "[a] release…does not relieve a fiduciary of any responsibility, obligation, or duty imposed by ERISA; instead, it merely settles a dispute that the fiduciary did not fulfill its responsibility or duty *on a given occasion*." *Leavitt v. Nw. Bell Tel. Co.*, 921 F.2d 160, 161-62 (8th Cir. 1990) (emphasis added); *see also, e.g., Bacon v. Stiefel Labs., Inc.*, 2011 WL 4944122, at *8 (S.D. Fla. Oct. 17, 2011) ("The law is clear that general releases cannot bar breach of fiduciary duty claims that arise after the effective date of the release."); *Ruppert v. Alliant Energy Cash Balance Pension Plan*, 255 F.R.D. 628, 635 (W.D. Wis. 2009) ("[T]o the extent plaintiffs' releases could be construed as releasing defendant from this ERISA suit, the agreement would be unenforceable because agreements that waive future violations of ERISA are unenforceable.").[11]

Defendants recognized the limits of the release in briefing Plaintiffs' motion to compel. Defendants expressly stated that "***Plaintiffs are free to challenge the Plan fiduciaries' conduct during the post-Release period*** …." *Defs' Memo in Opp. to Pls' Motion to Compel, ECF No. 59, at 13* (emphasis added). Defendants merely sought to "enjoin Plaintiffs from pursuing any claim

---

[11] Defendants cite only one case concerning an ERISA settlement release for future conduct. *See Defs' SJ Memo at 9* (citing *Bishop-Bristol v. Mass. Mut. Life Ins. Co.*, 2019 WL 1501581 (D. Mass. Feb. 5, 2019)). Crucially, that case concerned a release of future claims relating to a *non-fiduciary. Id.* at *5. As the court noted, "application of § 1110 requires one to find first that the person in question is a fiduciary." *Id.* Here, it is undisputed that the FBIC and the Retirement Committee were fiduciaries, so *Bishop-Bristol* is inapplicable.

that the June 2014 Amendment [which predated the effective date] was itself wrongful." *Id.*

Defendants cannot avoid the unambiguous language of the statute, case law, and their own prior acknowledgement by speciously asserting that Plaintiffs' claims "do not turn on events after the Settlement Effective Date." *Defs' SJ Memo at 9*. This assertion is obviously untrue. Because Plaintiffs' claims center on a failure to *monitor* the Plan's investments and expenses during the class period, rather than the initial selection of the investments and recordkeeper, those claims turn on Defendants' conduct after the effective date of the release.[12] It was presumably for this reason that the Court denied Plaintiffs' motion to compel discovery regarding events prior to the release date. *See ECF No. 106*. As a result of this ruling, the evidence upon which Plaintiffs rely is necessarily focused on events after the date of the release.

Defendants' argument also ignores the Supreme Court's decision in *Tibble*. In that case, the Ninth Circuit held that Plaintiffs' claims regarding certain investments related back to events prior to the limitations period because those investments were added to the plan more than six years before suit was filed, and plaintiffs "had not established a change in circumstances that might trigger an obligation to review and to change investments within the 6–year statutory period." *Tibble*, 135 S.Ct. at 1827. However, the Supreme Court disagreed. In a unanimous opinion, the Court held that (1) "a trustee has a continuing duty to monitor trust investments and remove imprudent ones"; and (2) "[t]his continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Id.* at 1828. Accordingly, the Court ruled that the plaintiffs' failure to monitor claim arose from events during the statutory period, not beforehand. *Id.* This ruling is dispositive of the claim accrual issue here.

---

[12] Once again, Defendants recognized this in their briefing on the motion to compel. *See Defs' Surreply in Opposition to Motion to Compel, ECF No. 69, at 2* ("The [pre-release] discovery sought will shed no light on the sufficiency of that monitoring.").

### B.    The *Bilewicz* Settlement Did Not Authorize Defendants to Abdicate Their Fiduciary Monitoring Responsibilities

Because the *Bilewicz* Release cannot be applied to future fiduciary breaches after the effective date of the release, Defendants argue that the "Affirmative Relief" provided by Paragraph 7.3 of the Settlement somehow justifies their conduct in this case. It does not.

