## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

KEVIN MOITOSO, *et al.*

      *Plaintiffs*,

      *v.*

FMR LLC, *et al.*

      *Defendants*.

No. 1:18-CV-12122-WGY

## MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

William M. Jay (admitted *pro hac vice*)
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC 20001
Tel: (202) 346-4000
Fax: (202) 346-4444
wjay@goodwinlaw.com

John J. Falvey, Jr. (BBO# 542674)
Alison V. Douglass (BBO# 646861)
Dave Rosenberg (BBO# 679434)
Benjamin S. Reilly (BBO# 693742)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel: (617) 570-1000
Fax: (617) 523-1231
jfalvey@goodwinlaw.com
adouglass@goodwinlaw.com
drosenberg@goodwinlaw.com
breilly@goodwinlaw.com

October 4, 2019

*Attorneys for Defendants*

**TABLE OF CONTENTS**

INTRODUCTION AND BACKGROUND ..................................................................1

FACTUAL BACKGROUND ...............................................................................2

ARGUMENT ...............................................................................................5

    I.      PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT
           ON THEIR CLAIM FOR FAILURE TO MONITOR INVESTMENTS.............. 5

           A.     Fidelity Fulfilled Its Duty To Monitor Designated Investment
                  Alternatives. .....................................................................5

                 1.     Fiduciaries are not required to monitor investments that
                         participants access through a brokerage window or
                         "similar" arrangement. ..................................................5

                 2.     The Fidelity funds at issue were made available through a
                         brokerage window or "similar arrangement."...................6

                 3.     Plaintiffs fail to identify any material way in which
                         Fidelity's offering was not a brokerage window or
                         "similar arrangement." ..................................................7

            B.     The Failure-to-Monitor Claim Ignores the Fiduciary Monitoring
                  of PAS-W.......................................................................9

    II.     THE MANDATORY REVENUE CREDIT DEFEATS THE CLAIM
           FOR EXCESSIVE RECORDKEEPING EXPENSES. ......................... 10

           A.     A Legally-Enforceable Right Is Not a Gimmick. .....................10

           B.     The Reasonableness of the *Plan's* Recordkeeping Expenses Does
                  Not Turn on Allocating Revenue Credit To Individual Plan
                  Participants...................................................................12

    III.    THE PROHIBITED TRANSACTION CLAIM FAILS.......................... 15

           A.     Plaintiffs Fail To Establish Any Element of a Prohibited
                  Transaction...................................................................16

           B.     PTE 77-3 Exempts the Disputed Transactions. .........................18

    IV.    PLAINTIFFS' CLAIMS ARE RELEASED AND TIME-BARRED. ................. 20

CONCLUSION............................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Brotherston v. Putnam Investments*,
  2017 WL 2634361 (D. Mass. June 19, 2017) .......................................................................5

*Brotherston v. Putnam Investments, LLC*,
  907 F.3d 17 (1st Cir. 2018) ................................................................... *passim*

*Cassell v. Vanderbilt Univ.*,
  285 F. Supp. 3d 1056 (M.D. Tenn. 2018) ..............................................................14

*Fisher v. Penn Traffic Co.*,
  319 F. App'x 34 (2d Cir. 2009) ............................................................................15

*In re Halpin*,
  566 F.3d 286 (2d Cir. 2009) ................................................................................11

*Hughes Aircraft Co. v. Jacobson*,
  525 U.S. 432 (1999) ............................................................................................16

*LaRue v. DeWolff, Boberg & Assocs., Inc.*,
  552 U.S. 248 (2008) ......................................................................................14, 15

*Lockheed Corp. v. Spink*,
  517 U.S. 882 (1996) ............................................................................................16

*Loomis v. Exelon Corp.*,
  658 F.3d 667 (7th Cir. 2011) ..............................................................................11

*Nieves-Villanueva v. Soto-Rivera*,
  133 F.3d 92 (1st Cir. 1997) ...................................................................................8

*Sacerdote v. NYU*,
  328 F. Supp. 3d 273 (S.D.N.Y. 2018) ................................................................14

*Wolf v. Causley Trucking, Inc.*,
  719 F. App'x 466 (6th Cir. 2017) ........................................................................15

**Statutes**

26 U.S.C. § 415(c)(1) .....................................................................................12, 20

Employee Retirement Income Security Act of 1974 (ERISA),
  29 U.S.C. § 1001 *et seq.* ................................................................... *passim*

29 U.S.C. § 1104(c)(5)............................................................................................................6

29 U.S.C. § 1106(b)(3) ............................................................................................15, 17, 18

29 U.S.C. § 1109(a) ...............................................................................................................15

29 U.S.C. § 1132(a)(2)....................................................................................................14, 15

**Rules and Regulations**

29 C.F.R. § 2550.404a-5 .........................................................................................................6

29 C.F.R. § 2550.404a-5(a) .....................................................................................................6

29 C.F.R. § 2550.404a-5(c) .....................................................................................................6

29 C.F.R. § 2550.404a-5(d) .....................................................................................................6

29 C.F.R. § 2550.404a-5(f) ......................................................................................................6

29 C.F.R. § 2550.404a-5(h)(4)..................................................................................................6

29 C.F.R. § 2550.408b-2 ........................................................................................................13

29 C.F.R. § 2550.408b-2(a) ....................................................................................................13

29 C.F.R. § 2550.408b-2(c) ....................................................................................................13

29 C.F.R. § 2550.408b-2(c)(1)(iv)(C) .................................................................................4, 13

29 C.F.R. § 2550.408b-2(c)(1)(iv)(D) .................................................................................4, 13

29 C.F.R. § 2550.408b-2(c)(1)(viii)(B) .....................................................................................4

29 C.F.R. § 2550.408b-2(c)(1)(viii)(B)(3)...............................................................................13

42 Fed. Reg. 18,734 (Mar. 31, 1977)...............................................................................18, 19

73 Fed. Reg. 58,450 (Oct. 7, 2008).........................................................................................17

75 Fed. Reg. 64,910 (Oct. 20, 2010).........................................................................................6

77 Fed. Reg. 5632 (Feb. 3, 2012) ...........................................................................................13

79 Fed. Reg. 49,469 (Aug. 21, 2014)...............................................................................4, 6, 7, 9

**Administrative Materials**

DOL, Field Assistance Bull. No. 2003-03, 2003 WL 24127777 (May 19, 2003)........................14

IRS Notice 2018-83, 2018-47 I.R.B. 774 (2018)...........................................................................12

**Dictionaries**

*Consideration*, Black's Law Dictionary 382 (11th ed. 2019)........................................................18

Webster's Third New International Dictionary 886 (2002)............................................................18

## INTRODUCTION

Rather than address the legal arguments and the factual record in *this case*, Plaintiffs' brief (ECF No. 136) focuses on a series of general (and unremarkable) propositions that no party contests.  Those undisputed, high-level legal principles do not resolve the actual issues presented.

