## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Kevin Moitoso, Tim Lewis, Mary Lee Torline, and Sheryl Arndt, individually and as representatives of a class of similarly situated persons, and on behalf of the Fidelity Retirement Savings Plan,<br><br>               Plaintiffs,<br><br>v.<br><br>FMR LLC, the FMR LLC Funded Benefits Investment Committee, the FMR LLC Retirement Committee, Fidelity Management & Research Company, FMR Co., Inc., and Fidelity Investments Institutional Operations Company, Inc.,<br><br>               Defendants. | Case No. 1:18-cv-12122-WGY |

## PLAINTIFFS' REPLY MEMORANDUM OF LAW IN
## SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................................1

ARGUMENT ..............................................................................................................................4

I.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT REGARDING WHETHER THE FBIC
     BREACHED ITS DUTY TO PRUDENTLY MONITOR THE PLAN'S INVESTMENTS .................4

     A.   ERISA Does Not Permit a Fiduciary to Abandon Billions of Dollars in Plan
          Investments ...................................................................................................4

     B.   Fidelity Cannot Wipe Away Its Statutory Responsibility to Prudently Monitor the
          Plan's Investments Based on a Disclosure Regulation ...........................................6

     C.   The SDBA is Not "Similar" to the Plan's Lineup of Fidelity Funds......................9

     D.   The Plan's Investments Were Not Monitored Through PAS-W ...........................13

II.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT REGARDING WHETHER THE
     RETIREMENT COMMITTEE BREACHED ITS DUTY TO PRUDENTLY MONITOR AND
     CONTROL RECORDKEEPING EXPENSES .......................................................................13

     A.   The Mandatory Revenue Credit is a Settlor Act that Cannot Excuse a Fiduciary
          Breach ........................................................................................................14

     B.   No Additional Consideration Was Provided in Connection with the "Credit" .....14

     C.   Class Members Did Not Receive the "Credit" in Any Event ...............................15

          1.   The Tax Code Is Not a Defense....................................................................15

          2.   The 408(b)(2) Disclosure Regulation Is Not a Defense.................................16

          3.   ERISA § 502(a)(2) Does Not Bar Relief .......................................................17

III. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT AS TO LIABILITY ON THEIR
     PROHIBITED TRANSACTION CLAIM IN COUNT III .......................................................18

     A.   FMR LLC is a Fiduciary of the Plan .................................................................18

     B.   FMR LLC Received Consideration in Connection with Transactions Involving
          Assets of the Plan, in Violation of 29 U.S.C. 1106(b)..........................................19

     C.   PTE 77-3 Does Not Apply................................................................................20

CONCLUSION..........................................................................................................................20

i

# TABLE OF AUTHORITIES

## Cases

*Boggs v. Boggs*,
  520 U.S. 833 (1997).............................................................................................6

*Brotherston v. Putnam Invs., LLC*,
  2017 WL 1196648 (Mar. 30, 2017).......................................................................3, 20

*Brotherston v. Putnam Invs., LLC*,
  2017 WL 2634361 (D. Mass. June 19, 2017).............................................................13

*Brotherston v. Putnam Invs., LLC*,
  907 F.3d 17 (1st Cir. 2018).............................................................................2, 3, 14

*Campbell v. BankBoston, N.A.*,
  327 F.3d 1 (1st Cir. 2003)....................................................................................19

*Fifth Third Bancorp v. Dudenhoeffer*,
  134 S. Ct. 2459 (2014).............................................................................1, 5, 6, 8, 9

*Fisher v. Penn Traffic Co.*,
  319 F. App'x 34 (2d Cir. 2009) .............................................................................18

*Howell v. Motorola, Inc.*,
  633 F.3d 552 (7th Cir. 2011) ...............................................................................19

*Kling v. Fidelity Mgmt. Trust Co.*,
  323 F. Supp. 2d 132 (D. Mass. 2004) ....................................................................19

*LaRue v. DeWolff, Boberg & Assocs., Inc.*,
  552 U.S. 248 (2008).......................................................................................17, 18

*Shaw v. Delta Air Lines, Inc.*,
  463 U.S. 85 (1983)...............................................................................................6

*Tibble v. Edison Int'l*,
  135 S. Ct. 1823 (2015)....................................................................................1, 5, 6

*Tracey v. Mass. Inst. of Tech.*,
  2019 WL 4192148 (D. Mass. Sept. 4, 2019) .............................................................4

*Wolf v. Causley Trucking, Inc.*,
  719 F. App'x 466 (6th Cir. 2017) ..........................................................................18

**Rules, Statutes, and Regulations**

29 C.F.R. § 2509.75-8 (FR-17) .................................................................................19

29 C.F.R. § 2550.404a-5 ..........................................................................................6

29 C.F.R. § 2550.404a-5(d)(1) .................................................................................6

29 C.F.R. § 2550.404a-5(f) .......................................................................................7

29 C.F.R. § 2550.404a-5(h)(4) ................................................................................10

29 C.F.R. § 2550.404c-1(b)(2)(B) ............................................................................7

29 C.F.R. § 2550.408b-2 ....................................................................................11, 16

29 U.S.C. § 1002(21)(A) .........................................................................................19

29 U.S.C. § 1102(a) .................................................................................................19

29 U.S.C. § 1104(a) ...................................................................................................5

29 U.S.C. § 1104(a)(1) ..............................................................................................6

29 U.S.C. § 1104(a)(1)(B) .........................................................................................4

29 U.S.C. 1106(b) ...................................................................................................19

29 U.S.C. 1106(b)(1) ...............................................................................................20

29 U.S.C. 1106(b)(3) .......................................................................................3, 19, 20

**Other Authorities**

Field Assistance Bull. No 2012-02R, 2012 WL 3612516 (July 30, 2012) ..................8, 9

Field Assistance Bull. No. 2003-03, 2003 WL 24127777 (May 19, 2003) ...................17

*Request for Information Regarding Standards for Brokerage Windows in Participant-Directed Individual Account Plans*, 79 Fed. Reg. 49,469 (Aug. 21, 2014) ................................8, 9

S. Rep. No. 93-127 (1973) ........................................................................................6

## INTRODUCTION

Fidelity's lawyer-driven scheme to write away its fiduciary obligations cannot be sustained. As Plaintiffs' fiduciary process expert (Marcia Wagner) explained in her unrebutted expert report, this type of "tactic" was once adopted by "more aggressive ERISA practitioners" in the pre-*Dudenhoeffer* era, but long since "went out of favor" after it was discredited by the Supreme Court. *See Wagner Report, ECF No. 138-20, ¶ 14*. In two separate opinions, the Supreme Court unequivocally stated that retirement plan fiduciaries have a "continuing duty to monitor investments," *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015), and this duty "trumps the instructions of a plan document." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2468 (2014). Yet, Fidelity proceeded as if these opinions had never been issued, and entirely ignores them in its response brief. Instead, Fidelity doubled down on its pre-*Dudenhoeffer* strategy,[1] and continues to pretend that it has no ongoing monitoring obligation with respect to approximately 200 Fidelity investments in the Plan holding **billions** of dollars in Plan assets (constituting the majority of total assets in the Plan). This is not only imprudent – it is reckless.

