## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

KEVIN MOITOSO, *et al.*

     *Plaintiffs*,

    *v.*

FMR LLC, *et al.*

     *Defendants*.

No. 1:18-CV-12122-WGY

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

William M. Jay (admitted *pro hac vice*)
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC 20001
Tel: (202) 346-4000
Fax: (202) 346-4444
wjay@goodwinlaw.com

John J. Falvey, Jr. (BBO# 542674)
Alison V. Douglass (BBO# 646861)
Dave Rosenberg (BBO# 679434)
Benjamin S. Reilly (BBO# 693742)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel: (617) 570-1000
Fax: (617) 523-1231
jfalvey@goodwinlaw.com
adouglass@goodwinlaw.com
drosenberg@goodwinlaw.com
breilly@goodwinlaw.com

October 11, 2019

*Attorneys for Defendants*

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

ARGUMENT .....................................................................................................................2

I.     THE FIDUCIARY DUTY CLAIMS FAIL. ......................................................... 2

      A.    Defendants Had No Duty to Monitor the Performance of the
Challenged Funds, Which Were in a "Brokerage Window" or
"Similar Arrangement." ...........................................................................3

      B.    Nothing in ERISA Required the Plan to Offer Non-Mutual
Funds. .......................................................................................................5

      C.    There Is No Duty to Monitor Recordkeeping Expenses That Net
to Zero. .....................................................................................................5

           a.    The Mandatory Revenue Credit refunded all relevant Plan
expenses, regardless of its doctrinal category. .................................6

           b.    Plaintiffs' "sham" argument lacks any basis in law ........................7

           c.    How the Mandatory Revenue Credit is allocated to
individual participants is irrelevant, because the *Plan*
indisputably is made whole ...............................................................8

II.    PLAINTIFFS FAIL TO ESTABLISH A PROHIBITED
TRANSACTION. .................................................................................... 10

III.   THE COMPLAINT IS BARRED BY THE RELEASE AND FINAL
JUDGMENT. ......................................................................................... 12

IV.   THE COMPLAINT IS TIME-BARRED. ........................................... 17

CONCLUSION.................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Univ. of N. Iowa*,
779 F.2d 441 (8th Cir. 1985) ............................................................................15, 16

*Bernaola v. Checksmart Fin. LLC*,
322 F. Supp. 3d 830 (S.D. Ohio 2018) .....................................................................20

*Bishop-Bristol v. Mass. Mut. Life Ins. Co.*,
2019 WL 1501581 (D. Mass. Feb. 5, 2019) .............................................................16

*Blunt v. Lower Merion Sch. Dist.*,
767 F.3d 247 (3d Cir. 2014) .....................................................................................16

*Breneman v. United States*,
381 F.3d 33, 38 (1st Cir. 2004) ................................................................................17

*Brotherston v. Putnam Invs., LLC*,
2017 WL 1196648 (D. Mass. March 30, 2017)..............................................19, 20, 21

*Brotherston v. Putnam Invs., LLC*,
907 F.3d 17 (1st Cir. 2018)..................................................................6, 7, 11, 12

*Cunningham v. Cornell Univ.*,
2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017)...........................................................4

*Edes v. Verizon Commc'ns Inc.*,
417 F.3d 133 (1st Cir. 2005)..............................................................................17, 18

*Ellis v. Fidelity Mgmt. Trust Co.*,
883 F.3d 1 (1st Cir. 2018) .........................................................................................15

*Fifth Third Bancorp v. Dudenhoeffer*,
134 S. Ct. 2459 (2014)...........................................................................................4, 5

*In re G.E. ERISA Litig.*,
2018 WL 6592091 (D. Mass. Dec. 14, 2018) ...........................................................19

*LeClair v. MBTA*,
300 F. Supp. 3d 318 (D. Mass. 2018) .......................................................................16

*Monahan v. N.Y.C. Dep't of Corr.*,
214 F.3d 275 (2d Cir. 2000)................................................................................16, 17

*Muehlgay v. Citigroup, Inc.*,
   649 F. App'x 110 (2d Cir. 2016) ........................................................................20

*Norman v. Niagara Mohawk Power Corp.*,
   873 F.2d 634 (2d Cir. 1989).................................................................................16

*Pricaspian Dev. Corp. v. Royal Dutch Shell, PLC*,
   382 F. App'x 100 (2d Cir. 2010) ........................................................................16

*Riley v. Metro. Life Ins. Co.*,
   971 F. Supp. 2d 186 (D. Mass. 2013), *aff'd*, 744 F.3d 241 (1st Cir. 2014)...........18

*Shaw v. Delta Air Lines*,
   463 U.S. 85 (1983)...............................................................................................10

*Shirk v. Fifth Third Bancorp*,
   2009 WL 3150303 (S.D. Ohio Sept. 30, 2009) ...................................................17

*Tibble v. Edison Int'l*,
   135 S. Ct. 1823 (2015)......................................................................................4, 20

*Tracey v. MIT*,
   2019 WL 4192148 (D. Mass. Sept. 4, 2019) .......................................................4

*Velazquez v. Mass. Fin. Servs. Co.*,
   320 F. Supp. 3d 252 (D. Mass. 2018) .................................................................19

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
   550 F. Supp. 2d 416 (S.D.N.Y. 2008), *aff'd*, 325 F. App'x 31 (2d Cir. 2009)........17

**Statutes**

26 U.S.C. § 402(b) ......................................................................................................10

29 U.S.C. § 1104(a)(1)(B) .............................................................................................7

Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et
   seq.* .................................................................................................... *passim*

   29 U.S.C. § 1104(c) ...............................................................................................3

   29 U.S.C. § 1106...................................................................................................6

   29 U.S.C. § 1106(b)(3) ........................................................................................10

   29 U.S.C. § 1110(a) .............................................................................................16

   29 U.S.C. § 1113(1) .............................................................................................20

29 U.S.C. § 1113(2) .........................................................................................17, 20

**Rules and Regulations**

29 C.F.R. § 2550.404a-5(h)(4) ...................................................................................3

29 C.F.R. § 2550.404a-5(h)(4) ...................................................................................3

29 C.F.R. § 2550.404c-1(b)(3)(i)(B) ..........................................................................3

29 C.F.R. § 2550.404c-1(d)(2)(iv) ..............................................................................3

29 C.F.R. § 2550.408b-2(c)(1)(viii)(B)(2) ..................................................................7

29 C.F.R. § 2550.408b-2(d) .......................................................................................7

29 C.F.R. § 2550.408c-2(a) ........................................................................................7

42 Fed. Reg. 18,734 (April 8, 1977) .........................................................................12

75 Fed. Reg. 64,910 (Oct. 20, 2010) ..........................................................................3

79 Fed. Reg. 49,469 (Aug. 21, 2014).......................................................................4, 5

**Administrative Materials**

I.R.S. P.L.R. 200136024 (Sept. 18, 2000) ................................................................10

I.R.S. P.L.R. 200640003 (Oct. 6, 2006)......................................................................9

I.R.S. P.L.R. 201440027 (Oct. 3, 2014)......................................................................9

DOL Adv. Op. 97-031, 1997 WL 28100 (Jan. 23, 1997) ............................................7

## INTRODUCTION

Fidelity's 401(k) plan provided excellent investment choices and strong performance—and it was well-suited to Fidelity's workforce.  For participants who want to "leave the driving to us," it offered a high-performing suite of target date funds that automatically reduce risk as participants approach retirement.  It also offered a managed account service tailored to the circumstances and risk preferences of the individual participant—which also generated strong performance.  Both of those options were monitored with care, diligence, and skill by highly-qualified fiduciaries.  ECF No. 141, ¶¶ 53, 68-72; ECF No. 167, ¶ 18.

