UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
KEVIN MOITOSO, TIM LEWIS,       )
MARY LEE TORLINE, and SHERYL    )
ARNDT, individually and as      )
representatives of a class      )
of similarly situated persons,  )
and on behalf of the            )
FIDELITY RETIREMENT SAVINGS PLAN,)
                                )
                  Plaintiffs,   )
                                )
         v.                     )          CIVIL ACTION
                                )          NO. 18-12122-WGY
FMR LLC, FMR LLC FUNDED          )
BENEFITS INVESTMENT COMMITTEE,   )
FMR LLC RETIREMENT COMMITTEE,    )
FIDELITY MANAGEMENT & RESEARCH   )
COMPANY, FMR CO., INC., and      )
FIDELITY INVESTMENTS INSTITUTIONAL)
OPERATIONS COMPANY, INC.,        )
                                )
                  Defendants.   )
_____)
```

YOUNG, D.J.                                    March 27, 2020


**MEMORANDUM & ORDER**

**I. INTRODUCTION**

Kevin Moitoso, Tim Lewis, Mary Lee Torline, and Sheryl

Arndt (collectively, the "Plaintiffs") are former employees of

FMR LLC or its affiliates and beneficiaries of the Fidelity

Employers' defined contribution 401(k) retirement plan, the

Fidelity Retirement Savings Plan (the "Plan"). Pls.' Fourth Am.

Compl., ("Compl.") ¶¶ 1, 18-21, 46, ECF No. 77. They have

brought this lawsuit pursuant to 29 U.S.C. §§ 1132(a)(2)-(3) on behalf of a certified class of former Fidelity employees, and on behalf of the Plan itself, asserting breaches of fiduciary duty in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001 et seq.. Compl. ¶¶ 15, 127-162; Stipulation and Order Regarding Class Certification ("Class Cert."), ECF No. 83

The Plaintiffs sued two groups of defendants (collectively, the "Defendants" or "Fidelity"). Compl. ¶ 2. The first group consists of the Plan's named fiduciaries: FMR LLC, FMR LLC's Board of Directors, FMR LLC Funded Benefits Investment Committee ("FBIC"), and FMR LLC Retirement Committee ("Retirement Committee) (collectively, the "Plan Fiduciaries"). Id. ¶¶ 2, 22-28. The second group consists of the plan's sponsor, FMR LLC, and the non-fiduciaries Fidelity Management & Research Company ("FMR"), FMR Co., Inc. ("FMRC"), and Fidelity Investments Institutional Operations Company, Inc. ("FIIOC") (collectively, "Fidelity Entities").[1] Id. ¶¶ 2, 29-34.

The Plaintiffs first bring claims against the Plan Fiduciaries for breach of the fiduciary duties of loyalty and prudence in violation of ERISA § 404, 29 U.S.C. § 1104(a)(1)(A)-

_____

[1] The Defendants collectively will be referred to as "Fidelity," but will be referred to by their specific names when this Court is analyzing the actions of a specific member of the group.

(B), (D) (count I).  Compl. ¶¶ 127-134.  The Plaintiffs further
accused the Plan Fiduciaries of breaching the duty of
impartiality, in violation of 29 U.S.C. § 1104(a) (count II),
but later withdrew that claim without prejudice.  Compl. ¶¶ 135-
141; Pls.' Opp'n Defs.' Mot. Summ. J. ("Pls.' Opp'n") 10, ECF
No. 154.  The Plaintiffs also accuse the Plan Fiduciaries of
engaging in prohibited transactions with a fiduciary in
violation of 29 U.S.C. § 1106(b) (count III).  Compl. ¶¶ 142-
147.  The Plaintiffs charge FMR LLC with failure to monitor the
Plan Fiduciaries (count IV), id. ¶¶ 148-154, and seek from all
the Fidelity Entities equitable disgorgement of profits (count
V), id. ¶¶ 155-162.  See 29 U.S.C. §§ 1109(a), 1132(a)(2)-(3).

Fidelity asserts as an affirmative defense that all of the
Plaintiffs' charges are not only barred by a prior court-
approved class action settlement but are also time-barred.
Defs.' Supp. Mem. Summ. J. ("Defs.' Mem.") 9-12, ECF No. 140.
Additionally, Fidelity argues that it has not violated any
fiduciary duties as matter of law.  Id. at 13-20. The two
parties agreed to a case stated hearing on some (but not all)
issues, which this Court conducted on November 20, 2019.[2]  Joint
Letter from Pls.' and Def.'s Regarding Nov. 7, 2019 Sum. J.

---

[2] Through the case stated procedure, the parties waive trial
on a specified set of issues and the Court may render judgment
based on the undisputed facts in the record.  See TLT Constr.
Corp. v. RI, Inc., 484 F.3d 130, 135 n.6 (1st Cir. 2007).

Proc. ("Case Stated Letter"), ECF No. 209; Electronic Clerk's notes, ECF No. 221.

Having heard the arguments of both sides, the Court now rules that, on count I, Fidelity has breached its duty of prudence by failing to monitor its mutual fund investments and by failing to monitor recordkeeping expenses. Fidelity, however, has not breached its duty of prudence by failing to investigate alternatives to those mutual funds because a prudent fiduciary would not be required to conduct those specific investigations. Fidelity additionally has not breached its duty of loyalty. On count III, Fidelity has not engaged in prohibited transactions because its dealings with proprietary products were no less favorable to the Plan as a whole than to other shareholders of Fidelity funds.

Counts IV and V are both derivative of counts I and III. Regarding count IV, this Court rules that FMR LLC is liable for the breach of its duty to monitor the Plan Fiduciaries with regards to their ongoing handling of the mutual fund investments and recordkeeping expenses. On count V, the Plaintiffs may recover from Fidelity Entities for any profits traceable to the aforementioned breach of the fiduciary duty to monitor. At trial, the Plaintiffs will bear the burden of proving the extent of any losses, and Fidelity will bear the burden of proving that any losses to the Plan were not caused by the lack of

monitoring.  See Brotherston v. Putnam Invs., LLC, 907 F.3d 17, 35 (1st Cir. 2018).

**A.  Procedural History**

The Plaintiffs first filed this suit On October 10, 2018, Class Action Compl. 1, ECF No. 1, amending the complaint three times. Am. Compl., ECF No. 31; Second Am. Compl., ECF No. 37; Third Am. Compl., ECF No. 56.  On May 2, 2019, the Plaintiffs filed their fourth and final amended complaint.  See generally Compl.  On September 6, 2019, the Plaintiffs filed a motion for partial summary judgment, and the Defendants then cross-moved for summary judgment.  Pls.' Mot. Partial Summ. J., ECF No. 135; Defs.' Mot. Summ. J., ECF No. 139.  Prior to considering the summary judgment motions, this Court entered a memorandum and order denying the Plaintiffs' request for a jury trial but providing for the selection of an advisory jury.  See Moitoso v. FMR LLC, 410 F. Supp. 3d 320 (D. Mass. 2019).  This Court then heard oral arguments on summary judgment on November 7, 2019, taking all matters under advisement, and setting a case stated hearing for November 20, 2019.  Electronic Clerk's Notes, ECF No. 218.  At the November 20 hearing, this Court also took all the matters under advisement.  ECF No. 221; Tr. Case Stated Hr'g ("Tr. Case Stated Hr'g"), ECF No. 222.

**B.  The Procedural Framework of this Decision: The Case Stated**

While the summary judgment motions were sub judice, the parties proposed that the Court resolve some -- but not all -- of the issues as a case stated.  Case Stated Letter.  This case stated hearing was based on stipulations by both parties that there were no material facts in dispute on any issue except the Defendants' statute of limitations defense.  Case Stated Letter 1.  "Case stated hearings provide an efficacious procedural alternative to cross motions for summary judgment." Sawyer v. United States, 76 F. Supp. 3d 353, 356 (D. Mass. 2015) (citing Continental Grain Co. v. Puerto Rico Mar. Shipping Auth., 972 F.2d 426, 429 n.7 (1st Cir. 1992)).  In a case stated decision "the parties waive trial and present the case to the court on the undisputed facts in the pre-trial record.  The court is then entitled to 'engage in a certain amount of factfinding, including the drawing of inferences.'"  TLT Constr. Corp. v. RI, Inc., 484 F.3d 130, 135 n.6 (1st Cir. 2007) (quoting United Paperworkers Int'l Union Local 14 v. International Paper Co., 64 F.3d 28, 31 (1st Cir. 1995)).

At the case stated hearing this Court announced that it would base its decision on the undisputed statements of facts provided by both parties.  Tr. Case Stated Hr'g 4; Pls.' Local R. 56.1 Statement Undisputed Material Facts ("Pls.' SOF"), ECF

No. 137; Statement Undisputed Material Facts Supp. Defs.' Mot.
Summ J. ("Defs.' SOF"), ECF No. 141; Pls.' Resp. Defs.' SOF
Statement Material Facts Pursuant Local R. 56.1 ("Pls.' Resp.
SOF"), ECF No. 153; Defs.' Resp. Pls.' SOF, ("Defs.' Resp.
SOF"), ECF No. 167.

It is worth remarking that, in this Court's experience,
case stated hearings usually involve but a modicum of fact
finding -- nothing more than the drawing of reasonable
inferences. Here, by converting the summary judgment record to
their case stated presentation the parties have provided the
Court with a plethora of affidavits characterizing the facts.
See D. Brock Hornby, The Business of U.S. District Courts, 10
Green Bag 2D 453, 462 (2007) (noting that much of the work of
the modern day judge consists of poring over affidavits and
other "facts" submitted by lawyers instead of holding trials).
This Court has independently drawn its own inferences from the
stipulated facts.

###    C.    Factual Background

This case concerns the nature of the fiduciary duties that
Fidelity owes to the Plan, along with the current and former
employees that are beneficiaries of this Plan.

The Plan is a defined contribution plan within the meaning
of 29 U.S.C. § 1002(34) and qualified under 26 U.S.C. § 401 (a
"401(k) plan"). Pls.' SOF ¶ 2; Compl. ¶ 46. FMR LLC is the

sponsor of the Plan, pursuant to 29 U.S.C. § 1002(16)(B). Pls.'
SOF ¶ 1. In defined contribution plans, fiduciaries curate
diversified investment options in which plan participants can
invest. Compl. ¶ 47; see 29 U.S.C § 1104(a)(1)(C). The Plan
allowed participants to invest in Fidelity funds, non-Fidelity
funds available through a self-directed brokerage account, and
two monitored options, the Portfolio Advisory Service at Work
account ("PAS-W") and the Fidelity Freedom K Funds. See Decl.
Dave Rosenberg ("Rosenberg Decl."), Ex. 56, Your Summary Plan
Description FID000137, ECF No. 142-56.

Fidelity's Plan included more than 58,000 participants and
assets under management of approximately $17,000,000,000 as of
the end of 2016. Pls.' SOF ¶ 4; Compl. ¶ 51. All members of
the class action are former Fidelity employees who were invested
in at least one fund available through the Plan. Id. ¶ 119
(describing precise parameters of certified class).

The current litigation is not the first class action
concerning this particular Plan. In 2013, a class of the Plan's
beneficiaries alleged that Fidelity breached its fiduciary duty
of loyalty by offering only Fidelity mutual funds on the Plan,
failing to offer cheaper alternatives, and committing prohibited
transactions under ERISA. See id. ¶ 35 (citing Bilewicz v. FMR
LLC, et al., Class Action Compl., Civ. A. No. 13-10636, ECF No.
