# Exhibit A



# Report of the Independent Fiduciary for the Settlement in
# *Moitoso v. FMR LLC*
# (Case No. 1:18-cv-12122-WGY (D. Mass.))

December 10, 2020

700 12th Street NW   Suite 700   Washington, DC 20005   202-558-5130   www.fiduciarycounselors.com

**TABLE OF CONTENTS**

I. Introduction ........................................................................................................................... 1

II. Executive Summary of Conclusions ..................................................................................... 1

III. Procedure ............................................................................................................................... 2

IV. Background ............................................................................................................................ 2

V. Settlement .............................................................................................................................. 4

VI. PTE 2003-39 Determination ................................................................................................. 9



**Report of the Independent Fiduciary**
**for the Settlement in**
*Moitoso v. FMR LLC*
**(Case No. 1:18-cv-12122-WGY (D. Mass.))**

## I.      Introduction

Fiduciary Counselors Inc. has been appointed as an independent fiduciary for the Fidelity Retirement Savings Plan (the "Plan") in connection with the settlement (the "Settlement") reached in *Moitoso v. FMR LLC* (the "Litigation" or "Action"), which was brought in the United States District Court for the District of Massachusetts (the "Court"). Fiduciary Counselors has reviewed over 70 previous settlements involving ERISA plans.

## II.     Executive Summary of Conclusions

After a review of key pleadings, decisions and orders, selected other materials and interviews with relevant parties, Fiduciary Counselors has determined that:

- The Court certified a class, and in any event, there is a genuine controversy involving the Plan.

- The Settlement terms, including the scope of the release of claims, the amount of cash received by the Plan, the non-monetary consideration and the amount of any attorneys' fee award or any other sums to be paid from the recovery, are reasonable in light of the Plan's likelihood of full recovery, the risks and costs of litigation, and the value of claims forgone.

- The terms and conditions of the transaction are no less favorable to the Plan than comparable arm's-length terms and conditions that would have been agreed to by unrelated parties under similar circumstances.

- The transaction is not part of an agreement, arrangement or understanding designed to benefit a party in interest.

- The transaction is not described in Prohibited Transaction Exemption 76-1.

- All terms of the Settlement are specifically described in the written settlement agreement.

- The Settlement includes non-monetary consideration that is in the interest of the Plan's participants and beneficiaries.

Based on these determinations about the Settlement, Fiduciary Counselors hereby approves and authorizes the Settlement on behalf of the Plan in accordance with Prohibited Transaction Exemption 2003-39 ("PTE 2003-39").



### III.    Procedure

Fiduciary Counselors reviewed significant documents, including the Fourth Amended Complaint, the answer, the parties' filings regarding summary judgment; Defendants' motions regarding the opinions and two damage models offered by Plaintiffs' expert Dr. Steve Pomerantz, the Court's Case Stated Order, the Settlement, the Motion for Preliminary Approval and related papers, the Court's Order Preliminarily Approving Settlement, the Notice and Plaintiffs' Motion for Attorneys' Fees and Costs, and Class Representative Service Awards and related papers. In order to help assess the strengths and weaknesses of the claims and defenses in the Litigation, as well as the process leading to the Settlement, the members of the Fiduciary Counselors Litigation Committee conducted separate telephone interviews with counsel for both Defendants and Plaintiffs.

### IV.    Background

####    A.    Procedural History of Case

*Litigation*.