The relevant paragraph of the Settlement Agreement provides as follows:

7.3    <u>Affirmative Relief During the Settlement Period</u>.  The *Company*, as sponsor of the *Plan*, shall amend the *Plan* no later than July 1, 2014, as follows, and maintain these features during the *Settlement Period* **unless otherwise** stated below or **required by law (including *ERISA*)**:

7.3.1    The default investment option under the Plan shall be the Fidelity Freedom Funds – Class K;

7.3.2    In addition to the default, the Plan shall allow Plan participants access to a large number of Fidelity and non-Fidelity mutual funds;

7.3.3    For employees eligible for a company match at 7%, the auto-enrollment deferral rate under the *Plan* shall be raised from 3% of eligible compensation to a minimum of 7% of eligible compensation and current participants who are deferring below 7% will be defaulted to 7%. ...;

7.3.4    The Plan shall provide that revenue sharing attributable to non-Fidelity mutual funds shall be credited to participants in the same way as revenue attributable to Fidelity mutual funds and collective trusts pursuant to the 8th amendment to the 2005 restatement of the Plan is credited to participants. This revision to the *Plan* shall remain in effect for at least three years.

*ECF No. 142-04, § 7.3* (bold added; italics and underlining in original). For three separate and independent reasons, this language does not exonerate Defendants' fiduciary breaches here.

***First***, the Affirmative Relief was expressly made subject to ERISA's legal requirements, as demonstrated by the bolded language above. Thus, regardless of the specific relief terms, such relief could not and did not excuse Defendants' unlawful conduct in violation of ERISA.

***Second***, nothing in Paragraph 7.3 or its subparagraphs addresses the monitoring of the Plan's investment options or recordkeeping expenses. The words "monitor", "designated investment alternative", "recordkeeping", and "expense" are nowhere to be found. Moreover, the

13

terms that *are* included did not in any way authorize the fiduciary misconduct here:

- <u>Subparagraph 7.3.1</u> is immaterial because Plaintiffs make no claim relating to the Freedom Funds or the Plan's default investment option.

- <u>Subparagraph 7.3.2</u> is immaterial because it (a) did not require Fidelity to include *all* of its mutual funds in the Plan; (b) did not preclude Fidelity from monitoring the funds that were included; (c) did not preclude Fidelity from removing funds where appropriate; (d) did not specify how funds would be offered to participants (on the Plan's recordkeeping platform or through an SDBA), or call for differential treatment between the Fidelity funds and non-Fidelity funds in that regard; (e) did not prohibit Fidelity from considering collective trusts or separate accounts; (f) did not require Fidelity to use mutual fund versions of investments where alternative investment vehicles were available; (g) did not prohibit Fidelity from considering a stable value fund; and (h) did not mandate the use of sector funds or any other types of funds without appropriate due diligence.

- <u>Subparagraph 7.3.3</u> is immaterial because Plaintiffs make no claim relating to the Plan's automatic enrollment provision or company matching contribution.

- <u>Subparagraph 7.3.4</u> is immaterial because it (a) does not address recordkeeping expenses or monitoring of such expenses; and (b) Plaintiffs make no claim relating to "revenue sharing attributable to *non*-Fidelity funds." Nor does this Paragraph allow Fidelity to offset "Company Contributions of Revenue Credits" (*see* Eighth Amendment to the Plan, *ECF No. 142-34, at page 8 of 10*) against recordkeeping expenses, or take away what it giveth by subtracting revenue credits from its annual 10% profit sharing contribution.

***Finally***, the period of Affirmative Relief was brief. Paragraph 7.3 expired at the end of the "Settlement Period," which was defined to fall two years from the effective date of the Plan amendment mandated by the settlement (i.e., July 29, 2016). *See ECF No. 142-04, ¶ 1.48*. The only exception was Paragraph 7.3.4, which expired three years from the effective date of the Plan amendment (i.e., July 29, 2017). Thus, even if these provisions had any bearing on the claims at issue (which they do not), they were inoperative for a large portion of the class period.