*First*, Plaintiffs fill pages of their brief with uncontroversial platitudes about the fiduciary duty to monitor investments.  *But Plaintiffs concede that some of the Plan's investments need not be monitored at all*, because Plan participants select them through a "brokerage window" (or "fund supermarket") that lets participants access the broader market.  This concession is compelled by Department of Labor ("DOL") regulations establishing that *"brokerage windows" and "similar arrangements"* are not subject to monitoring.  And this concession is fatal:  the investments Plaintiffs are complaining about are accessed through *just such a brokerage window*. The funds that were designated by the Plan, and thus subject to monitoring, *were* monitored, with a high level of diligence, care, and skill that Plaintiffs do not challenge.

Plaintiffs concede that the Plan did have a brokerage window, and that the non-Fidelity funds in it did not require monitoring.  Plaintiffs therefore argue that trivial operational differences between the manner in which the Fidelity and non-Fidelity funds were offered required Fidelity to monitor the former but not the latter.  Their distinction has no legal support, and Plaintiffs' expert could not point to any colorable distinction either.

*Second*, Plaintiffs' motion likewise spends pages on generalities about the duty to monitor recordkeeping expenses.  Again, nobody disagrees.  The question is whether this Plan in fact *incurred* any recordkeeping expenses.  And the answer is "no":  pursuant to the Plan's Mandatory Revenue Credit provision,[1] Fidelity was obligated to—and did—repay to the Plan all revenue that Fidelity received in connection with the Plan, including all revenue attributable to

---

[1] Capitalized terms have the same meaning given in Fidelity's summary judgment brief, unless otherwise noted.

recordkeeping.  Plaintiffs call the credit a "gimmick," but name-calling aside, they have no *legal* authority that would let their recordkeeping and prohibited transaction claims survive when Fidelity did not keep a penny in recordkeeping revenue from the Plan.

*Third*, Plaintiffs try to liken their prohibited transaction allegation to the one in *Brotherston v. Putnam Investments, LLC*, 907 F.3d 17 (1st Cir. 2018).  But unlike in *Brotherston*, Fidelity's Plan enjoys a Mandatory Revenue Credit:  no fiduciary receives any "consideration," and the Plan is treated *better* than other shareholders of Fidelity funds.

Plaintiffs offer legal authority only for propositions that no one contests.  On the legal issues that are actually in dispute, Plaintiffs rely on their "experts," and assert that their experts' opinions are "unrebutted."  But what their experts offer are just *legal opinions*, which are both irrelevant and wrong.  Identifying their legal errors requires no expert.

Finally, the facts recited in Plaintiffs' motion only confirm that their claims are both released via a 2014 class action settlement and time-barred, as Fidelity's summary judgment brief explains.  ECF No. 140, at 5-13.  Plaintiffs' brief here proves the point:  it does not reference *any* conduct during the class period, other than Fidelity having acted consistently with the plan structure that was promulgated in June 2014, touted to the Court as part of the settlement process, and disclosed repeatedly to the Plaintiff class.

In short, Plaintiffs' motion is an effort at misdirection through generalities.  It does nothing to establish that *this Plan's* fund supermarket is subject to a duty to monitor.  It does nothing to show that *this Plan* has *any* net recordkeeping expenses, foreclosing the expense monitoring and prohibited transaction claims.  And it does nothing to overcome the Release, Covenant Not to Sue and time-bars that are independently dispositive of all of Plaintiffs' claims.

## FACTUAL BACKGROUND

***The Plan's Restructuring:***  As detailed in Fidelity's motion for summary judgment (ECF

No. 140), Fidelity restructured its Plan and adopted the Plan features at issue here as part of a negotiated resolution to a prior class action.  SUMF (ECF No. 141) ¶¶ 11, 14, 53.  Plaintiffs were class members.  Their prior counsel advised the Court that the very Plan changes to which Plaintiffs now object would be worth an estimated "$50 million a year" to Plan participants.  *Id.* ¶ 26.

Fidelity engaged in a massive campaign to inform participants that the Plan was changing (including multiple emails, mailings, phone calls, and computer pop-ups), and urged participants to take affirmative steps in response.  The vast majority did so.  Resp. to Pls.' SUMF ¶¶ 14-15 (filed with this memorandum).

***The Plan's Investment and "Cost" Structure:***  The amended Plan provided for two designated investment alternatives ("DIAs"):  the Fidelity Freedom Funds, a series of target-date mutual funds, and "Portfolio Advisory Services at Work" ("PAS-W"), a managed account service that invests participants' accounts in fund portfolios tailored to their circumstances. SUMF ¶ 53.  The Plan's fiduciary committee monitors both DIAs.  *Id.* ¶¶ 66, 68-71.  In addition, Strategic Advisers, Inc. ("SAI"), acting as a second fiduciary on behalf of the Plan, monitors each specific fund used in PAS-W.  Resp. to Pls.' SUMF ¶ 18.  The Plan assets invested in PAS-W thus received two levels of fiduciary monitoring.  *Id.*

The Plan also contained a provision for "Other Available Investments."  SUMF ¶ 53. Pursuant to this provision, the Plan was to make available every mutual fund—Fidelity and non-Fidelity—that is "administratively feasible for the Plan to hold."  *Id.*  The Plan notified participants that it would "offer[] a mutual fund window through which other Fidelity mutual funds and thousands of non-Fidelity funds are available."  *Id.* ¶ 99.  Pursuant to this provision, the Plan makes available thousands of mutual funds, approximately 200 of which are Fidelity

3

funds.  *Id.* ¶ 60.  This type of arrangement is sometimes referred to as a "fund supermarket" or a "brokerage window."  79 Fed. Reg. 49,469, 49,471 (Aug. 21, 2014).  As the participants were informed, fiduciaries do not monitor the "potentially thousands of different investments" available through such a window; indeed, a monitoring requirement would effectively shut down this "open architecture structure."  SUMF ¶¶ 90-111; Resp. to Pls.' SUMF ¶ 18.