Faced with the Supreme Court's binding legal precedent, and Defendants' admitted failure to monitor the subject funds,[2] Fidelity pivots to argue that monitoring is not required on the "factual record in *this case*." *Defs' Memo in Opposition to S.J. ("Defs' SJ Response"), ECF No. 165, at 1* (emphasis in original). However, the Supreme Court's opinions admit of no exceptions, and in any event, Fidelity's "as applied" challenge to its monitoring duties is foreclosed by the expert reports in this case. Plaintiffs' expert, Ms. Wagner, has opined that the Plan fiduciaries' failure to monitor

---

[1] The Plan amendment upon which Fidelity relies was signed June 26, 2014, just one day after Supreme Court's decision in *Dudenhoeffer*. *See ECF No. 167 at p.5 (Defs' Response to Statement of Fact No. 9)*.

[2] *See Defs' Memo in Support of Motion to Exclude Opinions of Marcia Wagner, ECF No. 127, at 7* ("Fidelity does not dispute that the FBIC did not monitor the non-DIAs").

the subject funds (the so-called non-DIAs) was inconsistent with the applicable standard of care, and was not justified by the Plan Document. *Wagner Report, ¶¶ 51-67*. Defendants have offered no rebuttal to her opinions. Indeed, their own fiduciary process expert (Phillip Suess) has opined that "Plan fiduciaries typically…monitor investment options," *Suess Report, ECF No. 138-38, at p.23 n.43,* and discussed at length the "monitoring processes" he has observed and considers to be "standard" in the industry, *id., at p.22-30*. In his report, Mr. Suess specifically noted that "Defendants disclaim the existence of a fiduciary obligation to monitor," but he is "not offering an opinion on whether they were *right* to disclaim such a fiduciary obligation." *See Pls' Local Rule 56.1 Statement of Undisputed Material Facts ("Pls' SoF"), ECF No. 137, at ¶ 25* (emphasis added). Accordingly, there is no genuine dispute on the facts of this case regarding whether a prudent fiduciary would have monitored the subject funds, or whether Defendants did so.

The same is true with respect to monitoring of recordkeeping expenses. As Defendants admit, "nobody disagrees" that there is a duty to monitor recordkeeping expenses. *See Defs' SJ Response at 1*. Defendants also do not dispute that the Plan's fiduciaries never monitored the amount of recordkeeping expenses paid by the Plan or the Plan's participants (amounting to hundreds of dollars per participant annually, as shown on the Plan expense disclosures that the Plan's fiduciaries ignored). *See Pls' SoF, ¶¶ 28-30*.  Instead, Fidelity's defense rests on yet another lawyer-inspired Plan amendment through which the "Company's Contribution" to the Plan was restyled to include a component that was characterized as a "Revenue Credit." *See Plan Document, ECF No. 138-1, at § 5.1*. However, the efficacy of this Plan amendment is also debunked by binding case law. Specifically, the First Circuit has ruled that such company contributions (made in a settlor capacity) may not be used by a plan sponsor to set off its fiduciary obligations. *See Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 39 (1st Cir. 2018) ("*Brotherston III*"). And to the

extent that Defendants argue the facts of this case are distinguishable from *Brotherston*, those facts are undisputed, and the expert reports are again uncontested that Defendants failed to exercise appropriate care with respect to monitoring recordkeeping expenses – notwithstanding the purported "Revenue Credit." Both Plaintiffs' fiduciary process expert (Ms. Wagner) and recordkeeping expert (James Scheinberg) have so opined. *See Wagner Report, ¶¶ 81-92; Scheinberg Report, ECF No. 138-49, ¶¶ 90-105*. Defendants offer no rebuttal to either of these opinions, and offer no recordkeeping expert of their own. Accordingly, there is no genuine issue regarding whether Defendants breached their duty to monitor recordkeeping expenses, or whether that breach was somehow excused by Fidelity's contributions to the Plan.[3]

Finally, Defendants' efforts to evade liability for Plaintiffs' prohibited transaction claim are also unavailing. Fidelity's own fiduciary training materials identify the plan sponsor, FMR LLC, as a "fiduciary" of the plan. *See Pls' SoF, ¶ 40*. This Court has previously determined that the phrase "in connection with" in 29 U.S.C. § 1106(b)(3) is broad enough to encompass transactions in which plan fiduciaries are only indirectly involved. *See Brotherston v. Putnam Invs., LLC*, 2017 WL 1196648, *7 (Mar. 30, 2017) ("*Brotherston I*"), *aff'd in relevant part*, 907 F.3d 17, 25 (1st Cir. 2018). And under binding First Circuit authority, Fidelity's defense under PTE 77-3 cannot be sustained given its failure to offer the same revenue sharing payments to the Plan that it offered to other plans. *See Brotherston III*, 907 F.3d at 28.

For all of these reasons, and the reasons further set forth below and in Plaintiffs' prior briefing (ECF Nos. 136, 154), Plaintiffs respectfully request that the Court grant their motion for partial summary judgment.

---

[3] This is particularly true since (1) Fidelity's contributions to the Plan indisputably remained the same both before and after the "revenue credit" (10% of eligible employee compensation); and (2) none of the class members (who are former employees) received these company contributions while they were in the class. *See Pls' SoF, ¶¶ 34-38*.