At Fidelity, of course, there are also many employees who want to make their own investment decisions.  Those participants had access to a "fund supermarket" comprised of thousands of funds, approximately 200 of which were Fidelity funds.  The accounts of these participants generally outperformed even the accounts invested in the high-performing, professionally-managed target date funds and managed account service.  ECF No. 141, ¶¶ 53, 60, 74-76.

The other outstanding feature of Fidelity's Plan is its Mandatory Revenue Credit.  In this Plan provision, Fidelity has committed to return to the Plan *all* revenue that Fidelity earns on the funds in which Plan participants invest.  *Id.* ¶¶ 16, 121-24, 126.  Many plan sponsors make only *discretionary* contributions when and if they see fit.  By contrast, Fidelity has created for its Plan an *entitlement* that ensures that Fidelity does not profit at all from Plan investments.

So what do Plaintiffs find fault with?  First, they complain that the Fidelity funds in the supermarket were not monitored.  ECF No. 154, at 3-5.  But fund-by-fund monitoring is incompatible with a "supermarket" offering, which is why the Department of Labor has said that fund supermarkets (also known as "brokerage windows" or self-directed brokerage accounts (SDBAs)) do not require such monitoring.  ECF No. 140, at 14.  Plaintiffs previously conceded

that the non-Fidelity funds in the supermarket need not be monitored, but argue that the Fidelity funds did require monitoring.  That argument is based not on any law, rule, or precedent, but on immaterial differences between the "platforms" on which the funds were offered, and on the say-so of their expert, who conceded away at deposition virtually the entire basis of her opinion.

Second, they complain that the Plan's "recordkeeping expenses" (meaning a portion of mutual fund expense ratios) were not monitored.  ECF No. 154, at 6-9.  But these expenses were completely reimbursed to the Plan via the Mandatory Revenue Credit.  ECF No. 141, ¶ 126.  There is no need to monitor a net expense of zero, and it is, by definition, more than reasonable.  So Plaintiffs urge the Court to pay no attention to it, but none of the reasons they give has merit and cannot obscure the key point:  that *all* the Plan's expenses were reimbursed.

Third, Plaintiffs complain that the investments in Fidelity funds were prohibited transactions, and not exempt under PTE 77-3.  ECF No. 154, at 9.  The Mandatory Revenue Credit precludes this claim as well, and the Plaintiffs again ask the Court to ignore it.

Even if these claims had merit, the time to raise them was years ago, before approval of the *Bilewicz* Release and final judgment.  The Settlement expressly released every plan feature as of the Settlement Effective Date.  ECF No. 141, ¶¶ 28-34, 40.  And these Plan features were also fully disclosed to Plan participants well before the three year statute of limitation.  *Id.* ¶¶ 90-111.  Yet new counsel argue that they can sue over those very Plan provisions immediately after the Release took effect—in fact, they started their class period the very next day.  That treats both the prior Release and the statute of limitations as nullities; adopting that reasoning would make it impossible to settle an ERISA case by making prospective changes to a plan.

## **ARGUMENT**

## I.    **THE FIDUCIARY DUTY CLAIMS FAIL.**

## A. Defendants Had No Duty to Monitor the Performance of the Challenged Funds, Which Were in a "Brokerage Window" or "Similar Arrangement."

Plaintiffs have repeatedly conceded, in the Complaint, in their discovery motion, and in their expert report and deposition, that mutual funds in a vehicle described in 29 C.F.R. § 2550.404a-5(h)(4)—a "brokerage window," "self-directed brokerage account" or "similar plan arrangements"—do not require monitoring.  ECF No. 64, at 5; ECF No. 77, ¶ 77; ECF No. 141, ¶ 61; ECF No. 167, ¶ 24.  And Plaintiffs have conceded that the *non-Fidelity* funds in such vehicles need not be monitored.  ECF No. 136, at 11.  Plaintiffs now appear to regret their prior concessions and suggest that 29 C.F.R. § 2550.404a-5(h)(4) is just an irrelevant disclosure regulation.  But Plaintiffs themselves pointed to § 2550.404a-5(h)(4)'s definition of a DIA and identified it as the "applicable regulation" in connection with the establishment of brokerage windows.  ECF No. 64, at 5.[1]

Even if the Court were to let Plaintiffs do an about-face, their current position is wrong. The DOL issued § 2550.404a-5(h)(4) under Section 404(a), the fiduciary duty provision of ERISA.  75 Fed. Reg. 64,910 (Oct. 20, 2010).  And that is why both the Complaint and Ms. Wagner cite that very regulation—and no other source—when they concede that funds offered in brokerage windows need not be monitored.  ECF No. 167, ¶ 24; ECF No. 77, ¶ 54; *see also* ECF No. 165, at 5-7 & n.4.  Plaintiffs cannot now duck that authority by pointing (ECF No. 154, at 4)

---

[1] Plaintiffs now address DIAs only with the brand-new argument (raised for the first time in a footnote to their statute of limitations discussion) that the Plan cannot satisfy ERISA § 404(c) with "only two DIAs."  ECF No. 154, at 18 n.16.  That is flat wrong.  ERISA § 404(c) provides that plan fiduciaries will not be liable for losses resulting from a participant's exercise of control over her account.  29 U.S.C. § 1104(c).  The DOL regulation setting forth certain conditions for satisfaction of § 404(c) require a plan to offer "at least three investment alternatives," 29 C.F.R. § 2550.404c-1(b)(3)(i)(B), but there is no dispute that the Plan makes available thousands of investment alternatives with different risk and return characteristics through the DIAs and other available investments.  The 404(c) regulation does not require three *designated* investment alternatives—a term that is specifically defined and used elsewhere in the regulation, including in a statement clarifying that only DIAs are subject to monitoring.  29 C.F.R. § 2550.404c-1(d)(2)(iv).  Plaintiffs offer no other basis to dispute that the Plan is 404(c) compliant as the Answer asserts.  *See* ECF No. 88 (Eighth Defense).  Nor could they, where Fidelity provides thorough disclosures to participants in satisfaction of the DOL's regulations.  *See* Defs' Resp. to Plaintiffs' SAMF, ¶ 1.

to *silence* in various cases *that did not involve brokerage windows* and so had no occasion to discuss whether they must be monitored.[2]

Fidelity clearly offers what the DOL calls a "mutual fund window[ ] or 'supermarket." 79 Fed. Reg. 49,469, 49,471 (Aug. 21, 2014) ("*Defining 'Brokerage Windows'*"). A structure that includes every fund that is "administratively feasible for a Plan to hold," as the Plan requires, fits the definition of "supermarket" perfectly. Plaintiffs repeatedly conceded that the non-Fidelity fund offering is a "window." *See* ECF No. 165, at 6. And as the Plan documents and participant disclosures both make clear, the Fidelity and non-Fidelity funds are offered *together* as part of the "Other Available Investments" portion of the Plan. *See id.* at 6-7; ECF No. 141, ¶¶ 53, 60. Plainly this structure is a "brokerage window" or "similar arrangement."