1 (D. Mass. 2013) (Casper, J.) ("Bilewicz")). Plan participants

then filed a second lawsuit on January 7, 2014, alleging that
Fidelity had violated its fiduciary duties by paying excessive
recordkeeping fees.  Defs.' SOF ¶¶ 8-9 (citing Yeaw v. FMR LLC,
et al, Class Action Compl., Civ. A. No. 14-10035, ECF No. 1 (D.
Mass. 2014) (Casper, J.) ("Yeaw")).

In October 2014, Judge Casper approved a settlement
agreement between Fidelity and the plaintiffs, consolidated
under Bilewicz.  Order Approve Settlement Class Action,
Bilewicz, ECF No. 72.  This settlement agreement required the
defendants to pay $12,000,000 into a common fund and rewrite the
plan document to provide more benefits and protections for Plan
members.  See generally Bilewicz, Mem. Supp. Mot. Order, Ex. 1,
Class Action Settlement Agreement ("Bilewicz Settlement
Agreement" or "Settlement"), ECF No. 53-1.

All named plaintiffs in the current case were members of
the Bilewicz settlement class.  Defs.' SOF ¶ 12.  All named
Defendants in this case were also defendants in the Bilewicz
litigation.  Id. ¶ 29.  As part of the Settlement, the Bilewicz
plaintiffs agreed to release the defendants from "any and all
claims, debts, demands, rights or causes of action, suits,
matters, and issue or liabilities whatsoever . . . including
both known Claims and Unknown Claims" in any way related to the
claims at hand in that litigation.  Id. ¶ 30 (emphases deleted)
(citing Bilewicz Settlement Agreement § 3.3).

[9]

Following these settlement negotiations Fidelity announced
the First Amendment to the Plan Document, effective July 29,
2014 ("First Amendment"). Pls.' SOF ¶ 9. Under this First
Amendment, Fidelity identified two "designated investment
alternatives" ("DIAs"), the Fidelity Freedom target date funds
("Freedom Funds"), and the PAS-W, that would undergo full
fiduciary monitoring. Defs.' SOF ¶¶ 55-57, 93. It also offered
beneficiaries of the Plan the option to invest in an array of
other Fidelity and non-Fidelity funds by specifically selecting
them through the Plan's "open architecture" or "supermarket" of
fund offerings. Id. ¶ 53. Fidelity funds were available on
NetBenefits, the online platform previously used by Fidelity,
while participants could access the non-Fidelity funds by
creating an account on the separate, self-directed BrokerageLink
platform. Pls.' SOF ¶¶ 10-11. The majority of the Plan assets,
at the time of filing, were invested in one of the non-DIA
Fidelity funds available through NetBenefits. Id. ¶ 16.

To address the issue of excessive recordkeeping costs, the
Settlement also required an update to the Plan's existing
revenue credit system to create mandatory revenue-sharing with
Plan participants ("Revenue Credits"). Defs.' SOF ¶ 121. This
Revenue Credit matches or exceeds the management fees and
revenue generated by Fidelity pursuant to its role administering
the various funds, which includes the cost of recordkeeping, and

is paid to the Plan at the end of each year.  Id. ¶¶ 122, 126.
The Plan's fiduciaries have said they did not monitor these
administrative costs, on the grounds that all administrative
expenses paid to Fidelity would be credited back to the Plan
through the Revenue Credits.  Id. ¶ 128.

Former employees who had left Fidelity, though still
members of the Plan, do not receive any part of the Revenue
Credit, unless they were employed for a portion of a Plan year.
Pls.' SOF ¶ 37.  Before the implementation of the Revenue
Credit, Fidelity had provided a discretionary profit-sharing
contribution to the Plan account of each individual equivalent
to 10% of their compensation.  Id. ¶ 35.  After the Revenue
Credit's implementation, Fidelity adopted a practice of flexing
the amount of discretionary profit-sharing based on the amount
returned to each account through the Revenue Credit, so the
total of the (mandatory) Revenue Credit and (discretionary)
profit-sharing remained at 10% of compensation per year.  Id.
This leads the Plaintiffs to call the implementation of the
Revenue Credit an "accounting gimmick."  Id. ¶ 36 (quoting Decl.
Mark Thomson ("Thomson Decl."), Ex. 18, Expert Report Marcia S.
Wagner ("Wagner Report") ¶ 88, ECF No. 138-20).

## II.  ANALYSIS

As both parties have stipulated to the underlying facts in
this case, their conflict concerns the boundaries of the

fiduciary duty that Fidelity owes to the members of the Plan.
Fidelity believes that this Court need not reach any substantive
issues of fiduciary duty.  It contends that the Plaintiffs are
essentially re-litigating the <u>Bilewicz</u> Settlement Agreement in
arguing that many of the Plan's features (such as the Revenue
Credit) are themselves breaches of fiduciary duty, and that
their claims ought thus be denied under the principle of res
judicata.  Defs.' Mem. 5-8.  Fidelity also points to the release
and covenant not to sue in the Settlement as covering all the
named Plaintiffs, asking that this Court find the Plaintiffs'
claims are covered by the language of the release.  <u>Id</u>.[3]

The Plaintiffs primarily point to three places where they
allege Fidelity has breached its duties of prudence and loyalty.
First, the Plaintiffs contend that the Defendants breached their
duty to monitor funds in the plan outside the two DIAs.  <u>Compl.</u>
¶¶ 101-103.  The Plaintiffs argue this lack of monitoring
constitutes a violation of fiduciary duties because, for various

---

[3] Fidelity further argues that both counts I and III are
time-barred because the Plaintiffs would have been required to
sue within three years of discovering the breach of fiduciary
duty.  Defs.' Mem. 9-12 (citing 29 U.S.C. § 1113(2)).  The
statute of limitations under ERISA is based on an actual
knowledge standard, <u>see generally</u> <u>Intel Corp. Inv. Policy Comm.</u>
v. <u>Sulyma</u>, 140 S. Ct. 768, 776-77 (2020), and because the
parties did not stipulate to the underlying facts required to
make this actual-knowledge determination prior to the case
stated hearing, this Court will not address this statute of
limitation issue at this time.  <u>See</u> Case Stated Letter.

reasons, the choice to include these specific funds was imprudent.  Id. ¶¶ 65-72, 76-103.  Second, the Plaintiffs argue that Fidelity had a duty to investigate alternatives to mutual funds including stable value funds, collective trusts, and separate accounts.  Id. ¶¶ 68-71, 95-100.  Third, the Plaintiffs argue the Plan Fiduciaries had a duty to monitor and control administrative expenses, and that the Revenue Credit system does not adequately release them from this responsibility.  Id. ¶¶ 73-75, 104-116.  On the whole, the Plaintiffs argue, the Defendants inappropriately placed the interests of Fidelity over the interests of Plan participants.  Id. ¶ 131.

The Plaintiffs additionally assert that payment by the Plan to FMR LLC for administrative expenses constitutes a prohibited transaction with Fiduciary, in violation of 29 U.S.C. § 1106(b)(3).  Id. ¶ 143.  While Prohibited Transaction Exemption 77-3 ("PTE 77-3"), 42 Fed. Reg. 18734, 18735 (Apr. 8, 1977), would provide the Defendants a safe harbor were the Plan treated no less favorably than any other non-proprietary option, the Plaintiffs dismiss PTE 77-3 as a defense for two reasons: (1) they claim that the Revenue Credit is essentially illusory, so FMR LLC is still receiving net compensation from administrative expenses; and (2) the class members did not receive the Revenue Credits because they are former employees.  Pls.' Mem. Supp. Partial Summ. J., ("Pls.' Mem.") 18, ECF No. 136.

Derivative of the claimed breach of fiduciary duties, count IV is viable against FMR LLC only were this Court to find the Plan Fiduciaries to have committed a breach. Compl. ¶¶ 148-152. Similarly, count V asks for the disgorgement of profits that Fidelity has accrued pursuant to its breaches of duty and applies only to the extend this Court finds such a breach of duty. Id. ¶¶ 155-158.

The Court addresses the issues in this order.

A.  **Prior Court-Approved Class Action Settlement and Res Judicata**

Fidelity argues that all claims in the complaint are barred by the prior approved class action settlement and res judicata. Defs.' Mem. 5-6. The Plaintiffs submit that the settlement and res judicata do not bar their claims because their claims arise from breaches of Fidelity's continual duty of prudence and loyalty after the signing of the settlement. Pls.' Opp'n 10-15. The Court agrees.

"'Under the federal law of res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating claims that were raised or could have been raised in that action.'" Breneman v. United States ex rel. FAA, 381 F.3d 33, 38 (1st Cir. 2004) (quoting Apparel Art Int'l, Inc. v. Amertex Enters. Ltd., 48 F.3d 576, 583 (1st Cir. 1995)). A claim of res judicata must establish the following elements:

"'(1) a final judgment on the merits in an earlier proceeding, (2) sufficient identicality between the causes of action asserted in the earlier and later suits, and (3) sufficient identicality between the parties in the two actions.'"  <u>Id.</u> (quoting <u>Banco Santander de P.R.</u> v. <u>Lopez-Stubbe (In re Colonial Mortg. Bankers Corp.)</u>, 324 F.3d 12, 16 (1st Cir. 2003)).

ERISA provides that, unless covered by specified exceptions, "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy."  29 U.S.C. § 1110(a). In the interest of encouraging settlement of claims, courts have consistently held that section 1110(a) does not prevent parties from negotiating a release from existing fiduciary violations. <u>See</u> <u>Leavitt</u> v. <u>Northwestern Bell Tel. Co.</u>, 921 F.2d 160, 161-62 (8th Cir. 1990) (noting that such a release does not relieve a fiduciary of its responsibilities, but "merely settles a dispute that the fiduciary did not fulfill its responsibility or duty on a given occasion"); <u>see also</u> <u>Howell</u> v. <u>Motorola, Inc.</u>, 633 F.3d 552, 561 (7th Cir. 2011); <u>Taylor</u> v. <u>Visteon Corp.</u>, 149 F. App'x 422, 427 (6th Cir. 2005).  Courts have held, however, that such releases cannot protect a fiduciary from suit when the cause of action arose after the signing of the release.  <u>See</u> <u>Ruppert</u> v. <u>Alliant Energy Cash Balance Pension Plan</u>, 255 F.R.D. 628, 635

(W.D. Wis. 2009) ("[T]o the extent plaintiffs' releases could be construed as releasing defendant from this ERISA suit, the agreement would be unenforceable because agreements that waive future violations of ERISA are unenforceable . . . ."). An attempt to release future ERISA violations would not be valid because it would be an attempt to relieve the fiduciary of responsibility. See Taylor, 149 F. App'x at 426; Srein v. Soft Drink Workers Union, Local 812, 93 F.3d 1088, 1096 (2d Cir. 1996) (citing Leavitt, 921 F. 2d at 161-62).

Fidelity points to two provisions in the original Bilewicz Settlement Agreement that it argues bar the Plaintiffs' claims. Defs.' Mem 3-5. First, section 3.3 of the Settlement defines the scope of claims released by the Settlement. Id.; Bilewicz Settlement Agreement § 3.3. The provision covers "both known Claims and Unknown Claims," including those "in any way arising out of, relating to, based on, or in connection with: the structure, management, monitoring, servicing, administration, size and/or expenses of the Plan" as well as "any assertions regarding revenue sharing." Id. (emphases in original). Additionally, the Settlement includes a release barring litigation over any features of the Plan included in section 7.3, the section describing the steps Fidelity would take to meet the demands of the Settlement. Id. §§ 3.3, 7.3. According to Fidelity, the recordkeeping, breach of fiduciary duty, and

prohibited transaction claims are barred because they are all related to the system implemented by section 7.3. Defs.' Mem. 7-8. Fidelity additionally argues that the release should apply because the Plaintiffs' claims do not arise from a change in events after the Settlement, and because those claims previously could have been litigated. Id. at 9.