Plaintiffs Kevin Moitoso, Tim Lewis, and Mary Lee Torline filed their Class Action Complaint on October 10, 2018, alleging that Fidelity Management & Research Company ("FMR LLC") and related entities breached their fiduciary duties of prudence and loyalty under ERISA with respect to the Plan's investment lineup and by failing to secure revenue sharing rebates for Plan participants. Plaintiffs also asserted a claim against FMR LLC for allegedly failing to monitor Plan fiduciaries, and an equitable claim under 29 U.S.C. § 1132(a)(3). Defendants filed an Answer on October 19, 2018. On November 9, 2018, Plaintiffs filed an Amended Complaint ("AC") that added a prohibited transaction claim under 29 U.S.C. § 1106(b)(3) and certain supporting allegations. Defendants filed an Answer to the AC on November 21, 2018. On January 10, 2019, Plaintiffs filed a Second Amended Complaint ("SAC") that included several material revisions. First, the SAC included a new allegation that "the Plan Fiduciaries failed to prudently monitor and control the Plan's recordkeeping expenses." Second, the SAC alleged that the "Revenue Credits" that Fidelity makes available to participants under the Plan (which approximate the amount of fees paid to Fidelity in each Plan year) are not made available to former employees who remain in the Plan. Third, the SAC revised the class definition to include only former employees who participated in the Plan. Fourth, the SAC added a claim for breach of the duty of impartiality (Count II), as well as claims regarding the disclosures provided to participants (Count III) and regarding the management of the Portfolio Advisory Service at Work ("PAS-W") managed account program (Count IV). Fifth, the SAC added the FMR LLC Funded Benefits Investment Committee ("FBIC") as a defendant, and also added Strategic Advisors, Inc. (the managed account provider of the PAS-W program) as a defendant. Defendants filed an Answer to the SAC on January 24, 2019. On March 25, 2019, Plaintiffs filed a Third Amended Complaint ("TAC"), which added Sheryl Arndt as a class representative. Defendants filed an Answer to the TAC on April 8, 2019. Finally, on May 2, 2019, Plaintiffs filed a Fourth Amended Complaint ("FAC") that removed the



disclosure claim, dropped the claim related to the management of the PAS-W program, and removed Strategic Advisers, Inc. as a defendant. The FAC remains the operative complaint, and Defendants filed an Answer to the FAC on May 16, 2019.

On May 2, 2019, the Parties filed a Stipulation and Proposed Order for class certification, which the Court adopted on May 7, 2019. The Parties then filed cross-motions for summary judgment on September 6, 2019. On November 5, 2019, the Parties sent a joint letter to the Court requesting that, if summary judgment was not dispositive of the pending issues presented on summary judgment, those issues could be resolved on a case stated basis. On November 7, 2019, the Court held a summary judgment hearing in which it agreed to the parties' proposed case stated procedure.

On November 20, 2019, by agreement of the Parties, the Court held a case stated hearing. The Court then issued its Case Stated Order on March 27, 2020. In summary, the Court ruled that Fidelity breached its duty of prudence by failing to monitor recordkeeping expenses and failing to monitor certain mutual funds available in the Plan, but Fidelity did not breach its duty of prudence by failing to investigate alternatives to mutual funds, did not breach its duty of loyalty to the Plan and plan participants, and did not engage in prohibited transactions. The Court also noted that Plaintiffs withdrew their impartiality claim in their briefing. Further, the Court held that FMC LLC was liable for breach of its duty to monitor other Plan fiduciaries. However, the Court's Case Stated Order addressed only the question of breach, not causation or loss, and did not address Fidelity's statute of limitations defense.

On April 17, 2020, the Parties filed a Joint Stipulation in which Defendants voluntarily withdrew and dismissed with prejudice their statute of limitations defense with respect to all remaining claims, and Plaintiffs waived their right to appeal the Court's Case Stated Order as to their prohibited transaction claim. For the remaining issues of causation and loss on the monitoring claims, the Court set a trial date of July 6, 2020. Approximately one month before trial, on June 5, 2020, the Parties agreed to submit the loss and causation issues associated with failure to monitor recordkeeping expenses on a case stated basis. However, the issues of loss and loss causation with respect to the failure to monitor certain funds remained to be tried.

Prior to trial, the Parties engaged in extensive discovery. Defendants produced over 151,000 pages of documents and voluminous data, and Plaintiffs produced over 32,000 pages of documents. Class Counsel also took the depositions of nine fact witnesses and all three of Defendants' expert witnesses, and Defendants took the depositions of all four Named Plaintiffs and all four of Plaintiffs' experts. In addition, the Parties exchanged multiple rounds of expert reports.