Given the limited scope of the "Affirmative Relief" that was provided by the settlement, Defendants resort to characterizations of that relief that were made by counsel in the *Bilewicz* lawsuit. *See Defs' SJ Memo at 6-8*. However, such characterizations are irrelevant. Section 13.9 of the Settlement Agreement expressly provided:

13.9 Entire Agreement. This *Settlement Agreement* and the *Non-Disclosure Agreement* contain the entire agreement among the *Parties* relating to this *Settlement*.

ECF No. 142-04, ¶ 1.48; see also id., ¶ 13.2 ("the *Settlement Agreement* may be modified or amended only by written agreement signed by or on behalf of all *Settling Parties.*"). Further, there is no evidence that anyone ever represented to the *Bilewicz* court that Fidelity would forego all monitoring of the Plan's investments and recordkeeping expenses. For Fidelity to suggest that the court somehow endorsed this conduct in approving the settlement is beyond the pale.

### C.     Plaintiffs' Claims Are Not Barred By Res Judicata

For the same reasons that Plaintiffs' claims are not barred by the *Bilewicz* settlement and release, they are not barred by res judicata. "According to the doctrine of res judicata, a final judgment on the merits precludes parties from relitigating claims that were or could have been brought in a prior action." *Universal Ins. Co. v. Office of Ins. Comm'r*, 755 F.3d 34, 37 (1st Cir. 2014). Plaintiffs' claims could not have been brought in the prior action because they concern Defendants' monitoring of investments and expenses *after* the resolution of that case.

## III.     PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED

Defendants' final argument is that Plaintiffs' claims are time-barred. This argument is moot as to the impartiality claim, *see supra* at 10, and meritless as to Plaintiffs' other claims. Defendants have not shown that Plaintiffs had "actual knowledge of the breach[es] or violation[s]" more than three years before filing suit. *See* 29 U.S.C. § 1113(2).[13]

### A.     Defendants Do Not Contend that Plaintiffs Had "Actual Knowledge" of a Fiduciary Breach with Respect to Recordkeeping Expenses

Defendants do not even attempt to argue that Plaintiffs had actual knowledge of the Retirement Committee's failure to monitor the Plan's recordkeeping fees. *See Defs' SJ Memo at 9-13*. Nor do they contend that Plaintiffs knew that the Plan's recordkeeping fees were excessive

---

[13] Defendants bear the burden of proof on their statute of limitations defense. *Taylor v. Pension Plan of Pipefitters Local 537 Pension Fund*, 2009 WL 1812794, at *5 (D. Mass. June 11, 2009).

relative to other plans. Thus, Plaintiffs' recordkeeping allegations are indisputably timely.[14]

> **B.    Defendants Have Not Shown that Plaintiffs Had "Actual Knowledge" of Any Fiduciary Breaches with Respect to the Plan's Investments**

> **1.    There is no record evidence of actual knowledge.**

Defendants argue that Plaintiffs had knowledge of the FBIC's failure to monitor the Fidelity funds other than the two DIAs. *See Defs' SJ Memo at 11-13*. However, Defendants conspicuously fail to cite any deposition testimony from Plaintiffs (or any other class member) stating that they possessed such knowledge more than three years before suit was filed. To the contrary, each of the named Plaintiffs have submitted sworn declarations that they did ***not*** know the Plan's investments were unmonitored by the Plan's fiduciaries and had never been subjected to any screening criteria or due diligence. *See Plaintiffs' Statement of Additional Material Facts, ECF No. 153, at ¶¶ 1-2*. Further, Plaintiffs have testified that they (1) did not know how the fees or performance of the unmonitored Fidelity funds compared to similar funds in other plans; (2) did not know whether those unmonitored funds were appropriate for the Plan; (3) did not attend any FBIC meetings or have any knowledge of the FBIC's discussions regarding investment monitoring or the Plan's investments; (4) did not know whether the FBIC considered alternatives to mutual funds such as collective trusts or separate accounts; (5) did not know whether a stable value fund was ever considered for the Plan; (6) did not know whether the FBIC ever had any discussions relating to sector funds or considered the appropriateness of those funds; and (7) had no idea that they might have a claim relating to the Plan's investments. *Id.* On this record, there is simply no evidence to support Defendants' statute of limitations defense, much less enter judgment in favor of Defendants on that defense as a matter of law. *See Edes v. Verizon*