Plaintiffs attempt to draw a distinction between the Fidelity funds, which they claim were offered "***in the Plan*** on the Plan's recordkeeping platform," and the non-Fidelity funds, which they claim were "offered outside [the] plan through a self-directed brokerage account."  ECF No. 136, at 11-12 (quotation marks omitted).[2]  But Plaintiffs' in/out distinction has no basis in Plan documents:  *both* Fidelity *and* non-Fidelity funds were made available to participants pursuant to the Plan's single provision for "Other Available Investments" (as distinct from the "Designated Investment Alternatives").  SUMF ¶ 53.  Nor does Plaintiffs' distinction have any basis in fact.  To access *either* Fidelity *or* non-Fidelity funds, participants go to the same website— NetBenefits.  Resp. to Pls.' SUMF ¶ 24.  A different technological "chassis" ("BrokerageLink") supports the non-Fidelity funds, but that is seamless to participants.  *Id.*  Directing contributions to non-Fidelity funds is easy, requiring only a one-time enrollment in BrokerageLink that takes five minutes.  *Id.* ¶ 11.

With respect to recordkeeping costs, the Plan does not pay any "direct" or "hard dollar" fees for recordkeeping.  Resp. to Pls.' SUMF ¶ 28.  Plaintiffs' statement that participants paid "hundreds of dollars" in recordkeeping costs (ECF No. 136, at 2) refers not to actual charges, but to a portion of the funds' expense ratios that, per DOL regulation, must be attributed to recordkeeping.  Resp. to Pls.' SUMF ¶ 28; 29 C.F.R. § 2550.408b-2(c)(1)(iv)(C)-(D), (viii)(B).

---

[2] This "in the plan" citation is to a document created to provide operational instructions to operational staff.  Resp. to Pls.' SUMF ¶ 10.  It is not a legal description of the Plan.

***Mandatory Revenue Credit:***  The Plan's Mandatory Revenue Credit provision dictates that Fidelity must return to the Plan an amount equal to *all* revenue received by Fidelity in connection with the Plan.  ECF No. 140, at 15-17; SUMF ¶¶ 16, 122-31.  Fidelity has done so. *All* revenue received by Fidelity from the Plan's investments, including all amounts "attributable to recordkeeping," are returned to the Plan via this Credit.  Resp. to Pls.' SUMF ¶ 28.

## ARGUMENT

## I.   PLAINTIFFS' CLAIM FOR FAILURE TO MONITOR INVESTMENTS FAILS.

### A.  Fidelity Fulfilled Its Duty To Monitor Designated Investment Alternatives.

All parties agree that the duty of prudence requires ERISA fiduciaries to monitor a plan's DIAs—but that is not at issue here, because highly qualified fiduciaries *did* monitor the Freedom Funds and PAS-W, which provided exemplary performance.  Resp. to Pls.' SUMF ¶ 18.  All parties also agree that an ERISA fiduciary is *not* required to monitor investments that participants choose through a "self-directed brokerage arrangement," "brokerage window," or "similar arrangement," and that Fidelity had no duty to monitor the *non-Fidelity* funds offered in that arrangement.  *See* ECF No. 136, at 11.  To establish that Fidelity breached a duty to monitor the *Fidelity* funds at issue here, Plaintiffs therefore must prove that those funds are not actually in a "window" or "similar arrangement."  They have no such proof.

This question did not arise in *Brotherston*, so Plaintiffs' repeated citations to that case are irrelevant.  The parties there stipulated that the Putnam funds *were* "designated investment options."  2017 WL 2634361, at *6 (D. Mass. June 19, 2017) (quoting Joint Pretrial Mem., Ex. 1, ¶ 28), *aff'd in part and vacated in part on other grounds*, 907 F.3d 17 (1st Cir. 2018).

### 1.   *Fiduciaries are not required to monitor investments in a brokerage window or "similar" arrangement.*

As all parties agree, ERISA does not require fiduciaries to monitor funds offered in

brokerage windows. The pertinent regulation, 29 C.F.R. § 2550.404a-5(h)(4), states that designated investment alternatives do not include "'brokerage windows,' 'self-directed brokerage accounts,' or *similar plan arrangements that enable participants and beneficiaries to select investments beyond those designated by the plan*'" (emphasis added). Those exclusions, in turn, establish that fiduciaries need not monitor investments in brokerage windows and similar arrangements: it is a fiduciary's duty to "monitor . . . designated investment alternatives offered under the plan." 29 C.F.R. § 2550.404a-5(f).[3] Thus, a fiduciary does *not* have a duty to monitor non-DIA investment options. *See* 79 Fed. Reg. at 49,471 (expressly contrasting a DIA, which is "monitored by a plan fiduciary," with "brokerage windows"). This critical point of law is not disputable: both the Complaint and Ms. Wagner cite this very regulation, 29 C.F.R. § 2550.404a-5(h)(4), when they concede that funds offered in brokerage windows need not be monitored. Resp. to Pls.' SUMF ¶ 24; ECF No. 77, ¶ 54.[4] And Plaintiffs *concede* (ECF No. 136, at 11) that ERISA did not require Fidelity to monitor the *non-Fidelity* funds available in the brokerage window. Accordingly, the sole question is whether the non-DIA Fidelity funds are in a "brokerage window" or "similar plan arrangement[]" that enables participants to "select investments beyond those designated by the plan"; if they are, then under the applicable DOL regulation, they do not require monitoring. 29 C.F.R. § 2550.404a-5(h)(4).

### 2. *The Fidelity funds at issue were part of a brokerage window or "similar arrangement."*

The Fidelity funds at issue here were part of a "brokerage window" or "similar plan arrangement," per § 2550.404a-5. As the DOL explains:

---

[3] Fiduciaries also must provide specific disclosures to participants about those DIAs. *See* 29 C.F.R. § 2550.404a-5(a), (c), (d).