## ARGUMENT

I.   **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT REGARDING WHETHER THE FBIC BREACHED ITS DUTY TO PRUDENTLY MONITOR THE PLAN'S INVESTMENTS**

   A.   **ERISA Does Not Permit a Fiduciary to Abandon Billions of Dollars in Plan Investments**

This case, like all cases involving breach of fiduciary duty claims under ERISA, turns on a simple question: did the plan's fiduciaries act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity" would have used? *See* 29 U.S.C. § 1104(a)(1)(B). The undisputed answer to this question is "no." Fidelity never claims (nor could it) that its decision to abandon monitoring over half of the Plan's assets was one that other prudent fiduciaries would have made. All evidence is to the contrary.

No other plan has left billions of dollars in assets unmonitored, and no fiduciary expert would endorse such a decision. As Plaintiffs' fiduciary expert, Ms. Wagner, opined: "This was a bold and *unprecedented tactic* that I would never have recommended." *Wagner Report, ¶ 54* (emphasis added). Ms. Wagner further opined that "*I have never seen a retirement plan function in this manner*, nor would I counsel the fiduciaries of any retirement plan to administer a plan in this fashion. In my professional opinion, *no prudent fiduciary would do so*." *Id, ¶ 61* (emphasis added). Defendants do not rebut Ms. Wagner's opinions. This is dispositive. *Cf. Tracey v. Mass. Inst. of Tech.*, 2019 WL 4192148, at *4-6 (D. Mass. Sept. 4, 2019) (denying summary judgment on whether monitoring of "MIT Investment Window" was prudent where there was conflicting expert testimony, but granting summary judgment on separate issue regarding prohibited transaction exemption where defendant's expert testimony was unrebutted).

Instead of disputing whether it was prudent to abandon monitoring billions of dollars in investments (constituting over half the assets of the Plan), Fidelity focuses its attention on whether those investments were characterized in the Plan Document as "DIAs." This is beside the point.

The "prudent man standard of care" in ERISA § 404(a) applies "with respect to a plan," not just portions of plan investments that are labeled as DIAs (a term that appears nowhere in the statute). *See* 29 U.S.C. § 1104(a). Moreover, the pertinent case law calls for monitoring of all trust investments, not merely "designated investments" or "DIAs" within the trust. *See Tibble v. Edison Int'l*, 135 S.Ct. 1823, 1828 (2015) ("a trustee has a continuing duty to monitor trust investments"). Indeed, the Supreme Court has expressly rejected the argument that "the settlor can reduce or waive the prudent man standard of care by specific language in the trust instrument." *Dudenhoeffer*, 134 S.Ct. at 2469.

Here, it is undisputed that the at-issue Fidelity investments were "available in the Plan" and were offered to participants on the same recordkeeping platform as the DIAs. *See Pls' SoF, ¶¶ 10-11*. The notion that some separate "window" existed for the non-DIAs, or that they were somehow offered outside of the Plan, is a fiction created entirely by Fidelity's team of lawyers. *See Pls' Statement of Add'l Facts in Response to Defs' Motion for S.J., ECF No. 153, at p. 88, ¶ 6* (citing testimony of Bruce Strombom regarding the term "open architecture window" and where it came from). The Plan's fiduciaries could not simply walk away from their duty to monitor these investments "in the Plan."[4]

Defendants argue that investments available outside a plan through a self-directed brokerage account ("SDBA") need not be monitored. However, this is another red herring. It is undisputed that the Fidelity funds at issue were "excluded from BrokerageLink." *Pls SoF, ¶ 11, n.3*. Moreover, the nature of the Plan's investment in these Fidelity funds is not, in any way, comparable to BrokerageLink. *See infra* at I.C. Plan participants have invested *50 times* more in

---

[4] Defendants argue that the reference to Fidelity investments being made available "in the plan" comes from an "operational" document, and not a self-serving "legal description." *See Defs' SJ Response at 4 n.2*. That is precisely the point and it is not the only document containing such language. *See Pls SoF ¶ 11, n.5* ("under the plan").

the at-issue Fidelity funds than the brokerage account. *Pls' SoF, at ¶ 16*; *Declaration of Kai Richter in Further Support of Plaintiffs' Motion for S.J. ("Richter Decl."), Ex. 1 at Schedule of Assets.* Fidelity identifies no other plan in which billions of dollars are invested through a brokerage account. Nor is there any other plan in which anything approaching this *proportion* of participants' assets are invested in a brokerage account. Fidelity's strained analogies to the brokerage account are a naked attempt to wag the dog by the tail, and in no way justify its failure to monitor the at-issue Fidelity funds in the Plan. To allow Fidelity to walk away from monitoring the majority of the Plan's assets would undercut one of the core purposes of ERISA.[5]

### B. Fidelity Cannot Wipe Away Its Statutory Responsibility to Prudently Monitor the Plan's Investments Based on a Disclosure Regulation

Confronted with a clear mandate to prudently monitor the Plan's investments under the statute (29 U.S.C. § 1104(a)(1)) and binding Supreme Court precedent (*Tibble* and *Dudenhoeffer*),[6] Defendants retreat to a disclosure regulation in an effort to shield themselves from their fiduciary monitoring obligations. This only serves to highlight the weakness of their position.

What Defendants describe as the "pertinent" regulation (*Defs' SJ Response at 6*) has nothing to do with *monitoring* of Plan investments. Instead, it establishes "[f]iduciary requirements for *disclosure* in participant-directed individual account plans." 29 C.F.R. § 2550.404a-5 (emphasis added). The regulation sets forth an extensive list of information that must provided to participants "with respect to each designated investment alternative offered" under a plan. 29 C.F.R. § 2550.404a-5(d)(1). However, this hardly entails that fiduciaries are relieved of any duty

---

[5] *See Boggs v. Boggs*, 520 U.S. 833, 845 (1997) ("The principal object of the statute is to protect plan participants and beneficiaries.") (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983)); S. Rep. No. 93-127, at 29 (1973) ("[W]ithout standards by which a participant can measure the fiduciary's conduct…he is not equipped to safeguard either his own rights or the plan  assets.").
[6] Defendants' brief omits any reference to 29 U.S.C. § 1104(a)(1) or these Supreme Court opinions.

to monitor other types of investments.[7]

Defendants contort the meaning of the regulation in arguing that it establishes a set of investments that "fiduciaries need not monitor." *Defs' SJ Response at 6*. The subparagraph of the regulation that Defendants rely upon actually says: "***Nothing herein is intended to relieve a fiduciary from its duty to prudently select and monitor*** providers of services to the plan or designated investment alternatives offered under the plan." 29 C.F.R. § 2550.404a-5(f) (emphasis added). In other words, Defendants rely upon a disclosure regulation specific to DIAs, which explicitly says it is ***not*** intended to relieve fiduciaries of their fiduciary monitoring obligations with respect to those same DIAs, to argue that it somehow wipes away their fiduciary monitoring obligations with respect to other investments that are not even addressed. This is a bridge too far.