Plaintiffs' fallback position, relying on Ms. Wagner, is that the Fidelity funds "were not offered in a 'similar arrangement' to the Plan's SDBA." ECF No. 154, at 4. But at deposition, Ms. Wagner dramatically qualified if not retracted virtually every fact her report relied on for that conclusion. ECF No. 165, at 7 n.5, 8-9 (describing these concessions at length); ECF No. 167, ¶¶ 11, 24. Plaintiffs bear the burden of proof on breach, and having staked their position on an expert who conceded away nearly all of her opinion, they cannot sustain it.[3]

---

[2] *See Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015) ("We express no view on the scope of respondents' fiduciary duty in this case."); *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2463-64 (2014); *Tracey v. MIT*, 2019 WL 4192148 (D. Mass. Sept. 4, 2019). To the extent there is relevant authority on point, it confirms the permissibility of the Plan structure here. *See Cunningham v. Cornell Univ.*, 2017 WL 4358769, at *8-9 (S.D.N.Y. Sept. 29, 2017) (observing that that "the Plans distinguished between 'core' investment options which were 'vetted by fiduciaries,' and all other investment options which were not similarly monitored" and finding allegations that "defendants breached their fiduciary duties by failing to monitor any of the Plans' options . . . and monitoring only 'core' investment options . . . fails to plausibly allege a breach of fiduciary duty.").

[3] Furthermore, as Defendants explained in their opposition to Plaintiffs' motion for partial summary judgment, Plaintiffs' failure-to-monitor claim ignores that many funds *were* monitored through the PAS-W managed accounts service. *See* ECF No. 165, at 9-10. Many participants who owned Fidelity funds did so through PAS-W. *See* ECF No. 167, ¶ 18; *see also* ECF No. 165, at 9-10. As a DIA, PAS-W is comprehensively monitored, not just by the FBIC, which monitors PAS-W performance as a whole, but also by a second fiduciary, SAI, which evaluates the performance of each fund used in a PAS-W portfolio and regularly removes funds from the portfolios when those funds no longer satisfy SAI's criteria for inclusion. *See* ECF No. 141, ¶ 57; *see also* ECF No. 165, at 9-10. Notably, while Plaintiffs dispute whether PAS-W is appropriately classified as a DIA, they do not dispute the

### B.  Nothing in ERISA Required the Plan to Offer Non-Mutual Funds.

Plaintiffs' contention that Defendants were required to "investigat[e] non-mutual fund investment vehicles such as collective trusts" (ECF No. 154, at 5) runs straight into the Plan's limitation of available investments to mutual funds.  ECF No. 141, ¶ 53.  And while "the duty of prudence trumps the instructions of a plan document," *Dudenhoeffer*, 573 U.S. at 421, that is true only if following the plan provisions would violate ERISA.  Otherwise, the fiduciaries are *required* to follow the plan.  *Id.* (citing 29 U.S.C. § 1104(a)(1)(D)).

It is not a violation of ERISA for a plan to offer only mutual funds.  Numerous courts have so stated.  *See* ECF No. 140, at 15 n.17 (collecting cases).  So following this Plan provision did not violate ERISA.

Moreover, because the challenged funds were in a window and did not require monitoring, there was no duty to consider whether the window should include other investment options.  The DOL has specifically recognized that a plan's window may be "[m]ore limited," *i.e.*, "not necessarily [including] every mutual fund on the market." 79 Fed. Reg. at 49,471.

Finally, there was nothing in the performance of the Plan as a whole to suggest to the fiduciary committee that the "mutual fund only" structure created any grounds for concern about the Plan's performance.  Quite to the contrary, the FBIC saw regular reports showing the strong performance of all three participant segments:  the Freedom Funds investors, the PAS-W enrollees, *and* the "Other" investors referred to as DIY's or do-it-yourselfers.  All three had strong performance, and the DIY's generally performed even better than the high-performing Freedom Funds and PAS-W.  ECF No. 141, ¶¶ 74-76.

### C.  There Is No Duty to Monitor Recordkeeping Expenses That Net to Zero.

Plaintiffs do not dispute the dispositive fact—*i.e.*, that the amount of the Mandatory

---

existence or thoroughness of PAS-W's fiduciary monitoring.  *See* ECF No. 153, ¶ 57.

Revenue Credit exceeded the Plan's recordkeeping expenses.  *See* ECF No. 154, at 6-9.  The only expenses incurred by the Plan are the expense ratios of the mutual funds in which Plan accounts are invested (there are no hard-dollar recordkeeping charges) and the expense ratios of the Fidelity funds are repaid to the Plan in full via the Mandatory Revenue Credit.  ECF No. 141, ¶¶ 16, 122-131.  Accordingly, there was no breach of any duty to monitor revenue attributable to recordkeeping expenses because the Plan got it all back.  ECF No. 140, at 15.

In response, Plaintiffs reiterate their contention that the Court should simply ignore the Mandatory Revenue Credit.  But their four reasons for doing so each miss the mark.

### a.  The Mandatory Revenue Credit refunded all relevant Plan expenses, regardless of its doctrinal category.

Plaintiffs first focus not on the *effect* of the Mandatory Revenue Credit, but on its classification as a "settlor act."  ECF No. 154, at 6-7.  Doctrinally, the establishment of the Credit was indeed a settlor function.  *See* ECF No. 140, at 18.  And it therefore cannot be the basis of a claim for *fiduciary* breach.  In any event, substantively a zero net fee is still zero—and need not be monitored—regardless of who paid the Plan the credit that zeroed out the fee.

Plaintiffs' argument that the credit should be ignored *because it was written into the Plan document* is unsupported by any authority.  Plaintiffs rely on a portion of *Brotherston* that dealt with a prohibited transaction claim, *not* a duty to monitor claim.  ECF No. 154, at 7. That passage interpreted what constituted a "dealing" between Putnam and its plan for purposes of an exemption, PTE 77-3, to the prohibited transaction provisions of ERISA § 406.  *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 28-29 (1st Cir. 2018).  Whether conduct qualifies for an *exemption* under PTE 77-3 has nothing to do with whether it amounts to a fiduciary breach.  And even on its own terms, Plaintiffs' argument that *Brotherston* precludes any consideration of plan sponsor payments is wrong:  the First Circuit stated that, on remand, administrative fees paid by

Putnam could be considered under PTE 77-3—the court excluded from consideration only the specific discretionary profit-sharing contribution at issue in that case.  *Id.* at 30.