The Plaintiffs argue, and the Court agrees, that the holding from Tibble v. Edison Int'l suggests that there has been a sufficient "change in circumstances" justifying this new suit, because fiduciaries have a continual duty to monitor investments. Pls.' Opp'n 12 (quoting 135 S. Ct. 1823, 1828 (2015)). In outlining this continual duty to monitor, the Supreme Court held that "the trustee must 'systematic[ally] conside[r] all the investments of the trust at regular intervals' to ensure that they are appropriate." Tibble, 135 S. Ct. at 1828 (alterations in original) (quoting Amy Morris Hess, George Gleason Bogert & George Taylor Bogert, The Law of Trusts and Trustees § 684, at 147-48 (3d ed. 2009) ("Bogert 3d")). This continuing duty, combined with the case law interpreting section 1110(a), must be given effect here. Fidelity could not contract away this future duty to monitor by signing the Bilewicz release.

This is not to say that the release is ineffective. The Plaintiffs have had to limit their class only to those

participants whose claims arose after November 17, 2014, the effective date of the release.  See Class Cert. ¶ 1.  The Plaintiffs are also limited to claims concerning Fidelity's continuing duties, rather than those pre-dating the Settlement or arising from the Settlement.

Fidelity's arguments based on res judicata are similarly unavailing.  The present case and the Bilewicz case do not arise from a "common nucleus of operative facts."  See Haag v. United States, 589 F.3d 43, 46 (1st Cir. 2009) (quoting Gonzalez v. Banco Cent. Corp., 27 F.3d 751, 755 (1st Cir. 1994)). Fidelity's duty of continual monitoring, combined with its failure to monitor, means that the claims in the case at hand do not arise out of the "same transaction or series of connected transactions."  Id. (quoting Kale v. Combined Ins. Co., 924 F.2d 1161, 1166 (1st Cir. 1991)).

In conclusion, Fidelity's claims based on the continual duty to monitor are not barred by the Bilewicz settlement or res judicata.

### B.    Legal Standard

#### 1.    ERISA Fiduciary Duties

Retirement plan trustees are fiduciaries who owe duties of loyalty and prudence to participants in their plan.  29 U.S.C. § 1104(a)(1)(A); Bunch v. W.R. Grace & Co. (Bunch I), 532 F. Supp. 2d 283, 287-88 (D. Mass. 2008), aff'd, 555 F.3d 1 (1st Cir.

2009).  The statute defining these fiduciary duties provides in
part:

> [A] fiduciary shall discharge his duties with respect to
> a plan solely in the interest of the participants and
> beneficiaries and--
>
> > (A) for the exclusive purpose of
> >
> > > (i)    providing benefits to participants and
> > >        their beneficiaries; and
> > >
> > > (ii)   defraying  reasonable  expenses  of
> > >        administering the plan;
> >
> > (B) with the care, skill, prudence, and diligence
> >     under the circumstances then prevailing that
> >     a prudent man acting in a like capacity and
> >     familiar with such matters would use in the
> >     conduct of an enterprise of a like character
> >     and with like aims.

29 U.S.C. § 1104(a)(1).  A court considers "the merits of [the]
transaction" and "the thoroughness of the investigation into the
merits of [the] transaction" when determining if a fiduciary has
breached the duties of loyalty or prudence.  Bunch I, 532 F.
Supp. 2d at 288 (quoting Howard v. Shay, 100 F.3d 1484, 1488
(9th Cir. 1996)).  These duties of loyalty and prudence are
among "the highest known to the law."  Braden v. Wal-Mart
Stores, Inc., 588 F.3d 585, 598 (8th Cir. 2009) (quoting Donovan
v. Bierwirth, 680 F.2d 263, 272 n.8 (2d Cir. 1982)).

### a.    Duty of Loyalty

The duty of loyalty requires a fiduciary to act solely in
the interest of plan participants and beneficiaries, and with

the exclusive purpose of providing them benefits. 29 U.S.C. §
1104(a); see Vander Luitgaren v. Sun Life Assurance Co. of Can.,
765 F.3d 59, 65 (1st Cir. 2014); Bunch I, 532 F. Supp. 2d at
291-92; Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc.
Profit Sharing Plan & Tr. v. State St. Bank & Tr. Co., 931 F.
Supp. 2d 296, 305 (D. Mass. 2013) (Tauro, J.). The contours of
these duties are "derived from the common law of trusts."
Tibble, 135 S. Ct. at 1828 (quoting Central States, Se. & Sw.
Areas Pension Fund v. Central Transp., Inc., 472 U.S. 559, 570
(1985)).

To prevail on a breach of duty of loyalty claim, a
plaintiff must show, by a preponderance of evidence, that
defendants failed to act in the best interest of the
participants and beneficiaries. Bunch I, 532 F. Supp. 2d at 291
(quoting 29 U.S.C. § 1104(a)(1)(A)). In making this inquiry,
the court considers the "totality of circumstances." See Bunch
v. W.R. Grace & Co. (Bunch II), 555 F.3d 1, 7 (1st Cir. 2009)
(citing DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 418 (4th
Cir. 2007)). It is not enough for a plaintiff to identify a
potential conflict of interest from the defendant's investment
in its own proprietary funds, as a plan sponsor may invest all
plan assets with a single company, see Hecker v. Deere & Co.,
556 F.3d 575, 586 (7th Cir. 2009), and may invest in funds it
controls as long as it abides with the specific exemptions

governing self-dealing.  _See_ _Dupree v. Prudential Ins. Co. of_
_Am._, Civ. A. No. 99-8337, 2007 U.S. Dist. LEXIS 57857, at *144-
145 (S.D. Fl. Aug. 7, 2007) (noting the existence of exemptions
to ERISA § 408(b), 29 U.S.C. § 1108(b)(2), the statute barring
self-dealing).  Instead, the Court must take into account the
fiduciary's subjective motivation in making a decision for the
plan.  _See_ _Perez_ v. _First Bankers Tr. Servs., Inc._, 210 F. Supp.
3d 518, 534 (S.D.N.Y. 2016) ("[T]he duty of loyalty is grounded
in the motivation driving a fiduciary's conduct, and liability
will not lie where a fiduciary's decisions were motivated by
what is best for the [plan], even if those decisions also
incidentally benefit the fiduciary.").

### b.  Duty of Prudence

The duty of prudence requires that a fiduciary act with the
"care, skill, prudence, and diligence under the circumstances
then prevailing" equivalent to those of a prudent man in the
same position.  29 U.S.C. § 1104(a).  There is no exact,
"uniform checklist" that a prudent fiduciary must follow.  _Tatum_
v. _RJR Pension Inv. Comm._, 761 F.3d 346, 358 (4th Cir. 2014).
Generally, "ERISA requires fiduciaries to employ 'appropriate
methods to investigate the merits of the investment and to
structure the investment' as well as to 'engage[] in a reasoned
decision[-]making process, consistent with that of a 'prudent
man acting in [a] like capacity.'"  _Id._ (alterations in

original) (quoting DiFelice, 497 F.3d at 420). The key question when examining an alleged breach of the duty of prudence is whether the fiduciary "took into account all relevant information in performing its fiduciary duty under ERISA." Bunch I, 532 F. Supp. 2d at 288. The duty of prudence is continuous and includes the requirement that fiduciaries periodically ensure existing investments are sound, in addition to future investments. See Tibble, 135 S. Ct. at 1828-29.

### 2.    Prohibited Transaction

ERISA bars a fiduciary from causing a plan to engage in prohibited transactions, which include providing services or transferring assets between the fiduciary and the plan. 29 U.S.C. § 1106(b). There is an exception to these prohibited transactions under PTE 77-3, which renders the prohibition inapplicable to employee benefits plans investing in in-house mutual funds under certain conditions. See Brotherston, 907 F.3d at 27. The relevant condition is as follows:

> All other dealings between the plan and the investment
> company, the investment adviser or principal underwriter
> for the investment company, or any affiliated person of
> such investment adviser or principal underwriter, are on
> a basis no less favorable to the plan than such dealings
> are with other shareholders of the investment company.

42 Fed. Reg. at 18,735.

### 3. Causes of Action

A plaintiff alleging a breach of fiduciary duties may sue for losses sustained by the plan pursuant to two different provisions of 29 U.S.C. § 1132, the statute granting a private right of action for ERISA violations. Under section 1132(a)(2), a Plaintiff may sue for violations of ERISA § 409, 29 U.S.C. § 1109, which allows for the recovery from a fiduciary of "losses to the plan" resulting from a fiduciary duty's breach, along with "such other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. § 1109(a). A plaintiff may also sue for relief pursuant to 29 U.S.C. § 1132(a)(3), which allows a court to provide relief when plaintiffs do not have another section 1132 cause of action. See Varity Corp. v. Howe, 516 U.S. 489, 515 (1996). Section 1132(a)(3)(B) specifically allows for equitable relief. When a complaint is filed against a fiduciary, monetary relief available under section 1132(a)(2) is comparable to the equitable remedy of surcharge, while section 1132(a)(3) authorizes other equitable remedies, including disgorgement of profits. See Moitoso, 410 F. Supp. 3d at 328 (discussing nature of remedies under section 1109(a)). Additionally, section 1132(a)(3) allows the equitable remedy of surcharge when a fiduciary breaches its duties, CIGNA Corp. v. Amara, 563 U.S. 421, 442 (2011), though the remedy of surcharge

is not available against a non-fiduciary.  <u>Mertens</u> v. <u>Hewitt</u>
<u>Assocs.</u>, 508 U.S. 248, 256 (1993).

**B.    Duty to Monitor Funds other than the Designated**
       **Alternative Investments**

    **1.    Duty to Monitor Self-Directed Brokerage Accounts**

The Plaintiffs contend that the Plan Fiduciaries had a duty
to monitor investments other than the two DIAs (the PAS-W and
Freedom K Funds) as an aspect of their duty of prudence.  Pls.'
Mem. 9-10.  Fiduciaries have a general duty under ERISA
continuously to monitor investments and remove those that are
imprudent, which is a duty separate from their requirement
prudently to select those investments.  <u>Tibble</u>, 135 S. Ct. at
1829.  Even when a plan document dictates the investment scheme,
fiduciaries may follow that document only insofar as it is
consistent with their duties under ERISA, as "the duty of
prudence trumps the instructions of a plan document."  <u>Fifth</u>
<u>Third Bancorp</u> v. <u>Dudenhoeffer</u>, 134 S. Ct. 2459, 2468 (2014)
(citing 29 U.S.C. §§ 1104(1)(D), 1110(a)).  DIAs are among the
class of funds that must be monitored.  <u>See</u> 29 C.F.R. §
2550.404a-5(a), (c), (d).  The definition of a DIA excludes,
however, "'brokerage windows,' 'self-directed brokerage
accounts,' or similar plan arrangements that enable participants
and beneficiaries to select investments beyond those designated
by the plan."  <u>Id.</u> § 2550.404a-5(h)(4).