***Settlement and Preliminary Approval.***

Following the Court's Case Stated Order, the Parties engaged in direct negotiations and reached a settlement-in-principle in June 2020. Plaintiffs filed a motion seeking preliminary approval of the Settlement on July 2, 2020. The Court granted that motion on



July 9, 2020 and preliminarily approved the Settlement and scheduled a Fairness Hearing for January 12, 2021.

*Objections.*

The deadline for Class Members to file objections to the Settlement is December 22, 2020. As of the date of this report, no Class Members had filed objections to the Settlement.

## V.   Settlement

### A.   Settlement Consideration

The Settlement provides for a Gross Settlement Amount of $28,500,000. The net amount of the Settlement Fund, after payment of any attorneys' fees and costs, administrative expenses, and Class Representative service awards approved by the Court ("Net Settlement Amount"), will then be distributed to eligible Class Members according to a Plan of Allocation to be approved by the Court if and when the Court issues an order finally approving the Settlement.

The Settlement also provides for prospective relief. The following procedures shall apply to the management of the Plan on a prospective basis beginning no later than 30 days after the Settlement Effective Date:

(a)  One or more Plan fiduciaries will undertake to monitor Plan recordkeeping fees; and

(b)  One or more Plan fiduciaries will undertake to monitor the Plan's investment options, other than any investments available through the Plan's self-directed brokerage account.

### B.   Class

The Settlement defines the Class as follows:

> [A]ll participants and beneficiaries of the FMR LLC Profit Sharing Plan or the Fidelity Retirement Savings Plan who, during the Class Period, (1) remained Plan participants or beneficiaries for any length of time, (2) ceased to be employed by a participating employer before or during the period of time that they remained in the Plan, and (3) did not receive any portion of the mandatory revenue credit contributed to the Plan pursuant to § 5.1(e) of the 2014 Restatement of the Plan (as amended) and § 1.12(b)(3) of the 2017 Adoption Agreement for use with the Fidelity Basic Plan Document No. 17 for the Plan (as amended) issued by the Company in any Plan year or portion of a Plan year in which they maintained a Plan account balance and were no longer employed by a participating employer.
>
> Excluded from the class are Individual Board Members and Individual Committee Members.



This definition tracks the class previously certified by the Court.

## C.      The Release

The Settlement defines Plaintiffs' Released Claims as:

> any and all actual or potential claims, actions, demands, rights, obligations, liabilities, damages, interest, attorneys' fees, expenses, costs, expert or consulting fees, and any other liability whatsoever or causes of action, whether based on federal, state, local, statutory or common law or any other law, rule or regulation, whether fixed or contingent, accrued or unaccrued, liquidated or unliquidated, at law or in equity, matured or unmatured, and whether class, derivative, or individual in nature (collectively, "Claims"), including both known Claims and Unknown Claims, against any of the Released Parties, regardless of when the Class Member became a member of the Class:

> (a) That in any way arise out of, relate to, are based on, or have any connection with any of the allegations, acts, omissions, purported conflicts, representations, misrepresentations, facts, events, matters, transactions or occurrences that were or could have been asserted in the Action (including any assertion set forth in any of the Complaints, and in any submissions made by Plaintiffs in connection with the Action or any other submission made by the Plaintiffs, Class Members, or their expert witnesses or Class Counsel in connection with the Action) or in any other complaint, action, or litigation, whether or not pleaded in the Complaints. The Plaintiffs' Released Claims expressly include, but are not limited to any and all claims that arise out of, relate to, are based on, or have any connection with: (1) the structure, management, monitoring, servicing, administration, size and/or expenses of the Plan; (2) the selection, monitoring, oversight, fees, expenses, share classes, numerosity, performance, performance history (or absence of performance history) or any other attributes of the investments available under the Plan, including the Plan's self-directed brokerage window or account; (3) the designation or failure to designate any investments as designated investment alternatives in the Plan's governing document (the "Plan Document"), and consequences of such designation or failure to designate; (4) any alleged conflict of interest, self-dealing, or improper reversion of funds with respect to the Plan; (5) the selection, monitoring, oversight, retention, fees, expenses, performance of the Plan's services or service providers, including without limitation, administrative and/or recordkeeping services; (6) fees, costs, or expenses charged to, paid, or reimbursed by, or authorized to be paid or reimbursed by the Plan, including any fees or costs attributable to recordkeeping; (7) revenue sharing in connection with the Plan's investments; (8) any failure to capture, credit, offset or rebate recordkeeping offsets or revenue credits in connection with the Plan; (9) the mandatory revenue credit paid to the Plan by the Company pursuant to the Plan Document that approximates all revenue received by the Company and its affiliates in