---

[14] Defendants assert that "Plaintiffs … knew the essential facts of how the Mandatory Revenue Credit was credited[.]" *Defs' SJ Memo at 10*. However, this does not form the basis for Plaintiffs' claim for failure to monitor and control recordkeeping expenses, which is presumably why Defendants raise this supposed knowledge in connection with Plaintiffs' impartiality claim.

*Commc'ns, Inc.*, 417 F.3d 133, 142 (1st Cir. 2005) ("[K]nowledge of *facts* cannot be attributed to plaintiffs who have no actual knowledge of them.").

### 2.    Defendants cannot impute constructive knowledge to Plaintiffs.

Instead of pointing to evidence of actual knowledge of an investment-related claim, Defendants ask the Court to impute constructive knowledge to Plaintiffs based upon certain notices that were allegedly provided to them. This argument fails both on the law and the facts.

The statute requires "actual knowledge" of the breach or violation. 29 U.S.C. § 1113(2).[15] It is not sufficient that a plaintiff had "constructive knowledge" of the violation, or knew that "something was awry." *Edes*, 417 F.3d at 141-42. In fact, "a constructive notice provision was expressly removed from [the statute] in 1987." *Caputo*, 267 F.3d at 194. Thus, it would be "repugnant" to both the text of § 1113 and its legislative history to equate "actual knowledge" with constructive knowledge. *Id.* "[T]he phrase 'actual knowledge' means the plaintiff is actually aware of the facts constituting the breach, not merely that those facts were available to the plaintiff." *Sulyma v. Intel Corp. Inv. Policy Comm.*, 909 F.3d 1069, 1076 (9th Cir. 2018), *cert. granted,* 139 S. Ct. 2692 (2019). Defendants have presented no such evidence. *See supra* at 16.

It would be especially unfair to impute constructive knowledge to Plaintiffs based on the notices that were allegedly provided here. Defendants state that disclosures of Fidelity's failure to monitor "were sent to regularly maintained and monitored-email accounts or the mailing addresses on file for participants without email addresses." *Defs' SJ Memo at 12-13*. However, this is not totally accurate. Participants could only access the disclosure by clicking a hyperlink in Fidelity's email, *Rosenberg SJ Decl., ECF Nos. 142-42, 142-46*, and then navigating several pages to an un-emphasized paragraph containing the relevant language, *id., ECF No. 142-41*.

---

[15] This actual knowledge requirement is "strictly construed." *Leber v. Citigroup 401(k) Plan Inv. Cmte.*, 2014 WL 4851816, at *3 (S.D.N.Y. Sept. 30, 2014).

Nothing in the body of the emails indicated that the hyperlink concerned investment monitoring. *Id., ECF Nos. 142-42, 142-46*. Nor did the hyperlinked notice emphasize or focus on monitoring; the disclosure consists of a few sentences, several pages in. *Id., ECF No. 142-41*. Only an exceptionally diligent participant would have even found the disclosure, let alone understood it.

### 3.    Fidelity's disclosures were misleading and incomplete.

To the extent anyone actually read the disclosure (which Defendants have not shown), the disclosure was misleading. Fidelity's disclosure that the Plan's fiduciaries would not monitor any investments other than the DIAs was immediately followed by the assertion that "[i]t is your sole responsibility to evaluate whether the investments you select are suitable for your personal retirement savings needs." *ECF No. 142-50, at 3*. This is not true, and improperly suggested that the Plan's fiduciaries had no legal responsibility for evaluating the investments in the Plan.[16] Fidelity cannot reasonably expect Plan participants to have known that the FBIC was responsible for monitoring all Plan investments (and in breach of that responsibility) when Fidelity was simultaneously telling them that they had "sole responsibility" for evaluating those investments. This inaccurate description of monitoring responsibilities is the same type of disinformation that Mr. Derbyshire provided to the FBIC, which led committee members to believe they had no fiduciary monitoring responsibilities. *See Pls' SJ Memo at 5-6*. Plaintiffs cannot be ascribed "actual knowledge" of matters that not even the FBIC comprehended.