[4] Seeking to back away from that position, Plaintiffs now argue that § 2550.404a-5 is inapplicable because it was "promulgated pursuant to 29 U.S.C. § 1104(c)(5)"—*i.e.*, ERISA section 404(c)—and thus "ha[s] no bearing on ERISA's affirmative fiduciary duties with respect to the Plan under Section 404**(a)**." ECF No. 136, at 12 (emphasis in original). That is flatly wrong. DOL "issu[ed] this regulation *under ERISA section 404(a)*." 75 Fed. Reg. 64,910 (Oct. 20, 2010) (emphasis added). Indeed, that is why the regulation is numbered § 2550.404**a**-5, not .404**c**-5.

> [A] variety of different plan and investment arrangements may be encompassed
> by the terms 'brokerage window,' 'self-directed brokerage account,' and similar
> arrangements.  For example, open mutual fund windows may permit participants
> to invest in hundreds or thousands of mutual funds.  More limited mutual fund
> windows or 'supermarkets' may permit participants to invest in any mutual fund
> on one or more of a particular vendor's platforms, but not necessarily every
> mutual fund on the market.

79 Fed. Reg. at 49,471.  The means by which the Plan offered "Other Available Investments" comfortably fits this definition.

First, the governing Plan document places the non-DIA Fidelity funds in the same "Other Available Investments" category as the non-Fidelity funds that Plaintiffs concede need not be monitored.  SUMF ¶ 53.

Second, for that "Other Available Investments" category, the Plan's structure established exactly the type of "supermarket" the DOL referred to, by including the full panoply of mutual funds that are "administratively feasible for the Plan to hold."[5]  SUMF ¶ 53.

Third, the "Other" (non-DIA) funds were disclosed as a "window"—as a "mutual fund window through which other Fidelity mutual funds and thousands of non-Fidelity mutual funds are available."  SUMF ¶¶ 99-103; *see also id.* ¶¶ 104-111.  And the disclosures spell out what that means:  "the Plan's fiduciaries do not designate or monitor the other Fidelity or non-Fidelity mutual funds available in the Plan."  *Id.* ¶ 99.

### 3. *Plaintiffs fail to identify any material way in which Fidelity's offering was not a brokerage window or "similar arrangement."*

Plaintiffs offer no legal support for their effort to distinguish between the Fidelity and non-Fidelity funds that are not DIAs.  They rely instead on their expert, Ms. Wagner, an

---

[5] The Plan's one limitation on the non-DIA Fidelity funds that was not applicable to non-Fidelity funds is that Fidelity funds must be the lowest share class the Plan is eligible to purchase, while non-Fidelity funds in the window are offered in a range of share classes.  Resp. to Pls.' SUMF ¶¶ 10-11.  (Ms. Wagner admitted she did not know that, and incorrectly speculated that brokerage windows "typically offer retail share classes." *Id.* ¶ 11.)  That does not make the offerings "dissimilar" in any material respect.  The fact that Fidelity went to the effort to identify the lowest-cost share classes of its funds, but not for the thousands of non-Fidelity funds, should not be a basis to overturn the Plan's entire structure.

attorney. But Ms. Wagner was invoking her legal opinions and her "common sense" (Resp. to Pls.' SUMF ¶ 24); that is not admissible as expert evidence. *See, e.g.*, *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997).

Ms. Wagner opines that the "fundamental problem" is that the non-DIA Fidelity investments were offered "on the Plan's investment platform (FPRS), side by side with the two DIA's (in the same manner as they had been previously), and outside the SDBA." Resp. to Pls.' SUMF ¶ 24. But, at deposition, she conceded that by "platform" and "side by side," all she meant was that the Fidelity non-DIAs were offered on the same technology "chassis" as the Fidelity DIAs (FPRS), while the non-Fidelity funds were offered on a different technology "chassis" (BrokerageLink). *Id.* That is no "fundamental" difference, and certainly says nothing about whether the two "chassis" are "similar arrangements." In fact, going from one "chassis" to another is seamless to participants, who access all funds—Fidelity and non-Fidelity, DIA and non-DIA—by going to the same website.[6] *Id.* ¶ 11. She also conceded that being "outside" the BrokerageLink platform does not matter, because a plan may have two distinct brokerage windows. *Id.* ¶ 24. And she never identified any reason why the Fidelity Funds offered as "Other Available Investments" were not in a brokerage window "or similar arrangement." *Id.*

Ms. Wagner also opined that there were other "important" differences between the non-DIA Fidelity funds and the non-Fidelity funds, although she based her criteria for importance not on legal rules or pertinent knowledge, but on her "common sense." Resp. to Pls.' SUMF ¶ 24. For example, she asserted that BrokerageLink is "clunky," based on a document from before the class period, but she acknowledged that she didn't know whether that was rectified early in the class period. *Id.* It was. *Id.* ¶ 11. She opined that BrokerageLink required participants to "ask"

---

[6] Similarly, Ms. Wagner conceded away her assertion that the non-DIA Fidelity funds were offered "in the same manner as they had been previously" and therefore were subject to monitoring. She admitted that *if a fund is offered through a window*, it need not be monitored simply because it *used to be* offered in the plan lineup. *Id.*

to have investments moved from a money market to a non-Fidelity fund, but she acknowledged that she did not know whether an auto-direct process had eliminated that step. *Id.* It had. *Id.*; *see also* n. 5, *supra* (Ms. Wagner didn't know whether BrokerageLink offered institutional, as well as retail, share classes). Thus, the factual premise of her conclusion that the Plan displays a "preference" for the Fidelity funds over the non-Fidelity funds has fallen apart; to the contrary, the team implementing the amended Plan had no such preference and made substantial efforts to remove any distinctions between Fidelity and non-Fidelity funds. *Id.* ¶ 24.

In short, all the indicia of "similarity" show that the non-DIA Fidelity funds are in a "window" or "similar arrangement," and Plaintiffs have no evidence to the contrary that has survived Ms. Wagner's deposition. The DOL has expressly recognized that brokerage windows and similar arrangements come in a "variety of different plan and investment arrangements." 79 Fed. Reg. at 49,471. Indisputably, this is one of them. Therefore, Plaintiffs cannot meet their burden to establish a fiduciary duty to monitor the non-DIA Fidelity funds, and it is Fidelity—and not Plaintiffs—that is entitled to judgment.