The Department of Labor ("DOL") has never indicated that fiduciaries may walk away from their fiduciary duties under ERISA by relabeling investments in a 401(k) plan as something other than "DIAs." To the contrary, the DOL issued a Field Assistance Bulletin ("FAB") in connection with the foregoing disclosure regulation, which states that this tactic "raises questions under ERISA section 404(a)'s general statutory fiduciary duties of prudence and loyalty":

> [I]n the case of a 401(k) or other individual account plan covered under the regulation, a plan fiduciary's failure to designate investment alternatives, for example, to avoid investment disclosures under the regulation, ***raises questions under ERISA section 404(a)'s general statutory fiduciary duties of prudence and loyalty***.  Also, fiduciaries of such plans with platforms or brokerage windows, self-directed brokerage accounts, or similar plan arrangements that enable participants and beneficiaries to select investments beyond those designated by the plan are ***still bound by ERISA section 404(a)'s statutory duties of prudence and loyalty*** to participants and beneficiaries who use the platform or the brokerage window, self-directed brokerage account, or similar plan arrangement.

---

[7] Compliance with the disclosure regulation is a necessary condition for protection under ERISA § 404(c). *See* 29 C.F.R. § 2550.404c-1(b)(2)(B).  It is not a sufficient condition for compliance with ERISA § 404(a).

FAB 2012-02R, 2012 WL 3612516 (July 30, 2012), at Q&A 39 (emphasis added). Three things are clear from this guidance. _First_, the DOL's denunciation of this tactic is consistent with Ms. Wagner's opinions, as well as the Supreme Court's opinion in _Dudenhoeffer_ that fiduciary obligations apply regardless of the language of the plan document. _Second_, the reference to "avoid[ing] investment disclosures under the regulation" makes clear that a failure to designate investment options as DIAs would, at most, affect plan fiduciaries' disclosure obligations, not their monitoring obligations. _Finally_, the DOL made clear that fiduciaries were "still bound by ERISA section 404(a)'s statutory duties of prudence and loyalty" even with respect to brokerage windows, self-directed brokerage accounts, or similar plan arrangements. Thus, the DOL's position is entirely consistent with Plaintiffs' position, the text of the statute (which states that fiduciary duties apply "with respect to a plan," not just "DIAs"), and the Supreme Court's decisions in this area.[8]

The only other "authority" (of any kind) that Defendants cite to support their novel interpretation of the duty to monitor is a "Request for Information" that was issued by the DOL in 2014. _See Defs' SJ Response at 6_ (citing _Request for Information Regarding Standards for Brokerage Windows in Participant-Directed Individual Account Plans_, 79 Fed. Reg. 49,469, at 49,471 (Aug. 21, 2014)). Needless to say, a "Request for Information" is not an agency regulation or directive; rather, it is an effort by the DOL to obtain information that may inform future rulemaking or decision-making.[9] In any event, the RFI was entirely consistent with the FAB. The DOL explicitly referred readers to its prior guidance in FAB 2012-02R, specifically including its "cautionary statement" in Q&A 39 that "a plan fiduciary's failure to designate investment alternatives…may raise questions under ERISA's section 404 general statutory duties of prudence

---

[8] Regardless, the text of the statute and the Supreme Court's decisions would be controlling, especially since _Dudenhoeffer_ was decided two years _after_ the regulation was issued in 2012.

[9] No additional regulations or guidelines were issued as a result of this Request for Information.

and loyalty." 79 Fed. Reg. at 49,470. Further, the DOL emphasized that "[t]he Department wants to make sure that participants are not exposed to undue risks from brokerage windows." *Id.* at 49,471.

In response to this RFI, Fidelity submitted a lengthy letter to the DOL. *See Richter Decl., Ex. 2*. In its letter, Fidelity took exception to the DOL's guidance in Q&A 39 of the FAB, and "suggest[ed] that more formal regulatory guidance should be provided giving interested parties the opportunity to comment." *Id. at p.10*. Fidelity also "suggest[ed] that the Department consider some type of safe harbor approach…to avoid designated investment alternative status in situations where the investments are not identified as part of a designated line-up." *Id. at p.3*. However, the DOL did not adopt either of these suggestions, and maintained its existing guidance.

Fidelity is now attempting to get from this Court what it couldn't get from DOL, and what the petitioner-defendants in *Dudenhoeffer* couldn't get from the Supreme Court: *carte blanche* to completely forego monitoring of billions of dollars in retirement assets based on the language of a plan document. Fidelity has identified no court decision, DOL guidance, or expert opinion that would support this radical proposition. There is a simple explanation for this: Fidelity's position is unsupportable. This Court should not be the first to adopt it. To the contrary, it should enter summary judgment in favor of Plaintiffs with respect to whether the Plan's fiduciaries breached their investment monitoring duties.

### C.    The SDBA is Not "Similar" to the Plan's Lineup of Fidelity Funds

Even if the DOL's disclosure regulation defined the scope of Fidelity's monitoring duties (which it does not), and allowed Fidelity to structure the Plan in a manner designed to avoid its monitoring duties (which the FAB makes clear it cannot), Defendants' arguments still would fail. The term "[d]esignated investment alternative" means ***any*** investment alternative designated by the plan into which participants and beneficiaries may direct the investment of assets held in, or

contributed to, their individual accounts." 29 C.F.R. § 2550.404a-5(h)(4). Although the term does "not include 'brokerage windows,' 'self-directed brokerage accounts,' or similar plan arrangements," *id.*, the subject Fidelity funds were not offered under a "similar plan arrangement" to a brokerage account.

In claiming that the non-DIA Fidelity funds were offered under a "similar arrangement" to BrokerageLink, Fidelity cites only to its own legal machinations. *See Defs' SJ Response at 7*. It provides no insight into whether the non-DIA Fidelity funds actually resembled the Plan's SDBA.