Plaintiffs' argument for ignoring the Credit also makes no sense.  On Plaintiffs' theory, if the Plan sponsor paid all the Plan's recordkeeping expenses directly, Plan fiduciaries would still have to "monitor" those expenses because settlor acts "don't count."  *See* ECF No. 154, at 7. Nothing in ERISA requires that result.[4]  After all, ERISA's duty of prudence is assessed against the surrounding "circumstances"—the backdrop against which the fiduciary is acting.  29 U.S.C. § 1104(a)(1)(B).  The key circumstances on whether fees were excessive is how much they were and whether the Plan bore them at all.[5]

### b.  Plaintiffs' "sham" argument lacks any basis in law.

As Defendants explained in their earlier briefs, the Plan was amended in 2012 in a legally significant way: Before the amendment, Fidelity's profit-sharing contribution to the Plan was entirely discretionary; after the amendment, Fidelity was *required* to make the Mandatory Revenue Credit and *permitted* to make other discretionary contributions.  *See* ECF No. 140, at 16; ECF No. 165, at 10-11.  In other words, participants previously had no legally enforceable right to any of these contributions—and now they do.  *See id.*

Plaintiffs offer *no* authority in response.  *See* ECF No. 154, at 7.  Instead, Plaintiffs simply reiterate their claim that the Credit is a "sham."  At bottom, Plaintiffs' argument boils

---

[4] In their footnote 6, Plaintiffs appear to argue for the first time that the Mandatory Revenue Credit does not count as a credit because Fidelity had the general right to amend the Plan or terminate it altogether, as all settlors do.  ECF No. 154, at 7 n.6.  But the right to amend a plan *going forward* is a far cry from a right to renege on commitments already incurred.  Indeed, the DOL has issued specific guidance stating that a plan provision that allocates expenses to the employer can only be amended "prospectively."  DOL Adv. Op. 97-031, 1997 WL 28100, at *3 (Jan. 23, 1997).  And the existence of commonplace vesting requirements for new employees is irrelevant:  reasonableness of fees is determined at the Plan level, ECF No. 140, at 16-20, and Plaintiffs cite no authority to suggest that Fidelity could amend the Plan to eliminate the Mandatory Revenue Credit *to the Plan* retroactively.

[5] *See* 29 C.F.R. § 2550.408b-2(d) (reasonableness requirement limited to compensation paid by "plan"); 29 C.F.R. § 2550.408c-2(a) (requiring "reasonable compensation by a plan"); *see also* 29 C.F.R. § 2550.408b-2(c)(1)(viii)(B)(2) (fees paid by the plan sponsor not subject to scrutiny for reasonableness under 408(b)(2)).

down to the contention that Defendants have reduced their *discretionary* contributions.  But that is not actionable under ERISA.  *See* ECF No. 140, at 16; ECF No. 165, at 10-11.

Nor does it matter that Plaintiffs' expert parrots the term "gimmick."  Ms. Wagner's opinion was premised on an incorrect assumption—that Defendants did not actually calculate the amount of the Mandatory Credit owed.  ECF No. 165, at 11.  Defendants did do the math each year in providing the Credit—which Ms. Wagner said "would have changed" her opinion.  ECF No. 167, ¶ 36.  And in any event, Ms. Wagner's *legal* opinions are rebutted not by responsive experts but by the law.  *See* ECF No. 140, at 16; ECF No. 165, at 10-11.

### c.   How the Mandatory Revenue Credit is allocated to individual participants is irrelevant, because the *Plan* indisputably is made whole.

Plaintiffs next complain about how the Mandatory Revenue Credit is allocated to participants, and in particular that it was "not tied to the expenses paid by Plan participants." ECF No. 154, at 8.  Importantly, therefore, Plaintiffs are not arguing that the *total amount* of the Mandatory Revenue Credit was unrelated to Plan expenses: Plaintiffs do not dispute that the Mandatory Revenue Credit was calculated to equal *all* revenue received by Fidelity in connection with Plan investments.  *See* ECF No. 153, ¶ 122.  Instead, Plaintiffs complain only that "the credit was allocated to eligible participant accounts based on their compensation," and not to former employees.  ECF No. 154, at 8.

That is irrelevant.  The reasonableness of *the Plan's* recordkeeping expenses turns on whether the Plan received the Credit, not how it then allocated the Credit to *individual participants*.  That is true for multiple reasons.  ECF No. 140, at 16-20; ECF No. 165, at 12-15. Plaintiffs respond to only one, and that one only partially.  Plaintiffs do not dispute that the tax code prohibits Fidelity from making allocations to former employees.  ECF No. 140, at 17.  But they assert that an exception to that rule would have permitted allocations to former employees

in the form of "restorative payments."  That argument is legally meritless.

The "annual addition" to a participant's account—*i.e.*, the sum of "employer contributions," "employee contributions," and "forfeitures"—may not exceed "the lesser of" $56,000 or "100 percent of the participant's compensation."  ECF No. 165, at 12 (quoting 26 U.S.C. § 415(c)(1)).  Because contributions are not taxed, those limits prevent unlimited amounts of money from being contributed to 401(k) plans as tax-free compensation.

The IRS private letter ruling that Plaintiffs cite allows for a "restorative payment" to a plan under narrow conditions completely unlike those here.  In I.R.S. P.L.R. 201440027 (Oct. 3, 2014), the IRS ruled that one-time payments to a plan to rectify embezzlements from the plan qualified as restorative payments that would not constitute employer contributions limited by Section 415.  That ruling was based on longstanding IRS guidance that generally permits one-time, "restorative" payments in exceptional circumstances.  *See, e.g.*, I.R.S. P.L.R. 200640003 (Oct. 6, 2006) (employer's payment to plan to make participants whole from trustee's felony criminal offense deemed a valid restorative payment and not a contribution).  The Mandatory Revenue Credit does not fit that definition—and if Fidelity had tried to treat it as a restorative payment anyway, it risked jeopardizing the Plan's qualified status, which Plaintiffs' expert agreed "would not be in participants' best interest."  ECF No. 142-29, at 55:3-7; *see also* ECF No. 141, ¶ 144; *see generally* 26 U.S.C. § 402(b) (taxability of beneficiary of nonexempt trust).[6]

Finally, Plaintiffs make the unsupported assertion that the Mandatory Revenue Credit was not a "bona fide fee rebate" because former employees did not get their "fair share."  ECF No. 154, at 7.  Defendants have explained at length that there is no individual entitlement to any

---

[6] Plaintiffs' citation to an IRS private letter ruling regarding the treatment of "demutualization proceeds" is even farther afield.  That ruling was narrowly tailored to address how plans that held interests in insurance policies should allocate stock awards that they received from mutual insurance companies that demutualized and issued stock to policyholders.  I.R.S. P.L.R. 200136024 (Sept. 18, 2000). This case is not remotely analogous to demutualization.