Fidelity points out that there is no duty to monitor funds offered in a manner "similar" to a brokerage window. Defs.' Mem. 13 (citing 29 C.F.R. § 2550.404a-5(h)(4)); see also Wagner Report ¶ 60. Thus, it argues that its proprietary plans are the equivalent of a self-directed brokerage account. Defs.' Mem. 14 (citing Request for Information Regarding Standards for Brokerage Windows in Participant-Directed Individual Account Plans, 79 Fed. Reg. 49,469, 49,471 (Aug. 24, 2014); Defs.' SOF ¶ 60). In so arguing, Fidelity notes that the Plaintiffs are not alleging a breach of fiduciary duty with regards to the non-proprietary funds offered through the Plan's self-directed brokerage accounts. Id. at 13.

The Plaintiffs' argument is in two parts. First, they argue that Fidelity had a continuing duty to ensure that all Plan investments were prudent, and that this duty is unchanged by 29 C.F.R. § 2550.404a-5(h)(4). Pls.' Opp'n 3-4. They also say that Fidelity ought not be able to take advantage of the "brokerage window" safe harbor even if it does exist, because the alternative funds were effectively still "available in the plan." Id. at 4 (citing Pls.' SOF ¶¶ 10-11).

Some courts have extended the duty to monitor to funds available through brokerage windows while others have not, though this Court has not found a judicial opinion actually analyzing the issue. Compare Troudt v. Oracle Corp., Civ. A.

No. 16-00175-REB-SKC, 2019 U.S. Dist. LEXIS 33017, at *29 n.18
(D. Colo. Mar. 1, 2019) (noting, without comment, that the
recordkeeper (who happened to be Fidelity) did not monitor
investments available through a brokerage window), <u>with</u> <u>Larson</u>
v. <u>Allina Health Sys.</u>, 350 F. Supp. 3d 780, 799 (D. Minn. 2018)
(examining the mix of funds available through a brokerage window
to determine whether the sponsor could face liability).
Multiple regulations explicitly tie the duty to monitor to the
existence of DIAs.  <u>See</u> 29 C.F.R. § 2550.404c-1(d)(2)(iv)
(explaining that when a participant in a 404(c) plan exercises
independent control over an asset, the fiduciary of the plan
cannot be held responsible for losses, but that this "does not
serve to relieve a fiduciary from its duty to prudently select
and monitor any service provider or designated investment
alternative offered under the plan"); 29 C.F.R. § 2550.404a-5(f)
(noting that fiduciaries have a duty to "monitor . . .
designated investment alternatives offered under the plan").[4]
Just because these regulations apply to DIAs, however, does not

---

[4] The definition of "Designated Investment Alternative,"
though it originated in a regulation governing disclosure, <u>see</u>
29 C.F.R. § 2550.404a-5(h)(4), is a term of art now used
elsewhere throughout the ERISA landscape.  <u>Cf.</u> 29 C.F.R. §
2550.408g-1(c)(1) ("The term 'designated investment option' has
the same meaning as the term 'designated investment alternative'
as defined in 29 CFR 2550.404a-5(h).").

preclude them from applying also to other forms of investments, such as self-directed brokerage accounts.

Regulators have declined to weigh in on this question. In 2012 the Department of Labor (the "Department") issued a Field Assistance Bulletin indicating that an affirmative obligation to monitor could arise when a large number of plan participants partake in investments other than DIAs, <u>see</u> John J. Canary, Department of Labor, Field Assistance Bulletin No. 2012-02 Q&A 30 (May 7, 2012), https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2012-02, but then withdrew this guidance and replaced it with new guidance that did not include this duty to monitor. <u>See</u> John J. Canary, Department of Labor, Field Assistance Bulletin No. 2012-02R(1) Q&A 39 (July 30, 2012), https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2012-02r. This Court sees the withdrawal of guidance as the Department essentially declining to take a position on the issue, though other communications indicate that it may not consider such a duty to exist. <u>See</u> 79 Fed. Reg. at 49,472 (asking, in a request for information, "[h]ow do plan fiduciaries monitor investments made through their plan's brokerage window, <u>if at all</u>?") (emphasis added).

This Court need not defer to these statements,[5] but in the absence of other regulations explicitly imposing such a duty, it is hesitant to state unequivocally that there either is, or is not, a fiduciary responsibility to monitor self-directed brokerage accounts.

The goals of ERISA include protecting plan participants by controlling the administration of plan benefits, including through the imposition of stringent fiduciary standards. New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 651 (1995). At the same time, "courts have bristled at paternalistic theories that suggest ERISA forbids plan sponsors to allow participants to make their own choices." Short v. Brown Univ. 320 F. Supp. 3d 363, 369 (D. R.I. 2018) (quoting Sacerdote v. New York Univ., No. 16-6284 (KBF), 2017 U.S. Dist. LEXIS 137115, at *36 (S.D.N.Y. Aug. 25, 2017)).

Brokerage windows can provide plan participants significant freedom by allowing them to select from a menu of hundreds or

---

[5] Courts are required to defer to agency interpretations of their own regulations under Auer v. Robbins, 519 U.S. 452 (1997). Here, however, there is no explicit agency interpretation. Instead, there is a resounding absence of interpretation created by the second Department Bulletin, and an implication drawn from the phrasing of a request for interpretation. These do not rise to level of agency interpretation to which deference is owed. See Kisor v. Wilkie, 139 S. Ct. 2400, 2415-18 (2018) (explaining when Auer deference applies and noting that "it often doesn't").

thousands of investments, making it perhaps unrealistic for a fiduciary to monitor them all.  <u>See</u> Wagner Report ¶ 60.  On the other hand, the same regulation that defines "Designated Alternative Investments," 29 C.F.R. 2550.404a-5(h)(4), also includes the following language: "Nothing herein is intended to relieve a fiduciary from its duty to prudently select and monitor providers of services to the plan . . . ."  29 C.F.R. 2550.404a-5(f).  Using section 2550.404a-5 as a vehicle entirely to remove a fiduciary monitoring duty would seem to contradict this language.  <u>See</u> Field Assistance Bulletin No. 2012-02 Q&A 39, <u>supra</u> ("[A] plan fiduciary's failure to designate investment alternatives, for example, to avoid investment disclosures under the regulation, raises questions under ERISA section 404(a)'s general statutory fiduciary duties of prudence and loyalty.").

Furthermore, a plan sponsor can incur liability when it fails to carefully select or monitor the service provider, and that service provider then breaches a delegated duty.  <u>See</u> 29 U.S.C. §§ 1104, 1105(c)(2).  If the service provider has no duty to monitor the contents of a brokerage window, that implies the plan sponsor has no duty to oversee the service provider of the brokerage window, because it cannot breach its fiduciary duties by failing to monitor a party that itself has no fiduciary duties.  <u>Cf.</u> <u>Brotherston</u>, 907 F.3d at 32 (explaining that a fiduciary can incur liability for failing to independently

[ 29 ]

verify decisions by the service provider); <u>Rinehart</u> v. <u>Lehman</u> <u>Bros. Holdings Inc.</u>, 817 F.3d 56, 68 (2d Cir. 2016) ("Plaintiffs cannot maintain a claim for breach of the duty to monitor . . . absent an underlying breach of the duties imposed under ERISA . . . ." (first omission in original) (quoting <u>Rinehart</u> v. <u>Akers</u>, 722 F.3d 137, 154 (2d Cir. 2013))). Thus, this lax reading of section 2550.404a-5 could relieve a fiduciary of its duty prudently to select a service provider, contradicting its own language.

In sum, there is significant lack of clarity regarding the duties a fiduciary owes with regard to the funds within a brokerage window. This Court need not decide this thorny issue, however, because Fidelity was not offering its proprietary funds through a brokerage window or its equivalent.

### a. "Brokerage Window" or "Equivalent"

The Plaintiffs contend that the proprietary funds offered on Fidelity's platform were not offered through a program "similar" to a brokerage window. Pls.' Reply Mem. L. Supp. Mot. Summ. J. ("Pls.' Reply") 9-12, ECF No. 176. The Plaintiffs are correct. The manner in which Fidelity offered funds to Plan participants was not "similar" to the manner in which it offered funds through a brokerage window, but instead was far more similar to the manner in which it had offered the funds when they were considered "on the Plan" prior to the Settlement.

At first glance, the definition of "brokerage window" would appear sufficiently vague to encompass Fidelity's program. The original regulation defining "brokerage window" and "similar" vehicles defines them as "plan arrangements that enable participants and beneficiaries to select investments beyond those designated by the plan," see 29 C.F.R. § 2550.404a-5(h)(4), without defining what "similar" means. See also Scott Mayland, Ratcheting up the Duty: The Department of Labor's Misguided Attempt to Impose a Paternalistic Model upon Defined Contribution Plans Through ERISA, 75 Ohio St. L.J. 645, 661-62 (2014) (echoing the definition from § 2550.404a-5(h)(4)). The common definition is similar, referring to "a facility allowing plan participants to buy and sell securities through a brokerage platform." James Chen, Brokerage Window, Investopedia.com (Nov. 20, 2019), https://www.investopedia.com/terms/b/brokerage_window.asp. The Department has treated the term very broadly,[6] but only in the

---

[6] "The Department understands that a variety of different plan and investment arrangements may be encompassed by the terms 'brokerage window,' 'self-directed brokerage account,' and similar arrangements. For example, open mutual fund windows may permit participants to invest in hundreds or thousands of mutual funds. More limited mutual fund windows or 'supermarkets' may permit participants to invest in any mutual fund on one or more of a particular vendor's platforms, but not necessarily every mutual fund on the market. Other brokerage accounts also offer participants access to a virtually unlimited number of individual stocks, exchange-traded funds, and other securities." 79 Fed. Reg. at 49,471.

preamble to a request for information that lacks the force of
law.  See 79 Fed. Reg. at 49,471.

The way other courts have treated self-direct brokerage
accounts provides a better indicia of how they are defined in
practice.  In Tracey v. Massachusetts Inst. of Tech., another
session of this Court described Fidelity's BrokerageLink
platform as "designed for investors with a higher appetite for
risk and independent management."  404 F. Supp. 3d 356, 359 (D.
Mass. 2019) (Gorton, J.).  In Brotherston v. Putnam Invs., LLC,
this Court noted that only two percent of plan assets were
invested in a self-directed brokerage account offered by the
defendant company.  No. 15-13825-WGY, 2017 U.S. Dist. LEXIS
93654, at *14 n.7 (D. Mass. June 19, 2017), aff'd in part and
vacated in part, 907 F.3d 17 (1st Cir. 2018).  Another court has
contrasted funds available through BrokerageLink with
"principal" funds offered on a plan, which the fiduciary had a
duty to select and monitor.  In re Wash. Mut., Inc., No. 2:08-
md-1919 MJP, 2009 U.S. Dist. LEXIS 109961, at *16 (W.D. Wash.
Oct. 5, 2009).  On appeal in Brotherston, the First Circuit
noted that over 85% of assets were invested in the defendant
Putnam's proprietary funds offered "under the Plan," and that
Putnam was responsible for "selecting, monitoring, and removing
investments from the Plan's offering."  907 F.3d at 23.  These
cases suggest that self-directed brokerage accounts are designed

for the small percentage of active, independent investors, as opposed to normal funds -- whether called "DIA," "principal" or merely "on the plan" -- designed for the majority of non-expert investors.