connection with the Plan, and the allocation of such mandatory revenue credit among Plan participants; (10) any disclosures, reports, or filings in connection with the Plan; and/or (11) any assertions with respect to fiduciaries of the Plan, or the selection or monitoring of those fiduciaries, in connection with the foregoing;

(b) that would be barred by res judicata based on the Court's entry of the Final Approval Order;

(c) that arise from the direction to calculate, the calculation of, and/or the method or manner of the allocation of the Net Settlement Fund pursuant to the Plan Of Allocation; or

(d) that arise from the approval by the Independent Fiduciary of the Settlement Agreement.

The following are not included in the Released Claims: (i) claims to enforce the Settlement Agreement, and (ii) individual claims for denial of benefits from the Plan.

The terms of the release, including the provision for the Independent Fiduciary to provide a release of claims by the Plan, are reasonable.

## D.    The Plan of Allocation

The Plan of Allocation will provide for the allocation of monies to Class Members in proportion to their average quarterly account balances in the Plan, as follows:

(a) For each Participant Class Member and Authorized Former Participant Class Member, the Settlement Administrator shall determine an Average Account Balance, defined as follows:

Each Participant Class Member and Authorized Former Participant Class Member's average, aggregate quarter-ending account balance invested in the Plan for the period of November 17, 2014 to June 30, 2020.[1]

---

[1] Mathematically stated, the *Average Account Balance* shall be calculated as follows:

(Q4 2014 Account Balance * 45/92) + (Q1 2015 Account Balance) + (Q2 2015 Account Balance) + (Q3 2015 Account Balance) + (Q4 2015 Account Balance) + (Q1 2016 Account Balance) + (Q2 2016 Account Balance) + (Q3 2016 Account Balance) + (Q4 2016 Account Balance) + (Q1 2017 Account Balance) + (Q2 2017 Account Balance) + (Q3 2017 Account Balance) + (Q4 2017 Account Balance) + (Q1 2018 Account Balance) + (Q2 2018 Account Balance) + (Q3 2018 Account Balance) + (Q4 2018 Account Balance) + (Q1 2019 Account Balance) + (Q2 2019 Account Balance) + (Q3 2019 Account Balance) + (Q4 2019 Account Balance) + (Q1 2020 Account Balance) + (Q2 2019 Account Balance)

*Divided by*

22.49 quarters during the Class Period.



(b) The Settlement Administrator shall determine each Participant Class Member's and Authorized Former Participant Class Member's Entitlement Amount by calculating each individual's pro rata share of the Net Settlement Amount, based on his or her Average Account Balance compared to the sum of all Participant Class Members' and Authorized Former Participant Class Members' Average Account Balances.

The Plan accounts of Participant Class Members who are currently enrolled in the Plan will be automatically credited with their share of the Settlement Fund. Each Participant Class Member's Entitlement Amount shall be invested in accordance with and in proportion to such Participant Class Member's investment elections then on file for new contributions to his or her Plan account. If the Participant Class Member does not have an investment election on file, then his or her Entitlement Amount will be invested in the Plan's qualified default investment alternative. In order to be treated as Authorized Former Participant Class Members, Former Participant Class Members who no longer have a Plan account will be required to submit a claim form, which allows them to elect to have their distribution rolled over into an individual retirement account or other eligible employer plan, or to receive a check. Any checks that are uncashed will revert to the Qualified Settlement Fund and will be paid to a cy pres to be mutually agreed upon by the parties.

Beneficiaries of Participant Class Members that are entitled to receive all or a portion of a Participant Class Member's Entitlement Allocation will receive settlement payments in the form of a check issued by the Settlement Administrator. Beneficiaries of Former Participant Class Members that are entitled to receive all or a portion of a Former Participant Class Member's Entitlement Allocation can receive settlement payments under the methods applicable to Former Participant Class Members.