---

[16] As discussed above, the Plan's fiduciaries were responsible for monitoring all of the Fidelity investment options in the Plan, not just the DIAs. *See supra* at 3-5.  However, even if Fidelity was correct that DIA status has any relevance for purposes of the duty to monitor, it would run head on into another problem: there were only two DIAs. In order to charge participants with any responsibility for choosing their own investments under ERISA § 404(c), a plan must offer a "broad range" of investments, 29 C.F.R. § 2550.404c-1(b)(1), which is defined to mean at least three different investments, 29 C.F.R. § 2550.404c-1(b)(3)(i)(B). *See Wagner Report, ¶ 64*. And where a Plan does offer three qualifying investments to choose from, the Plan's fiduciaries still have a responsibility to prudently select and monitor what is offered. *See* 29 C.F.R. § 2550.404c-1(d)(2)(iv). Fidelity cannot have it both ways, treating only the two DIAs as investment options for purposes of its fiduciary responsibilities under ERISA § 404(a), but treating all Plan investments as investment options so as to qualify for ERISA § 404(c) protection.

Further, Fidelity's quarterly disclosures to Plaintiffs during the class period did not include any information about the fees or performance of the unmonitored Fidelity funds. *See Plaintiffs' Statement of Additional Material Facts, ECF No. 153, at ¶ 5.* Nor did Fidelity disclose to class members the fees or performance of comparable alternative funds. *Id.* Plaintiffs could not have known that the Plan's investments were being imprudently retained without any knowledge of the fees or performance of the Plan's funds or comparable funds available in the marketplace. *See, e.g.*, *In re G.E. ERISA Litig.*, 2018 WL 6592091, at *3 (D. Mass. Dec. 14, 2018); *Velazquez v. Mass. Fin. Servs. Co.*, 320 F. Supp. 3d 252, 258 (D. Mass. July 19, 2018) (stating that "material facts necessary to recognize a breach or violation" include "the availability of less expensive alternative investments, the costs of the Plans' investments compared to those in similarly-sized plans, [and] investment performance versus other available alternatives").[17]

### C.   Plaintiffs Lacked Knowledge Regarding an Essential Fact of Their Prohibited Transaction Claim

Contrary to Defendants' assertions, Plaintiffs also did not have actual knowledge of an essential fact concerning their prohibited transaction claim: the absence of revenue sharing payments to the Plan. For other Fidelity-recordkept plans that offer Fidelity funds that pay revenue sharing, Fidelity makes payments to the plan to offset the plan's recordkeeping fees. *Thomson Decl., ECF No. 138-65, ¶ 1.* However, its own Plan was an exception; Fidelity made no such payments to the Plan. *Id.* This is a crucial component of Plaintiffs' claim; had Fidelity made these payments to the Plan, the Plan would not have been treated less favorably than other shareholders of Fidelity funds, and Defendants would be exempt from any prohibited transaction claim under PTE 77-3. Defendants do not contend that Plaintiffs had knowledge of this fact.

---

[17] *See also Wildman*, 237 F. Supp. 3d at 911; *Moreno v. Deutsche Bank Americas Holding Corp.*, 2016 WL 5957307, at *4 (S.D.N.Y. Oct. 13, 2016); *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 2014 WL 4851816, at *5 (S.D.N.Y. Sept. 30, 2014); *Bell v. Pension Comm. of ATH Holding Co., LLC*, 2019 WL 387214, at *4 (S.D. Ind. Jan. 30, 2019).