### B. The Failure-to-Monitor Claim Ignores the Fiduciary Monitoring of PAS-W.

Many participants who owned the Fidelity funds at issue did so through PAS-W, a managed-portfolio service offered to participants at no cost. Resp. to Pls.' SUMF ¶ 18. SAI's PAS-W program selects a diversified portfolio of funds consistent with each participant's risk profile. *Id.* As a DIA, PAS-W is comprehensively monitored, not just by the FBIC, which monitors PAS-W performance as a whole, but also by a second fiduciary, SAI, which evaluates the performance of each fund used in a PAS-W portfolio and regularly removes funds from the portfolios when those funds no longer satisfy SAI's criteria for inclusion. *Id.*

Since Plaintiffs' theory is that there was *no* fiduciary monitoring (ECF No. 136, at 9-13), that theory easily fails as to this portion of the class. And that portion is sizeable: more than

one-third of the Plan's assets are invested through PAS-W, and ownership through PAS-W made up more than one-third of Plaintiffs' expert's calculated damages.  Resp. to Pls.' SUMF ¶ 18.

## II.    THE MANDATORY REVENUE CREDIT DEFEATS THE CLAIM FOR EXCESSIVE RECORDKEEPING EXPENSES.

Plaintiffs' motion devotes an entire section (§ I.B) to generalities about fiduciaries' obligations to monitor recordkeeping fees.  But there is no breach of a duty to be cost-conscious *where there are no costs.*  Here, there were no recordkeeping expenses to monitor.

The Mandatory Revenue Credit provision requires that Fidelity pay to the Plan an amount equal to *all* revenue received in connection with the Plan.  *See* ECF No. 140, at 15-17; SUMF ¶¶ 16, 122-31.  The credit includes the entire expense ratios of the Fidelity funds, not just the amounts "attributable to recordkeeping."[7]  SUMF ¶¶ 16, 122.  In other words, upon receipt of the Mandatory Revenue Credit, the Plan's recordkeeping expenses net to zero.  Plaintiffs do not dispute that these amounts have in fact been paid in full.  *See generally* ECF No. 136.  Plaintiffs' recordkeeping claim thus fails:  a net recordkeeping expense of zero need not be "monitored."

Relegating its discussion of the Mandatory Revenue Credit to a footnote (ECF No. 136, at 15 n.14), Plaintiffs argue the credit is a "gimmick" and that it was not allocated to certain participants.  Those arguments ignore both the applicable law and the facts.

### A.  A Legally-Enforceable Right Is Not a Gimmick.

From 2009 to 2012, the Plan provided that Fidelity could make a profit-sharing contribution to Plan participants "in an amount determined by the [Board] in [its] sole discretion."  SUMF ¶ 156.  In 2012, the Plan was amended to adopt the Mandatory Revenue Credit:  ever since, Fidelity has been *required* to make a contribution in the amount of the Mandatory Revenue Credit, while also being *allowed* to make an additional discretionary profit-

---

[7] These payments also included all revenue sharing received on Plan holdings in non-Fidelity funds.

sharing contribution (in the Board's "sole discretion"). *Id.* According to Plaintiffs, that change

in structure was a "gimmick," because the amount of Fidelity's entirely discretionary

contribution before the amendment (10% of participants' eligible compensation) is the same as

the sum of Fidelity's current mandatory credit plus discretionary contributions. ECF No. 136, at

7. And so, Plaintiffs say, the Court should ignore the Mandatory Revenue Credit.

Plaintiffs' argument disregards the legal significance of the change from discretionary to

mandatory. Before the change, Fidelity was under no obligation to provide *any* profit-sharing

contribution to the Plan; had Fidelity chosen to reduce its discretionary contribution, Plaintiffs

could not have sued to increase it again. *See Loomis v. Exelon Corp.*, 658 F.3d 667, 671 (7th

Cir. 2011). The Mandatory Revenue Credit, however, is a required contribution that is

*enforceable by the Plan*. More specifically, if Fidelity "fail[ed] to make [that] required

contribution . . . in accordance with the plan documents, the plan [would have] a claim against

[Fidelity] for the contribution, and that claim [would be] an asset of the plan." *In re Halpin*, 566

F.3d 286, 289 (2d Cir. 2009). The Plan gained an enforceable right to payment of a substantial

sum of money. That is not a "gimmick."[8]

Ms. Wagner's opinion dismissing the credit is not based on record evidence. She

conceded that she called the credit a "gimmick" because she saw no underlying "math" or

"calculations" to support it. Resp. to Pls.' SUMF ¶ 31. Indeed, she testified that if she had seen

calculations, "that would have changed my opinion." *Id*. But it is undisputed that the "math"

was performed; the amount of revenue received by Fidelity from the Plan was calculated

annually; and the Mandatory Revenue Credit was paid based on that calculation. SUMF ¶¶ 122-

---

[8] In fact, Plaintiffs' "gimmick" argument proves the point. The Mandatory Revenue Credit may amount to far less than 10% of eligible compensation. Resp. to Pls.' SUMF ¶ 35. If Fidelity had made *no* discretionary contributions, then Plaintiffs' gimmick argument would obviously collapse: they could no longer claim that things "remained the exact same as before." ECF No. 77 ¶ 108. If making *no* discretionary contribution would lead to no ERISA violation, then Fidelity's being *generous* in its discretionary contributions cannot lead to an ERISA violation.

11

131.  Ms. Wagner's premise is incorrect, and her opinion on this point is thus unsupported.[9]

**B.  The Reasonableness of the *Plan's* Recordkeeping Expenses Does Not Turn on How the Credit Was Allocated to *Participants*.**

Plaintiffs ask the Court to ignore the Mandatory Revenue Credit for a second reason:  in their view, even if the Mandatory Revenue Credit is genuine, it should be disregarded because it was not allocated to accounts of *former* Fidelity employees.  Plaintiffs are wrong for three reasons.  First, the tax code precludes allocation of the Mandatory Revenue Credit to former employees.  Second, the reasonableness of plan expenses is assessed at the plan level, not at the level of any individual participant or class of participants.  And, third, once the Mandatory Revenue Credit has eliminated all recordkeeping fees, *the Plan* does not have any claim for excessive fees, and only claims for losses *to the Plan* may be pursued under 502(a)(2).