Comparing the function, operation, and usage of the non-DIA Fidelity funds to the Plan's SDBA shows that they share little in common. Instead, this comparison shows that in reality, there was a plan lineup consisting of Fidelity funds (both DIAs and non-DIAs) and a self-directed brokerage account consisting of non-Fidelity funds. Specifically:

- All of the Fidelity funds, including the non-DIAs, were available "in the Plan" on the Plan's recordkeeping platform (FPRS). *Pls' SoF, ¶ 10*. The SDBA was maintained on a separate platform (BrokerageLink), and only included non-Fidelity funds. *Id. ¶ 11*.

- All of the Fidelity funds, including the non-DIAs, were presented to participants through NetBenefits, Plan's online platform. *Pls' SoF, ¶ 10*. To use the SDBA, participants had to navigate to a different website where only the non-Fidelity funds were listed. *Id. ¶ 11*.

- Despite Fidelity's claim that it created a new "window" for the non-DIA Fidelity funds in 2014, "[t]here was no difference between before and after in order to invest in those funds." *Id., ¶ 10*. By contrast, the SDBA was new to the Plan in 2014. *Id., ¶ 11*.

- Approximately 99% of all Plan assets were invested in the Fidelity funds in the Plan, and more than half were invested in the non-DIAs. *Id., ¶ 16*. By contrast, approximately 1% of Plan assets were invested in the SDBA. *Id.*

- Plan participants had automatic access to all Fidelity funds. *Id., ¶ 10*. By contrast, participants were required to enroll in the SDBA if they wished to invest in non-Fidelity funds. *Id., ¶ 11*.

- Participants could invest in the Fidelity funds effective immediately. *Id., ¶ 10*. By contrast, contributions to the SDBA were typically not accessible for trading for two business days, and were invested in a Fidelity money market fund unless the participant

gave Fidelity further instructions. *Id., ¶ 11*. Further, "some transactions [in the SDBA] may experience delays in processing." *Richter Decl., Ex. 6 at FID0128051*.

- The Fidelity Funds come in "the share class with the lowest expense ratio which the Plan is eligible to purchase." *Pls' SoF, ¶ 11*. By contrast, the SDBA offers more expensive retail share classes. *Id.*

- The Terms and Conditions for PAS-W—the Plan's managed account service—state that, when assembling model portfolios for participants enrolled in the service, only funds "included in the investment menu" are considered. *Declaration of Mark Thomson in Supp. of Pls' Motion for Partial S.J. ("Thomson SJ Decl."), ECF No. 138, Ex. 19 at FID0009219*. In accordance with that restriction, PAS-W used only Fidelity funds to construct portfolios for Plan participants; it gave no consideration to investments in the SDBA. *Id., Ex. 12, Hanson Dep. 95:11-25*.

- For the non-DIA Fidelity funds, Fidelity sent participants notices of fund name and strategy changes, *Richter Decl., Ex. 3*, fund mergers, *Richter Decl., Ex. 4*, and fund additions and share class changes, *Richter Decl., Ex. 5*. By contrast, Fidelity never sent participants any notices regarding funds in the SDBA.

- The SDBA's fact sheet for the Plan lists only the Fidelity funds as "Plan Options." *Richter Decl., Ex. 6 at FID0128051*. By contrast, the Plan's recordkeeping agreement stated that the SDBA was the Plan's "brokerage option." *Richter Decl., Ex. 7 at FID0001482*.

- Fidelity issued ERISA § 408(b)(2) fee disclosures throughout the Class Period "regarding the fees for *investment options offered under the plan.*" *See, e.g., Thomson SJ Decl., Ex. 48 at FID0002097* (emphasis added). These disclosures only include the Fidelity funds; investments available through the SDBA were omitted. *Id. at FID0002099-FID0002105.*

- The Plan's Form 5500 filings from 2014 to 2016 separately listed every Fidelity fund as an investment option, while relegating all assets in "Self-Directed Brokerage Accounts" to a single separate line item. *See id., Ex. 4 at MOITOSO0000572; Ex. 5 at MOITOSO0000735606; Ex. 6 at MOITOSO00011000606;* (years 2014-2016). After this case was filed, Fidelity issued a Form 5500 for the year 2017 that, for the first time, itemized the assets in each fund in the SDBA. *Id., Ex. 7 at MOITOSO024273124.*

These differences provide ample support for Ms. Wagner's opinion that the unmonitored Fidelity investments are not "equivalent to brokerage account investments." *Wagner Report, ¶ 63; see also Declaration of Mark Thomson in Supp. of Pls' Memo. in Oppo. To Defs' Motion for S.J., ECF No. 155, Ex. 12 at 146:23-147:5*. Notably, her opinion is not rebutted by any of Defendants'

experts.   Indeed, despite Defendants' efforts to undercut Ms. Wagner's opinion, *see Defs' SJ Response at 7-9*,[10] Fidelity itself co-signed many of her observations in its letter to the DOL (referenced *supra* at 9):

- "In common practice, brokerage windows are implemented through a brokerage account[.]" *Richter Decl., Ex. 2 at p.2*; *see also id. at p.3* ("brokerage windows are typically offered through a service called 'BrokerageLink®'");

- "Fidelity's BrokerageLink platform is separate from the recordkeeping platform used for the plan's designated investment alternatives." *Id. at p.6*;

- "[I]f a participant or beneficiary wishes to utilize BrokerageLink, they must complete an authorization form[.]" *Id. at p.8*;

- "The plan's designated investment options may include share classes or institutional products with lower asset based fees that are not available through BrokerageLink." *Id. at p.7*;

- "The costs of investing in funds or purchasing individual securities under BrokerageLink are essentially the same as an individual would pay for the same investments in a ***retail*** brokerage IRA at Fidelity." *Id. at p.7* (emphasis added);

- "[T]he adviser [to a plan] generally constructs the managed account portfolios from the plan's menu of designated investment options[.]" *Id. at p.8*;

- "[O]nly a small percentage of participants who have a brokerage window available to them actually utilize it." *Id. at p.8*; *see also id. at p.4* ("Of the total number of participants in plans with BrokerageLink, only 2.6 percent actually utilize the feature.").

In summary, the Fidelity funds look like a plan lineup and work like a Plan lineup because they *are* the Plan lineup, despite Fidelity's attempts to now dress them up as something else. They are not "similar" to an SDBA.