"share" of plan benefits.  ERISA does not "proscribe discrimination in the provision of employee benefits," *Shaw v. Delta Air Lines*, 463 U.S. 85, 91 (1983), and plans routinely treat participants differently in numerous material ways.  ECF No. 141, ¶¶ 135-149.  In response, Plaintiffs withdrew their impartiality claim.[7]  Decisions on the allocation of plan benefits are, as Plaintiffs concede, settlor functions, and it is black-letter law that settlor acts are not subject to ERISA's fiduciary rules.  Moreover, the reasonableness of fees is determined at the plan level, not at the level of impact to individual participants, ECF No. 165, at 12-14, and Plaintiffs cannot dispute that the *Plan* paid no recordkeeping fees in light of the Mandatory Revenue Credit.

## II.    PLAINTIFFS FAIL TO ESTABLISH A PROHIBITED TRANSACTION.

The prohibited transaction claim fails for multiple independent reasons, also set out in Fidelity's opposition to Plaintiffs' cross-motion.  ECF No. 165, at 15-20.  First, nothing "prohibited" happened:  *all* the money Plaintiffs are complaining about made a round trip back to the Plan via the Mandatory Revenue Credit.  Second, only transactions with a "fiduciary" are prohibited.  29 U.S.C. § 1106(b)(3).  Plaintiffs concede that their claim rests on FMR LLC being a fiduciary.  ECF No. 154, at 9.  It isn't.  The undisputed facts show that the only function that FMR LLC carries out in connection with the Plan is the enactment of the governing Plan documents.  ECF No. 141, ¶ 82.  That is not a fiduciary function.  *See* ECF No. 165, at 16-17.[8]

Third, PTE 77-3 exempts the disputed transactions:  through the Mandatory Revenue Credit, Fidelity's own plan is treated "no less favorably"—indeed, *more* favorably—than other shareholders of Fidelity funds.  *See* ECF No. 140, at 20; ECF No. 165, at 18.  Contrary to Plaintiffs' misreading (ECF No. 154, at 9), *Brotherston* does not direct the Court to disregard

---

[7] They purport to "withdraw [it] without prejudice," ECF No. 154, at 10, but to preserve this claim, Plaintiffs were obliged to defend it against Defendants' motion for summary judgment.  They did not.

[8] Plaintiffs incorrectly assert that Defendants concede that FMR LLC is a fiduciary, relying on out-of-context quotes from inapposite documents.  *See* ECF No. 165 at 17 n.14.

payments not made in a fiduciary capacity.  To the contrary, the First Circuit stated that

Putnam's payment of the plan's "recordkeeping expenses" and other "administrative fees" *would*

*be* considered in determining whether Putnam, on net, treated its plan as favorably as other fund

investors.  Indeed, it is hard to imagine what payments a plan sponsor *would* make to (or for) its

plan in a fiduciary capacity.  Yet the First Circuit remanded for the express purpose of having

this Court determine the value of Putnam's payment of those expenses.  907 F.3d at 29-30.

   *Brotherston* cannot fairly be read as expansively as Plaintiffs would like. It does not

purport to address every possible plan arrangement.  To the contrary, the First Circuit held only

that it would disregard *discretionary contributions* made by Putnam *in its capacity as an*

*employer.*  Putnam's discretionary contributions were *unrelated to the plan's investments in*

*Putnam funds* and thus were not "a relevant 'dealing' between Putnam and the plan" within the

meaning of PTE 77-3, *Brotherston*, 907 F.3d at 27-29, which looks to the dealings *between the*

*mutual fund company (Putnam) and the plan*, and compares those dealings to the *dealings*

*between the mutual fund company and other mutual fund investors*.  Putnam's discretionary

contributions had nothing to do with the Putnam plan's investments in Putnam mutual funds.

Rather, Putnam made the contributions exclusively in its capacity as an employer, and could no

more take credit for them under PTE 77-3 than if it had given Mr. Brotherston a bonus.  The

Mandatory Revenue Credit, by contrast, is entirely related to the Plan's investment in Fidelity

funds:  indeed, it is derived exclusively from, and computed based on, revenue that Fidelity

receives in connection with Plan's investments in those funds, and it is completely outside the

normal Benefits department cost and benefit considerations.  ECF No. 141, ¶ 158; *see also* ECF

No. 167, ¶ 35.  Critically, the court noted repeatedly that the Putnam contributions were

discretionary, as employee benefits programs generally are, whereas Fidelity's Mandatory

Revenue Credit is mandatory.  *See* 907 F.3d at 28-29; ECF No. 165, at 19.  Thus, unlike the

employer contributions in *Brotherston*, it qualifies as a relevant "dealing" between Fidelity and

the Plan under PTE 77-3.[9]

## III.   THE COMPLAINT IS BARRED BY THE RELEASE AND FINAL JUDGMENT.

The parties in the prior class action reached a bargain that gave Fidelity a fresh start to its

Plan, in return for a payment of $12 million:

- Fidelity was to amend its Plan no later than July 1, 2014.  ECF No. 141, ¶ 14.

- *After* that amendment was in place, the parties *commenced* the lengthy process by
  which the Court reviewed and approved the settlement's fairness—culminating in a
  Settlement Effective Date of November 17, 2014.  ECF No. 141, ¶¶ 17-26, 35-46.

- On that Settlement Effective Date, Fidelity secured a Release covering every
  conceivable Plan feature, including:  "the structure, management, monitoring, . . .
  and/or expenses of the Plan," "the selection, monitoring, fees, expenses, numerosity,
  performance . . . or any other attributes of the investments options," and "revenue
  sharing paid, received, or not recaptured."  ECF No. 141, ¶ 30.  As the Motion for
  Preliminary Approval states, the settlement was intended to release all claims
  "***relating in any way to the . . . new Plan lineup***."  *Id.* ¶ 33 (emphasis added).

- As of the Settlement Effective Date, the Plan amendment had been in place and
  operating for months, the key features had been disclosed to Plaintiffs, and Plaintiffs'
  counsel fully understood them.  ECF No. 141, ¶¶ 17-26.  It was *Plaintiffs' counsel*
  who described to Judge Casper the very features of the new Plan that they are now
  complaining about:  the creation of the brokerage window, the elimination of all
  funds as "direct" investments other than the target date "Freedom" funds, and the
  continuation of the Mandatory Revenue Credit.  *Id.*  Plaintiffs' current counsel now
  call the statements by Plaintiffs' former counsel "irrelevant" because they are not part
  of the settlement.  ECF No. 156, at 14.  The point is that counsel knew full well the
  features of the new plan.