With these indicia in hand it is manifest that there are significant similarities between how Fidelity offered its designated and non-designated proprietary funds, and that the treatment of these options differed significantly from that of non-Fidelity funds. Fidelity itself has noted that self-directed brokerage accounts allow investors to "access a larger investment universe"; that was not what was happening with Fidelity's proprietary funds offered on the Plan. Def.'s SOF ¶ 61. All proprietary funds were offered on Fidelity's internal NetBenefits platform rather than the BrokerageLink platform used to access outside funds. Defs.' Resp. SOF ¶ 10. Accessing the BrokerageLink platform required visiting a separate webpage, creating a separate login, and waiting up to two business days, while participants could automatically access the Fidelity funds. Pls.' SOF ¶ 11. Additionally, there is "no difference" between how Fidelity funds were offered before and after the Settlement, even though Fidelity argues that after the Settlement its proprietary funds should have been considered to be in the equivalent of a separate window. Id. ¶ 10. Following the re-enrollment period that resulted from the 2014 plan

amendment, only 1.41% of Plan participants moved to the non-proprietary funds on BrokerageLink, and the majority of plan assets remained in the non-monitored proprietary Fidelity funds. Id. ¶¶ 15-16. Fidelity's own description of brokerage windows in a 2014 letter to the Department appears to describe the type of offering available through BrokerageLink, not the proprietary funds available through NetBenefits. See Decl. Kai Richter, Ex. 2, Letter from Douglas O. Kant & Krista M. D'Aloia to the Department (Nov. 19, 2014) 4, ECF No. 177-2 (noting that Fidelity typically offers BrokerageLink as the brokerage window option for employers, and that only 2.6% of individuals across all employers with access to BrokerageLink utilize it). On the whole, the offering of the proprietary Fidelity funds on NetBenefits appears highly dissimilar to expert-level self-directed brokerage accounts (of the sort offered through BrokerageLink), and highly similar to the type of fund normally offered "on a plan."

Additionally, allowing a recordkeeper easily to disclaim fiduciary liability for its proprietary funds contradicts the goals of ERISA. There is no law preventing a recordkeeper from offering its own proprietary funds in a brokerage window. See Larson, 350 F. Supp. 3d at 797 (citing Hecker, 556 F.3d at 586). When a recordkeeper is also the manager of a retirement plan, however, it is not a disinterested party. It may earn

significant profits at the expense of participants in the plan because it has the unique ability to "stuff" a plan with its own "costly investment products." Id. (quoting In re M&T Bank Corp. ERISA Litig., No. 16-CV-375 FPG, 2018 U.S. Dist. LEXIS 154641, at *4, (W.D.N.Y. Sept. 11, 2018)). This Court need not, and does not, decide whether any unseemly "stuffing" is happening in this case. Yet this concern occasions significant reason not to give Fidelity the benefit of the doubt, given that its theory would allow it effectively to disclaim all fiduciary liability whatsoever for mutual funds available outside the two DIAs. When there are already ample indicia that the offering of proprietary funds was not "similar" to a self-directed brokerage window, this Court is not willing to extend that benefit and to excuse it from a duty to monitor its proprietary funds.

In conclusion, as Fidelity was not offering its funds in the equivalent of a brokerage window, it can face fiduciary liability for its lack of monitoring subsequent to the Settlement.

The question whether this alleged lack of prudence actually led to any losses is one of causation: a question upon which the defendant bears the burden of proof. Brotherston, 907 F.3d at 39. The plaintiff still bears the burden of showing the existence and extent of the alleged loss. Id. In their complaint, the Plaintiffs put forward numerous theories

regarding how Fidelity's lack of monitoring could have caused losses to the plan. Specifically, the Plaintiffs argue that Fidelity retained proprietary funds in the Plan despite excessive fees, Compl. ¶ 65, failed to investigate less-costly non-proprietary funds, id. ¶¶ 66-67, failed to utilize the cheapest available share class of certain proprietary funds, id. ¶ 72, retained inappropriately speculative funds, id. ¶¶ 76-84, should have investigated better-performing non-proprietary funds, id. ¶¶ 85-88, and failed to remove underperforming proprietary funds from its lineup over time, id. ¶¶ 89-94. Yet the parties in their letter requesting a case-stated resolution indicated that the scope of this judgment ought be limited to liability issues. It is therefore premature upon this record to determine whether any loss has occurred and, if so, whether the lack of monitoring caused it.

### 2. Investigation of Separate Accounts, Collective Trusts, and Stable Value Funds

The Plaintiffs argue that Fidelity breached its fiduciary duties by failing to investigate non-mutual fund investment vehicles, such as collective trusts and separate accounts. Id. ¶¶ 68-71.[7] They also argue that Fidelity had a duty to

---

[7] Separate accounts and collective trusts are types of investment vehicle available to institutional investors. For plans with significant assets, offering separate accounts can lead to substantial savings compared with utilizing mutual

investigate stable value funds as an alternative to its money

market accounts.  Id. ¶¶ 95-100.[8]  This Court concludes, however,

that Fidelity did not incur liability because it had no inherent

duty to investigate these particular types of funds.

While Fidelity offered several money market funds as

capital preservation options, it did not offer stable value

funds as an option.  See Defs.' SOF ¶ 64.  Fidelity also did not

offer collective trusts or separate accounts as investment

---

funds.  See Pension & Welfare Benefits Administration, U.S.
Dep't of Labor, Study of 401(k) Plan Fees and Expenses, at 16
(April 13, 1998),
https://www.dol.gov/sites/default/files/ebsa/researchers/analysi
s/retirement/study-of-401k-plan-fees-and-expenses.pdf.  Many
funds have adopted collective trusts or separate accounts as
options in addition to mutual funds, and they are more common
for larger funds.  BrightScope & Investment Co. Inst., The
BrightScope/ICI Defined Contribution Profile: A Close Look at
401(k) Plans, at 21 (Dec. 2014),
https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf.  The
regulatory and transparency requirements of separate accounts
and collective trusts, however, differ significantly from those
of mutual funds, making direct comparison between them "apples-
to-oranges."  White v. Chevron Corp., No. 16-cv-0793-PJH, 2016
U.S. Dist. LEXIS 115875, at *37 (N.D. Cal. Aug. 29, 2016)
(citing Tibble v. Edison Int'l, 729 F.3d 1110, 1134 (9th Cir.
2013), vacated and remanded, 135 S. Ct. 1823 (2015)).

[8] Stable value funds are a type of investment vehicle that
provide a low-volatility rate of return guaranteed by an
underlying contract.  David F. Babbel & Miguel A. Herce, Stable
Value Funds Performance, 6 Risks 2018, no. 1(12), Feb. 2018, at
3, http://www.mdpi.com/2227-9091/6/1/12/pdf.  Many large plans
use stable value funds rather than money market funds as their
default capital preservation option.  Chris Tobe, Do Money-
Market Funds Belong in 401(k)s?, MarketWatch (Aug. 30, 2013),
http://www.marketwatch.com/story/do-money-market-funds-belong-
in-401ks-2013-08-30.

options.  Id. ¶¶ 60, 93.  In fact, the June 2014 amendment to
the Plan required that Fidelity make only mutual funds available
through its "open architecture" window.  Id. ¶ 53; Thomson
Decl., Ex. 3, First Amendment to 2014 Plan Restatement, §
12.2(c), ECF No. 138-4.  Fidelity declined to investigate the
possibility of including alternatives to mutual funds on the
Plan –- including collective trusts and stable value funds –-
because of these restrictions in the 2014 First Amendment.
Thomson Decl., Ex. 9, Deposition Ralph Derbyshire 85:16-88:7,
ECF No. 138-11.

     Fidelity makes two arguments in rebuttal.  It first asserts
that the original design of the Plan in the 2014 amendment was a
settlor act for which Fidelity did not owe a fiduciary duty.
Defs.' Mem. 14 (quoting Lockheed Corp. v. Spink, 517 U.S. 882,
890 (1996)).  This argument is unavailing because the Plaintiffs
are claiming that Fidelity breached its duty not in the original
design of the Plan, but instead in its continued failure to
investigate mutual fund alternatives during the class period, an
aspect of its continued duty to monitor.  See Pls.' Opp'n 5
(citing Dudenhoeffer, 134 S. Ct. at 2468).

     Fidelity also argues that it had no specific duty to
investigate alternatives to mutual funds.  Defs.' Mem. 15.  Here
it is on firmer ground.  Numerous courts have ruled that plans
are under no duty to offer alternatives to mutual funds, even

when the plaintiffs argue they are markedly superior. See id.
at 15 n.17 (citing Larson, 350 F. Supp at 796; White, 2016 U.S.
Dist. LEXIS 115875, at *25-37; Dorman v. Charles Schwab Corp.,
No. 17-00285-CW, 2018 U.S. Dist. LEXIS 218049, at *10-12 (N.D.
Cal. Sept. 20, 2018)); see also Loomis v. Exelon Corp., 658 F.3d
667, 670 (7th Cir. 2011) ("[N]othing in ERISA requires every
fiduciary to scour the market to find and offer the cheapest
possible fund . . . ." (quoting Hecker, 556 F.3d at 586)).
Since plans are under no duty to offer any particular type or
mix of funds, "ERISA does not require a retirement plan to offer
an index fund or a stable value fund, and the failure to include
either in the Plan, standing alone, does not violate the duty of
prudence." Wildman v. American Century Servs., LLC, 362 F.
Supp. 3d 685, 704 (W.D. Mo. 2019) (citing Hecker, 556 F.3d at
586).

Still, the Plaintiffs are correct in pointing out that most
of these cases imply there may be some duty to investigate the
possibility of offering alternatives to mutual funds. In
Wildman, the court found that defendants had not breached their
fiduciary duty in declining to offer index funds or stable value
funds because it analyzed their decision-making and found it
prudent. 362 F. Supp. 3d at 704-05 ("[T]he issue is whether the
Defendants considered these options and came to a reasoned
decision for omitting them from the Plan. The evidence shows

the[y] did so."). Similarly, in White, the court denied a
motion to dismiss on this issue because the complaint had failed
to plead specific facts indicating that defendants had not made
a reasoned decision.  2016 U.S. Dist. LEXIS 115875, at *23-24.

There are several cases at the district court level holding
that a plan is under no such duty to investigate these
alternatives.  In Main v. American Airlines, Inc., the Northern
District of Texas found that a fiduciary defendant had not
breached its duty by failing either to offer or investigate
alternatives to mutual funds.  248 F. Supp. 3d 786, 794 (N.D.
Tex. 2017).  That opinion did not explain, however, why the lack
of duty to offer alternatives to mutual funds also translated
into a lack of duty to investigate.  Id.  In Larson, the
district court also found that the plaintiffs had failed to
state a claim for breach of duty by failing to "explore
collective trusts and separate accounts in lieu of mutual
funds," particularly as the plan document in that case
prohibited offering these investment vehicles.  350 F. Supp. 3d
at 796.  That opinion similarly did not analyze the issue of
whether there was a duty to "explore" these options, focusing
instead on the merits of the respective options.  Id. at 796,
802-03.

This Court agrees that there is no fiduciary duty to
investigate alternatives to mutual funds.  Separate accounts,

[40]

collective trusts, and stable value funds are all common
investment instruments with the potential to outperform mutual
funds.  See Terraza v. Safeway Inc., 241 F. Supp. 3d 1057, 1075
(N.D. Cal. 2017) (analyzing common trusts and separately managed
accounts); Abbott v. Lockheed Martin Corp., 725 F.3d 803, 806
(7th Cir. 2013) (noting that stable value funds generally
outperform money market funds).  These non-mutual fund vehicles
differ so much from mutual funds, however, in terms of their
regulatory and transparency features that other courts have
found it impossible to make an "apples-to-oranges" comparison of
the two.  White, 2016 U.S. Dist. LEXIS 115875, at *37 (quoting
Tibble, 729 F.3d at 1134); see also Loomis, 658 F.3d 671-72.