We find the Plan of Allocation to be reasonable, including the use of average account balances, the provisions for payments to current participants, former participants, beneficiaries and alternate payees. They are cost-effective, put the allocations of current participants in their Plan accounts, and allow others to elect a rollover or receive a direct cash payment.

**E.      Attorneys' Fees, Litigation Expenses and Service Awards**

Class Counsel seek an award of attorneys' fees in the amount of $9,002,127.67 (one-third of the $28.5 million settlement fund, net of expenses). In addition, Class Counsel seek reimbursement of $1,378,437.13 in litigation costs and $115,302 in settlement administration expenses.

As of the date of this report, Class Counsel's lodestar amounts to $4,319,335.50, resulting in a lodestar multiplier of 2.09.

Although the First Circuit has not endorsed a particular set of factors for assessing the reasonableness of a fee request, district courts in the circuit generally analyze factors such as: (1) awards in similar cases; (2) the size of the fund and benefit to class members; (3)



the risk that the litigation would be unsuccessful; (4) the skill and experience of counsel; (5) the time and labor expended by counsel; (6) any objections to the settlement; and (7) applicable public policy considerations. In its Memorandum of Law in Support of Plaintiffs' Motion for Approval of Attorneys' Fees and Costs, Administrative Expenses, and Class Representative Service Awards, Class Counsel stated that other class action cases in this district and within the First Circuit support a one-third fee. Class Counsel noted that this Court previously approved a one-third fee in another ERISA case in this District involving proprietary funds. *See Price v. Eaton Vance Corp.*, No. 18-12098, ECF Nos. 62, 63 (D. Mass. Nov. 25, 2019) (approving one-third fee net of administrative expenses). In their fee papers, Plaintiffs' counsel argued that the results achieved in this case also support the requested fee. Moreover, the settlement provides for important prospective relief, including monitoring of the Plan's recordkeeping expenses and investment options (other than any investments available through the Plan's self-directed brokerage account). These non-monetary benefits directly address the alleged deficiencies in Defendants' fiduciary processes, and further support approval of the requested fees. The risks of this type of litigation are illustrated by two recent trial judgments in favor of defendants in ERISA cases involving defined contribution plans. *See Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 711-12 (W.D. Mo. 2019); *Sacerdote v. New York Univ.*, 328 F. Supp. 3d 273, 317 (S.D.N.Y. 2018). Class Counsel argued that the benefit obtained for Class Members was substantial, the results achieved were impressive in light of the risks involved, Class Counsel was experienced in this complex area of the law, Class Counsel invested considerable time and effort in the case, there were no objections as of the date of Plaintiffs' fee filing, and public policy considerations support the requested fee.

Plaintiffs' counsel make a persuasive case based on these factors. In our experience, the percentage and the lodestar multiplier requested is within the range of attorney fee awards for similar ERISA cases. In light of the work performed, the result achieved, the litigation risk assumed by Plaintiffs' counsel, Fiduciary Counselors finds the requested attorneys' fees to be reasonable.

Plaintiffs' counsel also seek reimbursement of their out-of-pocket litigation expenses of $1,378,437.13, which include expert fees, travel, mediation fees, deposition fees, trial transcripts, financial data charges, postage, filing fees, on-line research, and courier fees. The majority of the Litigation expenses related to experts ($1,241,587.83), travel ($66,390.49), depositions/trial transcripts ($43,750.96), and on-line research ($6,776.79). Plaintiffs' counsel also seek reimbursement for Settlement Administration expenses for $115,302 as follows: Settlement Administrator: $97,802; Escrow Agent: $2,500; and Independent Fiduciary: $15,000. Fiduciary Counselors finds the request for expenses to be reasonable, including Settlement Administration expenses.