**D.      The Statute of Limitations Is Not a License for Recidivism**

Finally, even if Defendants had met their burden to support their statute of limitations defense, that defense would be incomplete. The fiduciary breaches in this case did not happen once, but repeatedly during successive committee meetings. *See Tibble*, 135 S. Ct. at 1828 ("[T]he trustee must systematically consider all the investments of the trust *at regular intervals* to ensure that they are appropriate.") (citation omitted) (emphasis added). While it is one thing to charge a participant with knowledge in 2014 of a failure to monitor in 2014, it is another thing to charge a participant in 2014 with knowledge of a failure to monitor in 2019. Each breach is independent and has its own limitations period under *Tibble*.[18] Likewise, each prohibited payment involving FMR LLC has its own limitations period. Thus, Defendants would at most have a defense to claims based on fiduciary misconduct or prohibited fiduciary transactions prior to October 10, 2015 (three years before the suit was filed). Defendants cannot wipe their hands of their fiduciary responsibilities indefinitely into the future based on a mere disclosure.[19]

## CONCLUSION

For the above reasons, Defendants' motion for summary judgment should be denied.

---

[18] *See also Meagher v. Int'l Ass'n of Machinists & Aerospace Workers Pension Plan*, 856 F.2d 1418, 1423 (9th Cir. 1988) (issuance of each monthly benefits checks with improperly reduced value triggered new statute of limitations); *Feikes v. Cardiovascular Surgery Assocs. Profit Sharing Plan, Tr.*, 2013 WL 6205424, at *3 (D. Nev. Nov. 26, 2013) (each improperly early plan distribution triggered new statute of limitations); *Williams v. Webb Law Firm, P.C.*, 2014 WL 3890358, at *10 & n.1 (W.D. Pa. July 31, 2014), *aff'd*, 628 F. App'x 836 (3d Cir. 2015) (each improper benefits payment triggered new statute of limitations).

[19] *See* Proposed Commission Interpretation Regarding Standard of Conduct for Investment Advisers; Request for Comment on Enhancing Investment Adviser Regulation, 83 FR 21203-01, at 21205-06 ("The investment adviser cannot disclose or negotiate away, and the investor cannot waive, the federal fiduciary duty."); *accord*, *Laurenzano v. Blue Cross & Blue Shield of Mass., Inc. Ret. Income Tr.*, 134 F. Supp. 2d 189, 196 (D. Mass. 2001) ("Courts reason that to allow a fiduciary to escape liability after disregarding the interests of plan beneficiaries would undermine congressional intent.") (citation omitted); *Ream v. Frey*, 107 F.3d 147, 153 (3d Cir. 1997) ("Allowing an ERISA trustee to escape liability after disregarding the interests of plan beneficiaries would undermine Congress' intent" to "impose on ERISA fiduciaries a strict code of conduct to protect adequately pension and welfare plan assets.").

Respectfully Submitted,

Dated: October 4, 2019          **NICHOLS KASTER, PLLP**

s/Kai Richter_____
Kai Richter (admitted *pro hac vice*)
Paul J. Lukas (admitted *pro hac vice*)
James H. Kaster (admitted *pro hac vice*)
Brock T. Specht (admitted *pro hac vice*)
Carl F. Engstrom (admitted *pro hac vice*)
Jacob T. Schutz (admitted *pro hac vice*)
Mark E. Thomson (admitted *pro hac vice*)
NICHOLS KASTER, PLLP
4600 IDS Center
80 S. 8th Street
Minneapolis, Minnesota 55402
krichter@nka.com
lukas@nka.com
kaster@nka.com
bspecht@nka.com
cengstrom@nka.com
jschutz@nka.com
mthomson@nka.com

Jason M. Leviton (BBO #678331)
Jacob A. Walker (BBO #688074)
BLOCK & LEVITON LLP
260 Franklin Street, Suite 1860
Boston, Massachusetts 02110
(617) 398-5000
jason@blockesq.com
jacob@blockesq.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2019, a true and correct copy of the foregoing was served by CM/ECF to the parties registered to the Court's CM/ECF system.

Dated: October 4, 2019          s/ Kai Richter_____
Kai Richter