*Tax Code:*  The structure of the Mandatory Revenue Credit follows naturally from the tax code, because Fidelity is the participants' (current or former) employer.  In particular, tax law places strict limits on the contributions that employers can make to employees' 401(k) plans.  26 U.S.C. § 415(c)(1).  As relevant here, the "annual addition" to a participant's account—*i.e.*, the sum of "employer contributions," "employee contributions," and "forfeitures"—may not exceed "the lesser of" $56,000[10] or "100 percent of the participant's compensation."  *Id.*  Because former employees have an annual compensation of $0, this provision effectively prohibits employers from making any contributions to their former employees' 401(k) accounts.

*The Reasonableness of Plan Expenses Is Evaluated at the Plan Level:*  The pertinent DOL fee disclosure regulation, industry practices, and the case law on excessive fees all demonstrate that the reasonableness of plan fees is evaluated at the level of the Plan, not at the

---

[9] Mr. Scheinberg, the other expert relied on by Plaintiffs, conceded at deposition that whether the Mandatory Revenue Credit was a "return" is a legal question, on which he is not offering an opinion.  Resp. to Pls.' SUMF ¶ 33.
[10] *See* IRS Notice 2018-83, 2018-47 I.R.B. 774 (2018) (inflation adjustment).

level of individual participants or classes of participants.

The linchpin of the DOL's fee disclosure regime is 29 C.F.R. § 2550.408b-2, pursuant to which recordkeepers and other service providers are required to disclose to plan fiduciaries the compensation that they expect to receive for their services to the plan. *Id.* § 2550.408b-2(c)(1)(iv)(C)-(D). The purpose of these disclosures is to allow plans to evaluate whether the costs that the plan is incurring are reasonable. *Id.* § 2550.408b-2(a), (c). The regulation requires the disclosure of compensation paid *by the plan*, or an estimate of the cost *to the plan*. *Id.* § 2550.408b-2(c)(1)(iv)(C)-(D). Nothing in it requires disclosure of the costs that any class of participants will incur,[11] nor does the regulation require fiduciaries to evaluate the reasonableness of plan expenses at the participant or "class" level. Plaintiffs' expert agrees that this regulation "doesn't require the provider to disclose what each individual participant in a plan is paying in recordkeeping expenses." Resp. to Pls.' SUMF ¶ 29. As the DOL has explained, this regulation is intended to provide plan fiduciaries "comprehensive" information about the cost of the plan's services, and to ensure that plan fiduciaries receive the information "needed to make informed decisions about service costs." 77 Fed. Reg. 5632, 5636 (Feb. 3, 2012). Thus, in the DOL's judgment, these disclosures are "comprehensive" and provide fiduciaries with what is "needed" to evaluate plan costs, *id.*—even though they disclose costs at the plan level—because the reasonableness of costs is evaluated at the plan level, not at the level of individual participants or classes of participants.

The actual practices of industry participants are consistent with this plan-level evaluation. Ms. Wagner testified that she does not advise plan sponsors that they need to determine whether

---

[11] While some service providers elect to express plan costs on an average per capita basis by dividing total plan costs by the number of participants, as Fidelity did (Resp. to Pls.' SUMF ¶ 29), such disclosure is not required. *See* 29 C.F.R. § 2550.408b-2(c)(1)(viii)(B)(3). And in all events, a per-participant average reflects little about what many participants actually pay, and nothing about what "classes" of participants pay.

13

individual participants' administrative fees are reasonable.  Resp. to Pls.' SUMF ¶ 29.  And commonplace, permissible fee arrangements would be rendered unlawful if reasonableness had to be evaluated at the individual or class level.  For example, DOL guidance leaves no doubt that ERISA plans may allocate plan expenses to individual participants on a pro rata basis—*i.e.*, "on the basis of assets in the individual account."  DOL, Field Assistance Bull. No. 2003-03, 2003 WL 24127777, at *3 (May 19, 2003); *see also* Resp. to Pls.' SUMF ¶ 29.  But consider what that means for those with high account balances:  even if the *average* fee for the plan as a whole is reasonable, the fee paid by those with high account balances may be unreasonable *as to that class of participants*.  (To use hypothetical numbers: even if the average fee across participants is $50 per person, the pro rata share of a high-balance participant might be $1,000 while the pro rata share of a low-balance participant might be $1.)  Furthermore, evaluating reasonableness at the class level requires deciding which classes to evaluate—and there are infinite possibilities, from employment status to age to position.

 The cases that have evaluated the reasonableness of recordkeeping fees have also looked at fees at the plan level.  *See, e.g., Sacerdote v. NYU*, 328 F. Supp. 3d 273, 305-07 (S.D.N.Y. 2018) (assessing "total fees" at the plan level); *Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1064 (M.D. Tenn. 2018) (discussing the reasonableness of fees at the plan level).

 ***Section 502(a)(2):***  ERISA itself bars a fiduciary-breach suit once a plan is made whole.  Here, because the Mandatory Revenue Credit returns all revenue to the Plan, Plaintiffs cannot sue under section 502(a)(2), 29 U.S.C. § 1132(a)(2).  *See* ECF No. 77, ¶¶ 15, 118, 133, 140, 147, 154.  Section 502(a)(2) claims must be brought based on losses *to the Plan*.  *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008); *see also id.* at 261 (Thomas, J., concurring) ("The plain text of § 409(a), which uses the term 'plan' five times, leaves no doubt that

§ 502(a)(2) authorizes recovery only for the plan."). Section 502(a)(2) cross-references ERISA

section 409, which requires fiduciaries to "to make good to [a] plan any losses to the plan." 29

U.S.C. § 1109(a). That provision "does not provide a remedy for individual injuries distinct

from plan injuries." *LaRue*, 552 U.S. at 256.[12]

For that reason, post-*LaRue* courts have rejected claims under section 502(a)(2) where a

plaintiff could not demonstrate some harm to the Plan itself. *Fisher v. Penn Traffic Co.*, 319 F.

App'x 34, 35 (2d Cir. 2009); *Wolf v. Causley Trucking, Inc.*, 719 F. App'x 466, 476 (6th Cir.