---

[10] Defendants' efforts to discredit Ms. Wagner's unrebutted opinions take her testimony out of context.   For example, Defendants argue that Ms. Wagner "conceded" that a plan may have two distinct brokerage windows. *See Defs' SJ Response at 8.* However, she further testified that in the "large plan marketplace…I've never seen anything other than one SDBA." *Id. at 148:5-6.*

D.      **The Plan's Investments Were Not Monitored Through PAS-W**

Finally, Fidelity reveals its concern about the strength of its case by arguing for the first time—albeit only briefly—that the FBIC's monitoring of PAS-W should be imputed to all of the Fidelity funds. *See Defs' SJ Response at 9-10*. This argument cannot be squared with Fidelity's prior admissions. *See, e.g.*, *Defs' Memo in Support of Motion to Exclude Opinions of Marcia Wagner, ECF No. 127, at 7* ("Fidelity does not dispute that the FBIC did not monitor the non-DIAs"); *Thomson SJ Decl., ECF No. 138, Ex. 30, MacDonald Dep. 45:17-21* (FBIC did not monitor PAS-W's underlying holdings).

To the extent that Fidelity argues that Strategic Advisors ("SAI") monitored the funds, this argument fails for multiple reasons. <u>*First*</u>, this Court rejected a similar argument in *Brotherston*; where a plan sponsor is engaged in the business of investment management, the plan's fiduciaries cannot "blindly" rely on an investment unit of the plan sponsor to monitor the funds in the plan. *Brotherston v. Putnam Invs., LLC*, 2017 WL 2634361, at *9 (D. Mass. June 19, 2017) (Young, J.) ("*Brotherston II*"). <u>*Second*</u>, PAS-W's own portfolio manager testified that it was not the responsibility of SAI to monitor the underlying funds in a plan menu. *See Richter Decl., Ex. 8 at 17:5-18:1*. <u>*Third*</u>, there is no evidence that the FBIC believed such monitoring was taking place. <u>*Finally*</u>, PAS-W did not maintain all Fidelity funds for its model portfolios (as the Plan's fiduciaries did for the Plan); to the contrary, those portfolios only included a fraction of the Fidelity funds in the Plan lineup. *See Richter Decl., Ex. 9 at FID0005732*. For all of these reasons, Fidelity's 11th-hour resort to its PAS-W program is unavailing.

II.    **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT REGARDING WHETHER THE RETIREMENT COMMITTEE BREACHED ITS DUTY TO PRUDENTLY MONITOR AND CONTROL RECORDKEEPING EXPENSES**

Fidelity does not attempt to argue that the Plan's fiduciaries monitored recordkeeping fees. This undisputed fiduciary failure is not excused by its so-called "Mandatory Revenue Credit."

A.     **The Mandatory Revenue Credit is a Settlor Act that Cannot Excuse a Fiduciary Breach**

It is undisputed that the Mandatory Revenue Credit is provided by Fidelity in a settlor capacity as a Plan employer. *See Defs' Memo in Support of S.J., ECF No. 140, at 18* ("The establishment of the Mandatory Revenue Credit was a settlor act"). Under the Plan Document, this so-called credit is considered part of the "Company's Contribution," made for the purpose of "funding…the Plan," and paid to eligible employees as a percentage of their compensation. *ECF No. 138-1, § 5.1*. These are all hallmarks of settlor employer contributions. *See Brotherston III*, 907 F.3d at 29 (holding that "determining 'the level of benefits'" and making a contribution "for the benefit of its employees qua employees" are indicia of a settlor act). Indeed, Fidelity describes the Mandatory Revenue Credit as a "paradigmatic settlor act." *ECF No. 140 at 18*.

The First Circuit has directly held that such employer contributions may not be used to excuse or offset damages from a fiduciary breach. *See Brotherston III*, 907 F.3d at 29. "To hold otherwise would be to allow employers to claw back with their fiduciary hands compensation granted with their employer hands." *Id*. Consistent with the First Circuit's opinion, Ms. Wagner and Mr. Scheinberg have both opined, based on the facts of this case, that the so-called Mandatory Revenue Credit ("MRC") did not justify the Retirement Committee's failure to monitor and control recordkeeping expenses. *See Wagner Report, p.7 & ¶¶ 88-91; Scheinberg Report, ¶¶ 114-16*. Defendants offer no rebuttal to these opinions. Nor do they distinguish *Brotherston* in the relevant section of their brief. *See Defs' SJ Response at 10-15*. Accordingly, summary judgment is ripe on Plaintiffs' claim for failure to monitor recordkeeping expenses.

B.     **No Additional Consideration Was Provided in Connection with the "Credit"**

Because Fidelity cannot claim any fiduciary credit for its settlor contributions, the question of whether the MRC provides a benefit to participants is moot.  Regardless, it is undisputed that

no additional consideration was provided in connection with this "credit." Both before and after the implementation of this "credit," Fidelity's contribution to the Plan was equal to 10% of the compensation of eligible employees. *See Pls' SoF, ¶¶ 34-35.*

Fidelity does not dispute this point. Instead, Fidelity argues that the MRC has value because it is "enforceable by the Plan." *Defs' SJ Response at 11.* However, the fact that a contract is enforceable does not mean that it provides consideration to a contracting party.[11] The problem with Fidelity's argument is that it wants a ***double*** offset for its "credit": first against its annual profit sharing contribution, and second against the excess recordkeeping expenses that the Plan paid. Having chosen the former, Fidelity cannot now seek the latter.  While the credit may have been "mandatory" in name, it was not mandatory in fact where Fidelity retained the right – and exercised the right – to take away with one hand what it gave with other hand.[12]

### C.       Class Members Did Not Receive the "Credit" in Any Event

Fidelity's reliance on the MRC is even more absurd in light of the fact that all of the class members are former employees who did not receive this "credit" while in the class. This fact is not only undisputed, it is *stipulated. See Stipulation and Order Regarding Class Certification, ECF No. 83, at ¶ 1.*  Defendants cannot explain away this inconvenient truth.

### 1.       The tax code is not a defense.

Fidelity repeats almost verbatim its tax code argument from its brief in support of its summary judgment motion. *Compare Defs' SJ Response at 12, with Defs' SJ Memo, ECF No. 140 at 17.* Because Fidelity adds nothing to its previous argument, Plaintiffs direct the Court to their

---

[11] While consideration is a necessary condition of an enforceable contract, an otherwise enforceable contract does not *ipso facto* entail that consideration is being paid.