This Court has already recognized the "breadth of the release."  ECF No. 106.  If the Release left

any doubt about the parties' intent, the chronology makes it clear:  the Plan features complained

---

[9] Plaintiffs also point out that the Mandatory Revenue Credit "is allocated based on compensation."  ECF No. 154,
at 9 n.9.  But that is a non sequitur.  What matters under PTE 77-3 is the nature of the "dealings between *the plan*
and the investment company*"—specifically, whether the terms are "no less favorable to *the plan* than such dealings
are with other shareholders of the investment company."  42 Fed. Reg. 18,734, 18,735 (April 8, 1977) (emphasis
added); *see* ECF No. 165, at 19.  Plaintiffs offer no reason to depart from this plain text to further consider how the
relevant "dealings" are allocated.  Once equality between *the plan* and other mutual fund investors is established,
PTE 77-3 is satisfied.

of in this case were included in the litany of features that were released, and those features were implemented, disclosed, and understood *before* the release took effect.

On Plaintiffs' view of the law, Plaintiffs could have refiled *the Yeaw complaint itself* (which complains about failure to capture revenue sharing rebates) the day after the Settlement Effective Date. On this view, even an unambiguous and court-approved release covering certain specific conduct cannot protect the defendant from a new lawsuit *about that same conduct* the day after the release. That is not the law, as discussed below. If it were, parties in ongoing relationships could never settle disputes in a final and binding way. Public policy is to the contrary, and encourages the settlement of disputes. ECF No. 140, at 2 (collecting cases).

***The Release Covers the Claims Asserted Here:*** The scope of the Release is set forth in the section entitled "Released Claims" (§ 3.3)—yet remarkably, Plaintiffs *never cite or acknowledge that provision*. Released Claims include claims over every conceivable feature of a 401(k) plan, including monitoring of the investment options, expenses of the Plan, and "any assertions regarding revenue sharing paid, received or not recaptured," as of the Settlement Effective Date. The Released Claims also include any claims that "***have any connection with*** the Plan features reflected in Section 7.3." ECF No. 141, ¶ 30 (§ 3.3(v)) (emphasis added). One of the "features reflected in Section 7.3" is the Mandatory Revenue Credit, which is referred to in Section 7.3.4 as the 8th amendment to the 2005 Plan restatement. *Id.* In other words, if a claim has "any connection with" the Mandatory Revenue Credit, it is released. Plaintiffs' claims indisputably "have [a] connection with" the Mandatory Revenue Credit. The entire premise of the key claims here is that the Mandatory Revenue Credit is a "sham." ECF No. 154, at 7. That is certainly a "connection." Moreover, the Settlement required that the Mandatory Revenue Credit be expanded and continued for three years. ECF No. 141, ¶ 14 (§ 7.3.4). Yet Plaintiffs

say they could have filed a lawsuit the day after the Settlement Effective Date claiming, as they do in this Complaint, that that very Credit is a "gimmick" and a "source of liability."  ECF No. 77 at ¶ 107 and page 48.[10]  Clearly, such a claim would be barred.

**This Claim Challenges Pre-Release Conduct:** Plaintiffs' only rejoinder to a complete application of the Release is their argument that they are suing for "failure to monitor," not for the initial decisions about how the Plan was structured.  ECF No. 154, at 12.  That mischaracterizes both the nature of Plaintiffs' claim and the record, and, in any event, does not solve their problem, because the "failure to monitor" is part of the "single core of operative facts" with the released Amendment.

As an initial matter, Plaintiffs *are* complaining about the June 2014 Amendment, not solely about what happened afterwards.  The Complaint criticizes the June 2014 Amendment as an "attempt to evade liability for [Fidelity's] continued self-dealing."  ECF No. 77, ¶ 102.  In prior motion practice, Plaintiffs described the June 2014 Amendment as the "defining event" of the litigation and a "scheme" "tainted" by self-interest.  ECF No. 50, at 9, 11.  Consistent with this theory, their expert offers as his primary damages model a model that purports to address a breach in the Plan "design" and to calculate damages from day one of the class period.[11]

As Defendants explained during discovery in language that Plaintiffs now quote (ECF No. 154, at 10), if Plaintiffs had some meritorious, new, post-Release claims to bring, they were free to bring them.  For example, if Fidelity stopped paying the expanded Revenue Credit as the

---

[10] Plaintiffs note that they have changed lawyers.  ECF No. 153, ¶ 19 ("counsel in *Bilewicz/Yeaw* were not the same as counsel in the present case").  That is completely irrelevant:  both sets of lawyers represented the same *parties*, and the parties remain bound by the Release and judgment.

[11] *See* ECF No. 131-1 (Pomerantz Report) ¶ 50 ("I was asked to evaluate whether the Plan's fiduciaries acted consistent with their fiduciary duties *in designing the lineup of investments available to participants*." (emphasis added)); *id.* ¶ 51 ("In my opinion, the Plan's fiduciaries failed to exercise appropriate skill and care *in designing the Plan's lineup*." (emphasis added)); ECF No. 142-28 (Pomerantz Dep.) at 45:7-12 ("I don't have an opinion on the prudence at a fund level of any of these particular funds.  My concern, and where I think the breach lies, is at a much higher level in terms of the actual *design of the plan*." (emphasis added)).

Plan amendment requires, that claim would not be barred.  What Plaintiffs seek to obscure is that their own characterization of their own claims shows that they date back to before the Release.

Contrary to their current characterization, Plaintiffs argued during discovery that Fidelity "breached its fiduciary duties *by cutting off all monitoring* of hundreds of Fidelity funds in its 401(k) Plan . . . ."  ECF No. 64, at 1 (emphasis added).  It is the "cutting off" that Plaintiffs challenge.  Once monitoring duties were "cut off," the fact that monitoring did not occur is just a natural outcome of that "cut off."  No new event or new conduct has transpired.  A plaintiff who settles a discrimination case complaining that she is paid less than another employee in a similar role cannot bring a subsequent suit complaining of the continued payment differential, simply because the allegedly deficient payments she is complaining about post-date her settlement. *Anderson v. Univ. of N. Iowa*, 779 F.2d 441, 443-44 (8th Cir. 1985).  The claim Plaintiffs have maintained throughout this case are released and their pivot to a new case theory to avoid such outcome should not be countenanced.  *See, e.g.*, *Ellis v. Fidelity Mgmt. Trust Co.*, 883 F.3d 1, 5 (1st Cir. 2018) (criticizing litigant's efforts to pursue multiple theories "like a toy mole in an arcade game" and focusing on the "constant and essential fact" underlying the litigation).

***Plaintiffs Cannot Evade The Prior Judgment By Citing "New Incidents" Of The Same Conduct:***  Plaintiffs suggest that neither the Release nor res judicata can bar them from suing if they point to some conduct that postdates the prior litigation.  They are wrong.

First, they overstate the reach of ERISA § 410(a).  As Judge Mastroianni observed, "courts have held, despite [§ 410(a)'s] broad wording, that waiver or release of known ERISA rights is permissible in the context of settlement agreements." *Bishop-Bristol v. Mass. Mut. Life Ins. Co.*, 2019 WL 1501581, at *5 (D. Mass. Feb. 5, 2019) (citations omitted).  There, just as here, the parties agreed in their first litigation that future claims over the same ongoing issue

would be precluded.  The parties' agreement was enforced, based on the "strong policy in favor

of encouraging settlements, especially 'in a hard-fought, complex class action.'"  *Id*.