Unlike mutual funds, these alternatives are not subject to the
reporting, governance, and transparency requirements of the
Securities Act of 1933, 15 U.S.C. § 77a et seq., and the
Investment Company Act of 1940, 15 U.S.C. § 80a-1 et seq.  See
Tibble, 729 F.3d at 1134 (citing Renfro v. Unisys Corp., 671
F.3d 314, 318 (3d Cir. 2011); Jones v. Harris Assocs. L.P., 559
U.S. 335, 338 (2010)).  Other courts have found that ERISA
defendants acted prudently in both offering and declining to
offer these alternatives to mutual funds.  Compare Terraza, 241
F. Supp. 3d at 1075 (rejecting the argument that choosing to
offer mutual fund alternatives is a per se violation of
fiduciary duty), with Larson, 350 F. Supp. 3d at 796 (rejecting

the argument that choosing not to offer mutual fund alternatives is a per se violation of fiduciary duty). Conversely, the Plaintiffs (and this Court) have found no cases where a court held that a fiduciary breached its duty by making an informed decision not to offer these alternatives. The fact that courts have repeatedly upheld fiduciaries' decisions not to offer these alternatives indicates that a prudent fiduciary is under no reasonable duty to offer them.

As Fidelity pointed out at oral argument, the managers of the fund "didn't consider . . . gold bars or they didn't consider hedge funds." Tr. Case Stated Hr'g 20. There is no inherent fiduciary duty to offer any particular type of investment vehicle, whether gold bars, hedge funds, collective accounts, or stable value funds. See Hecker, 556 F.3d at 586; Wildman, 362 F. Supp. 3d at 704. The Plaintiffs have failed to show that a prudent fiduciary would have considered these alternatives to mutual funds, and because liability for Fidelity's lack of monitoring is derivative of the underlying violation, Brotherston, 907 F.3d at 39, without an underlying breach there can be no liability. In conclusion, Fidelity has breached no duty by declining to offer stable value funds, collective accounts, or collective trusts.

### 3. Duty to Monitor Recordkeeping Expenses

The Plaintiffs next argue that Fidelity has breached its fiduciary duty to monitor the Plan's recordkeeping expenses. Pls.' Mem. 1. Fidelity does not dispute that the Plan Fiduciaries declined to monitor recordkeeping expenses but argues that it has not violated its fiduciary duties because all expenses were returned to the Plan through the mandatory Revenue Credit, and thus netted to zero. Defs.' Mem. 15-16. Its argument rests on the proposition that "there is no breach of a duty to be cost-conscious where there are no costs." Defs.' Opp'n Mot. Partial Summ. J. ("Defs.' Opp'n") 10, ECF No. 165 (emphasis in original).

Fiduciaries have a general duty to monitor recordkeeping expenses. This duty stems from a fiduciary's prudential duty to be cost-conscious in administering its duties. Restatement (Third) of Trusts § 88 cmt. a (2007); Tibble v. Edison Int'l, 843 F.3d 1187, 1197-98 (9th Cir. 2016). Courts have found that fiduciaries can breach their duty of prudence by failing diligently to investigate and monitor recordkeeping expenses. Tussey v. ABB, Inc., 746 F.3d 327, 336 (8th Cir. 2014) (upholding a district court finding of breach of duty for failure to monitor); Pledger v. Reliance Tr. Co., 240 F. Supp. 3d 1314, 1329-30 (N.D. Ga. 2017); Tracey v. Massachusetts. Inst. Of Tech., No. 16-11620-NMG, 2017 U.S. Dist. LEXIS 162806, at

*42-47, 60 (D. Mass. Aug. 31, 2017) (Bowler, M.J), <u>adopted in</u>
<u>relevant part</u>, 2017 U.S. Dist. LEXIS 161263, at *2-3 (D. Mass.
Sept. 29, 2017) (Gorton, J.); Order, <u>Tracey</u> v. <u>Massachusetts.</u>
<u>Inst. Of Tech.</u>, Civ. A. No. 16-11620 (D. Mass. Oct. 4, 2017),
ECF No. 79.

The Plan's current recordkeeping expense regime first
appeared in the Eighth Amendment to the 2005 Restatement of the
Plan. Defs.' SOF ¶ 16. This Amendment included the addition of
a Revenue Credit, which approximated the revenue paid to
Fidelity by the Plan. <u>Id.</u>; Rosenberg Decl., Ex. 34, FMR Corp.
Profit Sharing Plan, Eighth Amendment to 2005 Restatement
MOITOSO0014016, ECF 142-34. When Fidelity amended the Plan
again in July 2014 pursuant to the <u>Bilewicz</u> Settlement
Agreement, this Revenue Credit was altered to require the
inclusion of any revenue-sharing Fidelity received for
investments in non-Fidelity funds. Thomson Decl., Ex. 1, FMR
LLC Profit Sharing Plan: 2014 Restatement ("2014 Profit Sharing
Plan") art. 5.1, ECF No. 138-1. The full amount of this Revenue
Credit is calculated and distributed each year back to the Plan.
Defs.' SOF ¶¶ 122-123. These clauses, in effect, reimburse the
Plan an amount at least equivalent to all fees paid into it,
which is an amount higher than the total recordkeeping expense.
<u>Id.</u> ¶ 126. The entire system of returning Revenue Credits to
the Plan is codified in the 2014 amendment and is mandatory

under those rules. 2014 Profit Sharing Plan art. 5.1-2. The establishment of this Revenue Credit was a settlor act, as the design of a plan is a settlor function. See Lockheed Corp., 517 U.S. at 890.

Because Fidelity credited all revenue generated by the Plan back to the Plan through this Revenue Credit, the Plan Fiduciaries, including the Retirement Committee, did not monitor these expenses or conduct third-party benchmarking of its fees. Def.'s SOF ¶ 128. The Retirement Committee also never reviewed the fee disclosures required by ERISA section 408(b)(2), 29 U.S.C. § 1108, and the relevant regulation, 29 C.F.R. § 2550.408b-2(c). Pls.' SOF ¶ 29. These fee disclosures indicated that, in 2017 for example, Fidelity charged $288 per participant for recordkeeping services, as well as an additional $212 per person for "Additional Value for Fidelity Products" (making an even $500 per head), or a total of 0.19% of assets. Thomson Decl., Ex. 59, Statement Services & Compensation Fidelity Retirement Savings Plan FID0001247, ECF 138-61. The parties have stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity

is the recordkeeper.  Thomson Decl., Ex. 65, Stipulations of Facts ("Stipulations of Facts") 3-4, ECF 138-67.

The 2014 Amendment also dictated how the Revenue Credit would be distributed to Plan participants.  2014 Profit Sharing Plan arts. 3.3, 5.1, 5.2, 6.2.  Article 6.2(f) of the 2014 Profit Sharing Plan states that each participant shall receive an amount equal to the sum of the Revenue Credit and the discretionary Employer Profit Sharing Contribution, in an amount proportionate to their compensation.  This clause applies only to those employees who meet the requirements of section 3.3. Id.  Article 3.3 states that the Employer Profit Sharing Contribution and the Revenue Credit shall be distributed only to current employees.  All members of the class action in this case are former employees of Fidelity who did not receive the Revenue Credit for at least a portion of the class period because they were excluded by the Plan.  Compl. ¶ 119.

For qualified employees, the total of the Revenue Credit and the discretionary company contribution was 10% for all years immediately preceding the 2014 Settlement and for all years since then.  Pls.' SOF ¶ 35.  Prior to 2014, this 10% contribution consisted entirely of discretionary profit sharing, while after 2014 the amount consisted of the Revenue Credit plus a discretionary amount.  Id.  Thus, the discretionary contribution from Fidelity increased or decreased based on the

value of the mandatory Revenue Credit.  *See* Thomson Decl., Ex.
70, FMR LLC Retirement Committee Meeting Minutes (Dec. 9, 2014)
2, ECF No. 138-73; Thomson Decl., Ex. 69, Retirement Benefits
Overview FID0000128, ECF No. 138-72.

Fidelity argues that the *Bilewicz* release shields it from
liability because the Revenue Credit structure derives from the
2014 Amendment, which was part of the Settlement.  Defs.' Mem.
7.  As explained in section II.A, *supra*, the release cannot
disclaim Fidelity's continued duty to monitor, so the Plaintiffs
are correct that Fidelity can potentially incur liability for
any losses that stem from a lack of monitoring.  *See* Pls.' Opp'n
13-14.

The main dispute between the parties concerns whether the
Revenue Credit system shields Fidelity from fiduciary liability
notwithstanding the lack of monitoring, because the Plan itself
could not have sustained any losses when all revenue was
automatically returned to it.  The Plaintiffs present two
theories to explain how the Plan may have incurred a loss: that
the Revenue Credits were "illusory," and that all members of the
class action, as former employees, did not receive the benefit
of these Revenue Credits.

### a.    The Revenue Credits theory

The Plaintiffs' first theory of liability is that the
Revenue Credit system is essentially "illusory" because the

total compensation returned to eligible employees remained at 10% both before and after the 2014 amendment, and thus the Revenue Credits are nothing more than an "accounting gimmick." Pls.' Mem. 7. This matters, the Plaintiffs argue, because it shows that the Revenue Credit was really being used to shore up Fidelity's compensation structure. Tr. Case Stated Hr'g 38-39. The Plaintiffs assert in summary that Fidelity is attempting to use these Revenue Credits as a "double credit" -- against both the Plan expenses and against Fidelity's profit-sharing year-end bonus. Id. at 40.[9]

The Plaintiffs point to the First Circuit's holding in Brotherston for the proposition that employers may not "claw back with their fiduciary hands compensation granted with their employer hands." Id. at 36 (quoting 907 F.3d at 26). The facts in Brotherston differ enough from the facts here, however, that the cited language is not on point. There, the employer,

_____

[9] At the case-stated hearing, the Plaintiffs also argued that Fidelity was seeking a "triple credit" because if an employee departs the company in less than five years, her account balance will not be fully vested, and the Revenue Credit portion can be used to offset other company contributions. Tr. Case Stated Hr'g 44 (citing 2014 Profit Sharing Plan arts. 6.4, 9.2, 9.4). While the Revenue Credit portion is not itself subject to forfeiture, the forfeiture account as a whole can be used to pay for "appropriate Plan expenses." 2014 Profit Sharing Plan art. 6.4(c). If the forfeiture account is being used to pay Plan expenses, though, there would still be no loss to the owner of the account because it could only be used to pay for expenses she would otherwise owe regardless. Thus, this Court finds that there is no "triple credit" problem.

Putnam, provided _discretionary_ payments to employees' 401(k) accounts to offset recordkeeping fees, and the First Circuit ruled that the plan itself could nonetheless be considered to have lost value, because these payments were made in Putnam's capacity as an employer, rather than as a fiduciary. 907 F.3d at 28, 31-32. Here, the payments into the 401(k) accounts of Fidelity employees, though created by a settlor act, are _mandatory_. This distinction matters because it means that after the changes came into effect, Fidelity paid the revenue credits pursuant to its duty to administer the Plan, a fiduciary -- not settlor -- act. Thus there is no "clawing back" within the context of the Plan, because only Fidelity's fiduciary hand is at work within the Plan.