Plaintiffs' counsel have also requested service awards in the amount of $10,000 to each of the four Named Plaintiffs as Class Representatives, for a total of $40,000. The Class Representatives also have worked to advance the interests of the Class. Among other things, the Class Representatives: (1) reviewed the allegations in the Complaints; (2) provided information to counsel in connection with the lawsuit; (3) produced documents



in response to Defendants' discovery requests; (4) reviewed and signed answers to interrogatories; (5) appeared for their depositions and prepared for their depositions in advance; (6) communicated with counsel regarding the litigation and Settlement; and (7) reviewed the Settlement Agreement in its entirety.

These awards are within the range of similar awards in ERISA cases. Additionally, the awards are not material in comparison to the total settlement amount and are reasonable.

## VI.    PTE 2003-39 Determination

As required by PTE 2003-39, Fiduciary Counselors has determined that:

- **The Court certified the Litigation as a class action.** Thus, the requirement of a determination by counsel regarding the existence of a genuine controversy does not apply. Nevertheless, we have determined that there is a genuine controversy involving the Plan. Based on the Fourth Amended Complaint and the extensive litigation history, we find that there is a genuine controversy involving the Plan within the meaning of the Department of Labor Class Exemption, which the Settlement will resolve.

- **The Settlement terms, including the scope of the release of claims, the amount of cash received by the Plan, and the amount of any attorneys' fee award or any other sums to be paid from the recovery, are reasonable in light of the Plan's likelihood of full recovery, the risks and costs of litigation, and the value of claims foregone.**

  Continued litigation against Defendants posed substantial risk that would make any recovery uncertain. Plaintiffs lost their claims that Fidelity breached its duty of prudence by failing to investigate alternatives to mutual funds, breached its duty of loyalty, and engaged in prohibited transactions on the case stated record. Even on the issues that the Court found in Plaintiffs' favor, it expressly noted that its decision "addresse[d] only the question of liability, not causation or loss." Thus, it is uncertain whether Plaintiffs ultimately would have prevailed. In two other recent trials involving defined contribution plans, the defendants were the prevailing party. *See Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 711 (W.D. Mo. 2019); *Sacerdote v. New York Univ.*, 328 F. Supp. 3d 273 (S.D.N.Y. 2018). Moreover, in the *Putnam* case that the Court recently tried, the defendants also were initially the prevailing party before the case was remanded on appeal. With respect to losses attributable to the failure to monitor investments, the First Circuit noted in *Putnam* that "questions of fact" remained regarding whether plaintiffs' expert (the same expert retained in this case) had "picked suitable benchmarks, or calculated the returns correctly, or focused on the correct time period." *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 34 (1st Cir. 2018). These questions were significant issues in this case, as Fidelity filed both a *Daubert* motion with respect to Dr. Pomerantz and a separate motion to exclude certain of his models.[2] The *American Century* case further illustrates the risks associated with proving losses associated with the failure to

---

[2] At the time the parties reached a settlement-in-principal, these motions remained pending. The Court did not rule on the motions until the morning that the Parties filed their Notice of Settlement.



monitor investments, as the trial court concluded that the plaintiffs failed to prove loss based on the damages models of the same expert. *See Wildman*, 362 F. Supp. 3d at 710 (W.D. Mo. 2019) (finding "Dr. Pomerantz's models did not use suitable benchmarks and relied on unfounded assumptions"). Similarly, in *Sacerdote*, the court found that "while there were deficiencies in the Committee's processes—including that several members displayed a concerning lack of knowledge relevant to the Committee's mandate— plaintiffs have not proven that … the Plans suffered losses as a result." 328 F. Supp. 3d at 280. These court decisions illustrate the risks that Plaintiffs faced on the issue of loss.

Adding to this risk, Defendants put forward two very substantial expert reports in support of their arguments concerning loss and loss causation related to the failure to monitor certain Fidelity investments. By contrast, the Defendants offered no expert in support of their defenses on the failure to monitor recordkeeping expenses. Given the risks, it was reasonable for Plaintiffs to reach a settlement that approximated the amount of the alleged excess recordkeeping fees, as Dr. Pomerantz's estimates of damages associated with a failure to monitor recordkeeping fees were less vigorously challenged than his estimates of damages attributable to the failure to monitor certain Fidelity funds, and those alleged damages overlapped in part with damages associated with a failure to monitor recordkeeping fees in any event.