2017). Where, as here, the Plan has been made whole, but Plaintiffs complain that they did not

get their fair share of what the Plan received, there is no loss "to the Plan" that is recoverable

under 502(a)(2). Indeed, if the Plan were to recover where it has already been made whole, it

would be receiving a double recovery.

For all these reasons, the question is whether *the Plan* paid reasonable recordkeeping

fees, not whether every individual participant or every class of participants paid reasonable

recordkeeping fees. And there can be no genuine dispute that the Plan's net fees for Fidelity

funds and recordkeeping were reasonable: in light of the Mandatory Revenue Credit, they were

zero. *See* p. 5, *supra*.[13]

## III.    THE PROHIBITED TRANSACTION CLAIM FAILS.

ERISA section 406(b)(3), 29 U.S.C. § 1106(b)(3), prohibits "a fiduciary with respect to a

---

[12] To be sure, *LaRue* recognized that fiduciary breaches resulting in plan losses may sometimes "impair the value of plan assets in a participant's individual account"—and that in those circumstances a plaintiff may sue under section 502(a)(2). But in those cases the plan itself was diminished—even though the harm was visited on only a subset of the plan. Here, Plaintiffs' position is that the Plan can recover even if the Plan itself was made whole.

[13] A claim for breach of fiduciary duties under ERISA has three elements: "breach, loss, and causation." *Brotherston*, 907 F.3d at 30. Plaintiffs' memorandum addresses only breach, and concedes that Plaintiffs are not seeking summary judgment on whether, assuming a breach, the Plan suffered a loss. *See* ECF No. 136, at 2 (explaining that the issue of loss "is not relevant to this motion"). Nor could they: there exists a genuine dispute as to that question. *See* ECF Nos. 135, 139. As for causation, Plaintiffs argue that Fidelity bears the burden of proof on that question under *Brotherston*. *See* ECF No. 136, at 2, 13 n.11. But in the event the Supreme Court grants the pending certiorari petition, *see* 139 S. Ct. 1614 (2019), and reverses, Plaintiffs would bear the burden on loss causation as well—and have adduced no evidence with which to carry it.

plan" from "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."  Trying to liken this case to *Brotherston*, Plaintiffs allege that prohibited transactions arose here because, when Plan participants invested in Fidelity funds, monthly fees were deducted from those funds in exchange for services performed by three Fidelity affiliates, and revenue from those fees eventually made their way to bank accounts registered to FMR LLC.  *See* ECF No. 77 ¶ 143; ECF No. 136, at 16.  But especially given the Mandatory Revenue Credit (which *Brotherston* did not consider), Plaintiffs have failed to establish *any* element of a prohibited transaction, and the transaction is exempted in any event.

### A.  Plaintiffs Fail To Establish Any Element of a Prohibited Transaction

Try as they might, Plaintiffs cannot fit these facts into the prohibited transaction framework.  Most obviously, because of the Mandatory Revenue Credit, FMR LLC *retained none of the challenged revenue*.  In other words, any "consideration" that allegedly made its way to FMR LLC was transferred back to the Plan, so, on a net basis, FMR LLC received nothing. Plaintiffs have failed to establish the other elements as well.

*No Fiduciary:*  The alleged "fiduciary" is FMR LLC.  ECF No. 77 ¶ 142; ECF No. 136, at 15-16.  While Plaintiffs assert that FMR LLC was a fiduciary because it had authority to amend the governing Plan documents, ECF No. 136, at 16, the law could not be clearer: amending Plan documents is a quintessential *settlor* act—and decidedly *not* a fiduciary act.  As the Supreme Court has explained, "the defined functions [of a] fiduciary do not include plan design," meaning that "an employer may decide to amend an employee benefit plan without being subject to fiduciary review."  *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996) (brackets omitted).  Or, as the Supreme Court later stated even more emphatically:  "***without exception***, plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries."  *Hughes*

*Aircraft Co. v. Jacobson*, 525 U.S. 432, 445 (1999) (quotation marks and brackets omitted) (emphasis added).

Plaintiffs attempt to quarrel with that fundamental principle by relying on two out-of-context quotations from Fidelity documents, as if they could change the law. *See* ECF No. 136, at 16. But neither document purports to interpret fiduciary law differently than the Supreme Court.[14] The undisputed facts show that the sole role played by the FMR LLC Board in connection with the Plan is the promulgation and approval of the governing Plan documents, SUMF ¶ 82, and that is the function of a settlor. FMR LLC is not a fiduciary.

**No "Consideration for" a Fiduciary's "Own Personal Account."** Plaintiffs do not contend that the transactions on which their prohibited transaction claim rests are transactions between the Plan and FMR LLC. To the contrary, the parties have stipulated that the revenue at issue was booked by three FMR LLC affiliates, *see* Resp. to Pls.' SUMF ¶ 41, none of whom are alleged to be fiduciaries. ECF No. 77, ¶ 2, 29, 31, 33.[15] Even if FMR LLC were a fiduciary, that fiduciary status would not be imputed to its affiliates: the DOL has made clear that the "fiduciary" referred to in § 1106(b)(3) does not encompass corporate affiliates. *See* 73 Fed. Reg. 58,450, 58,454 (Oct. 7, 2008).

Plaintiffs' argument boils down to the contention that FMR LLC is liable for prohibited transactions because, as a matter of corporate cash management, the fees received by the three Fidelity affiliates eventually "transferred . . . through various channels, to a centralized corporate

---

[14] Exhibit 72 was part of a presentation made before any of the structural amendments to the Plan negotiated in the *Bilewicz* settlement were enacted, when the Plan's structure was different. *See* Resp. to Pls.' SUMF ¶ 40. Indeed, the language Plaintiffs rely upon in Exhibit 72 is not included in the versions of the analogous presentations subsequent to the June 2014 Amendment. *Id.* The other document, Exhibit 27, is a generalized training presentation discussing general principles applicable to many plans. It does not purport to apply to all plans, and says nothing at all about *this* Plan or about FMR LLC. *See id.*

[15] The Complaint expressly divides the named defendants into two categories: those who are alleged to be fiduciaries and those who are not, but are named because they received consideration from the Plan. ECF No. 77, ¶ 2. Three entities are stipulated to have received consideration from the Plan; Plaintiffs allege that all three are in the latter category. *See id.*

account registered to FMR LLC."  ECF No. 142-73, at 3; *see* ECF No. 136, at 16.  But that

argument ignores the language of § 1106(b)(3).  Funds that are merely transferred from

subsidiaries to a parent company are not "consideration"; they were not "bargained for and

received" by the parent in exchange for any promise.  *Consideration*, Black's Law Dictionary

382 (11th ed. 2019).  And consideration paid to the subsidiary, if it is not "intend[ed] to go to or

toward" the parent's account (as it was not here), is not "for [the parent's] own account."