[12] This is what Ms. Wagner meant when she testified that she saw no "math" that would support the credit. *See Defs' SJ Response at 11.* Ms. Wagner specifically spelled out how the MRC is calculated in her report. *Wagner Report, ¶ 88.* Defendants offer no rebuttal expert opinion to contradict her opinion that the MRC was a "gimmick."

earlier briefing explaining the multiple reasons why the tax code does not provide a defense to Fidelity's fiduciary misconduct. *See Pls' Memo in Opp. to S.J., ECF No. 154, at 8.* In summary, the tax code did not cause Fidelity's ERISA violations (including its failure to monitor recordkeeping expenses), nor did it prevent Fidelity from making "restorative payments" to former employees to redress those violations. *Id.* To the extent there was ever any question about this, it is not reflected in the Retirement Committee minutes, and Fidelity never raised it with the IRS. *Id.*

### 2.    The 408(b)(2) disclosure regulation is not a defense.

Fidelity also resorts to another disclosure regulation, this time in 29 C.F.R. § 2550.408b-2. However, Fidelity cannot rely on a disclosure regulation to justify its failure to monitor recordkeeping expenses any more than it can rely on a disclosure regulation to justify its failure to monitor the Plan's investments. *See supra* at § I.B.

Although Fidelity argues that "[n]othing in [the regulation] requires the disclosure of the costs that any class of participants will incur," *Defs' SJ Response at 13*, Plaintiffs do not allege that the Plan's recordkeeping fees were improperly *disclosed*. Nor do they allege that the Plan's fiduciaries failed to monitor recordkeeping fees for some participants and not others. Instead, Plaintiffs allege, consistent with the undisputed evidence in this case, that the Plan's fiduciaries failed to monitor "*the Plan's* recordkeeping expenses." *Pls' Memo in Supp. of Motion for S.J., ECF No. 136, at* 1 (emphasis added). Thus, there is no inconsistency between the disclosure regulation and Plaintiffs' allegations. Indeed, Plaintiffs' allegations are based, in part, on the Retirement Committee's failure to review the required disclosures. *See Pls' SoF, ¶ 29.*

The issue of how expenses are allocated to participants only comes into play with respect to the MRC, which does not form the basis for Plaintiffs' claim, but rather Fidelity's *defense*.[13]

---

[13] Plaintiffs have voluntarily withdrawn their impartiality claim in light of Fidelity's admission that the MRC was a "settlor act." *See Pls' Memo in Opp. to S.J., ECF No. 154 at 10.*

For the reasons discussed above, the MRC is not a bona fide expense reimbursement and therefore has no bearing on the Plan's expenses or the allocation of those expenses. But even if it were, Fidelity would not be able to justify providing this purported expense "credit" to some participants and not others. While Fidelity argues that "ERISA plans may allocate plan expenses to individual participants on a pro rata basis," *Defs' SJ Response at 14*, the MRC was *not* allocated pro rata (or per capita); rather, it was entirely denied to former employees, except in instances where they worked for a portion of a Plan year. *See Pls' SoF, ¶ 37.* Defendants offer no legitimate explanation for this.[14] Nor was "any consideration given" to this allocation, *id. ¶ 37*, which Ms. Wagner described as "really atypical, really outside the norm, really not up to the standard of care that I've seen or that exists in the industry." *Richter Decl., Ex. 10 at 259:13-16.* To the extent the MRC has any relevance here, Defendants' allocation of the MRC is certainly not endorsed by the DOL. *See* Field Assistance Bull. No. 2003-03, 2003 WL 24127777, at *2 (May 19, 2003) ("A plan fiduciary must be prudent in the selection of the method of allocation. Prudence in such instances would, at a minimum, require a process by which the fiduciary weighs the competing interests of various classes of the plan's participants and the effects of various allocation methods on those interests.").

### 3. ERISA § 502(a)(2) does not bar relief.

For the same reasons, ERISA § 502(a) does not bar Plaintiffs' recordkeeping claim. Although Fidelity argues that the Plan was "made whole" by the MRC, *Defs' SJ Response at 14*, the MRC was a settlor contribution, not a bona fide expense reimbursement, and plays no proper role in the calculus. It is Fidelity – not Plaintiffs – who seeks a "double recovery." *See supra* at 15.

Regardless, Plaintiffs are entitled to bring their claims on behalf of the class of former employees in this case. *LaRue* held only that an ERISA plaintiff may not recover for injuries to

---

[14] It is undisputed that *all* participants in the Plan – both current employees and former employees – paid for recordkeeping through the investments in the Plan. *Id. ¶ 30.*

her individual defined-contribution account under § 502(a)(2). *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008). It explicitly *permitted* recovery where "a fiduciary breach diminishes plan assets payable…only to persons tied to particular individual accounts," such as the class in this case. *Id.* Defendants' citations to *Fisher* and *Wolf* are similarly inapposite.[15]

## III.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT AS TO LIABILITY ON THEIR PROHIBITED TRANSACTION CLAIM IN COUNT III

Fidelity also raises obligatory challenges to every element of Plaintiffs' prohibited transaction claim.  However, each of its arguments fail.

### A.   FMR LLC is a Fiduciary of the Plan

Fidelity cannot walk back its repeated admissions in its fiduciary training materials that FMR LLC is a fiduciary to the Plan. *See Pls' SoF, ¶ 40*. Fidelity now seeks to discard one of those admissions because it was made before the 2014 Plan amendment, but Fidelity does not explain why that amendment would have altered FMR LLC's fiduciary status. *Defs' SJ Response at 17 n.14*. If anything, the amendment *heightened* FMR LLC's fiduciary role because it resulted in the FBIC punting all non-DIA investment decisions to FMR LLC. *See Pls' SoF, ¶¶ 20-21*.