Second, ERISA does not supersede the law of judgments, which bars subsequent

litigation over "the same series of transactions" addressed in a judgment, even if the plaintiff

invokes "new incidents" that post-date the judgment.  *Monahan v. N.Y.C. Dep't of Corr.*, 214

F.3d 275, 289-90 (2d Cir. 2000) (judgment adopting new policy barred attacks on that policy "as

applied" to post-judgment conduct); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 277 (3d

Cir. 2014) (res judicata extinguished "all rights of the plaintiff to remedies against the defendant

with respect to all or any part of the transaction, or ***series of connected transactions***, out of

which the action arose," even though the plaintiff alleged "several new and discrete

discriminatory events"); *Anderson*, 779 F.2d at 444.[12]

Res judicata clearly applies here.  The same parties previously litigated to final judgment.

ECF No. 141, ¶¶ 12, 29, 39.  "[B]oth sets of claims—those asserted in the earlier action and

those asserted in the subsequent action—derive from a common nucleus of operative facts."

*Breneman v. U.S.*, 381 F.3d 33, 38 (1st Cir. 2004); ECF No. 141, ¶¶ 4-9 (citing *Bilewicz* Compl.

at ¶¶ 1, 57-58 and *Yeaw* Compl. at ¶¶ 9, 50, 56, 104).  The same claims in this litigation—which

allege that Defendants breached fiduciary duties and engaged in prohibited transactions through

the use of proprietary funds in the Plan and the manner in which the Mandatory Revenue Credit

was paid—were in fact litigated (and certainly could have been litigated) in the prior lawsuit.

Contrary to Plaintiffs' hyperbole, no one is suggesting that this bar extends "indefinitely

---

[12] Numerous courts agree.  *See Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634 (2d Cir. 1989) (affirming dismissal on res judicata grounds where acts that occurred after initial judgment "arose from a 'single core of operative facts'"); *Pricaspian Dev. Corp. v. Royal Dutch Shell, PLC*, 382 F. App'x 100, 104 (2d Cir. 2010) (affirming dismissal on res judicata grounds where allegedly wrongful post-judgment transaction arose from defendant's use of same confidential information complained of in first litigation); *LeClair v. MBTA*, 300 F. Supp. 3d 318 (D. Mass. 2018) (ADA claim arising from 2014 events barred by 2006 settlement which "encompassed all types of ADA claims that disabled persons . . . could have against the MBTA").

into the future." ECF No. 154, at 11.  Changes in the factual circumstances or the law may of course permit new claims *based on those changes*.  *See, e.g.*, *Monahan*, 214 F.3d at 290.  The point here is that Plaintiffs do not allege that anything has changed:  they complain about the Plan features described to the Court at the 2014 Fairness Hearing.

## IV.    THE COMPLAINT IS TIME-BARRED.

ERISA's statute of limitations bars claims not commenced within "three years after the earliest date on which [the plaintiff] had actual knowledge of the breach of violation."  29 U.S.C. § 1113(2).  The question here is whether, before October 10, 2015, Plaintiffs **knew** or were **willfully blind** to "**the essential facts of the . . . conduct constituting the violation**."  *Edes v. Verizon Commc'ns Inc.*, 417 F.3d 133, 142 (1st Cir. 2005) (citation omitted; emphasis added).[13]

*Duty to Monitor:*  The "essential fact" of the claim for failure to monitor the challenged funds is that Fidelity was not monitoring the challenged funds.  Plaintiffs were advised *four times* before October 10, 2015 that: (i) "Plan Officials **do not and will not monitor**, and do not make any representations and warranties as to the soundness of*, any investment options other than the Fidelity Freedom . . . Funds and PAS-W*"; and, (ii) "the Plan's fiduciaries **do not designate or monitor the other Fidelity** or non-Fidelity **mutual funds available in the Plan**."  *See* ECF No. 141, ¶¶ 90-111 (emphases added); *see also* Defs' Resp. to Plaintiffs' SAMF, ¶ 4.

Plaintiffs' responses fall short.  First, Plaintiffs assert that they did not know a litany of

---

[13] Plaintiffs refer only superficially to the First Circuit's governing *Edes* standard while attempting to import a Ninth Circuit standard instead.  ECF No. 154, at 17 (citing *Sulyma v. Intel Corp. Inv. Policy Comm.*, 909 F.3d 1069, 1076 (9th Cir. 2018), *cert. granted*, 139 S. Ct. 2692 (2019) (to be argued Dec. 4, 2019)).  But the Ninth Circuit's actual knowledge standard is currently under review by the Supreme Court precisely because it conflicts with the First Circuit's *Edes* decision and the overwhelming majority of lower courts.  *See, e.g.*, *Young v. Gen. Motors Inv. Mgmt. Corp.*, 550 F. Supp. 2d 416, 419 n.3 (S.D.N.Y. 2008) ("Any interpretation of the term 'actual knowledge' that would allow a participant to disregard information clearly provided to him/her would effectively provide an end run around ERISA's limitations requirement"), *aff'd*, 325 F. App'x 31 (2d Cir. 2009); *Shirk v. Fifth Third Bancorp*, 2009 WL 3150303, at *3, *6 (S.D. Ohio Sept. 30, 2009) ("In making this "actual knowledge" determination, courts have "focused on whether documents provided to plan participants sufficiently disclosed the alleged breach of fiduciary duty, not whether the individual plaintiffs actually saw or read the documents.").

*other facts* (*e.g.*, fund performance, FBIC discussions).  ECF No. 154, at 16.  But a plaintiff need

not know every fact related to the subject matter of her grievance—only the "essential facts."

*Edes*, 417 F.3d at 142.  In a breach of duty case, the defendant's clear repudiation of the alleged

duty is the "essential fact" and starts the clock.  *See Riley v. Metro. Life Ins. Co.*, 971 F. Supp. 2d

186, 194 (D. Mass. 2013) (plaintiff "had a 'complete and present action'" at "[t]he point of

repudiation,"; this approach "is also consonant with the statute of limitations prescribed by

ERISA for breach of fiduciary duty claims"), *aff'd*, 744 F.3d 241, 246 (1st Cir. 2014).