To the Plaintiffs' charge that Fidelity was not providing any real consideration by offering the Revenue Credits, _see_ Pls.' Opp'n 7, Pls.' Reply 14-15, Fidelity responds that "a legally enforceable right is not a gimmick," and that following the 2014 Amendment, Plan participants gained a right to enforce the Revenue Credits that did not exist before. Defs.' Opp'n 11 (citing _In re Halpin_, 566 F.3d 286, 289 (2d Cir. 2009)). It further points out that if it had made _no_ discretionary contributions to supplement the mandatory credits, then the Plaintiffs would not have a claim, so they are alleging a breach based on "Fidelity's being generous." _Id._ at 11 n.8 (emphasis

deleted).  On this point, Fidelity is correct that Plan
participants did receive consideration in the Settlement by
virtue of the Revenue Credit becoming mandatory.  See In re
Halpin, 566 F.3d at 289.

Regarding the alleged "accounting gimmick," ERISA does not
protect members of a Plan from employers who reduce
discretionary compensation to offset fiduciary benefits.
"ERISA's principal function [is] to 'protect contractually
defined benefits.'"  US Airways, Inc. v. McCutchen, 569 U.S. 88,
100 (2013) (quoting Massachusetts Mut. Life Ins. Co. v. Russell,
473 U.S. 134, 148 (1985)).  ERISA protects only benefits granted
by a plan, and generally does not protect participants from
decisions made by their employers outside the plan's language.
See Coulter v. Morgan Stanley & Co. Inc., 753 F.3d 361, 368 (2d
Cir. 2014) ("Courts have consistently explained that conflicts
may exist between an employer's interests and an employee's
interests and that, as a result, settlor functions may
detrimentally impact a benefits plan."); Akers v. Palmer, 71
F.3d 226, 231 (6th Cir. 1995) (explaining that the existence of
conflicts between employers and employees is inevitable and does
not give rise to fiduciary duty).

Decisions made at an employer's discretion are said to be
made in its "business" capacity.  See Noorily v. Thomas & Betts
Corp., 188 F.3d 153, 158 (3d Cir. 1999) (explaining that an

employer must administer a plan in its fiduciary capacity by providing all contractual benefits to eligible employees, but that the determination about which employees were eligible was instead a business decision allowed by the plan). A trustee's discretionary decision-making when granted by a plan is reviewed under an abuse of discretion standard, see Varity Corp., 516 U.S. at 514-15, while a business's discretionary decisions outside a plan are protected by the highly deferential "business judgment rule," the presumption that it acted on an informed basis and in good faith. Cf. Risberg ex rel. Aspen Tech., Inc. v. McArdle, 529 F. Supp. 2d 213, 220 (D. Mass. 2008) (Stearns, J.) (discussing business judgment rule under Delaware law).

Here, Fidelity's decision to change its yearly discretionary payments based on the amount of mandatory Revenue Credit was a business judgment. These discretionary payments were outside the Plan; calculated in response to the Plan, but not dictated by the Plan. Businesses must be able to make business decisions based on weighing the costs of their fiduciary outflows, simply as a function of balancing their books. See, e.g., Douglas J. Elliott, What Happens to GM Pensions in Bankruptcy?, Brookings (May 29, 2009), https://www.brookings.edu/research/what-happens-to-the-gm-pensions-in-bankruptcy/ (describing how General Motors' 2009 bankruptcy would affect its pension plan, and how overfunding

the pension plan contributed to its bankruptcy).  What Fidelity
is doing here with its year-end bonuses is no different from a
legal standpoint.  In conclusion, Fidelity's business decision
to set the total end-of-year bonus at 10% does not violate its
fiduciary duties because a proper fiduciary analysis includes
only the actions taking place within the Plan, all of which were
mandatory.

### b.    The Former Employees Theory

The Plaintiff's second theory of liability is that members
of its class have incurred losses because all of them, at some
point during the class period, paid for recordkeeping expenses,
but did not receive back Revenue Credits because they were no
longer employed by Fidelity.  Pls.' Opp'n 8.  The Plaintiffs
developed this theory first as part of their now-withdrawn
second claim that Fidelity had violated its duty of
impartiality, but at oral argument repurposed it as evidence
that the Revenue Credits were being used as a form of
compensation rather than reimbursement.  Tr. Case Stated Hr'g
39-41.  They argue that this means, in effect, that the members
of the class action have suffered a loss.  Id. at 41.  Fidelity
argues that losses to the plan must be analyzed at the Plan
level, not the individual level, and as the Plan has not
suffered a net loss, the individualized members of the class
have no claim.  Defs.' Mem. 17.

The Plaintiffs' theory has merit because 29 U.S.C. § 1132(a)(2) allows for the equitable relief of surcharge for losses sustained by individuals, even when a Plan has not suffered losses. Here, members of the class paid higher recordkeeping fees as a result of Fidelity's failure to monitor. This is a violation of the duty of prudence for which the Plaintiffs may seek equitable relief, even though the Court does not credit Plaintiffs' theory that the high recordkeeping expenses evidence a breach of the duty of loyalty.

There are two potential pathways for analyzing loss under the duty of prudence: through section 1132(a)(2) and through section 1132(a)(3). For purposes of a section 1132(a)(2) cause of action, the controlling case is LaRue v. DeWollf, Boberg & Assocs., Inc., 552 U.S. 248 (2008). The Supreme Court in LaRue held that, in circumstances where the beneficiary of a defined contribution 401(k) retirement plan incurred losses in his individual account due to his employer's failure to carry out his directions, that individual beneficiary could have a cause of action for fiduciary breach under section 1132(a)(2) of ERISA. Id. at 256. The Supreme Court distinguished its previous holding in Russell that there was no such individualized injury for the beneficiary of a defined benefits plan, 473 U.S. at 140, by stating that "[f]or defined contribution plans . . . fiduciary misconduct need not threaten

[53]

the solvency of the entire plan to reduce benefits below the amount that participants would otherwise receive." LaRue, 522 U.S. at 255-56. In so ruling, the Supreme Court also stated that "[section 1132(a)(2)] does not provide a remedy for individual injuries distinct from plan injuries." Id. at 256.

This distinction is crucial. In LaRue, the plaintiff alleged that the plan had suffered a loss due to its fiduciary breach, even if the entirety of that loss was confined to his account. 552 U.S. at 251. Here, the Plaintiffs have alleged only individual losses, with no net loss to the Plan. Though the Court in LaRue distinguished Russell insofar as it stated that a loss need not threaten the "entire plan," it did not overturn the analysis in Russell that defined the fiduciary relationship as being one between the fiduciary and the "plan." LaRue, 552 U.S. at 254 (citing Russell, 473 U.S. at 136-42; 29 U.S.C. § 1109(a)). Reading the two cases together, the Court concludes that there must be some net loss to the Plan to create cognizable liability under sections 1132(a)(2) and 1109(a).

This Court may, however, grant equitable relief under section 1132(a)(3). Courts may grant equitable relief for "those categories of relief that were typically available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)." Mertens, 508 U.S. at 256. Equitable relief is an available remedy for individuals even when the Plan

as a whole has not suffered losses, see Varity Corp., 516 U.S. at 510, if such relief is "appropriate."  29 U.S.C. § 1132(a)(3).  Surcharge, the equitable form of relief that compensates a beneficiary for losses traceable to a fiduciary's breach, may be available under section 1132(a)(3) even when a party does not have a cause of action under other sections of ERISA.  See Amara, 563 U.S at 442; Moitoso, 410 F. Supp. 3d at 329.  Surcharge is defined as "the imposition of personal liability on a fiduciary for wilful or negligent misconduct in the administration of his fiduciary duties."  LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 7 (1st Cir. 1999) (alteration omitted) (quoting Black's Law Dictionary 1441 (6th ed. 1990)).

The decision by the Plan Fiduciaries not to monitor recordkeeping expenses was clearly negligent.  The Plan Fiduciaries conducted multiple meetings over the course of years in which they could have accessed the section 408(b)(2) disclosure reports that contained recordkeeping fees, but they chose not to request or review them.  Pls.' SOF ¶ 29. Fidelity's own training material acknowledged that the Plan Fiduciaries had an ongoing duty to monitor recordkeeping fees and perform due diligence, and to ensure that the fees paid were reasonable.  Id. ¶ 27.  Particularly, in light of the 2015 ruling in Dudenhoeffer, 134 S. Ct. at 2468, and the 2016 ruling

in Tibble, 135 S. Ct at 1828, both of which emphasized the importance of the duty to monitor, it was imprudent for the Plan Fiduciaries to fail to monitor recordkeeping expenses. The apparent belief on the part of the Plan Fiduciaries that the Plan incurred no recordkeeping expenses does not provide a defense, because they failed closely to investigate the available documentation to confirm that this belief was true. Pls.' SOF ¶ 30.

Given the stipulated facts that the recordkeeping services would have been available to the Plan for a significantly lower cost per head, Stipulations of Facts 3-4, it is fair to say that but for the lack of monitoring on the part of the Plan Fiduciaries, the members of the class action would have paid less in recordkeeping costs. Surcharge is an "appropriate" remedy in these circumstances. Here, the Plan Fiduciaries were negligent in failing to monitor recordkeeping expenses, an important component of the administration of their fiduciary duties. There are no "special circumstances" excusing this breach of their duties, see Restatement (Third) of Trusts § 95 cmt d., and Fidelity's primary defense is based on an analysis of losses at the Plan level that is not necessarily applicable for equitable remedies.

Conversely, restitution and disgorgement of ill-gotten gains are not appropriate remedies for this breach. These

remedies are appropriate only if Fidelity had received gains or profits as a result of the breach, but 100% of the money collected for recordkeeping expenses was returned to the Plan. See Mertens, 508 U.S. at 252 (defining "restitution" as restoring to the plan any profits made by the fiduciary as a result of breach (citing 29 U.S.C. § 1109(a)). In order to provide these remedies, this Court would have to find that Fidelity had in fact accrued profits as a result of its breaches of fiduciary duty, which would involve finding that the design of the Plan itself served to extract value from beneficiaries and place it in Fidelity's pocket, and thus violated the duty of loyalty.

The Plaintiffs contend exactly this, arguing that the Revenue Credits were actually a form of compensation, providing larger reimbursements to more highly compensated individuals. Pls.' Mem. 15 n.14, 17-18; Tr. Case Stated Hr'g 38-39. This is really a question of how the Plan allocates expenses, rather than benefits, because after the distribution of the Revenue Credit each member of the Plan will have paid a different amount of net expenses, with the members of this class action paying a higher amount relative to current employees. Fidelity's Plan did provide a larger Revenue Credit (and thus lower expenses) to highly compensated individuals and to current employees than to former employees, supporting the Plaintiffs' theory that the

Revenue Credits were acting as a form of compensation, and thus, gains for Fidelity. Defs.' SOF ¶ 141; 2014 Profit Sharing Plan art. 6.2(f). It is common, however, for retirement plans to differentiate expenses between current and former employees, and between employees based on factors such as their compensation. Defs.' SOF ¶ 141.