This case has already been pending for nearly two years, and although trial was set to begin in July 2020, it is difficult to predict how long any appellate proceedings or subsequent proceedings would have taken. Continuing the Litigation would have been complex and time consuming, with any recovery for Class Members delayed substantially and reduced by substantial additional litigation expenses and potentially additional attorneys' fees.

The size of the Settlement is $28,500,000, a fair and reasonable recovery given the results in numerous similar cases in the last several years, the defenses the Defendants would have asserted, the risks involved in proceeding to trial, and the possibility of reversal on appeal of any favorable judgment. The $28,500,000 million settlement amount compares favorably to other ERISA settlements involving 401(k) plans, representing approximately 29.2% of the total estimated damages. This recovery is substantial not only in the aggregate, but also on a per-participant basis (approximately $1,000 per Class Member).

Given the substantial expense and risk involved in further litigation, the difficulty in prevailing on the merits and establishing damages, and the delay that would have resulted in providing any relief to the Class if the matter had been prolonged through trial and appeal, the amount of the Settlement of $28,500,000 is reasonable.

Fiduciary Counselors finds the scope of the release, the requested attorneys' fees and expenses and service awards, and the proposed Plan of Allocation to be reasonable.

- **The terms and conditions of the transaction are no less favorable to the Plan than comparable arm's-length terms and conditions that would have been agreed to by unrelated parties under similar circumstances.** As indicated in the finding above,



Fiduciary Counselors determined that Plaintiffs' counsel obtained a favorable agreement from Defendants in light of the challenges in proving the underlying claims. The agreement also was reached after arm's-length negotiations.

- **The transaction is not part of an agreement, arrangement or understanding designed to benefit a party in interest.** Fiduciary Counselors found no indication the Settlement is part of any broader agreement between Defendants and the Plan.

- **The transaction is not described in Prohibited Transaction Exemption 76-1.** The Settlement did not relate to delinquent employer contributions to multiple employer plans and multiple employer collectively bargained plans, the subject of PTE 76-1.

- **All terms of the Settlement are specifically described in the written settlement agreement.**

- **The inclusion of consideration other than immediate cash payments in the Settlement meets the requirements of PTE 2003-39.** In addition to the cash payment, the Settlement provides for prospective relief designed to address the two main issues raised in the Action. Defendants have agreed that: (1) one or more Plan fiduciaries will undertake to monitor Plan recordkeeping fees; and (2) one or more Plan fiduciaries will undertake to monitor the Plan's investment options, other than any investments available through the Plan's self-directed brokerage account.

  This non-monetary consideration is specifically described in the Settlement. Including the non-monetary consideration was more beneficial to participants and beneficiaries than an all-cash settlement would have been. The non-cash consideration rules were not intended to preclude settlement provisions intended to address on a prospective basis the issues that gave rise to the Litigation. The non-cash consideration does not include non-cash assets, so the requirements related to non-cash assets do not apply.

- **Acknowledgement of fiduciary status.** Fiduciary Counselors has acknowledged in its engagement that it is a fiduciary with respect to the settlement of the Litigation on behalf of the Plan.

- **Recordkeeping**. Fiduciary Counselors will keep records related to this decision and make them available for inspection by the Plan's participants and beneficiaries as required by PTE 2003-39.

- **Fiduciary Counselors' independence**. Fiduciary Counselors has no relationship to, or interest in, any of the parties involved in the litigation, other than the Plan, that might affect the exercise of our best judgment as a fiduciary.

Based on these determinations about the Settlement, Fiduciary Counselors (i) authorizes the Settlement in accordance with PTE 2003-39; (ii) approves and authorizes the settlement of Plaintiffs' Released Claims (as defined in the Settlement) on behalf of the Plan; and (iii) gives a release in its capacity as a



fiduciary of the Plan, for and on behalf of the Plan. Fiduciary Counselors also has determined not to object to any aspect of the Settlement.


Sincerely,

Stephen Caflisch

Stephen Caflisch
Senior Vice President & General Counsel