Webster's Third New International Dictionary 886 (2002).  Contrary to Plaintiffs' assertions,

nothing in any of the *Brotherston* rulings is to the contrary:  the intercompany transfer issue was

not argued, and this Court had no occasion to address it in that case.

### B.  PTE 77-3 Exempts the Disputed Transactions.

The challenged transactions are exempted in any event under Prohibited Transaction

Exemption (PTE) 77-3.  The DOL has "render[ed] the prohibition of section 1106 inapplicable to

employee benefit plans that invest in in-house mutual funds, provided that four conditions are

met."  *Brotherston*, 907 F.3d at 27; *see* PTE 77-3, 42 Fed. Reg. 18,734 (Mar. 31, 1977).

The condition at issue here is whether "all other dealings between the plan and the

investment company . . . are on a basis no less favorable to the plan than such dealings are with

other shareholders of the investment company."  42 Fed. Reg. at 18,735.  That condition is

satisfied by virtue of the Mandatory Revenue Credit, which treated Fidelity's own plan *more*

favorably than it treated other shareholders of Fidelity funds.  Fidelity made payments to some

other plans of revenue sharing amounts—a portion of the expense ratio that Fidelity earned from

its funds.  *See* Resp. to Pls.' SUMF ¶ 28.  For this Plan, Fidelity paid the Plan the *entire* expense

ratio.  SUMF ¶ 16, 122.  That treatment is not just "at least as favorable"—it is better.

Plaintiffs cite *Brotherston* for the proposition that employer compensation "is irrelevant

to the analysis under PTE 77-3" (ECF No. 136, at 18), but that is a misreading of *Brotherston*.

The First Circuit concluded that, in considering the dealings between Putnam and its plan, it would disregard *discretionary payments* made by Putnam *in its capacity as an employer*, because they amounted to compensation for the employees.  Putnam could no more rely on that payment under PTE 77-3 than it could rely on having given Mr. Brotherston a raise.

The Mandatory Revenue Credit here is very different.  It is intrinsically plan-related.  The very calculation of the amount to be paid is based on Plan metrics—it is the sum of the revenue received by Fidelity *in connection with the Plan* (rather than based on the types of metrics that drive determinations of the amount to be spent on benefits, *see* Resp. to Pls.' SUMF ¶ 35).  Moreover, like a typical benefits program, the Putnam contribution was discretionary.  Indeed, the First Circuit repeated five times that Putnam's *discretionary* employer contributions were irrelevant for the PTE 77-3 analysis.  907 F.3d at 28-29.  The Mandatory Revenue Credit, by contrast, is a compulsory component of the Plan.  It therefore qualifies as a relevant "dealing" between Fidelity and the Plan.

Plaintiffs also claim, again, that the Court should ignore the Mandatory Revenue Credit because it is only allocated to some participants.  But that ignores the plain text of PTE 77-3:  the question is the nature of the "dealings between *the plan* and the investment company" and whether the terms are "no less favorable *to the plan* than such dealings are with other shareholders of the investment company."  42 Fed. Reg. at 18,735.  In other words, PTE 77-3 is expressly a comparison between the investment company's dealings with the subject *plan* and its dealings with other shareholders.  And if that plan-versus-plan comparison passes muster, the transaction is exempt—period.  PTE 77-3 says nothing about any *further* examination of how a *plan* must allocate the money that it receives from the investment company's "at least as favorable" dealings.  Plaintiffs provide no authority to support their assertion that satisfying the

express requirements of PTE 77-3 is not enough without a further inquiry into participant-level allocation of credits.  And their interpretation would run headlong into IRC § 415, which effectively precludes an employer from making contributions to the accounts of former employees.  *See* p. 12, *supra*.

If Plaintiffs' analysis were correct, *no* payment by an employer to its own plan would ever satisfy this exemption, and the DOL has effectively prohibited the use of proprietary funds—yet PTE 77-3 has stood for 42 years without any court or guidance reading it that way. *Brotherston* rendered a specific ruling about the particular discretionary contribution made to the Putnam plan; it did not say that PTE 77-3 is a dead letter.

## IV.     PLAINTIFFS' CLAIMS ARE RELEASED AND TIME-BARRED.

Even if Plaintiffs' claims were viable on the merits, they would be foreclosed by the Release and Covenant Not to Sue and ERISA's three-year statute of limitations, as set forth in Fidelity's motion for summary judgment.  *See* ECF No. 140, §§ I-II.  The substance of Plaintiffs' claims turns on the Mandatory Revenue Credit adopted in 2012 and the Plan structure adopted in 2014.  The Plan features complained of in this case were covered by the release in the prior litigation, and expressly disclosed to Plaintiffs well before the three-year limitations period.

<u>**CONCLUSION**</u>

The Court should deny Plaintiffs' motion for partial summary judgment.

Dated: October 4, 2019
      Boston, MA

Respectfully submitted,

 /s/ John J. Falvey, Jr.
John J. Falvey, Jr. (BBO# 542674)
Alison V. Douglass (BBO# 646861)
Dave Rosenberg (BBO# 679434)
Benjamin S. Reilly (BBO# 693742)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel: (617) 570-1000
Fax: (617) 523-1231
jfalvey@goodwinlaw.com
adouglass@goodwinlaw.com
drosenberg@goodwinlaw.com
breilly@goodwinlaw.com

William M. Jay (admitted *pro hac vice*)
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC 20001
Tel: (202) 346-4000
Fax: (202) 346-4444
wjay@goodwinlaw.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

      I, John J. Falvey, Jr., hereby certify that the foregoing document is being filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on October 4, 2019.  The foregoing document will be available for viewing and downloading from the ECF system.

 /s/  John J. Falvey, Jr.
John J. Falvey, Jr.