Fidelity also reprises its formalistic argument that any action taken via plan amendment is immunized from fiduciary scrutiny, but this is just another attempt to lawyer itself out of ERISA. Plaintiffs do not challenge the Plan amendment, but rather the ongoing mismanagement of the Plan and the Plan's investments. It is undisputed that any changes to those investments required approval of the FMR LLC Board. *See Pls' SoF, ¶ 40*. Thus, regardless of whether FMR LLC was

---

[15] The *Fisher* court dismissed plaintiff's case under section 502(a)(2) because plaintiff sought "relief for himself as an individual, rather th[a]n on behalf of all or any part of the plan." *Fisher v. Penn Traffic Co.*, 319 F. App'x 34, 35 (2d Cir. 2009). By contrast, Plaintiffs bring this case "on behalf of the Fidelity Retirement Savings Plan." *Fourth Amended Complaint, ECF No. 77, ¶ 1*. The *Wolf* court held that there was not a loss to the plan because "[t]he Plan at issue here had no funds held in trust." *Wolf v. Causley Trucking, Inc.*, 719 F. App'x 466, 476 (6th Cir. 2017). Here, the trust at issue holds billions of dollars. *Richter Decl., Ex. 1 at Schedule of Assets*.

a named fiduciary for purposes of 29 U.S.C. § 1102(a), it was a functional fiduciary under 29 U.S.C. § 1002(21)(A) because it exercised "discretionary authority or discretionary control respecting the management of [the] Plan . . . or management of disposition of its assets."

Under ERISA, "the existence of a duty turns not on who acts but on the nature of the action." *Campbell v. BankBoston, N.A.*, 327 F.3d 1, 6-7 (1st Cir. 2003) (emphasis added). Here, FMR LLC's "selection of plan investment options and the decision to continue offering [those] particular investment vehicle[s] are acts to which fiduciary duties attach." *Howell v. Motorola, Inc.*, 633 F.3d 552, 567 (7th Cir. 2011). Moreover, it is undisputed that Fidelity's Board retained fiduciary oversight over the FBIC and Retirement Committee. *See Pls' SoF, ¶¶ 8-10*; *Richter Decl., Ex. 11 at 49:22-50:5, 54:22-55:2* ("The board has oversight" over the FBIC and Retirement Committee). This further demonstrates FMR LLC's fiduciary status. *See* 29 C.F.R. § 2509.75-8 (FR-17); *Kling v. Fidelity Mgmt. Trust Co.*, 323 F. Supp. 2d 132, 142 (D. Mass. 2004).

**B.     FMR LLC Received Consideration in Connection with Transactions Involving Assets of the Plan, in Violation of 29 U.S.C. 1106(b)**

Next, Fidelity attempts to sidestep 29 U.S.C. 1106(b)(3) by claiming that FMR LLC did not receive "consideration" from the Plan. *Defs' SJ Response at 17-18*. Fidelity argues that monies paid by the Plan to Fidelity's subsidiaries were not "intended to go to or toward the parent's account." *Id. at 18* (quotes and brackets omitted). However, this is contradicted by Fidelity's own stipulation that the amounts paid to Fidelity (specifically including its "subsidiaries or affiliates") are "transferred from each mutual fund's custodial account, through various channels, to a centralized corporate account registered by FMR LLC," which "commingles corporate cash received from most of Fidelity's domestic affiliates and business channels." *See Pls' SoF, ¶ 41*. These payments meet the "in connection with" standard of § 1106(b)(3), which this Court has held

19

"covers a broader swath of conduct than 1106(b)(1)." *Brotherston I*, 2017 WL 1196648, at *7.[16]

### C.     PTE 77-3 Does Not Apply

Finally, Fidelity claims that its dealings with the Plan were "no less favorable" than its dealings with other shareholders because of the MRC. Fidelity has no choice but to make this argument, as it has stipulated that it does ***not*** qualify for PTE 77-3 and treated the Plan "less favorable" than other plans, unless the MRC is considered a substitute for the revenue sharing it provided to other plans. *Pls' SoF, ¶ 43*. However, the MRC is no more relevant in the prohibited transaction context than it is in the fiduciary context. *See supra* at 14-15.

Fidelity attempts to distinguish the MRC from the employer contributions that the First Circuit held were irrelevant to the PTE 77-3 analysis in *Brotherston*. However, these distinctions make no difference, as they do not alter the settlor nature of the MRC. *See supra* at II.A. Nor has Fidelity shown that any bona fide consideration was provided. *Id.* at II.B. This does not mean that "*no* payment by an employer to its own plan would ever satisfy [PTE 77-3]." *Defs' SJ Response at 20*. Had Fidelity provided revenue sharing payments to the Plan in the same manner that it did to other plans, it would be a different story. But Fidelity did no such thing, and it cannot redeem its prohibited transactions by pointing to settlor contributions based on employee compensation.

### **CONCLUSION**

For the reasons set forth herein and in Plaintiffs' prior Memoranda (ECF No. 136, 154), Plaintiffs respectfully request that the Court grant their motion for partial summary judgment.[17]

---

[16] In *Brotherton*, this Court stated that "[a]bsent the protections of a broad reading of Section 1106(b)(3), a fiduciary could shield itself from liability under the First Circuit's narrow definition of plan assets by simply structuring its transaction to avoid paying fees to a related party, . . . directly out of plan assets." *Id.* Fidelity is attempting to do exactly that by claiming it has exempted itself from liability by initially routing fees to a subsidiary.

[17] Fidelity's arguments regarding its release and statute of limitations defenses are not at issue on this motion, and simply refer back to its earlier briefing. *Defs' SJ Response at 20*. Plaintiffs refer the Court to their earlier briefing on these issues as well. *See ECF No. 154 at 10-20*.

Respectfully Submitted,

Dated: October 11, 2019                **NICHOLS KASTER, PLLP**

s/Kai Richter
Kai Richter (admitted *pro hac vice*)
Paul J. Lukas (admitted *pro hac vice)*
James H. Kaster (admitted *pro hac vice*)
Brock J. Specht (admitted *pro hac vice*)
Carl F. Engstrom (admitted *pro hac vice*)
Jacob T. Schutz (admitted *pro hac vice*)
Mark E. Thomson (admitted *pro hac vice*)
NICHOLS KASTER, PLLP
4600 IDS Center
80 S. 8th Street
Minneapolis, Minnesota 55402
krichter@nka.com
lukas@nka.com
kaster@nka.com
bspecht@nka.com
cengstrom@nka.com
jschutz@nka.com
mthomson@nka.com

Jason M. Leviton (BBO #678331)
Jacob A. Walker (BBO #688074)
BLOCK & LEVITON LLP
260 Franklin Street, Suite 1860
Boston, Massachusetts 02110
(617) 398-5000
jason@blockesq.com
jacob@blockesq.com

ATTORNEYS FOR PLAINTIFFS


## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2019, a true and correct copy of the foregoing was served by CM/ECF to the parties registered to the Court's CM/ECF system.

Dated: October 11, 2019                s/Kai Richter
Kai Richter