     Similarly, Plaintiffs assert that Fidelity did not disclose the pertinent *legal* rules.  *See* ECF

No. 154, at 18.  But the law is clear that knowledge of *facts* starts the clock, regardless of

whether Plaintiff understood their legal implications.  *Edes*, 417 F.3d at 141.[14]

     Second, Plaintiffs argue that sending *four notices* of these essential facts was not good

enough, because the critical information was not given sufficient prominence.  The ERISA

disclosure requirements are extensive, which necessarily means that not every disclosure can be

on the first page or boldfaced.  That is why disclosure documents have tables of contents and

headings.  This disclosure was prominently featured on a page entitled "Investing the Money in

Your Plan Account," which in turn was readily found through the table of contents.  Defs.' Resp.

to Pls.' SAMF, ¶ 4.  For the Court's convenience, the specific page is attached as Appendix A.[15]

     Third, Plaintiffs do not dispute that the Summary Plan Description and Participant

---

[14] *In re G.E. ERISA Litig.*, 2018 WL 6592091, at *3 (D. Mass. Dec. 14, 2018) and *Velazquez v. Mass. Fin. Servs. Co.*, 320 F. Supp. 3d 252, 258 (D. Mass. 2018), do not change the analysis.  Both cases were decided on a motion to dismiss standard, and both concerned fundamentally different allegations.  *Velazquez* involved the application of a conceded duty to monitor.  320 F. Supp. 3d at 259.  It sheds no light on how to analyze a plan's express disclosure to participants that certain investments are not subject to any monitoring at all.  The *G.E.* court's statute of limitations determination is irreconcilable with this Court's *Brotherston* holding that a prohibited transaction claim based on the use of proprietary funds was "not so intricate as to impede the Plaintiffs from having actual knowledge," and that "Plaintiffs were well aware that the parties involved were all Putnam entities" which satisfied the actual knowledge requirement—a determination not challenged on appeal.  2017 WL 1196648, at *11.

[15] The Re-Enrollment Notice, which was provided to Plan participants twice, featured the disclosure under a bolded and shaded heading titled "Investment Options" that was at the top of the document's third page.  Defs.' Resp. to Pls.' SAMF, ¶ 4.  The Participant Disclosure Notice discloses the same information, under a heading titled "Mutual Fund Window;" the disclosure was the only language on that page of the document.  *Id.*

Disclosure Notices were sent to them.  ECF No. 153, ¶¶ 97-98, 106-07.  Those disclosures were e-mailed to participants at email addresses Plaintiffs admitted were active and monitored, and mailed to participants who did not have an email address on file.  *Id.*; *see also id.* ¶¶ 95-98.  The emails made clear what they were disseminating, under headings like "Important Plan Information."  ECF No. 141, ¶ 100.  Mr. Moitoso testified that he specifically recalled receiving the October 2014 Participant Disclosure Notice and clicking on the emailed hyperlink to open it.  *Id.* ¶ 102.  Plaintiffs claim they aren't responsible for what is in the notices because they didn't read them.  Receiving (indeed, opening) an important notice but refusing to read it is "willful blindness," which is the standard in this Circuit—a standard which Plaintiffs ignore in favor of the Ninth Circuit's contrary rule.  ECF No. 154, at 17; *see* note 13, *supra*.[16]

Fourth, Plaintiffs' reliance on *Tibble v. Edison Int'l*, 135 S. Ct. 1823 (2015) to suggest that "[e]ach breach is independent and has its own limitations period" is misplaced.  ECF No. 154, at 20.  *Tibble* applied ERISA's six-year statute of *repose* (29 U.S.C. § 1113(1)).  This Court explained in *Brotherston* why that analysis does not carry over to ERISA's "three year statute of limitations," which "applies where plaintiffs have actual knowledge of the violation."  2017 WL 1196648, at *10 n.11.  The statute of *limitations* runs from the "earliest date" of Plaintiffs' knowledge; the statute of *repose* runs from the "day of the *last* action" constituting a part of the breach.[17]  Here the "earliest date" is outside the limitations period.

Finally, Plaintiffs assert that Fidelity's disclosures do not cover their claim of failure to

---

[16] Plaintiffs' baselessly assert that the Plan's clear disclosures were "misleading and incomplete" because the disclosures suggest that the fiduciaries had no obligations with respect to non-DIAs.  ECF No. 154, at 18.  Plaintiffs' premise is wrong, *see supra* § I.A, and knowledge of *law* does not affect when the clock starts, *see supra*, p. 18

[17] Several other courts have similarly reasoned that ERISA's three-year statute of limitations runs from the "earliest date of actual knowledge of a breach . . . ***even if the breach continues***."  *See Bernaola v. Checksmart Fin. LLC*, 322 F. Supp. 3d 830, 841-42 (S.D. Ohio 2018) (emphasis added and quoting *Tibble v. Edison Int'l*, 843 F.3d 1187, 1196 (9th Cir. 2016) (en banc post-dating remand from the United States Supreme Court); *Muehlgay v. Citigroup, Inc.*, 649 F. App'x 110, 112 (2d Cir. 2016) (unpublished) ("applying the continuing-violation theory to § 1113(2) would improperly supplant the plain language of the statute.").

monitor *expenses*.  But the only expenses in this Plan were the expense ratios *of the mutual funds*.  Fidelity's flat-out statement that it would not be monitoring the funds did not need to be supplemented to say "for performance or fees."  Fidelity said it was not monitoring.

      ***Failure to Offer Non-Mutual Funds:***  Participants were repeatedly notified that the investments available to the Plan were mutual funds.  ECF No. 141, ¶¶ 91-111.

      ***Prohibited Transaction:***  The Opposition also fails to offer any meaningful rejoinder to the application of the three-year limitations period to Plaintiffs' prohibited transaction claim.  The essential facts of that claim are that the Plan offered Fidelity funds and that those funds paid fees to Fidelity.  *See Brotherston*, 2017 WL 1196648, at *11 ("The Plaintiffs were well aware that the parties involved were all Putnam entities.  As a result, the actual knowledge requirement is satisfied, and the three-year statute of limitations bars the Plaintiffs' prohibited transactions claims based on seventy-two investment funds.").  Both of those essential facts were known to Plaintiffs outside the limitations period.

      The Opposition's only response is that Plaintiffs allegedly lacked knowledge of the *absence* of revenue sharing payments to the Plan and, therefore, lacked knowledge necessary to overcome a defense under Prohibited Transaction Exemption 77-3.  *See* ECF No. 154, at 19.  But this too is foreclosed by this Court's holding in *Brotherston* (unchallenged on appeal):  the clock starts when plaintiffs know the essential facts *of their claim*, not facts negating possible affirmative *defenses*.  2017 WL 1196648, at *11.

## <u>CONCLUSION</u>

      Defendants are entitled to summary judgment on all of Plaintiffs' claims.

Dated: October 11, 2019
      Boston, MA

Respectfully submitted,

 /s/ John J. Falvey, Jr.        
John J. Falvey, Jr. (BBO# 542674)
Alison V. Douglass (BBO# 646861)
Dave Rosenberg (BBO# 679434)
Benjamin S. Reilly (BBO# 693742)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel: (617) 570-1000
Fax: (617) 523-1231
jfalvey@goodwinlaw.com
adouglass@goodwinlaw.com
drosenberg@goodwinlaw.com
breilly@goodwinlaw.com

William M. Jay (admitted *pro hac vice*)
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC 20001
Tel: (202) 346-4000
Fax: (202) 346-4444
wjay@goodwinlaw.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

      I, John J. Falvey, Jr., hereby certify that the foregoing document is being filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on October 11, 2019.  The foregoing document will be available for viewing and downloading from the ECF system.

                            /s/  John J. Falvey, Jr.
                            John J. Falvey, Jr.