Fidelity points out that the design and distribution of the Revenue Credits is a settlor act, and that ERISA "does not 'proscribe discrimination in the provision of employee benefits.'" Defs.' Mem. 18 (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 91 (1983) & citing Walsh v. Bank of Am. Corp. Severance Program, No. 07cv12315-NG, 2008 WL 2856805, at *4 n.5 (D. Mass. July 22, 2008) (Gertner, J.)). It further argues that it is barred from providing "addition[s]" to the accounts of former employees in excess of their compensation, and that as former employees received no compensation, it could not reimburse them for administrative expenses. Defs.' Opp'n 12 (citing 26 U.S.C. § 415(c)(1)). This is because a violation of these provisions can lead to the loss of the plan's tax-exempt status. See, e.g., Churchill, Ltd. Emp. Stock Ownership Plan & Trust v. Commissioner of Internal Revenue, 104 T.C.M. (CCH) 508, 511-12 (2012).

Ultimately, these are arguments over the design of the Plan rather than over Fidelity's lack of monitoring, and the design

of the Plan is covered by the Bilewicz release. Bilewicz
Settlement Agreement § 3.3. Thus, the release in the Settlement
Agreement and the principle of res judicata foreclose analysis
of this issue. Additionally, though "a trustee has a duty to
deal impartially with beneficiaries," see Morse v. Stanley, 732
F.2d 1139, 1145 (2d Cir. 1984), Fidelity designed the Revenue
Credit system in its capacity as a settlor, and there are no
allegations that it has done anything except accurately carry
out the dictates of the plan document.[10] As a settlor, Fidelity
was not under a fiduciary duty of loyalty, so this settlor act
cannot form the basis of an alleged fiduciary violation. See
Lockheed Corp., 517 U.S. at 890. Unlike the Supreme Court
decisions altering Fidelity's ongoing duty of prudence, there
have been no major changes in binding law since the signing of
the Settlement Agreement indicating that the duty of loyalty
"trumps the instructions of a plan document." Dudenhoeffer, 134
S. Ct. at 2468; see also Peter J. Wiedenbeck, Untrustworhy:
ERISA's Eroded Fiduciary Law, 59 Wm. & Mary L. Rev. 1007, 1025–
33 (2018) (explaining that courts do not conduct fiduciary
review of settlor plan design decisions that discriminate
between employees). But see Dana Muir & Norman Stein, Two Hats,

---

[10] That Fidelity violated its duty of impartiality is the
argument the Plaintiffs originally made in their now-withdrawn
Count II. See Compl. ¶ 135-141.

[59]

*One Head, No Heart: The Anatomy of the ERISA Settlor/Fiduciary Distinction*, 93 N.C. L. Rev. 459, 464-65 (2015) (arguing that the rigid settlor/fiduciary distinction does not allow for nuanced policy analysis, and allows plan sponsors to craft plans that dilute its fiduciary duties).

In conclusion, Fidelity has breached its duty of prudence with regard to its failure to monitor the recordkeeping expenses, and the class members may recover under the equitable doctrine of surcharge. As with the failure to monitor the proprietary mutual funds, the Plaintiffs at trial will bear the burden of proving the exact extent of loss (an exercise that may or may not be trivial given the parties' stipulations), while Fidelity will bear the burden of showing this lack of monitoring has not caused this loss. See *Brotherston*, 907 F.3d at 39.

### C.    Count III: The Prohibited Transaction Claim

The Plaintiffs' third count is based on the alleged violation of 29 U.S.C. § 1106, which prohibits transactions between a plan and a party in interest unless one of four exceptions apply. See 42 Fed. Reg. 18,734, 18,735; *Brotherston*, 907 F.3d at 27. At issue here is the fourth element of the PTE 77-3 exemption, which asks whether "[a]ll other dealings between the plan and the investment company . . . are on a basis no less favorable to the plan than such dealings are with other

shareholders of the investment company."  42 Fed. Reg. at
18,735.

Fidelity has stipulated that, absent the Revenue Credit
system, "Fidelity's dealings with the Plan during the Class
Period . . . would have been on terms less favorable than
Fidelity's dealings with some other shareholders of certain
Fidelity-advised mutual funds."  Stipulations of Facts 4.  With
the inclusion of the Revenue Credit system, there was no net
transfer of consideration from the Plan to Fidelity.  Defs.' SOF
¶ 126.

The Plaintiffs cite Brotherston for the proposition that
the Revenue Credits are "irrelevant" to the PTE 77-3 analysis
because they are made in Fidelity's capacity as an employer,
Pls.' Mem. 18 (quoting 907 F.3d at 29), but this argument is
based on a misreading of that case.  The First Circuit in
Brotherston held that discretionary payments are a form of
compensation.  907 F.3d at 28.  The discretionary nature of
these payments was key to the First Circuit's analysis, because
those contributions were non-fiduciary by virtue of being
"decisions relating to the timing and amount of contributions,"
and therefore did not affect the fiduciary analysis.  Id.
(quoting ERISA Practice & Litigation § 3:32).  In contrast, the
Revenue Credits system here was mandatory, see 2014 Profit
Sharing Plan art. 5.1(e), and by the logic of Brotherston this

Court may thus consider these mandatory contributions when conducting its analysis of "[a]ll other dealings." 42 Fed. Reg. at 18,735; see also Akers, 71 F.3d at 230 (noting that a company is bound by fiduciary duty to follow the written terms of a plan, but not when it is making discretionary decisions).

The Plaintiffs also argue that Fidelity's actions do not fall within the PTE 77-3 safe harbor because the Revenue Credits were not provided to the class members. Pls.' Mem. 18. As with the duty to monitor, this is another question of whether a fiduciary incurs liability at the level of the Plan or of the individual. The language of the exemption asks if "dealings between the plan [and the company] . . . are on a basis no less favorable to the plan" than are comparable dealings with other shareholders. This language mirrors the language of section 1109, which creates a liability for a breach of fiduciary duty "with respect to a plan." The Supreme Court has held that section 1109 provides for recovery only when the plan itself has suffered an injury. See LaRue, 552 U.S. at 256; Russell, 473 U.S. at 142. In contrast, section 1132(a)(3)(B), which grants equitable relief, makes no mention of "the plan," and can provide a remedy for individual beneficiaries whose rights have been violated. See Varity Corp., 516 U.S. at 510. The Plaintiffs' theory requires relief at the level of individual beneficiaries, as allowed under section 1132(a)(3)(B), but the

language of the particular regulations governing prohibited transactions clearly refers to "the plan." The appropriate level of analysis is therefore at the level of the plan, and at that level, the transactions are protected by PTE 77-3.

In conclusion, because there was no net transfer of consideration from the Plan to Fidelity for administrative expenses, and because the proper level of analysis is at the level of the Plan, Fidelity has not engaged in prohibited transactions in violation of section 1106.

**D.  Count IV: the Failure to Monitor Fiduciaries Claim**

The Plaintiffs' fourth count, against FMR LLC only, alleges that it is a fiduciary and that it failed in its fiduciary duty of monitoring the FBIC and Retirement Committees to ensure they were properly administering the plan.  Compl. ¶¶ 148-154.

An employer is considered a plan fiduciary when it controls the administration of the plan.  Negron-Fuentes v. UPS Supply Chain Solutions, 532 F.3d 1, 10 (1st Cir. 2008).  FMR LLC is the sponsor of the Plan, Defs.' SOF ¶ 14, was responsible for the writing of the current Plan documents, id., and appointed the Retirement Committee, which was the named fiduciary and plan administrator, Pls.' SOF ¶ 13.  Though the Retirement Committee had the "authority and obligation to control and manage the operation and administration of the Plan," these powers were delegated from FMR LLC.  Defs.' Resp. SOF ¶ 13; see also Thomson

Decl., Ex. 72, Fiduciary Obligations 2, ECF No. 138-75 (naming the FMR LLC Board of Directors as a fiduciary in an internal briefing).

A plan sponsor is a fiduciary only when acting in certain roles. For example, when amending or terminating a plan, a plan sponsor acts in a settlor role, Lockheed Corp., 517 U.S. at 890, but when overseeing the ongoing administration of a plan, the sponsor acts in a fiduciary role. See 29 U.S.C. § 1002(21)(A) (explaining that a person is a fiduciary of a plan if she exercises any discretionary authority, renders investment advice, or has any discretionary authority in the administration of a plan). In particular, when a plan sponsor appoints other fiduciaries, that appointment is a fiduciary function because it is discretionary and carries an ongoing duty to monitor. Kling v. Fidelity Mgmt. Trust Co., 323 F. Supp. 2d 132, 142 (D. Mass. 2004) (Lasker, J.) (citing Coyne & Delany Co. v. Selman, 98 F.3d 1457, 1465 (4th Cir. 1996)). The Department has also weighed in, advising that a fiduciary who has delegated responsibility should review the delegate's performance at reasonable intervals. 29 C.F.R. § 2509.75-8, at FR-17. A fiduciary who violates this ongoing duty to monitor is responsible for any breaches on the part of the appointed fiduciaries. 29 U.S.C. §§ 1104, 1105(a)(2); Howell, 633 F.3d at 573 (citing Leigh v. Engle, 727 F.2d 113, 133-35 (7th Cir. 1984)).

Here, the FBIC, which derived its fiduciary power from appointment by FMR LLC, has specifically disclaimed any obligation to monitor investments other than the two DIAs. Pls.' SOF ¶¶ 20-21. By the same token, FMR LLC conducted no fiduciary monitoring of the FBIC or Retirement Committee to ensure they were themselves prudently monitoring the menu of Fidelity investments, because it delegated all investment-related plan fiduciary duties to the FBIC. Defs.' Resp. SOF ¶ 17. It appears that it did not monitor or investigate the Plan Fiduciaries either to ensure they were monitoring recordkeeping expenses. Defs.' SOF ¶ 128 ("The Plan's fiduciaries, and in particular the Retirement Committee that was responsible for the operation and administration of the Plan, did not conduct benchmarking or otherwise monitor the administrative revenue that the Plan generated to Fidelity . . . ."). As this Court has ruled that the Retirement Committee and FBIC breached their fiduciary duties in failing to monitor the non-DIA investments as well as recordkeeping expenses, FMR LLC is also liable for its breach in failing to monitor.

**E.    Count V: The Failure to Monitor Fiduciaries Claim**

The fifth count of the complaint charges all the Defendants with profiting from the breach of their fiduciary duties, and requests equitable relief under section 1132(a)(3) for these breaches. Compl. ¶¶ 155-162. Like the fourth count, this count

is derivative of the underlying fiduciary breaches alleged in counts I and III.

Equitable relief may be available to the Plaintiffs based on Fidelity's violation of its duty of prudence under count I. See Moitoso, 410 F. Supp. 3d at 322. This Court notes, however, that it may not award duplicate recoveries stemming from the same injury by classifying the injury as creating both loss and gain. See Silva v. Metro. Life Ins. Co., 762 F.3d 711, 726 (8th Cir. 2014). At the stage in the proceedings where both parties have the opportunity to contest causation and loss, additional equitable remedies may be available to the Plaintiffs, where appropriate. Amara, 563 U.S. at 444.

**III. CONCLUSION**

There remains a live issue as to whether Fidelity's statute of limitations defense is viable. Additionally, this decision addresses only the question of liability, not causation or loss. On the case-stated record, the Court has made the following findings and rulings:

Fidelity has incurred liability under count I for its breach of the duty of prudence in failing to monitor proprietary funds other than the two DIAs, and for failing to monitor recordkeeping expenses. FMR LLC is liable under count IV for breaches related to this failure to monitor. All Fidelity Entities may be liable under count V for breaches related to the

failure to monitor.  At the close of this case, judgment will enter for Fidelity on the other theories under count I, as well as count III.

**SO ORDERED.**

_/s/ William G. Young__
WILLIAM G. YOUNG
U.S. DISTRICT JUDGE